NONCONFIDENTIAL
Nos. 17-1118, -1202

IN THE
# United States Court of Appeals for the Federal Circuit

ORACLE AMERICA, INC.,
*Plaintiff-Appellant,*

*v.*

GOOGLE INC.,
*Defendant-Cross-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:10-cv-03561-WHA Hon. William H. Alsup

## OPENING BRIEF AND ADDENDUM FOR ORACLE AMERICA, INC.

Dorian E. Daley
Deborah K. Miller
Matthew M. Sarboraria
Ruchika Agrawal
ORACLE AMERICA, INC.
500 Oracle Parkway
Redwood Shores, CA  94065

Mark S. Davies
Kelsi Brown Corkran
Melanie L. Bostwick
Jeremy Peterman
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
1152 15th Street NW
Washington, DC  20005

E. Joshua Rosenkranz
Peter Bicks
Annette L. Hurst
Lisa T. Simpson
Andrew D. Silverman
Matthew L. Bush
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
51 West 52nd Street
New York, NY  10019
(212) 506-5000

Dale M. Cendali
Joshua L. Simmons
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022

*Counsel for Plaintiff-Appellant*

## 17 U.S.C. § 107, Limitations on exclusive rights: Fair use

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.  In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include --

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Oracle America, Inc.     **v.**     Google Inc.

Case No.    17-1118, -1202

## AMENDED   CERTIFICATE OF INTEREST

Counsel for the:

☐ (petitioner) ☒ (appellant) ☐ (respondent) ☐ (appellee) ☐ (amicus) ☐ (name of party)

Oracle America, Inc.

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10 % or more of stock in the party |
|---|---|---|
| Oracle America, Inc. | None | Oracle Corporation |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

See Attachment A.

February 10, 2017

Date

/s/ E. Joshua Rosenkranz

Signature of counsel

Please Note: All questions must be answered

E. Joshua Rosenkranz

Printed name of counsel

cc:   Counsel of Record

i

# ATTACHMENT A

4.    The following law firms and partners or associates appeared for Oracle America, Inc. in the Northern District of California or are expected to appear in this Court (and have not or will not enter an appearance in this case):

ORRICK, HERRINGTON & SUTCLIFFE LLP

Alyssa M. Caridis
Jeffrey L. Cox
Michelle O'Meara Cousineau
Kelly M. Daley
Vickie Feeman
Melinda Haag
Karen G. Johnson-McKewan
Ayanna Lewis-Gruss
Randall S. Luskey
Elizabeth C. McBride (no longer with firm)
Denise M. Mingrone
Geoffrey G. Moss
Gabriel M. Ramsey
Nathan D. Shaffer
Robert P. Varian
Christina M. Von Der Ahe

KIRKLAND & ELLIS LLP

Susan Davies
Sean Fernandes (no longer with the firm)
Diana M. Torres

MORRISON & FOERSTER LLP

Richard S. Ballinger (no longer with firm)
Michael A. Jacobs
Rudolph Kim
Kenneth A. Kuwayti
Daniel P. Muino
Marc David Peters
Roman A. Swoopes
Yuka Teraguchi
Mark E. Ungerman (no longer with firm)

BOIES, SCHILLER & FLEXNER LLP

David Boies
Meredith R. Dearborn
Steven C. Holtzman
William F. Norton, Jr. (no longer with the firm)
Beko Osiris Ra Reblitz-Richardson
Alanna Rutherford

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ...................................................................i

TABLE OF AUTHORITIES ..................................................................vii

STATEMENT OF RELATED CASES ....................................................... x

INTRODUCTION ........................................................................................ 1

JURISDICTION .......................................................................................... 4

STATEMENT OF ISSUES ......................................................................... 4

STATEMENT OF THE CASE ................................................................... 6

    Oracle Creates The Popular Java Platform ................................... 6

    Google Copies The Most Important Parts Of The Java
        Platform Into Android........................................................... 10

    Android Competes Directly For Licensees Against Oracle's
        Java Platform ........................................................................ 14

    Oracle Sues, The District Court Rejects Copyrightability,
        And This Court Reverses ...................................................... 15

    The Remand Resolves Key Fact Disputes, Including Proving
        How Android Decimates Oracle's Java Licensing
        Business................................................................................. 16

    The District Court Guts Oracle's Market Harm Case................. 19

    Google Falsely Asserts That Android Is Not For Personal
        Computers ............................................................................. 20

    The Jury Finds Fair Use............................................................ 21

SUMMARY OF THE ARGUMENT ....................................................... 22

STANDARD OF REVIEW....................................................................... 25

ARGUMENT ............................................................................................. 25

    I.     Oracle Is Entitled To Judgment As A Matter Of Law
           On Fair Use. ..................................................................... 25

         A.    Factor 1: Google's purpose in copying was purely
              commercial and not transformative............................ 27

1.    Google's copying was entirely commercial. ....... 28

2.    Google's copying was not transformative. ......... 29

3.    Google's purported evidence of good faith does not count in favor of fair use. ..................... 37

B.    Factor 2: Oracle's API packages are undisputedly creative. ....................................................... 39

C.    Factor 3: Google undisputedly copied the heart of Java. .......................................................... 43

D.    Factor 4: Google's copying harmed both the actual and potential markets for the Java platform and its derivatives. ............................................ 47

1.    Undisputed facts establish that Google's use harmed the market for the Java platform ......... 48

2.    The district court's contrary conclusion ignored established law. ..................................... 52

II.    At A Minimum, Oracle Is Entitled To A New Trial Because It Was Prevented From Presenting Its Full Case On The First and Fourth Factors. ............................... 55

A.    The district court erred in banning evidence that Android is an ecosystem that competes with Java across devices. ............................................ 56

1.    The district court's rulings excluding evidence about the purpose and effects of Android were highly prejudicial. ....................... 57

2.    The district court's severe constraints on Oracle's case were legally erroneous. ................ 60

B.    Google's misrepresentation that Android is not for personal computers entitles Oracle to a new trial. ............................................................. 66

1.    Google built its defense on the falsehood that Android could not run on PCs. ................... 67

2.    Google's written discovery responses concealed Android's expansion into PCs. .......... 70

C.    The district court excluded critical evidence of Google's bad faith.........................................................74

CONCLUSION .........................................................................78

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF COMPLIANCE WITH RULE 28d

Material has been redacted from page 58 of the Nonconfidential Opening Brief and Addendum for Oracle America, Inc. This material has been designated pursuant to the Protective Order entered in *Oracle America, Inc. v. Google Inc.*, No. 3:10-cv-03561-WHA (N.D. Cal.).  The redacted material contains the confidential terms of certain third party agreements.

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A&M Records, Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001)..................................................48, 51, 54

*ABF Freight Sys., Inc. v. NLRB*,
  510 U.S. 317 (1994)............................................................................69

*Advanced Display Sys., Inc. v. Kent State Univ.*,
  212 F.3d 1272 (Fed. Cir. 2000) ........................................................73

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994).........................................26, 27, 29, 31, 43, 44, 47

*Elvis Presley Enters., Inc. v. Passport Video*,
  349 F.3d 622 (9th Cir. 2003)..................................................37, 48, 64

*Engquist v. Or. Dep't of Agric.*,
  478 F.3d 985 (9th Cir. 2007)............................................................25

*Gaylord v. United States*,
  595 F.3d 1364 (Fed. Cir. 2010) ...............................................26, 32, 36

*Harper & Row Publ'rs, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985)..................................26, 28, 38, 44, 47, 49, 50, 52

*Kelly v. Arriba Soft Corp.*,
  336 F.3d 811 (9th Cir. 2003)......................................................32, 34

*L.A. News Serv. v. KCAL-TV Channel 9*,
  108 F.3d 1119 (9th Cir. 1997)..........................................................55

*L.A. News Serv. v. Reuters Television Int'l., Ltd.*,
  149 F.3d 987 (9th Cir. 1998)............................................................47

*Leadsinger, Inc. v. BMG Music Publ'g*,
  512 F.3d 522 (9th Cir. 2008)......................................................32, 48

*Micro Star v. Formgen, Inc.,*
    154 F.3d 1107 (9th Cir. 1998)...................................32, 33, 35, 51, 55

*Monge v. Maya Magazines, Inc.,*
    688 F.3d 1164 (9th Cir. 2012)............................................28, 29, 34, 38

*Obrey v. Johnson,*
    400 F.3d 691 (9th Cir. 2005).........................................................62, 74

*Ollier v. Sweetwater Union High Sch. Dist.,*
    768 F.3d 843 (9th Cir. 2014)................................................................73

*Oracle Am., Inc. v. Google Inc.,*
    750 F.3d 1339 (Fed. Cir. 2014) ................................................. *passim*

*Perfect 10, Inc. v. Amazon.com, Inc.,*
    508 F.3d 1146 (9th Cir. 2007)..............................................................34

*Schreiber Foods, Inc. v. Beatrice Cheese, Inc.,*
    402 F.3d 1198 (Fed. Cir. 2005) ..........................................................66

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
    464 U.S. 417 (1984) .............................................................................48

*Stewart v. Abend,*
    495 U.S. 207 (1990)................................................1, 26, 33, 35, 36, 51

*United States v. Curtin,*
    489 F.3d 935 (9th Cir. 2007)...............................................................65

*United States v. Dhingra,*
    371 F.3d 557 (9th Cir. 2004)...............................................................76

*United States v. Procter & Gamble Co.,*
    356 U.S. 677 (1958) .............................................................................74

*Vanderhye v. iParadigms, LLC,*
    562 F.3d 630 (4th Cir. 2009)...............................................................35

*Wagner v. Cty. of Maricopa,*
    747 F.3d 1048 (9th Cir. 2012)..............................................................77

*Wall Data Inc., v. L.A. Cty. Sheriff's Dep't,*
    447 F.3d 769 (9th Cir. 2006).................................................26, 39, 41

*Wharf v. Burlington N. R.R. Co.,*
    60 F.3d 631 (9th Cir. 1995)..............................................25, 67, 69, 70

*Worldwide Church of God v. Phila. Church of God,*
    227 F.3d 1110 (9th Cir. 2000)..............................................27, 30, 54

## Statutes & Rules

17 U.S.C. § 101...............................................................................33

17 U.S.C. § 106(2) ..........................................................................33

17 U.S.C. § 107....................................................26, 28, 34, 57, 60, 61, 66

17 U.S.C. § 501...............................................................................63

28 U.S.C. § 1295(a)(1) ......................................................................4

28 U.S.C. § 1331...............................................................................4

28 U.S.C. § 1338(a) ..........................................................................4

Fed. R. Civ. P. 26(e)(1)(A) ..............................................................71

Fed. R. Civ. P. 50 ......................................................................16, 68

Fed. R. Evid. 403........................................................................65, 76

Fed. R. Evid. 801(d)(1)(B).................................................................77

## Other Authorities

4 Melville B. Nimmer & David Nimmer on *Copyright*
    (Matthew Bender rev. ed. 2011) ..........................................................38

Hon. Pierre N. Leval, *Toward A Fair Use Standard*, 103
    Harv. L. Rev. 1105 (1990) ...................................................................38

## STATEMENT OF RELATED CASES

This appeal arises from copyright and patent infringement litigation in the Northern District of California between Plaintiff-Appellant Oracle America, Inc. ("Oracle") and Defendant-Cross-Appellant Google Inc. ("Google").  This matter has previously been before this Court on appeal from then-final judgment as well as via a petition for writ of mandamus by Google.

1.  In the first trial in this case, the jury found that Google's Android software infringes Oracle's copyrights in the Java Standard Edition ("SE") platform but hung on the question of whether Google's copying was a fair use.  After the trial, the district court held that the portions of Java that Google copied were not entitled to copyright protection and entered judgment for Google.  *Oracle Am., Inc. v. Google Inc.*, 872 F. Supp. 2d 974 (N.D. Cal. 2012) (Appx626-666).  Oracle appealed, and this Court (Judges O'Malley, Plager, and Taranto) reversed.  *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1348 (Fed. Cir. 2014) ("*Oracle I*," Appx82-124).  The Court then remanded for a new trial on Google's affirmative defense of fair use, concluding that, with the jury hung, "neither the jury nor the district court made findings of

fact," and there was "an insufficient record as to the relevant fair use factors." *Oracle I*, Appx116, *accord Oracle I*, Appx97.

Google subsequently petitioned for certiorari on the copyrightability question. The Supreme Court called for the views of the Solicitor General, the Solicitor General sided with Oracle, and the Supreme Court denied cert. *Google Inc. v. Oracle Am., Inc.*, 135 S. Ct. 2887 (2015) (Mem.).

**2.** Earlier in the district court proceedings, Google filed a writ of mandamus in this Court. Pet. for a Writ of Mandamus, *In re Google Inc.*, 462 F. App'x 975 (Fed. Cir. 2012) (No. 2012-M106). The petition arose from the district court's denial of Google's assertion of privilege over an important internal email that stated in relevant part: "What we've actually been asked to do (by [Google co-founders] Larry and Serge[y]) is to investigate what technical alternatives exist to Java for Android and Chrome. We've been over a bunch of these, and think they all suck. We conclude that we need to negotiate a license for Java under the terms we need." *Id.* at 976. This Court (Judges Lourie, Prost, and Moore) agreed with the district court that the email was not privileged and denied the writ. *Id.* at 977-79.

No other appeal from this civil action was previously before this Court or any other appellate court.  There is no case pending in this Court or any other court that will directly affect or be directly affected by the Court's decision here.  There are no other cases related to this dispute.

# INTRODUCTION

When a plagiarist takes the most recognizable portions of a novel and adapts them into a film, the plagiarist commits the "classic" unfair use: "a commercial use … that adversely affects the … owner's adaptation rights." *Stewart v. Abend*, 495 U.S. 207, 238 (1990).  No court would accept the defense, "I *added* other content and creativity to make the story work as a movie" or "I transformed the story by adapting it to a *different medium*."

Google's copying in this case is the software equivalent of this classic unfair use.  Google copied thousands of lines of copyrighted code from Oracle's Java programming platform.  Google concedes it put that code to the same use in the competing Android platform, for what this Court already has deemed "entirely commercial" purposes.  And Google reaped billions of dollars while leaving Oracle's Java business in tatters.

When this case was last here, this Court considered Oracle's claim that Google's copying was not a fair use as a matter of law, and concluded it "was not without force."  Citing its "respect for the limits of [the] appellate function" and "[in]sufficient factual findings" absent a

judgment on fair use below, this Court remanded to assess facts that Google purported to dispute, such as whether Android used the copied code for the same purpose as Java, whether Google copied more than necessary to write in the Java programming language, and whether Oracle was substantially harmed in its actual or potential business. *Oracle I*, Appx119-120.

On remand, Oracle followed the Court's roadmap. Oracle secured a concession from Google that the copied software serves the same purpose in Android as in Java: as part of a platform to develop and run applications. The parties also stipulated that 170 of the 11,500 lines of code Google copied were necessary to program in the Java language. Oracle also presented new evidence establishing that Google copied the heart of Java and that Android devastated actual and potential markets for Java. Android's chief admitted Android competes with the Java platform, and Oracle adduced unrebutted evidence that numerous customers abandoned Java for Android while others stayed only upon extracting 97.5% discounts from Oracle.

Google, on the other hand, rehashed the argument this Court criticized as "overstat[ing]" what qualifies as fair use: that it

2

"transformed" Oracle's work by adding more code to the code that it copied from Java and transferring the copied code to an allegedly new context (i.e., from PCs and feature phones to smartphones). That is exactly what a plagiarist says when adapting a novel for the screen, or writing a sequel, without permission. No reasonable jury with a proper understanding of the law could have excused Google's copying as a fair use based on the evidence presented at the second trial.

The jury reached the wrong result because the district court repeatedly undermined Oracle's case, often directly contrary to this Court's prior opinion. The court sua sponte reinforced Google's theme that Android was limited to the smartphone market where Java supposedly did not compete—and eliminated one of Oracle's central arguments—by precluding Oracle from showing all the markets where Android and Java overlapped. Android supersedes Java in markets Java occupied before Android—including TVs, cars, and wearables. But the district court barred all evidence of Google's competition in any market other than smartphones and tablets.

Google exploited the evidentiary void at trial. It argued that Android does not compete with Java because Java is for PCs and

Android is not.  Google alone knew that was false.  Minutes after Oracle rested, Google announced to the public (but not the jury) that Google was launching Android for PCs.  Google was secretly planning the launch for months, but Google explicitly—and falsely—denied any such plan in written discovery responses.  Nevertheless, when the truth emerged, the district court declined to vacate the verdict.

Oracle is entitled to judgment as a matter of law, or at least a new trial where it can fairly present its case.

## JURISDICTION

The district court had jurisdiction, 28 U.S.C. §§ 1331, 1338(a), and entered final judgment on June 8, 2016, Appx28.  Oracle timely moved for judgment as a matter of law and a new trial, Appx1064-1094, Appx1270-1300, which were denied on September 27, 2016, Appx56-81.  Oracle timely appealed on October 26, 2016.  Appx1683-1684.  Because this action included patent claims, this Court has jurisdiction.  28 U.S.C. § 1295(a)(1).

## STATEMENT OF ISSUES

1.    The undisputed evidence showed that Google verbatim copied the heart of Oracle's creative work for an entirely commercial

4

purpose without any change to Oracle's expressive content or message, took far more than necessary to program in the Java language, and, in so doing, harmed the market for Java. Did the district court err in denying Oracle judgment as a matter of law on Google's fair use defense?

2.    "[T]he effect of the use upon the potential market for or value of the copyrighted work … is undoubtedly the single most important element of fair use." *Oracle I*, Appx119 (quotation marks omitted). Android competes against Oracle's licensing of Java in many devices, including TVs, cars, and PCs, as well as phones and tablets. Did the district court err in sua sponte limiting the trial to markets for smartphones and tablets?

3.    Google repeatedly told the jury, "Android is not a substitute. Java SE is on personal computers; Android is on smartphones." It had also assured Oracle in written discovery responses that it was not "intend[ing] to use some or all of Android … to create a platform that runs on desktops and laptops." Throughout, Google knew it was on the verge of announcing an expansion to PCs. Did the district court err in failing to grant a new trial based on Google's misrepresentations?

4.     Google urged the jury to find that it copied in good faith on the ground that no one in the industry believed they needed a license to copy Oracle's copyrighted work.  Did the district court err in excluding the most powerful contemporaneous written evidence that the industry knew it needed a license?

## STATEMENT OF THE CASE

### *Oracle Creates The Popular Java Platform*

This Court's prior opinion describes Oracle's work.[1]  *See Oracle I*, Appx91-93.  The Java platform is software for developing and running applications ("apps") written in the Java programming language.  The Java platform allows programmers to write programs that "run on different types of computer hardware without having to rewrite them for each different type."  *Oracle I*, Appx91.  In other words, programmers can "write once, run anywhere."  *Id.*

The Java platform includes a library of thousands of programs called "methods" carefully organized into an intricate web of structures known as "packages," "interfaces," and "classes."  *Oracle I*, Appx91-92;

---

[1] Oracle purchased Sun Microsystems, Inc. primarily for the Java platform.  Appx51394.  For simplicity, this brief refers only to Oracle.

Appx34; *infra* 40-41.  These sets of pre-written programs are known as

application programming interfaces and referred to as "Oracle's APIs."

Oracle's APIs work across different types of devices, from servers to PCs

to smaller, more resource-constrained devices.  Appx51402-51403.

"[P]rogrammers … use the pre-written code to build certain functions

into their own programs, rather than write their own code to perform

those functions from scratch."  *Oracle I*, Appx92.  To include a

particular function in a program, the programmer invokes the Java

"declaring code" (what Google copied verbatim).  *Id*.  When it comes

time to run the app, the device's Java platform recognizes the declaring

code and calls the "implementing code" to perform the function.

By 2008, the Java Standard Edition Platform ("Java SE") included

166 "API packages" divided into 3000 classes containing more than

30,000 methods.  Appx51519-51520.  Oracle also developed a "derivative

version of" Java SE called the Java Micro Edition ("Java ME"), intended

mainly for mobile devices.  *Oracle I*, Appx93.  This derivative work

contained subsets of the Java SE APIs plus some others.  Appx51451-

51452.

7

"[D]esigning the Java API packages was a creative process."
*Oracle I*, Appx99; *accord* Appx51460-51463, Appx51545-51548. Oracle
spent years crafting the declaring code and defining the
interrelationships among the packages, classes, interfaces, and methods
to make them compelling and memorable. Appx51459-51463. The
organizational choices were expressive and stylistic—designed to appeal
to a community of programmers—rather than dictated by necessity or
convention. *Id.*; *Oracle I*, Appx104 n.7 & Appx111.

Oracle devised a licensing scheme to attract programmers while
simultaneously commercializing the platform for use by technology
companies, including competitors, and device manufacturers. Oracle
makes the Java platform freely available to programmers building
apps. Appx51411-51414. But Oracle charges a license fee to those who
want to use the APIs in a competing platform or embed them in an
electronic device. Appx51412-51413. To preserve "write once, run
anywhere," Oracle imposes strict compatibility requirements on those
licensees. *Oracle I*, Appx93; Appx51398-51405.

The result was one of the most successful software platforms ever
developed. Oracle licensed Java in 700 million PCs by 2005,

Appx54087; as well as 40 million TVs, Appx54709; e-readers,

Appx51361; cars, Appx51630; and many other devices, Appx51629.



The mobile device market was particularly lucrative. Java quickly

became the leading platform for developing and running apps on mobile

phones. *Infra* 17-19, 49-50; Appx51664-51670. By 2005, the Java

platform was in over a billion mobile handsets. Appx54087. As of 2006,

Java powered "[n]early a hundred percent" of *smart*phones.

Appx51669. By 2008, Oracle was working toward a next generation

Java mobile platform based on Java SE for new, more powerful mobile

devices. Appx51706, Appx54270-54271. As mobile devices became "as

powerful as yesterday's computers," Appx54042, Oracle was poised to

9

license the Java platform into the next generation of mobile devices,

Appx51669-51670.

### *Google Copies The Most Important Parts Of The Java Platform Into Android*

In 2005, Google confronted an existential threat. Google made its money from selling advertising in connection with search results. But consumers were increasingly searching the internet from their phones, and Google search was not optimized for mobile devices. Appx54337-54338 (Google 10-K). Google risked losing a "significant share of an increasingly important portion of the [internet search] market" if it did not quickly "develop products and technologies that are more compatible with non-PC communications devices." *Id*. As a top Google executive later reflected, had Google "miss[ed] the mobile window," it would have "be[en] out of business." Appx54116. Google's solution was Android.

Google knew a successful platform required: (1) API packages that device manufacturers would trust enough to install in their devices and (2) a community of programmers who would enhance the consumer appeal of any device by writing countless apps. Appx54005. Google could have designed its own API packages from scratch, like Apple,

10

Microsoft, and Oracle. "[O]ut of [the] question," the Android team concluded; it would take too long. Appx50632. Worse, it would require app programmers "to learn something completely new," *id.*, which would delay "build[ing] a community force around Google handset APIs and applications," Appx54005. With the iPhone launch in January 2007, Google was "beyond out of time." Appx54410.

By copying Oracle's Java APIs, Google could "reduce [its] development time," Appx50631-50632, Appx54013, and achieve both objectives. First, it would yield a platform instantly acceptable to device manufacturers. Appx54007, Appx54013-54015, 54023-54024. Second, it could tap into "[s]ix million Java developers worldwide" to build apps for Android. Appx54102.

The problem, as Google's founder advised, was that Oracle's "APIs are copyrighted," Appx51832; *accord* Appx54032, and Google "[m]ust take [a] license," Appx54008. Google sought a license—but on terms detrimental to Oracle's licensing model. Google insisted that Oracle let device manufacturers use Oracle's APIs in Android for free, with no limits on modifying the code. Appx50487, Appx50801, Appx50807, Appx54108-54109, Appx54205-54207. But Oracle was making $100

11

million annually licensing the platform to mobile device manufacturers, and, unlike Google, did not make its money on advertising. Appx54016, Appx54114. Moreover, unchecked modifications to the code risked creating incompatibility with Java, jeopardizing "write once, run anywhere." Appx50807, Appx51628; *Oracle I*, Appx93.

When negotiations cratered, Google panicked. Appx54115. The Android team had been working on its own APIs, but, as a top Android engineer lamented, Google's versions were "half-ass at best. We need another half of an ass." *Id*. Another Google engineer tasked to "investigate what technical alternatives exist to Java for Android" later summarized Google's predicament: The alternatives "all suck … we need to negotiate a license for Java." Appx54012. Android's chief gave Google's founder two bad options: "1) Abandon our work … -or- 2) Do Java anyway and defend our decision, perhaps making enemies along the way." Appx54010-54011.

Google chose option 2. Google copied verbatim "the declaring code … of 37 Java API packages," Appx372—11,500 lines of Oracle's copyrighted code, Appx984, Appx51495-51496. Google also "copied the elaborately organized taxonomy," known as the "structure, sequence,

12

and organization" ("SSO") of the Java API packages. *Oracle I*, Appx93-94; *see* Appx372. Google then "paraphrased the remainder of the SSO by writing its own implementing code." *Oracle I*, Appx99.

The Oracle APIs Google copied were the most "central" and "important" to the Java platform, Appx51528—those "that one could reasonably expect to be useful on a high-end mobile device," Appx51122; *see* Appx51273-51274. What Google copied was also essential to Android—the very "core" on which Android itself "depend[s]." Appx51532-51535.

By copying, Google achieved what it could not do with a license. It not only gave away the Android platform to device manufacturers, it made Android *in*compatible with Java, so a program written for Android will not run on the Java platform and vice versa, *Oracle I*, Appx94 & Appx114; *accord* Appx51357-51358, breaking Java's "write once, run anywhere" promise, Appx51357. Google then covered its tracks, admonishing its salespeople not to "demonstrate [Android] to any [S]un employees *or lawyers*," Appx54034 (emphasis added), and directing its engineers to "scrub" the word "Java" from the code and documentation, Appx51126.

13

### Android Competes Directly For Licensees Against Oracle's Java Platform

Android's chief recognized what Google achieved by copying Oracle's APIs: Overnight, Android became a new "competitor" for Java, "targeting the same industry with similar products." Appx50844. As this Court recognized, Android is "a software platform that was designed for mobile devices and competes with Java in that market." *Oracle I*, Appx93. But Google was no ordinary competitor; it lured away Oracle's customers by giving them for free what Oracle sold. Appx51358, Appx51635-51636, Appx51643.

Google embarked on a roadshow to Oracle's customers, using the code it lifted from Java as a selling point. In private meetings, with customers as big as LG, Qualcomm, and AT&T, Google's salespeople presented PowerPoints touting Android's plagiarized "Core Java Libraries," "Java API," and "Powerful, simple Java Application Framework." *E.g.*, Appx54501, Appx54503-54504, Appx54509, Appx54521, Appx54595, Appx54599, Appx54605, Appx54660, Appx54665.

Android was a blockbuster. It was not just "hugely profitable," as Google's CEO put it, Appx54221; it has generated over $42 billion in

revenue—$41 billion since the first trial. Appx51764. Meanwhile, the consequences for Oracle were "devastating." Appx51641; *accord* Appx51773.

### *Oracle Sues, The District Court Rejects Copyrightability, And This Court Reverses*

Oracle sued for copyright infringement in 2010. Appx400-411. The case proceeded to trial in 2012, where Google admitted copying the declaring code and the structure and organization of 37 API packages. Appx590-591. The jury found that Google infringed, but hung on fair use. Appx604-605.

Instead of retrying fair use, the district court entered judgment for Google, holding that Oracle's APIs were not copyrightable. Appx626-666. This Court unanimously reversed. *Oracle I*, Appx82-124. This Court explained that the declaring code and its organization are entitled to copyright protection as "creative and original" works, and thus ordered the district court "to reinstate the jury's infringement finding." *Oracle I*, Appx91 & Appx99.

This Court also considered Oracle's argument that it was entitled to judgment as a matter of law on Google's fair use defense. It observed that Oracle's position was "not without force." *Oracle I*, Appx119. It

15

also criticized Google's argument—that Android was transformative because it "incorporated the packages into a smartphone platform"—as "overstat[ing]" what could be fair use under the law. *Id.*

Ultimately, however, without a jury verdict or Rule 50 opinion assessing the evidence, the Court felt it had "an insufficient record as to the relevant fair use factors." *Oracle I*, Appx97. The Court explained that the record was unclear about how many of the copied "packages were … essential components of any Java language-based program"—important information for the second and third fair use factors. *Oracle I*, Appx120. The Court identified other facts it understood to be disputed, including whether Oracle's APIs serve the same purpose in Android as in Java and the extent to which Android harmed actual or potential commercial licensing of Java. *Oracle I*, Appx119-120. It thus concluded that "due respect for the limit of [its] appellate function" required remand. *Oracle I*, Appx119.

### *The Remand Resolves Key Fact Disputes, Including Proving How Android Decimates Oracle's Java Licensing Business*

The remand resolved these uncertainties. The parties stipulated that 170 of 11,500 lines—less than 1.5% of code Google copied—were necessary to write in the Java language. Appx51444-51445. Google

16

conceded that it uses Oracle's APIs in Android for the same purpose they serve in Java. Appx54713-54714. And evidence accumulated between the first and second trials showing the extent of market harm inflicted on Oracle—although the jury never heard most of it.

The jury did learn that Oracle's licensing business began to "disappear[]." Appx51360-51361. Although Oracle was able to continue earning revenue from Java SE in PC licensing, its mobile phone licensing took a nosedive. Oracle's customers "switch[ed] to Android …, some very quickly," resulting in "less design wins, less future volumes, and less future revenue as [device manufacturers] moved to Android instead of Java." Appx51635; *accord* Appx51358 (Oracle's CEO). Samsung, Motorola, HTC, and ZTE all began making Android phones and phased out of the Java platform. Appx51358, Appx51637, Appx51775.

By the retrial, Oracle's market share for smartphones had collapsed from 80% to almost zero, while Android skyrocketed from zero to 80%:



Appx1104, Appx51776-51777.  Meanwhile, Android's annual revenue

surged 30-fold, from $600 million the year of the first trial to $18.6

billion in 2015.  Appx1110.



*Id.*; *accord* Appx54491.

18

Android supplanted Oracle's platform as the Java-powered platform in mobile devices.  Appx51360-51361.  Even customers who stayed with Oracle cited Android as a basis to demand steep discounts.  Appx51635.  A $40 million contract with Samsung shriveled by 97.5%— to $1 million.  Appx51361.  Amazon, which had licensed Java for the Kindle, abandoned Java altogether for Android in the Kindle Fire.  *Id.*  Then, Amazon leveraged Android to extract a 97.5% discount from Oracle in the latest generation Kindle.  Appx51362, Appx51635.  As Oracle's CEO testified:  It's "very difficult to compete with free, especially since they were using our software."  Appx51363-51364.

### The District Court Guts Oracle's Market Harm Case

What the jury never learned was that this was the tip of the iceberg; Google was expanding Android into a growing ecosystem of devices well beyond smartphones.  As Oracle documented in a supplemental complaint after remand, Appx686-687, Google began touting Android in a wide variety of "other devices and other market segments," such as TVs, cars, and wearables—markets in which Oracle had licensed Java for years.  Appx54110; *see* Appx54244-54245, Appx1528.  Oracle "lost business to Android" in "smart TVs," Appx1243,

19

and is locked in a "huge battle" with Android in cars, Appx1483; *see* Appx1583.  In short, Google began to realize the full promise of the Android platform: competing with the existing Java ecosystem for market share across a broad variety of devices.

Google did not oppose the supplemental complaint, and the district court accepted it.  Appx684.  Both parties conducted extensive discovery focused on these new markets in the Android ecosystem.

*Six months* after accepting Oracle's supplemental complaint, however, the district court reversed course.  Without any request from Google, it limited the trial to Android software only when used in smartphones and tablets.  Appx50.  Later, on the eve of trial, the court barred Oracle from making *any* reference to "implementations of Android in devices other than phones or tablets."  Appx55.

### Google Falsely Asserts That Android Is Not For Personal Computers

Exploiting this evidentiary gap, Google emphasized that Android is a fair use because it is for a different market than Java.  From opening to closing, Google argued that "Android is not a replacement for any version of the Java platform," Appx50286, because "Java SE is on personal computers; Android is on smartphones," Appx52127.  The

20

district court's orders prevented Oracle from fully countering Google's fiction by demonstrating that there was huge market overlap.

Worse yet, Google knew that its theme was false—even as to PCs versus phones. Minutes after the evidence closed, Google announced it was incorporating Android into its laptops, called "Chromebooks." Appx1643-1644.

Although Google's project to bring Android's full functionality to Chromebooks was under way well before the close of discovery, Google falsely denied its existence in written discovery responses. For example, three months after launching the secret project, Google denied that it "intend[ed] to use some or all of ANDROID, including … the 37 JAVA API PACKAGES, to create a platform that runs on desktops and laptops." Appx1163; *infra* 70-71.

### *The Jury Finds Fair Use*

The parties agreed to a single trial on fair use and damages that would enable Oracle to present its market harm case in a single presentation. But the court, sua sponte, bifurcated the trial between fair use and damages. Rather than Oracle, as plaintiff, going first to

explain the harm from Google's infringement, bifurcation permitted

Google to go first and frame the case.

Based on Google's misrepresentations, an artificially truncated

picture of the severe market harm Android wrought on Java, and

numerous erroneous rulings favoring Google, the jury found fair use.

Oracle moved for judgment as a matter of law and a new trial,

Appx1064-1094, which the court denied, Appx56-81 (adopting 50(a)

order, Appx29-48).

## SUMMARY OF THE ARGUMENT

I.  Google admits it copied Oracle's expressive code into a

competing commercial product where the code serves the identical

purpose as in Oracle's work.  No reasonable jury could have found such

copying fair use.  Each of the four statutory factors weighs against fair

use.

A.  On factor 1, the "purpose and character" of Google's use was

overwhelmingly commercial and not transformative, as Google makes

billions from Android and used Oracle's work without changing its

expressive purpose.  Google's purported good faith was a confusing

distraction that did not, as a matter of law, advance its defense.

B.  On factor 2, the "nature of" Oracle's work is highly creative.

As Google's Java "guru" admitted, Oracle's work was "an art, not a

science."  Appx54210.

C.  On factor 3, the "amount and substantiality" of the copied

material, Google copied the heart of Java—code and corresponding

structure of the Oracle APIs that "one could reasonably expect to be

useful on a high-end mobile device."  Appx51122.  Google copied 11,330

more lines of code than necessary to write a Java language-based

program.

D.  On factor 4, market harm, Oracle's customers stopped

licensing the Java platform and switched to Android.  Others used

Android to demand steep discounts.  Android also constrained Oracle's

ability to further productize its work for potential markets.  Each of

these harms far exceeds the modest showings of harm that the Supreme Court has found weighed against fair use.

II.  Alternatively, Oracle is entitled to a new trial because multiple errors deprived it of a fair opportunity to present its full case against Google's fair use defense.

A.  By limiting the trial to Android in smartphones and tablets only, the district court deprived Oracle of critical evidence on the first and fourth fair use factors.  Oracle could not show the jury that the "purpose and character" of Google's use of Oracle's APIs was the same as Oracle's purpose: facilitating the development and running of apps across different types of devices.  Nor was Oracle permitted to show the jury the full harm Android posed to the "markets for and value of" the Java platform.

B.  Google exacerbated this inaccurate picture of Android by arguing to the jury that Android transformed, and did not compete with, the Java platform because Android runs on smartphones and tablets only, while Java was for PCs.  After the evidence closed, Google announced publicly (but not to the jury) that Android is for PCs too.  Having reasonably relied upon Google's denial in written discovery of

24

any such use, Oracle could not rebut Google's misrepresentation during trial.

C.  The court improperly excluded some of Oracle's strongest evidence to counter Google's asserted good faith.  Since the court recognized that good faith was a "close call," Appx52017, this evidence could have moved the jury to Oracle.

## STANDARD OF REVIEW

"Fair use is a mixed question of law and fact."  *Oracle I*, Appx116. The Court adopts Google's characterization of disputed facts, if supported by substantial evidence, *Engquist v. Oregon Dep't of Agriculture*, 478 F.3d 985, 999 (9th Cir. 2007), but reviews "the ultimate application of those facts de novo," *Oracle I*, Appx116.  "[T]his court reviews the denial of a new trial motion for abuse of discretion."  *Wharf v. Burlington N. R.R. Co.*, 60 F.3d 631, 637 (9th Cir. 1995).

## ARGUMENT

## I.    Oracle Is Entitled To Judgment As A Matter Of Law On Fair Use.

There is no dispute that Google copied Oracle's copyrighted work into a competing commercial product.  The only question is whether

Google can avoid liability based on the defense of fair use. The answer is no, as a matter of law.

The Copyright Act prescribes four fair use factors: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. Google bears the burden to prove that these factors weigh in its favor. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994). For purposes of this discussion, we accept Google's version of the very few disputed facts.

Even so, this Court has a critical duty: It must apply the law and balance the factors de novo. *Harper & Row Publ'rs, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985). The Supreme Court has exercised that duty, finding no fair use as a matter of law despite stronger showings than Google's. *E.g.*, *id.* at 568-69; *Stewart*, 495 U.S. at 238-39. So has this Court, *Gaylord v. United States*, 595 F.3d 1364, 1376 (Fed. Cir. 2010), and the Ninth Circuit, *Wall Data Inc., v. L.A. Cty. Sheriff's*

*Dep't*, 447 F.3d 769, 780 (9th Cir. 2006); *Worldwide Church of God v.*

*Phila. Church of God*, 227 F.3d 1110, 1120 (9th Cir. 2000).

These precedents leave this Court no choice but to reject fair use here. Uncontested facts show: Google reaped enormous commercial benefits from copying the most expressively valuable portions of the Java APIs to target and steal Oracle's customers; Google took many thousands more lines of code than necessary to write Android in the Java language; and (even without the extensive evidence improperly excluded) Google's conduct had devastating actual effects on the market for the Java platform as well as undeniable effects in potential markets. No court has recognized as fair use anything resembling Google's use.

### A.    Factor 1: Google's purpose in copying was purely commercial and not transformative.

In considering factor 1 ("the purpose and character of the use"), courts consider (A) how commercial the use is; (B) how transformative it is; and sometimes (C) whether the infringer acted in bad faith. These considerations are evaluated differently. Commerciality and transformativeness are a sliding scale: Where a work is significantly commercial, factor 1 weighs against the infringer unless the use is meaningfully transformative. *See Campbell*, 510 U.S. at 579. Even

27

copying that falls squarely within § 107's classic examples of fair use may not be sufficiently transformative to outweigh commerciality. *See Harper & Row*, 471 U.S. at 562 (criticism and news reporting); *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1173 (9th Cir. 2012) (news reporting). Bad faith, however, is a one-way ratchet: Bad faith weighs against fair use, while a copyist's good faith cannot weigh in favor of fair use. *See Harper & Row*, 471 U.S. at 562-63 ("Fair use presupposes good faith and fair dealing") (quotation marks omitted); *Monge*, 688 F.3d at 1170 ("innocent intent constitutes no defense to liability").

Factor 1 weighs heavily in Oracle's favor, because (1) Google's use was highly commercial; (2) it was not at all transformative; and (3) whatever minimal evidence of good faith Google adduced in response to a veritable avalanche of bad faith evidence cannot advance Google's defense.

### 1.    Google's copying was entirely commercial.

The commercial nature of copying "tends to weigh against a finding of fair use." *Oracle I*, Appx118 (quoting *Harper & Row*, 471 U.S. at 562). As this Court correctly noted (twice), Google "admittedly copied portions of the API packages … for … purely commercial purposes."

28

*Oracle I*, Appx119; *see* Appx996.  Google repeated its concession before this Court:

> Judge O'Malley:  "[Y]ou don't dispute that it was entirely a commercial purpose?"
>
> Google:  "No."

Oral Arg. at 1:02:53; Appx1776 (transcript).

The district court erroneously rejected the very admission this Court accepted, *see Oracle I*, Appx119, holding that the "word 'entirely'" is "too conclusive, inaccurate, and unfair," Appx40-41.  To the contrary, Android is "hugely profitable," Appx50404, as Google reaps billions from exploiting Java in Android, Appx51764.  No reasonable jury could have found Android anything but overwhelmingly commercial.  Accordingly, to win factor 1, Google must show that its transformation of Oracle's expression was especially significant.  *See Monge*, 688 F.3d at 1177 (weighing degree of commerciality versus transformation).

### 2.    Google's copying was not transformative.

Google's use was not transformative unless it "alter[ed] the [APIs] with new expression, meaning, or message."  *Campbell*, 510 U.S. at 579.  "[C]op[ying] … material to use it for the *same intrinsic purpose* for which the copyright owner intended it to be used" is not transformative

but rather "strong indicia of no fair use." *Worldwide Church*, 227 F.3d at 1118 (quotation marks omitted; emphasis added). Because Google concededly uses Oracle's APIs for the same purpose as Oracle, no reasonable jury could have found that Google sufficiently transformed Oracle's APIs to overcome its highly commercial use.

**a.** The remand resolved the factual uncertainties that prevented this Court from deciding transformative use last time. It is now undisputed that Oracle's APIs "serve the same purpose in Android that they serve in Java." Appx54713-54714. Oracle uses its copyrighted expression to enable programmers to remember, locate, and run prepackaged programs on the Java platform. Appx51452-51454. Google uses Oracle's copyrighted expression to enable programmers to remember, locate, and run prepackaged programs that perform the exact same tasks on Android. Appx54714, Appx51541-51542. When, for example, a Java programmer wants an app to open an internet connection, she knows to type, "new URL("[website'sURL]").openConnection()"—or knows exactly where to look to find the declaring code corresponding to that function. Appx51541-51542. Google designed Android so a programmer will type

30

the same code to achieve the same exact result on the Android platform. Google does not dispute the same is true for every line of code it copied. *Cf.* Appx54714.

That is why the district court, Google's 30(b)(6) witness, and its technical expert all recognized the APIs "serve the same function in both works." Appx42 (district court); *accord* Appx54713-54714 (30(b)(6) witness: "the Java classes and methods that are reproduced in Android" "serve the same purposes"); Appx51267 (technical expert: "the API has the sa[m]e purpose."). That was the whole point: Google concedes "including the declarations (and their associated SSO) was for the benefit of developers, who … had certain expectations," including "access to a rich suite of [Java] APIs." Appx1009. Google did not transform the original but supplanted it—which is quintessential *un*fair use. *Campbell*, 510 U.S. at 579, 591.

**b.** As it did in the first trial and appeal, Google claims it transformed Oracle's APIs by copying code written for a computer and moving it verbatim into the supposedly new context of software designed for a smaller computer (smartphone) where it otherwise serves the same purpose. Google's theory of transformation fails at the outset

31

because smartphones were not even a new context for Oracle's APIs. *Supra* 9-10.

Moreover, this is the same theory this Court criticized as "overstat[ing] what activities can be deemed transformative," *Oracle I*, Appx119—and for exactly the reason discussed immediately above: A "work is not transformative where the user makes no alteration to the *expressive content or message* of the original work." *Oracle I*, Appx117 (quotation marks omitted). In other words, using the same expression to achieve the same purpose is not transformative—even in a different medium.

Thus, courts categorically reject fair use "when an original work is merely retransmitted in a different medium." *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 819 (9th Cir. 2003). It is not transformative to move a series of statues to a postage stamp, *Gaylord*, 595 F.3d at 1373, or to move printed song lyrics into a karaoke machine, *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 530 (9th Cir. 2008). Nor does an author transform anything when he tries to piggyback on a work by creating its sequel. *See Micro Star v. Formgen, Inc.*, 154 F.3d 1107, 1113 (9th Cir. 1998). Similarly, the Supreme Court has held, a

32

moviemaker does not transform a short story by adapting it into a movie. *Stewart*, 495 U.S. at 237-38. Each of these adaptations entails many changes—and additional creativity—but they do not alter the fundamental expressive purpose of the original work.

In each situation, any other outcome would strip the author of an important component of the copyright holder's bundle of rights: the right "to prepare derivative works based upon the copyrighted work." 17 U.S.C. § 106(2). By definition, a derivative work is "based upon one or more preexisting works," such as translations, dramatizations, film adaptations, or "other form[s] in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101. The author, alone, has the exclusive right to create (or license others to create) derivative works— or decide they should not be created at all. *See Micro Star*, 154 F.3d at 1113 (no fair use where the infringing work "impinged on [the copyright holder's] ability to market new versions of the [original work]" (quoting *Stewart*, 495 U.S. at 238)). Likewise, Oracle alone had the right to use its APIs to make sequels or variants of the Java platform, as it had done in the past. Google had no right to co-opt those variants for itself.

**c.**  Google's use is nothing like the classic transformative uses listed in § 107—"criticism, comment, news reporting, teaching."  In those uses, the copyrighted work's expressive purpose is materially altered by being used in ways that do not misappropriate the derivative work right.  The same applies to the modern-day example of an internet search engine that displays results using "thumbnails" of copyrighted images.  *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1168 (9th Cir. 2007); *Kelly*, 336 F.3d at 817-19.  The search engine "functions as a tool to help index and improve access to images on the internet." *Kelly*, 336 F.3d at 818.  Courts have held this use transformative because the index puts the images to a use "unrelated to [the images' original] aesthetic purpose."  *Id.*; *accord Perfect 10*, 508 F.3d at 1165 (similar).  A search engine displays grainy thumbnail images of Monets, not for aesthetic pleasure, but to educate the searcher about what they look like.  But here, "unlike the thumbnail images at issue in *Perfect 10*, [Google] left the inherent character of the [copied code] unchanged." *Monge*, 688 F.3d at 1176.

Under these precedents, Google's use could have been transformative had Google copied the APIs for a different purpose—

such as teaching students how to design an API, making fun of its complexity, or developing a code plagiarism comparison engine. *See Vanderhye v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009). But repackaging the same exact copyrighted material from one platform to another without changing the expressive purpose is not transformative. Copyright law gives Oracle the exclusive right to adapt or serialize its work. It does not condone an unlicensed adaptation for commercial profit as fair use. *See Stewart*, 495 U.S. at 238-39; *Micro Star*, 154 F.3d at 1112.

**d.** The district court rejected this authority, opining that "[i]f [using a work in the same way as the original] were enough to defeat fair use … presumably the Federal Circuit would have disallowed this factor on the first appeal." Appx42. But this Court remanded in part because Google had represented to this Court that the parties *disputed* the factual predicate: "how Android was used" and whether the APIs Google copied serve the same function in Android and Java. *Oracle I* Oral Arg. at 1:00:06; Appx1773-1774 (transcript). Without the benefit of briefs exploring the record on the issue, this Court concluded, "we cannot say that there are no material facts in dispute" on this issue.

35

*Oracle I*, Appx119. Now that Google has conceded away any such dispute, the district court should have found this factor supported Oracle as a matter of law, as this Court now should.

The district court's other holding—that Android is transformative because Google took only "37 out of 166 Java SE API packages" and "combined" the declaring code and structure and organization it copied "with brand new methods, classes, and packages"—is also wrong on the law. Appx42. This Court rejected that point last time: "[N]o plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Oracle I*, Appx118 (quotation marks omitted). Turning a short story into a feature length movie requires the addition of new material, but that is still a "classic" scenario of unfair use—and classically non-transformative. *Stewart*, 495 U.S. at 238.

In *Gaylord*, this Court rejected the argument that a photograph of the Korean War memorial used for a postage stamp transformed the original work by depicting it in snow, with altered angles, an eerie light, and a monochromatic feel. 595 F.3d at 1374. The Ninth Circuit likewise held not transformative a documentary that added material to excerpts of Elvis's performances, including "narrat[ion] … explain[ing]

36

[the clips'] context in Elvis' career." *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 628 (9th Cir. 2003).  Google's additions to Java are no more transformative here.[2]

### 3. Google's purported evidence of good faith does not count in favor of fair use.

There was ample evidence that Google intentionally copied knowing Oracle's work was copyright-protected.  The evidence was compelling that Google was in dire straits because it was late to the mobile market and all its APIs were "half-ass at best."  Appx54115.  Android's founder accurately assessed the situation when he told Google's founder that proceeding with Java without Oracle's consent

---

[2] The jury may have been confused about what constitutes a transformative use because of a last-minute change to the transformative-use instruction.  After seeing Oracle's case, the district court sua sponte modified the instruction in a way that directly contradicted Oracle's approach to the case.  Appx50319; *see* Appx972-979 (full pre-instruction).  The modified instruction directed the jurors not to "disqualify [Google's use] from being transformative merely because the declaring code and SSO were carried over without change."  Appx374.  While copying without alteration could conceivably be fair in some context, the instruction masked the requirement of a new purpose or expression, enabling Google to tell the jury in closing that a transformative use "can use [the copyrighted work] in the new work the same way."  Appx52120.

meant "making enemies along the way." Appx54011. Google then tried to conceal its copying from Oracle's lawyers. Appx54034-54035.

Bad faith weighs against fair use. *See Harper & Row*, 471 U.S. at 562-63. Google therefore presented evidence that it believed its copying was legal. *E.g.*, Appx51849-51850. Assuming for argument's sake that a reasonable jury could conclude Google acted in good faith, the most the jury could have legally drawn from that evidence is that this subfactor does not weigh against fair use.[3] Google's supposed good faith cannot as a matter of law carry any further weight on factor 1, because "the innocent intent of the defendant constitutes no defense to liability." *Monge*, 688 F.3d at 1170 (quoting 4 Melville B. Nimmer & David Nimmer on *Copyright* § 13.08[B][1] (Matthew Bender rev. ed. 2011)); *accord* Hon. Pierre N. Leval, *Toward A Fair Use Standard*, 103 Harv. L. Rev. 1105, 1126-27 (1990) (good faith irrelevant to fair use analysis).

Factor 1, then, boils down to this: Google's highly commercial use weighs heavily against fair use. Only the most robust showing of transformation could outweigh that level of commerciality, and Google

---

[3] The jury likely would have reached the opposite conclusion but for two erroneous evidentiary rulings excluding some of Oracle's strongest evidence of Google's bad faith. *Infra* II.C.

did not come close because it made no change to the expressive purpose, meaning, or message of Oracle's work.

## B.    Factor 2: Oracle's API packages are undisputedly creative.

**1.** Factor 2 considers "the nature of the copyrighted work"—the degree to which "the work is informational or creative." *Oracle I*, Appx118 (quotation marks omitted). Software need not be "purely creative" for this factor to weigh against fair use. *Wall Data*, 447 F.3d at 780. Software does not get much more creative than the Java APIs. This Court already found that "designing the [APIs] was a creative process and that the Sun/Oracle developers had a vast range of options for the structure and organization." *Oracle I*, Appx99; *accord id.* at Appx104 n.6. At trial, *Google's* Java expert put it best:  API design is "an art, not a science," distinguished by "the complexity of figuring out how best to express what it is that the programmer wants done." Appx51005, Appx54210; *see* Appx51456-51457 ("Declaring code is extremely expressive."). The unrebutted testimony explained that these creative choices resulted in an intricate structure and organization shaped by aesthetic judgments. Appx51462.

The map below shows all 166 API packages represented by clusters of blue classes, as well as green interfaces.  The gray lines cutting within and across packages represent the relationships among packages, classes, and interfaces, each the product of the Java designers' conscious expressive choices.  Appx51520-51522.  None of this organization was mandated by any function, and it does not even include the methods—which would add significantly more complexity.  Appx51521.

**Figure 1.  Java Platform Software Map**



Appx1821.

    If, as the Ninth Circuit held in *Wall Data*, a program that enabled

"personal computers that use one operating system to access data

stored on computers that use a different operating system" was

sufficiently creative to weigh against fair use, plainly the Java platform

is too.  447 F.3d at 774, 780.

41

**2.** Ignoring *Wall Data*, the district court held that a "jury could reasonably have … concluded that the declaring code was not highly creative"—specifically, that "functional considerations predominated in [the APIs'] design." Appx44. But Google admitted (and this Court already found) that functional considerations did *not* predominate in the APIs design. *Oracle I*, Appx104 & Appx111.

To reach the opposite conclusion, the district court did not cite to a single line of testimony. It merely mentioned "Dr. Owen Astrachan [Google's expert], among [unnamed] others." Appx44. But neither Dr. Astrachan nor anyone else disputed that Oracle's APIs are creative. This Court previously found that "[t]his was not a situation where Oracle was selecting among preordained names and phrases to create its packages." *Oracle I*, Appx104. And no testimony even suggests that the structure and organization is anything other than creative and not required by any particular function.

In the end, the district court's error rested on the fallacy that because the Java APIs have a "functional role," Appx44, they cannot be viewed as creative. That would mean that factor 2 would always cut against the copyright holder in software cases. As *Wall Data* shows,

42

that is not the law.  Instead, this Court must look to the degree of creativity within the functional universe of software.  And on that, there was no dispute that these APIs were creative.

## C.    Factor 3: Google undisputedly copied the heart of Java.

Factor 3, the "amount and substantiality of the portion" of the copyrighted work used, considers the "quality and … quantity" of material taken.  *Campbell*, 510 U.S. at 586-87 (quotation marks omitted).  Google cannot prevail on this factor because it copied the heart of Java—the parts the fan base found most attractive.  *Supra* 10-13.

Google copied 11,500 lines of code and the structure and organization of the 37 most "central" and "important" Java SE packages, Appx51528.  As a Google witness confirmed, Google copied the packages "one could reasonably expect to be useful on a high-end mobile device."  Appx51122.  Nevertheless, the district court concluded that "[t]he number of lines of code duplicated constituted only a tiny fraction … of the copyrighted works," Appx45, by Google's calculation, 0.23% of the total lines of code in the Java platform, Appx51246-51247.

43

Even on its own quantitative terms, the district court overlooked that Google copied verbatim nearly all of the declaring code and all the organization across 37 massive API packages. More importantly, factor 3 focuses "not only [on] the quantity of the materials used, but [on] their quality and importance." *Campbell*, 510 U.S. at 587. The Supreme Court found this factor weighed against fair use, when the copying amounted to an even smaller percentage of the original—only 0.15%—because the defendant took key portions of the copyrighted work. *Harper & Row*, 471 U.S. at 566. Taking the "heart" of a copyrighted work and capitalizing on its creativity by putting it to the same expressive purpose as the original author weighs strongly *against* fair use regardless of the numerical size of the material copied. *Id.* at 565.

The following illustration captures just how integral what Google copied is to the Java platform. *See* Appx51527-51528. Using the same map as above, the overlaid red nodes and lines reflect the packages, classes, interfaces, and relationships that Google copied in Android. Appx51526-51527. Google's copying "is widespread," "touch[ing] many,

many different parts" of the Java platform "all over … the API

packages." Appx51528.

**Figure 2. Google Copying In Android**



Appx1822. No reasonable jury could find this degree of copying

insubstantial.

45

On the previous appeal, this Court felt constrained in ruling on factor 3, because it needed more evidence on how much of the copied packages were "essential components of any Java language-based program." *Oracle I*, Appx120. The parties stipulated on remand that 170 lines of code in three packages of the 37 copied packages were necessary to write in the Java language. Appx51493-51494, Appx51271. Google concedes it copied 11,500 lines of code—11,330 lines of code more than necessary to "speak" the Java language. Appx1620.

The district court suggested that Google copied "just enough to preserve inter-system consistency," Appx45, by which it meant "avoid[ing] confusion among Java programmers between the Java system and the Android system," Appx47. In other words, Google wanted to "allow developers to rely on their familiarity" with the Java APIs to drive Android's commercial success. Appx1621. Or, as this Court put it, Google's "competitive objective" was to "capitalize on the fact that software developers were already trained and experienced in using the Java API packages at issue." *Oracle I*, Appx114-115.

This interest has nothing to do with the *need* to copy, but rather refers to Google's commercial *desire* to use Oracle's work to enhance

46

Android's potential for commercial success. Crediting the district court's reasoning would effectively negate this Court's copyrightability holding, as *any* competitor could copy rather than license Oracle's declaring code for this purpose. It would also run afoul of this Court's recognition that "copyrighted works [do not] not lose protection when they become popular." *Oracle I*, Appx115.

### D.    Factor 4: Google's copying harmed both the actual and potential markets for the Java platform and its derivatives.

Factor 4 considers "the effect of the use upon the potential market for or value of the copyrighted work." *Harper & Row*, 471 U.S. at 566. It weighs against fair use where the infringing use harms an actual or potential market for the copyrighted work, including markets for licensing revenues, *Campbell*, 510 U.S. at 590-92, and "derivative works," *Harper & Row*, 471 U.S. at 568. It also considers what would happen "if the challenged use should become widespread." *Id.* (quotation marks omitted).

Market harm need not be certain, and actual present harm need not have materialized. *L.A. News Serv. v. Reuters Television Int'l., Ltd.*, 149 F.3d 987, 994 (9th Cir. 1998). That is because "lack of harm to an

established market cannot deprive the copyright holder of the right to develop alternative markets for the works," i.e., potential markets. *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1017 (9th Cir. 2001). Moreover, "[i]f the [defendant's] use is for commercial gain, [market harm] may be presumed." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984); *see Leadsinger*, 512 F.3d at 531-32 (applying presumption of harm from commercial use); *Elvis Presley Enters.*, 349 F.3d at 631 (same). Harm to any one of these protected areas suffices to weigh factor 4 against fair use—and Oracle proved harm to all of them.

### 1. Undisputed facts establish that Google's use harmed the market for the Java platform.

On the first appeal, this Court saw unspecified "material facts in dispute on this factor." *Oracle I*, Appx120. On remand, Oracle addressed this concern with a wealth of new evidence decisively establishing harm to multiple actual and potential markets for the Java platform (as well as evidence of harm to the rest of the platform ecosystem that was excluded from trial, *infra* Point II.A). As the "single most important element of fair use," *Oracle I*, Appx119, this strong showing of market harm entitled Oracle to judgment in its favor.

48

***Harm to actual markets***.  This is the "rare[] … case of copyright
infringement [with] … clear-cut evidence of actual damage."  *Harper &
Row*, 471 U.S. at 567.  As Android's chief admitted:  Android and Java
are "competitor[s]," "targeting the same industry with similar products."
Appx50844; *Oracle I*, Appx93 (Android "competes with Java").  It was
undisputed on remand that Oracle licensed Java SE and Java ME for
mobile devices for years before Android's release, including in early
smartphones.  Appx50913, Appx51617, Appx51624, Appx51668,
Appx51770.  By Android's launch, Java was on nearly 80% of all mobile
phones, and Oracle was receiving millions of dollars of licensing
royalties from all the major phone manufacturers.  *Supra* 9-12, 16-19.
That included Danger and Nokia, which licensed Java SE for use in
smartphones.  Appx50618, Appx51617, Appx51629, Appx51699.

It is also undisputed that once Android was released, licensing
revenues for the Java platform in mobile phones plummeted.  The 80%
share that Java had in mobile phones soon flipped to an 80% share for
Android.  *Supra* 17-18.  That was the direct result of the competition
that Google conceded.  Appx50844.  For example, the Android-based
HTC Dream competed directly with the "very similar" Java-licensed

49

HTC Touch Pro. Appx51769-51770. Later, Motorola, Samsung, and Sony Ericsson also switched to Android. *Supra* 17-19. And Samsung negotiated a 97.5% discount for its remaining business. Appx51361. Android's co-founder even admitted that investors stopped investing in Oracle's Java-SE-based SavaJe smartphone after Android began to compete directly with it for investment. Appx54466.

Oracle similarly established that Android caused direct harm to the Java platform in e-reader tablets. Amazon initially licensed the Java platform for the Kindle, but switched to Android for the Kindle Fire. *Supra* 19. For its latest-generation Kindle, Amazon returned to the Java platform but demanded a 97.5% discount based on the availability of the (free) Android platform. *Id.* Google did not dispute that Android caused these losses, which far exceed the single lost sale that weighed against fair use in *Harper & Row*, 471 U.S. at 567.

***Harm to potential markets***. Also undisputed was the harm that Android inflicted on Oracle's ability to exploit any potential new markets for Java SE created by advancements in mobile computing. One potential market was the new mobile devices with increased processing capacity emerging around the "time that Android came out"

50

that were "more capable of running Java SE." Appx51617-51618.

Amazon, for example, began licensing Java SE for its new, "more

powerful" Kindle. Appx51771. But Google gobbled up that market,

offering its Java-SE-based Android programming platform for free.

Android's rapid success also effectively barred Sun/Oracle from

further developing the sequel—a new derivative version of Java SE

optimized for improved hardware in smartphones it had been working

on. Appx54693 (Oracle founder); Appx54699. Android was that

derivative work, and by giving it away for free, Google necessarily

impeded Oracle's later entry into that market. *See Napster*, 239 F.3d at

1017 (finding harm from illicit copying creating "barriers to plaintiffs'

entry into the market for digital downloading of music"). Indeed, the

Supreme Court and the Ninth Circuit have repeatedly found factor 4

weighs against fair use based *solely* on even less potential harm to the

"ability to market new versions" of the work. *E.g.*, *Stewart*, 485 U.S. at

238; *Micro Star*, 154 F.3d at 1113.

**Harm from widespread conduct**. As this Court instructed,

factor 4 "requires that courts consider … whether unrestricted and

widespread conduct of the sort engaged in by the defendant … would

51

result in a substantially adverse impact on the potential market for the original." *Oracle I*, Appx119 (quotation marks omitted). Oracle's CEO testified without contradiction: "[I]f everyone else did what Google did, which is just take a copy of the software without a license[,] [w]e wouldn't have a business." Appx51365; *accord* Appx50389 (Google's CEO), Appx51831 (Google's founder). This undisputed evidence alone "negate[s]" Google's defense. *Harper & Row*, 471 U.S. at 568.

The evidence of actual and potential harm was overwhelming. No court has ever found factor 4 supported fair use on evidence of actual harm as significant or potential harm as imminent and dire as the harm presented here.

### 2. The district court's contrary conclusion ignored established law.

The district court's two rationales for weighing factor 4 against Oracle ignored established law and undisputed evidence.

First, the court reasoned that the jury could have found "no harm to the market for the copyrighted works, which were desktop and laptop computers." Appx45. Of course, *potential* harm is enough. Moreover, the court was wrong that PCs were the only market for Oracle's work. As catalogued above, Oracle licensed Java SE and ME for mobile

52

devices, one of the markets where Android "competes with Java," *Oracle I*, Appx93. And, independently, mobile devices were undoubtedly a market for new derivative works. Harm or potential harm in any one of these markets suffices. Factor 4 does not require that harm has *already* materialized in *every* market. *Supra* 47-48, 51.

Second, the court held that the jury could have found that Java's losses in the mobile phone market were due entirely to factors having nothing to do with Android. Appx45. For example, the court posited that the market for the Java platform would have been decimated regardless of Android because "Sun made all of the Java API available as free and open source under [a project called] OpenJDK." *Id*. But the undisputed testimony was that OpenJDK had no such effect. OpenJDK, while free, comes with a catch: Any company that improves upon the packages in OpenJDK must "give away those changes for free" to the Java community. Appx51412-51413, Appx54682. That was a nonstarter for most device manufacturers because they typically want to edit the Java platform "and keep [their changes] for themselves at a competitive advantage." Appx51413. As if to prove the point, Google itself considered OpenJDK for Android and rejected it as "unacceptable"

for these very reasons.  Appx50845-50846, Appx54409, Appx54717.

Thus, the evidence was undisputed that OpenJDK "didn't really impact

the [licensing] business."  Appx51651.

Similarly, the court believed the jury could have concluded that

Oracle's decline in mobile devices was attributable to the marketplace

moving from supposedly less advanced feature phones to smartphones.

Appx45.  In so holding, the court ignored the undisputed evidence that

the markets overlap—that, in the words of Android's chief, Android and

Java "compet[e]" in "the same industry."  Appx50844; *accord*

Appx54245.  Indeed, Amazon and Samsung both leveraged Android to

demand 97.5% discounts in their contracts with Oracle.

But even if there was a distinct and new smartphone market that

the Java platform was not yet servicing, it would not matter, because

"the copyright holder [has] the right to develop alternative markets for

the works."  *Napster*, 239 F.3d at 1017.  A market remains a potential

market even where the copyright owner chooses not to market its work

or is unsuccessful in doing so.  *Worldwide Church*, 227 F.3d at 1119

(even an "author who had disavowed any intention to publish his work

during his lifetime" can prevail under factor 4, which also considers

"potential market[s]"); *Micro Star*, 154 F.3d at 1113 ("Only [copyright holder] has the right to enter [the] market [for derivative works]; whether it chooses to do so is entirely its business."). Here, it was undisputed that Oracle was attempting to license its work on mobile devices, including smartphones. Google would have—and should have—been one of those Java licensees. *See L.A. News Serv. v. KCAL-TV Channel 9*, 108 F.3d 1119, 1123 (9th Cir. 1997). Yet, inexplicably, the district court ignored harm to potential markets in holding a jury could have found factor 4 tipped in Google's favor. Appx45.

## II.  At A Minimum, Oracle Is Entitled To A New Trial Because It Was Prevented From Presenting Its Full Case On The First and Fourth Factors.

Although Oracle is entitled to judgment on the evidence the jury heard, Oracle's actual case against fair use was far stronger. At every turn, in countless ways, the district court issued rulings that obstructed Oracle's case. We focus only on three especially consequential categories.

First, the district court sua sponte limited the trial to specific device "implementations" for Android—namely, smartphones and tablets—and barred Oracle from telling the jury that Google uses

Oracle's APIs in a platform, like Oracle's, that runs on multiple types of devices and also competes with the Java platform in other markets. Appx49-50. § II.A.

Second, the district court's artificial limitation played into one of Google's themes on factors 1 and 4—that Android transformed Java because Android runs only smartphones and tablets, while Java was designed for PCs. But moments after the evidence closed, Google revealed that its premise was false, announcing to the world what Google concealed in discovery: Android would soon run on Google's Chromebook PCs. It is legally impermissible to allow a verdict to stand when premised on an untruth this stark, central, and improperly concealed. § II.B.

Third, the court improperly excluded some of Oracle's strongest evidence to counter Google's claimed good faith. These errors require reversal or, at a minimum, should be corrected for any remand. § II.C.

## A.     The district court erred in banning evidence that Android is an ecosystem that competes with Java across devices.

The district court gutted Oracle's evidence on the two most important factors—1 and 4. First, the court limited the trial to the

56

smartphone and tablet markets for Android.  Appx49-50.  Then, on the

eve of trial, the court extended its ruling to hold that Oracle "may not

refer to" other markets for Android at all.  Appx55.  These rulings

precluded Oracle from presenting its full answer to two key fair use

questions—to Oracle's prejudice.  § II.A.1.  Because these rulings were

inconsistent with § 107, a new trial is necessary.  § II.A.2.

> **1.   The district court's rulings excluding evidence about the purpose and effects of Android were highly prejudicial.**

But for the district court's rulings, the jury would have learned

that Android is supplanting Java in several markets beyond

smartphones and tablets.  For example, Oracle has been licensing the

Java platform in TVs since the 1990s.  By 2014, 125 million TVs used

"Java TV."  Appx909-910.  But Android's recent release of AndroidTV

has "pushed out" Java from the market for TVs.  Appx1234.  "[M]any …

vendors have moved on [from Java] to Android."  Appx1196; *see*

Appx1243.  Toshiba-Samsung, for example, "[a]dopted Android for TV"

and declined to renew its Java contract with Oracle.  Appx1589.

Similarly, Oracle historically offered Java in the automotive

market, recently collaborating with car manufacturers on rich display

CONFIDENTIAL
MATERIAL OMITTED

and real-time information systems. *See* Appx1357-1358. In direct

competition, Google launched Android Auto to run a car's "infotainment

system." Appx1249. In short order, Android Auto acquired 50

licensees. Appx1131-1132. Now, Oracle is locked in a "huge battle"

with Google in cars. Appx1483; *accord* Appx1357, Appx1583. Oracle

has lost "business [opportunities] due to Android" with ███████████,

███████, and ████████████. Appx1695-1696.

The prejudice was manifest because the excluded evidence went to

the heart of factors 1 and 4. On factor 1, as discussed above (at 6-9, 31),

Oracle uses its APIs to enable app development across different types of

devices. Appx51452. The district court prevented the jury from

learning that Google uses Oracle's work in this same way: Google

designed its latest versions of Android (called Kit Kat, Lollipop, and

Marshmallow) to run Android and its apps not only on smartphones

and tablets but across a wide assortment of devices including TVs, cars,

and wearables.

This evidence would have eviscerated Google's theory of

"transformative" use, the core of its fair use defense. As discussed (at

31-32, 67-68), Google argued that Android is transformative and caused

Java no harm because it uses Oracle's APIs in the new context of smartphones instead of the old context of PCs. The excluded evidence would have shown that Google uses Oracle's APIs not just for smartphones but—like Java—as part of an ecosystem for developing and running apps across many different types of devices.

On factor 4, the excluded evidence showing the breadth of Android's uses would have revealed the full scope of the harm to Java's actual and potential markets, including for derivative works. *Supra* 47-52. By understanding Java and Android as platforms, the jury would have appreciated that Android poses a comprehensive threat to Java far greater than the effects in any one device market. A platform's success depends on a "positive feedback loop" between a critical mass of programmers and users. Appx807, Appx847, Appx51748-51751. Programmers write apps for the platform, motivating device manufacturers to install the platform on their devices so consumers can access the apps. Appx51748. As the platform runs on more devices (and types of devices), it becomes more attractive to programmers whose apps can reach an ever-larger audience. Appx51748-51750.

That same feedback loop can quickly devolve into a death spiral. Programmers and device manufacturers each want to invest in a platform that will succeed.  Appx51750.  When "everyone realizes that one [platform] … is going … to have the biggest network, … everyone else wants to be with that network."  *Id.*  So as more devices run Android in more markets, more programmers invest only in Android, and Android pushes *all* of the device markets closer to the "tipping point" of domination by Android and obscurity for Java.  Appx51749-51750.  Google's expansion of Android to TVs, cars, wearables—and now to PCs—showed the real-world implications of that principle.  But by excluding the evidence of that expansion, the court allowed the jury to discount this harm as mere speculation.

### 2.    The district court's severe constraints on Oracle's case were legally erroneous.

To determine whether an otherwise infringing use is fair use, § 107 dictates that "the factors to be considered *shall* include … the purpose and character of the use" and "the effect of the use upon the potential market for or value of the copyrighted work."  That congressionally mandated inquiry does not permit a court to artificially carve up purposes and markets for the infringing use, allowing the jury

to hear evidence only about part of the "purpose … of the use" and some, but not all, of the "effect[s] of the use." As discussed above (at 47-48), the fair use inquiry entails consideration of all effects—actual and potential—and effects on the market for the work itself and any derivative. With the full picture of Google's use, this case would have looked entirely different to the jury.

The district court tacitly acknowledged as much by accepting Oracle's supplemental complaint to bring the new Android versions and markets into the case. Appx58. So did Google, which acceded to the supplemental complaint and conducted months of discovery premised on its legitimate scope.

The district court's sua sponte decision to reverse course and limit the trial to smartphones and tablets was as erroneous as it was abrupt. Appx50. The court cited no case authorizing it to eliminate entire tranches of relevant evidence that directly rebutted Google's defense or any authority suggesting mini-cases on different uses of the infringing work—*Android*—is consistent with § 107. The court pointed only to "trial management" concerns, none of which justified constricting Oracle so severely. Appx55.

**a.** The court suggested that permitting Oracle to present its full case against fair use might require a trial-within-a-trial on infringement in each market based on the false premise that those uses of Android (e.g., TVs or cars) might not be subject to the jury's original infringement verdict. Appx59. The court never determined whether a mini-trial would actually be required; it never inquired which witnesses would address the subject, how much trial time those issues would consume, or even whether there was any genuine dispute. That was an abuse of discretion. *Obrey v. Johnson*, 400 F.3d 691, 699 (9th Cir. 2005) (abuse of discretion to exclude evidence based on "the prospect of mini-trials" without "first address[ing] the[] concern[] with the parties through other, less restrictive means").

The court claimed it could not make this determination because "[t]here wasn't sufficient time for the Court to pursue that alternative." Appx59. But the only reason there was any time pressure was that the court waited until six months after Oracle filed its supplemental complaint before raising this speculative concern.

Had the district court inquired, it would have learned there was no real dispute and thus no need for mini-trials. Google stipulated that

the infringement verdict extended to the new versions of Android designed for both smartphones and other devices.  Appx49-50.  Google admitted that these newer versions of Android were not "a new platform" but the same Android platform—with the same copied code and structure—running on different hardware.  Appx1422 (Android TV "isn't a new platform," which was "kind of the point."); Appx970 (Android Auto is powered by Android Lollipop, which concededly uses all 37 copied API packages).  Indeed, Google wanted them to be the same so developers could "leverage [their] existing skills and investment in Android."  Appx1422.

That should have resolved the mini-trial concern.  Neither of the elements of infringement—ownership and copying, 17 U.S.C. § 501— changes from one device to another because Android infringes when it uses the same copied APIs, regardless whether they power TVs, cars, or phones.  The first jury found the Android *platform* infringed, without regard to the device it was put into.  Appx590-591, Appx604.  Thus, the original infringement verdict plainly applies.

**b.**  For largely this same reason, the court was wrong in concluding that Android "might be a fair use" when loaded onto some

devices but not others.  Appx60.  Again, it is Google's copying of Oracle's APIs into the Android *platform* that Google must establish was fair. *See supra* 60-61; Appx408.  The fair use analysis for a pirated song is the same whether the infringer loads it on a mobile device or a CD.  So too, here:  The fair use analysis does not change whether the software is loaded on a mobile device or a TV.  *Elvis* is instructive.  The infringing documentary used clips from numerous different Elvis performances. The Ninth Circuit recognized each discrete use may have been fair in isolation.  But the court nonetheless treated copying all the clips as a single use because "[o]ne of the most salient selling points … [was] that 'Every Film and Television Appearance is represented.'"  349 F.3d at 628-29.  Google similarly touted Android's ability to run across different devices as one of its most "salient" features.  Appx1422.

c.  The district court also suggested that it carved up the case to "protect[] our second jury from needing to absorb ever greater complexity in technology and the business models of new and different uses."  Appx62.  The assumption that the new Android markets were different business models—rather than a single effort to exploit a

64

software platform—reflects another of the court's errors prejudicing Oracle while favoring Google.

And it was not more complex.  The experts were already talking about platform economics; all the court did was prevent Oracle's expert from telling the full story.  Appx807-808, Appx847.

Moreover, we entrust juries with far greater complexity.  Rule 403 prohibits courts from excluding relevant evidence on such grounds unless the probative value is "substantially outweighed" by the danger of unfair prejudice or confusion.  The court erred in never even conducting this balancing test.  *See United States v. Curtin*, 489 F.3d 935, 958 (9th Cir. 2007) (error "as a matter of law" not to perform balancing under Rule 403).

Had it done so, the result would not have been close.  The excluded evidence was vital to Oracle's case against fair use, and any "complexity" arose from Google's decision to exploit Oracle's work in so many markets.  It is hardly fair to protect Google from some of the worst evidence against it on the ground that it infringed on a scale too massive for a jury to comprehend.

**d.**  The court suggested that its ruling worked no prejudice because Oracle "remains[] free to pursue its claims for infringement arising from Google's implementations of Android in devices other than smartphones and tablets in a separate proceeding and trial."  Appx60. But dicing up the evidence of Google's purpose and market harms into separate trials is the problem, not the solution.  Oracle should have been permitted to inform the jury about the Android platform's full purpose and harmful effects and fully rebut Google's incorrect claim that Android and Java were in different markets.  Future trials limited to different market subsets cannot solve that problem.  Under the district court's decision, Oracle will never present to a single jury its full rebuttal on factors 1 or 4, including the ways in which harm in one market affects another, as § 107 requires.

## B.  Google's misrepresentation that Android is not for personal computers entitles Oracle to a new trial.

Google built its defense around an assertion we now know is false: that Android is not for PCs.  Google avoided cross-examination on its plans by concealing them in its discovery responses.  A verdict cannot stand where a party has made "highly material false statements" and failed to correct related discovery responses.  *Schreiber Foods, Inc. v.*

*Beatrice Cheese, Inc.*, 402 F.3d 1198, 1204-06 (Fed. Cir. 2005); *see*

*Wharf*, 60 F.3d at 637-38 (ordering new trial where verdict based on

misrepresentation).  Google's misrepresentation warrants a new trial.

### 1.    Google built its defense on the falsehood that Android could not run on PCs.

Google started trial knowing a fact it kept secret from everyone

else:  It was days away from announcing that "the full functionality of

Android would soon be working on desktops and laptops, not just on

smartphones and tablets."  Appx64.  The new development, called

ARC++, made "Android (with all of Android's public APIs, including

those reimplemented from Java)" available on Chrome-OS-powered PCs

called "Chromebooks."  *Id*.  ARC++ enables "users to run all Android

apps on Chrome OS devices" without app programmers rewriting each

app.  *Id*.  In short, as Google alone knew, it was launching Android for

PCs, using Oracle's code for exactly the same purpose as Java—as a

platform to develop and run applications—in what Google had always

conceded was Java SE's core market.  Appx52127.

Yet Google repeatedly told the jury the opposite.  As the district

court recognized, Google emphasized at trial that there was "a

significant distinction between desktops and laptops (Java) and

67

smartphones and tablets (Android)." Appx62. Google built its opening

around the false proposition that "Android is not a replacement for any

version of the Java platform." Appx50286. Google's key expert falsely

declared Android "wouldn't work on your desktop or laptop computer,"

Appx51233, and Android could "not supersede[] Java SE" because "the

two products are on very different devices.... Java SE is on personal

computers. Android ... is on smartphones," Appx51900-51901. Google's

closing emphasized: "Android is not a substitute. Java SE is on

personal computers; Android is on smartphones." Appx52127. This

was false.

Google's misrepresentation had profound implications for the

jury's assessment of transformative use and market harm. Google told

the jury that Android was transformative because it "is a different

context than creating an application on the laptop or desktop

computer." Appx51267. Google also misled the jury to believe Android

posed no threat to Oracle's core Java business because the platforms did

not compete on the same devices and the markets did not overlap.

Appx52127. The court found this (false) distinction so critical that it

denied Oracle's Rule 50 motions on the ground that a reasonable jury

could conclude that "Android caused no harm to the market for the copyrighted works, which were for desktop and laptop computers." Appx45.

Google's ploy violated the basic rule that litigants may not urge the jury to base its verdict on "a fact known to be false." *Wharf*, 60 F.3d at 638. Its violation was "a 'flagrant affront' to the truth-seeking function of adversary proceedings." *ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 323 (1994).

When the truth emerged, however, the district court found Google's misrepresentations to be "fair argument," because the court had already limited the trial to smartphones and tablets. Appx67. It reasoned that "the trial was focused … on … smartphones and tablets," so that evidence of Android in PCs would never have come in; and in that artificial universe, Google's argument "related to the *accused* uses on trial." *Id.*

Far from justifying Google's misconduct, this logic confirms how wrong the court's evidentiary rulings were. It cannot be that the court could let Google build its defense around the absence of potential harm

to the PC market while prohibiting Oracle from showing that the harm

was not just potential but imminent.

More importantly, the district court overlooked what the cases

cited above establish:  If a trial is to have any integrity, parties cannot

exploit the exclusion of evidence by building a defense around a

proposition known to be false.  Google secured the verdict based on a

"misrepresentation" that "prevented [Oracle] from fully and fairly

presenting [its] case."  *Wharf*, 60 F.3d at 637.  A new trial is warranted.

### 2.    Google's written discovery responses concealed Android's expansion into PCs.

The adversarial process was no check against this trial

misrepresentation because Google set the stage by providing false

responses in written discovery.  We now know that by September 2015,

Google was working in "secret" on extending Android to PCs, Appx1314;

*see* Appx1657 at ¶13.  Yet Google repeatedly disavowed such a project in

responses given *after* that date.  Oracle asked whether "GOOGLE

intends to use some or all of ANDROID, including DECLARING CODE

and SSO from the 37 JAVA API PACKAGES, to create a platform that

runs on desktops and laptops."  Appx1163-1164.  "[D]enie[d]," Google

responded in December 2015, three months after undertaking the secret

ARC++ project. *Id.*; *accord* Appx1806-1807 (Google "denie[d]" "Chrome OS contains DECLARING CODE contained in the 37 JAVA API PACKAGES."); Appx1168-1169. Each of those (and other) responses were false when made or soon after, and Google never corrected them, as it was required to do. Fed. R. Civ. P. 26(e)(1)(A).

Had Google responded truthfully, the trial would have played out differently. Google could not have pressed its theme that Android and Java were for different devices. Oracle could have pointed to Android's expansion to Chromebooks as evidence of actual and potential harm.

The district court did not disagree that Google's discovery responses were false. Instead, it made excuses for Google. First, it speculated that the truth would not have changed Oracle's trial strategy. Appx68. The court based its hypothesis on the view that Oracle did not make an argument based on ARC, an earlier program that was disclosed but which Google abandoned. But ARC, though similarly named, was a totally different undertaking from ARC++. Appx1140, Appx1308-1311 (Google acknowledging differences). Unlike ARC++, ARC was not a version of the Android platform running all the Android apps on PCs; it was a failed "experiment" that would have

71

allowed developers only through tremendous labor to convert a "tiny, little subset" of Android apps for Chromebooks.  Appx1139.  Because ARC was not Android, and because it failed, it would have been a poor rebuttal to Google's trial claim that Android is not on PCs.  Appx52127.  If anything, it would have reinforced Google's theme.

Second, the court blamed the victim.  Throughout six months of discovery on remand, Google produced 200,000 pages of documents.  Not a single page mentioned ARC++.  Then in the final week, after it became impossible to use them in depositions, Google dumped 350,000 pages on Oracle—almost double its production in the previous five months.  Appx1678.  Buried in this haystack were nine draft documents mentioning ARC++.  Notably, even Google's counsel professed ignorance of these documents, and of ARC++, until Oracle raised it in post-trial motions.  Appx1662.  Nevertheless, the district court faulted Oracle for not discovering the needle in this haystack after Google repeatedly assured it in written discovery responses that there was no needle.  Appx66.

Furthermore, these nine draft documents could not possibly have been anywhere near all of Google's responsive documents about a

72

project as significant as ARC++.  And Google made no effort to correct
or supplement its erroneous written discovery responses.

Where a party provides false written discovery, the fact that the
deceived party might have learned the truth is irrelevant.  The Ninth
Circuit held that a witness was properly excluded from trial where a
party failed to list the witness in discovery disclosures, even though
opposing counsel knew of the witness from other discovery.  *Ollier v.
Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 862 (9th Cir. 2014).
This Court held a new trial was required based on improperly withheld
evidence even though there was "some overlap" between the withheld
evidence and an earlier deposition.  *Advanced Display Sys., Inc. v. Kent
State Univ.*, 212 F.3d 1272, 1287 (Fed. Cir. 2000).

This is the only sensible rule.  "To find otherwise would be to
prejudice the party who acts diligently and complies with the Federal
Rules of Civil Procedure and to benefit the party who contravenes those
rules and uses dilatory discovery tactics."  *Id.*  If a party is presumed
aware of all produced documents that expressly conflict with assurances
provided in written discovery, then written discovery is largely
meaningless.  Litigants would have an incentive to deny and then

73

conceal inconvenient facts in unreviewable document dumps on the eve

of the discovery cutoff, which is what happened here.  Discovery would

become "a game of blindman's buff."  *United States v. Procter & Gamble*

*Co.*, 356 U.S. 677, 682 (1958).  It is vital that this Court correct the

abuse.

### C.    The district court excluded critical evidence of Google's bad faith.

Google's good faith argument would have been defused had the

district court's evidentiary rulings not stacked the deck in Google's

favor.  Google's theory was that "Sun/Oracle made the Java API

declarations free and open," and everyone in the industry understood

that.  Appx52099, Appx52130-52134.  The court improperly excluded

Oracle's strongest evidence disproving Google's theory.  Those errors

are presumed prejudicial and entitle Oracle to a new trial, because

Google cannot show that "it is more probable than not that the jury

would have reached the same verdict even if the evidence had been

admitted," *Obrey*, 400 F.3d at 701, particularly where the court believed

bad faith was "a close call," Appx52017.  Instead, with the complete

picture, the jury likely would have found that Google's bad faith

weighed against fair use.  At a minimum, if this Court remands on

74

other grounds, it should correct these three errors to ensure a fair
retrial.

First, Google's main example of widespread unlicensed use of
Oracle's APIs was a project called Apache Harmony.  Appx52095.
Apache copied the Java declaring code, but not in a product for
commercial purposes.  Even so, Stefano Mazzocchi, a member of
Apache's Board of Directors (now at Google, though the court hid that
conflict from the jury, too, Appx73-74, Appx51591), admitted not only
that Harmony's use of the Java declarations was illegal, but that
Android's was as well.  Appx54407.  Mazzocchi wrote an email stating
that copying the Java declaring code "makes us [Apache] *already*
doing illegal things (in fact, Android using Harmony code is illegal as
well)."  *Id.*  The court sua sponte redacted that key sentence, ruling it
was "inflammatory."  Appx51590; *see also* Appx72-73.  It continued to
redact Mazzocchi's statement that Harmony and Android were illegal
infringements even after Mazzocchi testified *on direct examination by
Google*:  "I would have left [Apache] slamming the door if I thought that
what [Apache] was doing was causing harm *or doing any illegal things.*"
Appx51729 (emphasis added); Appx985-989, Appx51818.  Particularly

in light of that contradictory testimony, the district court's "assertion" that the document was inflammatory is insufficient to justify exclusion under Rule 403. *United States v. Dhingra*, 371 F.3d 557, 566 (9th Cir. 2004).

Second, the court prevented Oracle from introducing contemporaneous evidence showing that Sun believed that Google's copying was unlawful. During Oracle's acquisition of Sun, the European Union posed numerous questions to the two companies. One question requested an explanation of "the conflict between Sun and Google with regard to Google's Android." Appx54451 (emphasis omitted). Sun responded before the merger was approved: "*Sun* believes that the Dalvic virtual machine plus class libraries, which together constitute the Android runtime environment, are an *unauthorized derivative work of Java SE.*" *Id.* (emphasis added). The court excluded this document as hearsay because Oracle, not Sun, filed it. Appx51341; *see also* Appx75.

But the document said it was Sun's statement: "*Sun* believes …." Appx54451. Moreover, there was unrefuted foundation evidence from Oracle's CEO—who led the acquisition and integration of the

76

companies—that "[o]nly [Sun] could supply those [answers] to us." Appx51315.  And the document was at least admissible, as the court earlier recognized, as a prior consistent statement "meet[ing] [Google's] suggestion" that Oracle "cooked up" this lawsuit after purchasing Sun. Appx51311; *see* Fed. R. Evid. 801(d)(1)(B).  Excluding the document was an abuse of discretion.  *See Wagner v. Cty. of Maricopa*, 747 F.3d 1048, 1052-53 (9th Cir. 2012).

Third, the district court allowed Google exceptional evidentiary leeway on its theme of "everybody thought it was okay to copy."  Before trial, the court properly prohibited Google (with two narrow exceptions) from introducing irrelevant and prejudicial evidence about a non-commercial research entity (GNU) copying the Oracle APIs.  Appx1837-1838.  But at trial, when Google exceeded those narrow exceptions, the court overruled Oracle's objections seeking to enforce the earlier order. Appx50514, 50527-50528.  The court later conceded that Google went "way past" the order, yet declined to direct the jury to disregard the testimony, Appx51683; *see* Appx50528, and instead instructed the jury it could "take into account" the evidence for purposes prohibited by the in limine order, Appx375.

77

Google exploited the district court's rulings.  In its closing, Google told the jury:  "There isn't a single document from anyone … anywhere … that says Google was wrong or it was somehow a violation to use [the Java API] labels."  Appx2200.  There were at least two such documents.  But the jury never knew because the district court redacted one and excluded the other.  These prejudicial rulings require reversal, or at least correction.

## CONCLUSION

This Court should reverse the judgment, or, at a minimum, order a new trial.

Respectfully submitted,

*/s/ E. Joshua Rosenkranz*
E. Joshua Rosenkranz
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY  10019
(212) 506-5000

*Counsel for Plaintiff-Appellant*

February 10, 2017

# ADDENDUM

# TABLE OF CONTENTS

Final Judgment, Dated June 8, 2016 (Dkt. 1989).......................... Appx28

Order Denying Rule 50 Motions, Dated June 8, 2016
(Dkt. 1988) ................................................................. Appx29-48

Order Regarding Google's Motion to Strike, Dated
February 5, 2016 (Dkt. 1479).................................... Appx49-50

Opinion Regarding Google's Motion in Limine No. 2, Dated
May 2, 2016 (Dkt. 1781) ........................................... Appx51-55

Order Denying Renewed Motion for Judgment as a Matter of
Law and Motion for a New Trial, Dated September 27, 2016
(Dkt. 2070) ............................................................... Appx56-81

# Final Judgment, Dated
# June 8, 2016 (Dkt. 1989)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ORACLE AMERICA, INC.,

        Plaintiff,

  v.

GOOGLE INC.,

        Defendant.

No. C 10-03561 WHA

**FINAL JUDGMENT**

Based upon the unanimous verdict by the jury, **FINAL JUDGMENT IS HEREBY ENTERED** in favor of defendant Google Inc., and against plaintiff Oracle America, Inc.

**IT IS SO ORDERED.**

Dated: June 8, 2016.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

**Appx28**

# Order Denying Rule 50 Motions, Dated June 8, 2016 (Dkt. 1988)

United States District Court

For the Northern District of California

1

2

3

4

5

6                  IN THE UNITED STATES DISTRICT COURT

7

8              FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   ORACLE AMERICA, INC.,

11              Plaintiff,                    No. C 10-03561 WHA

12      v.

13   GOOGLE INC.,                     **ORDER DENYING RULE 50 MOTIONS**

14              Defendant.

15   ─────────────────────────/

16          In this copyright case, the Federal Circuit remanded for a second jury trial on the issue

17   of fair use, rejecting the argument of Oracle America, Inc., that the first trial record entitled

18   it to judgment as a matter of law and that a remand on that issue would be "pointless" (Br. at

19   68). Now, after an adverse verdict in the second trial, Oracle again asserts that it is entitled to

20   judgment as a matter of law on fair use. For the same reasons as before, Oracle is wrong in

21   saying that no reasonable jury could find against it.

22          Under the law as stated in the final charge and on our trial record, our jury could

23   reasonably have found for either side on the fair use issue. Our trial presented a series of

24   credibility calls for our jury. Both sides are wrong in saying that all reasonable balancings of

25   the statutory factors favor their side only. To the extent either side now quarrels with the law

26   as stated in the final charge (Dkt. No. 1950), the time for those arguments was at or before the

27   charging conference or eventually on appeal. For now, at the district court, the jury instructions

28   control.

**Appx29**

Based on those instructions, the Rule 50 motions must be **DENIED**.  Since an appeal is promised, however, it may be of assistance to leave a few important observations.

1.      The fair use instructions followed largely the review of fair use law as set forth in the Federal Circuit's opinion except for modifications urged by counsel and to account for how the case was actually tried.  The final jury charge culminated an exhaustive and iterative process of proposals by the judge followed by critiques by counsel.  Months before trial, the Court informed both sides that it expected to use the Federal Circuit's opinion canvassing fair use law as the starting point and requested briefing from the parties addressing what modifications should be made (Dkt. Nos. 1518, 1519 at 51).  After reviewing those comments, the Court circulated a first proposed charge on fair use and requested critiques (Dkt. No. 1615).  Counsel submitted their critiques a week later with replies the following week.  In light of the critiques, a second draft made substantial revisions (Dkt. Nos. 1688, 1716), asking counsel to meet and confer to reach an agreed-on instruction in light of that proposal and to submit briefs and responses regarding the areas of disagreement.  After reviewing the further briefs and responses, the Court next circulated "penultimate instructions on fair use," a third draft, and invited a third round of comment (Dkt. No. 1790).  Those critiques also led to modifications and a final notice of the pre-instruction on fair use to be read to the jury before the start of the evidence (Dkt. No. 1828).  Counsel (and the jury) were advised that the final instructions at the end of the evidence would possibly be adjusted to reflect the way the case was tried (and, in fact, some minor modifications did occur).  During the trial, the judge sought briefs on several issues in play as the evidence came in.  Based thereon, a notice of the proposed final charge circulated the night before the close of evidence (Dkt. No. 1923).  At the charging conference, counsel raised both new points and old ones (although they were permitted to rest on prior critiques). Final modifications followed.  The jury was charged accordingly (Dkt. No. 1950).

2.      On fair use, Oracle's most emphatic argument remains the "propriety of the defendant's conduct," meaning the subjective awareness by Google Inc. of the copyrights and, construing its internal e-mails in a light most unfavorable to Google, its "bad faith." This, however, underscores an important point for the appeal.  Although the Federal Circuit

United States District Court
For the Northern District of California

1   opinion omitted any reference to the "propriety of the defendant's conduct" (good faith versus

2   bad faith) as a consideration under any part of the four-factor test for fair use, Oracle insisted

3   on remand that the jury be told that it could consider bad faith by our accused infringer as a

4   subfactor under Factor One. This Court acquiesced in Oracle's view and did so despite an

5   omission — conceivably a studied omission — of any such consideration in the Federal Circuit

6   opinion and despite the fact that there is a respectable view that good or bad faith should no

7   longer be a consideration after the Supreme Court's decision in *Campbell v. Acuff-Rose Music,*

8   *Inc.*, 510 U.S. 569, 585 n.18 (1994). *See* 2 Paul Goldstein, *Goldstein on Copyright* § 12.2.2,

9   at 12:44.5–12:45 (3d ed. 2016). Put differently, either a use is objectively fair or it is not and

10   subjective worry over the issue arguably should not penalize the user.[1]

11       Still, Oracle is correct that the Supreme Court in *Harper & Row Publishers, Inc. v.*

12   *Nation Enterprises*, 471 U.S. 539, 562 (1985), called out the propriety of the defendant's

13   conduct as a consideration in that case. Footnote 18 in *Campbell* later questioned whether or

14   not propriety should persist as a consideration but did not rule it out. At the district court level,

15   we must treat *Harper & Row* as still the law and leave it to the appellate courts to revise

16   (although our instructions included a modification based on *Campbell*). This is no small point

17   in this case, for no Oracle jury argument received more airtime than its argument that Google

18   "knew" it needed a license and chose in bad faith to "make enemies" instead.

19       This leads to a reciprocal key point. Given that Oracle was allowed to try to prove

20   Google acted in bad faith, Google was allowed to try to prove good faith. Its witnesses testified

---

22     [1] On appeal, Oracle argued as follows (Br. 72):

23         Finally, "[f]air use presupposes good faith and fair dealing." *Harper & Row*,

24         471 U.S. at 562 (internal quotation marks omitted). Google considered,
        negotiated, and ultimately rejected the opportunity to license the packages,

25         deciding to "[d]o Java anyway and defend our decision, perhaps making enemies
        along the way." A1166. That Google knew it needed a license, and then sought

26         but did not obtain one, weighs heavily in showing "the character of the use" was
        not fair. *Los Angeles News Serv. v. KCAL-TV Channel 9*, 108 F.3d 1119, 1122

27         (9th Cir. 1997). Google "knowingly . . . exploited a purloined work for free that
        could have [otherwise] been obtained." *Id.*

28

Despite this argument, the Federal Circuit did *not* include this consideration in its discussion of factors on fair use,
remaining silent on the issue.

3

**Appx31**

**United States District Court**
For the Northern District of California

that they had understood that "re-implementing" an API library was a legitimate, recognized practice so long as all that was duplicated was the "declaring code" and so long as the duplicator supplied its own "implementing code," that is, the methods were "re-implemented." In this way, Java programmers using the Android API could call on functionalities with the same Java command statements needed to call the same functionalities in the Java API, thereby avoiding splintering of the ways that identical functionalities became invoked by Java programmers.

Google asked to go a step further and asked for an instruction on "custom," citing *Wall Data Inc. v. Los Angeles County Sheriff's Dept.*, 447 F.3d 769, 778 (9th Cir. 2006), which stated "fair use is appropriate where a 'reasonable copyright owner' would have consented to the use, *i.e.*, where the 'custom or public policy' at the time would have defined the use as reasonable" (quoting Subcomm. on Patents, Trademarks & Copyrights of the Sen. Comm. on the Judiciary, 86th Cong., 2d Sess., Study No. 14, *Fair Use of Copyrighted Works 15* (Latman) (Comm. Print 1960)). Oracle objected on the ground that custom was omitted from the Federal Circuit opinion. It was omitted from that opinion — true. But neither was there any mention in that opinion of the propriety of the accused infringer's conduct. So, that omission by itself wasn't a good reason to ignore a pertinent statement by the Ninth Circuit, the law applicable in this copyright case arising in the Ninth Circuit. Oracle also argued that "custom" had to be vastly more entrenched than the "practice" evidence Google wished to present.

Whether or not the evidence would have warranted a *Wall Data* instruction on custom, the fact remained that once Oracle endeavored to prove bad faith, it opened the door for Google to prove good faith, so Google explained its mental state and explained that it believed it had followed a recognized practice in freely re-implementing API libraries by duplicating only declaring code. Oracle vigorously tried to impeach this testimony. Whether or not the practice rose to the level of an entrenched custom under *Wall Data* fell by the wayside. Paragraph 27 of the instructions allowed the jury to consider, in evaluating good faith or not, together with all other circumstances, the extent to which Google's conduct followed or contravened any

recognized practice in the industry. The instructions were not adjusted to insert a further

reference to custom or *Wall Data* in a second place (presumably in the concluding paragraph

on the fair use).[2] Mentioning it twice would have elevated practice and custom to a higher

profile than deserved over and above the other fair use factors. Google's point was adequately

subsumed under the discussion of propriety of the accused infringer's conduct.

     3.    Deserving notice before turning to Oracle's main challenges is a tediously

undramatic yet highly practical point. Our jury could reasonably have concluded as follows.

Sun developed the Java programming language and made it free for all to use without a license.

Sun further accumulated the copyrighted Java API library of pre-written code, including its

implementing code, to carry out common and more advanced functions and made it available

for all to use with a license, although the question for our jury was the extent to which, if at all,

---

[2] Paragraph 27 stated:

> Also relevant to the first statutory factor is the propriety of the accused
> infringer's conduct because fair use presupposes good faith and fair dealing.
> Where, for example, the intended purpose is to supplant the copyright holder's
> commercially valuable right of first publication, good faith is absent. In
> evaluating the question of the propriety of Google's conduct, meaning good faith
> or not, you may only consider evidence up to the commencement of this lawsuit
> on August 12, 2010, and may not consider events thereafter. Your decision as to
> fair use, however, will govern as to all versions of Android at issue in this case,
> regardless of their date of issue. Again, in evaluating good faith or not, you
> should limit your consideration to events before August 12, 2010, and disregard
> any evidence you have heard after that date. This evidence cut-off date applies
> only to the issue of good faith or not.
>
> In evaluating the extent to which Google acted in good faith or not, you may
> take into account, together with all other circumstances, the extent to which
> Google relied upon or contravened any recognized practices in the industry
> concerning re-implementation of API libraries.
>
> You have heard evidence concerning the possibility of Google seeking a license
> from Oracle. Under the law, if the accused use is otherwise fair, then no
> permission or license need be sought or granted. Thus, seeking or being denied
> permission to use a work does not weigh against a finding of fair use.
>
> Similarly, you have heard evidence about various licenses from the Apache
> Foundation, the Apache Harmony Project involving Java, and the General Public
> License. These are relevant in some ways, but Google concedes it had no
> license from Sun or Oracle, and it is important to remember that Google makes
> no claim that its use was pursuant to a license from Sun or Oracle, directly or
> indirectly. Instead, Google claims that its use was a fair use and therefore
> required no license at all.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   the declaring code and its structure, sequence, and organization ("SSO") could be carried over

2   into the Android platform without a license under the statutory right of fair use.

3          The Java API library contains, as stated, pre-written Java source code programs for

4   common and more advanced computer functions.  They are organized into "packages,"

5   "classes," and "methods."  A "package" is a collection of "classes," and in turn, each "class"

6   is a collection of  "methods" (and other elements).  Each method performs a specific function,

7   sparing a programmer the need to write Java code from scratch to perform that function.  Put the

8   other way, various methods are grouped under various classes with the classes grouped under

9   various packages, as in "java.lang.Math" with "java.lang" being the package and

10  "java.lang.Math" being the class.  The particular taxonomy adopted for the Java API reflects

11  its unique file system, that is, its SSO.

12          Significantly, under the rules of the language itself, each method must begin with a

13  "declaration," usually referred to herein as "declaring code."  This declares or defines (i) the

14  method name and (ii) the input(s) and their type as expected by the method and the type of

15  any outputs.  After the declaration, each method next includes "implementing code," *i.e.*, the

16  pre-written program, which takes the input(s) and, using step-by-step code, carries out the

17  function.  The implementing code is set off by special punctuation.

18          A simple example of a pre-written method is one that finds a square root.  At the place

19  in a developer's own program that needs a square root (of say 81), he or she inserts a line (or a

20  "statement") in the specified format invoking a method pre-written to find square roots.  When

21  the computer runs the program and reaches this line, the computer calls upon the pre-written

22  method in its file in the Java API library, provides the method with the input (81), steps through

23  the "implementing code" to the end of the method, and finally "returns" the square root (9) to

24  the program in progress.

25          The two definitional purposes of "declaring code" are critical.  The first declares the

26  precise name of the method (so that the right file will be accessed).  The second specifies the

27  input(s) and their type (so that the implementing code will receive the input(s) in the way

28  expected) as well as the type of the output.  In our simple square root example, there is only

6

**Appx34**

United States District Court
For the Northern District of California

1    one input, but it must be in parentheses after "sqrt," which is the name of the method.  In the

2    Java API library, that particular input is a special kind of floating decimal point number (rather

3    than a whole integer) known as a "double."  That part of the method declaration would look like

4    this:

5                                   public static double sqrt(double x)

6    wherein sqrt is the method name, the input is a floating decimal number in the form of a

7    "double" (like 81.0 or 11.56), and the method will return a "double" (like 9.0 or 3.4).

8    (For present purposes, we may ignore the words "public" and "static.")

9              In writing his or her own Java program, a programmer may only invoke a method with

10   a statement using the precise form defined by the declaring code for the method, both as to

11   name of method and the input format specification.  To repeat, the precise name finds the

12   precise file containing the pre-written code for that method.  The precise inputs must match the

13   format expected by the method.  In our programmer's own program, the statement calling upon

14   the method might look like the second line just below:

15                                          x = 81.0

16                                          y = Math.sqrt(x)

17   wherein the right side of the statement is dictated by the declaring code and the left side y is a

18   variable choice made by the programmer (so that y would be set to the square root, here 9.0).[3]

19             Regardless of the approach taken by the implementing code to solving the problem

20   addressed by the method (*e.g.*, getting the square root), the input(s) to the method, to repeat,

21   must be of the type as specified in the method declaration, so that the implementing code will

22   receive the inputs in the type expected.  Similarly, the method will return an output in the type

23   specified in the method declaration.

24             Many thousands of pre-written methods have been written for Java, so many that thick

25   books (*see, e.g.*, TX 980) are needed to explain them, organized by packages, classes, and

26   methods.  For each method, the book sets forth the precise declaring code but does not (and

27   need not) set forth any implementing code.  In other words, the book duplicates all of the

28

---

[3]  "Math.sqrt" corresponds to "Class.method."  The package need not be specified in our example.

7

**Appx35**

United States District Court
For the Northern District of California

1   method declarations (organized by packages and classes) together with plain English

2   explanations.  A Java user can study the book and learn the exact method name and inputs

3   needed to invoke a method for use in his or her own program.  The overall set of declarations is

4   called the Java Application Program Interface or Java API.  Again, all that the Java programmer

5   need master are the declarations.  The implementing code remains a "black box" to the

6   programmer.

7           In this important sense, the declarations are "interfaces," meaning precise doorways

8   to command access to the pre-written methods and their implementation code performing the

9   actual work of the methods.  Java users (and Android users for that matter) must invoke the

10  methods using command statements conforming to the specifications declared by the

11  declarations.

12          Oracle has portrayed the Java programming language as distinct from the Java API

13  library, insisting that only the language itself was free for all to use.  Turns out, however, that in

14  order to write at all in the Java programming language, 62 classes (and some of their methods),

15  spread across three packages *within* the Java API library, *must* be used.  Otherwise, the

16  language itself will fail.  The 62 "necessary" classes are mixed with "unnecessary" ones in the

17  Java API library and it takes experts to comb them out.  As a result, Oracle has now stipulated

18  before the jury that it was fair to use the 62 "necessary" classes given that the Java

19  programming language itself was free and open to use without a license (Tr. 1442–43; TX

20  9223).[4]

21          That the 62 "necessary" classes reside without any identification as such within the Java

22  API library (rather than reside within the programming language) supports Google's contention

23  that the Java API library is simply an extension of the programming language itself and helps

24

25

26  _____

27          [4]  Java 2 SE Version 5.0 (one of the copyright works), included 166 API packages.  Those packages
    included over three thousand classes and interfaces, which, in turn, included a total of more than ten thousand
    methods.  Android used the declaring code and SSO of 37 of those API packages including more than six
28  hundred classes (and other elements) which, in turn, included more than six thousand methods.  As stated, the
    implementing code was not copied.

explain why some view the Java API declarations as free and open for use as the programming language itself. At least to the extent of the 62 "necessary" classes, Oracle agrees.[5]

All this said, our fair use issue, as presented to our jury, came down to whether someone using the Java programming language to build their own library of Java packages was free to duplicate, not just the "necessary" functions in the Java API library but also to duplicate any other functions in it and, in doing so, use the same interfaces, *i.e.*, declaring code, to specify the methods — so long as they supplied their own implementing code.

Oracle's argument in the negative amounts to saying: Yes, all were free to use the Java programming language. Yes, all were free to use the 62 necessary classes from the Java API. Yes, all were free to duplicate the same functionality of any and all methods in the Java API library so long as they "re-implemented" (since copyright does not protect functionality or ideas, only expression). But, Oracle would say, anyone doing so should have scrambled the functionalities among a different taxonomy of packages and classes (except as to the 62 "necessary" classes). That is, they should have used a different SSO.

Here, the undramatic yet practical point comes into sharp focus. If, as it was entitled to do, Google had simply reorganized the same functionality of the 37 re-implemented Java packages into a different SSO (taking care, however, not to disturb the 62 necessary classes and their three respective packages), then Java programmers, in order to use the Java system as well as the reorganized Android system, would have had to master and keep straight two different SSO's as they switched between the two systems for different projects. Our jury could reasonably have found that this incompatibility would have fomented confusion and error to the detriment of *both* Java-based systems and to the detriment of Java programmers at large. By analogy, all typewriters use the same QWERTY keyboard — imagine the confusion and universal disservice if every typewriter maker had to scramble the keyboard. Since both systems presupposed the Java programming language in the first place, it was better for both to

---

[5] Trial Exhibit 980, *The Java Application Programming Interface, Volume 1*, is a book that covers four packages and refers to them as the "core packages." According to the back cover of the book, these four packages "are the foundation of the Java language. These libraries include java.lang, java.io, java.util, and java net. These are the general purpose libraries fundamental to every Java program."

United States District Court
For the Northern District of California

share the same SSO insofar as they offered the same functionalities, thus maintaining usage consistency across systems and avoiding cross-system confusion, just as all typewriter keyboards should use the QWERTY layout — or so our jury could reasonably have found.

The same could have been reasonably found for the second purpose of the declaring code — specifying the inputs, outputs, and their type. To the extent a specification could be written in more than one way to carry out a given function, it was nevertheless better for all using the Java language to master a single specification rather than having to master, for the same function, different specifications, one for each system, with the attendant risk of error in switching between systems — or so our jury could reasonably have found.

In terms of the four statutory factors, this consideration bears significantly upon the nature and character of the use (the First Factor), the functional character of the declaring code (the Second Factor), and the limited extent of copying (the Third Factor), that is, Google copied only so much declaring code as was necessary to maintain inter-system consistency among Java users. Google supplied its own code for the rest. Overall, avoiding cross-system babel promoted the progress of science and useful arts — or so our jury could reasonably have found.[6]

This order will now turn to specific arguments raised by Oracle, the losing party, in its challenge to the verdict.

4. With respect to Factor One, Oracle presses hard its view that Google copied in bad faith disregard of Sun/Oracle's property rights. As stated, there remains an ongoing debate regarding whether the "propriety of the use" is a cognizable consideration in any fair use inquiry. Nevertheless, our jury was instructed, as requested by Oracle, to consider whether Google acted in good faith or not as part of its consideration of the first statutory factor. Although mental state is a classic question reserved to the jury, and in our trial mental state was much contested, Oracle now insists that our jury could not reasonably have concluded that Google acted in good faith.

---

[6] This point of inter-system consistency, by the way, differs from the interoperability point criticized by the Federal Circuit. 750 F.3d at 1371. The immediate point of cross-system consistency focuses on avoiding confusion in usage between the two systems, both of which are Java-based, not on one program written for one system being operable on the other, the point addressed by the Federal Circuit.

United States District Court

For the Northern District of California

1    Oracle cites numerous examples of internal documents and trial testimony that

2  suggested that Google felt it needed to copy the Java API as an accelerant to bring Android to

3  the market quicker.  It points to the breakdown in negotiations between Google and Sun seeking

4  to form a full partnership leaving Google with Java class libraries that were "half-ass at best.

5  [It] need[ed] another half of an ass" (TX 215).  In light of that breakdown, Google elected to

6  "[d]o Java anyway and defend [its] decision, perhaps making enemies along the way" (TX 7 at

7  2).  Oracle further notes that even after Sun's CEO at the time publicly praised Android, Andy

8  Rubin (head of Google's Android team) instructed representatives at a trade show, "don't

9  demonstrate [Android] to any [S]un employees or lawyers" (TX 29).  Finally, Oracle points to

10  internal communications indicating that Google believed it needed a license to use Java (TX 10;

11  *see also* TX 409 (discussing the possibility of buying Sun to "solve all these lawsuits we're

12  facing")).

13    On the other hand, Google presented evidence that many at Google (and Sun)

14  understood that at least the declaring code and their SSO were free to use and re-implement,

15  both as a matter of developer practice and because the availability of independent

16  implementations of the Java API enhanced the popularity of the Java programming language,

17  which Sun promoted as free for all to use (Schmidt Testimony, Tr. 361; Page Testimony,

18  Tr. 1846; Rubin Testimony, Tr. 639; Rubin Testimony, Tr. 1088–89).

19    Sun's own CEO at the time, Jonathan Schwartz, testified on Google's behalf at trial

20  and supported Google's view that a practice of duplicating declarations existed and that the

21  competition was on implementations.  Oracle's harsh cross-examination focused on character

22  assassination and showing that Schwartz resented Oracle for its treatment of Schwartz after the

23  buyout.  That Oracle resorted to such impeachment underscores how fact-bound the issue was,

24  another classic role of a jury to resolve.

25    In light of the foregoing, our jury could reasonably have concluded that Google's use

26  of parts of the Java API as an accelerant was undertaken based on a good faith belief that

27  at least the declaring code and SSO were free to use (which it did use), while a license was

28  necessary for the implementing code (which it did not use).  Our jury could reasonably have

**Appx39**

concluded that Google's concern about making an enemy of Sun reflected concern about the parties' business relationship in light of the failed negotiations that would have brought Sun in as a major partner in Android, rather than concerns about litigation. Mental state was and remains a classic province of the jury.

5.     With respect to the Factor One and commercialism, it is undisputed that Google's use of the declaring code and SSO from 37 Java API packages served commercial purposes and our jury was so instructed, including an instruction that a commercial use weighed against fair use. Nevertheless, our jury could reasonably have found that Google's decision to make Android available open source and free for all to use had non-commercial purposes as well (such as the general interest in sharing software innovation). Indeed, Sun itself acknowledged (before Android launched) that making OpenJDK available as open source, as Sun did, could undermine its own commercial efforts with Java SE licensing (TX 971 at 14). Thus, even though Google's use was commercial, which weighed against fair use, the jury could reasonably have found the open-source character of Android tempered Google's overall commercial goals.

Of course, even a *wholly* commercial use may still constitute a fair use. *Campbell*, 510 U.S. at 585. Thus, in the alternative, our jury could reasonably have found that Google's use of the declaring code and SSO from 37 Java API packages constituted a fair use despite even a heavily commercial character of that use.

It is true that in the first appeal, the following exchange occurred at oral argument between Circuit Judge Kathleen O'Malley and counsel for Google:

> *Judge O'Malley:* But for purpose and character, though, you don't dispute that it was entirely a commercial purpose.
>
> *Van Nest:* No.

Oral Arg., *Oracle Am., Inc. v. Google Inc.*, Nos. 2013-1021, 2013-1022 (Fed. Circ.) 1:02:54–1:03:00.

On remand, Oracle sought to convert this colloquy to a judicial admission that Google's use was "entirely commercial." It is for the district court, in its discretion, to determine the extent, if any, of a judicial admission. *American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224,

United States District Court
For the Northern District of California

1    226 (9th Cir. 1988).  As set forth in the final pretrial order (Dkt. No. 1760), the undersigned

2    examined the colloquy (and all other statements of record on the point) and determined that the

3    "commercial" part would be treated as a judicial admission, but the "entirely" part would not be.

4    The word "entirely" was part of the give and take of an oral argument.  In light of all statements

5    by counsel and in light of the free and open availability of Android, the word "entirely" would

6    have been too conclusive, inaccurate, and unfair.  The district court exercised its discretion to

7    limit the admission to "commercial" and let the jury decide for itself how commercial, according

8    to the evidence.

9        Accordingly, our jury was instructed that Google's use was commercial, but that it was

10   up to the jury to determine the extent of the commerciality, as follows (Dkt. No. 1981 ¶ 21)

11   (emphasis added):

> In evaluating the first statutory factor, the extent of the commercial
> nature of the accused use must be considered.  *In this case, all
> agree that Google's accused use was commercial in nature but
> disagree over the extent*.  Commercial use weighs against a finding
> of fair use, but even a commercial use may be found (or not found,
> as the case may be) to be sufficiently transformative that the first
> statutory factor, on balance, still cuts in favor of fair use.  To put it
> differently, the more transformative an accused work, the more
> other factors, such as commercialism, will recede in importance.
> By contrast, the less transformative the accused work, the more
> other factors like commercialism will dominate.

18   Our jury could reasonably have agreed with Oracle that the evidence showed the use was

19   entirely commercial (yet still ruled for Google), but it could also have reasonably found that the

20   use, while commercial, served non-commercial purposes as well, *i.e.*, as part of a free and open

21   software platform, namely Android.[7]

22       6.      With respect to the Factor One and "transformativeness," a use is transformative

23   if it "adds something new, with a further purpose or different character, altering the first with

24   new expression, meaning, or message."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579

---

26       [7]  Although Google gives Android away for free, Oracle argues that the "Android Ecosystem" has
27   generated over forty billion dollars in revenue and thus Android has had a massive commercial benefit to
     Google.  There is no doubt that Android has contributed to a large expansion of smartphones but the revenue
     benefit to Google flows from the ad revenue generated by its search engine which pre existed Android.  In other
28   words, our jury could reasonably have found that without Android the void would have been filled by other
     mobile platforms, yet those platforms would still have led to more Google search requests and ad revenue.

(1994). Oracle argues that no jury could reasonably find that Google's use of the declaring

code and SSO from 37 Java API packages in Android imbued the copyrighted works with new

expression, meaning, or message. Specifically, Oracle argues that the copied code served the

same function in Android as it did in Java, inasmuch as the code served as an interface for

accessing methods in both systems (*see* Astrachan Testimony, Tr. 1265; Bloch Testimony,

Tr. 997).

It should go without saying (but it must be said anyway) that, of course, the words

copied will always be the same (or virtually so) in a copyright case — otherwise there can be

no copyright problem in the first place. And, of course, the copied declarations serve the same

function in both works, for by definition, declaring code in the Java programming language

serves the specific definitional purposes explained above. If this were enough to defeat fair use,

it would be impossible ever to duplicate declaring code as fair use and presumably the Federal

Circuit would have disallowed this factor on the first appeal rather than remanding for a jury

trial.

With respect to transformativeness, our jury could reasonably have found that

(i) Google's selection of 37 out of 166 Java API packages (ii) re-implemented with new

implementing code adapted to the constrained operating environment of mobile smartphone

devices with small batteries, and (iii) combined with brand new methods, classes, and packages

written by Google for the mobile smartphone platform — all constituted a fresh context giving

new expression, meaning, or message to the duplicated code.[8] (The copyrighted works were

designed and used for desktop and laptop computers.)

In *Campbell*, the accused work (a rap parody song) used the same bass riff and an

identical first line of Roy Orbison's "Oh, Pretty Woman." The parody also included exact

copies of certain phrases in subsequent lines and maintained the same structure and rhyme

---

[8] As stated, the Android core libraries included over one hundred new API packages that had never
been part of the Java API. Those packages enabled functionality specifically intended for use in a mobile
smartphone environment, and like the 37 Java API packages at issue here, they were written in the Java
programming language (Rubin Testimony, Tr. 670). Some additional functionality in Android, however, was
performed by a separate set of libraries written in C or C++ for performance purposes (Douglas Schmidt
Testimony, Tr. 1602).

14

1    scheme throughout.  The copied elements served the same function in the accused work as in

2    the original.  Nevertheless, the Supreme Court acknowledged that the transformative purpose

3    of parody had a "need to mimic an original to make its point," and thus, warranted copying some

4    exact elements.  *Id*. at 580–81.  The question of the *extent* of the copying permissible to serve

5    that function was the subject of the inquiry of the third statutory fair use factor.  So too here.

6         Android did not merely incorporate the copyrighted work "as part of a broader work,"

7    without any change to the purpose, message, or meaning of the underlying work (*see* Dkt.

8    No. 1780).  Android did not merely adopt the Java platform wholesale as part of a broader

9    software platform without any changes.  Instead, it integrated selected elements, namely

10   declarations from 37 packages to interface with all new implementing code optimized for mobile

11   smartphones and added entirely new Java packages written by Google itself.  This enabled a

12   purpose distinct from the desktop purpose of the copyrighted works — or so our jury could

13   reasonably have found.

14        In light of the foregoing, our jury could reasonably have concluded that Google's use of

15   the declaring code and SSO of 37 API packages from the desktop platform work in a full-stack,

16   open-source mobile operating system for smartphones was transformative.[9]

17        7.   With respect to Factor Two, the "nature of the copyrighted work," the final

18   charge to the jury stated "[t]his factor recognizes that traditional literary works are closer than

19   informational works, such as instruction manuals, to the core of intended copyright protection.

20   Creative writing and expression lie at the very heart of copyright protection, so fair use is

21

22

23

24

---

25        [9]  The instructions on "transformativeness" deleted a point from the Federal Circuit opinion that might
26   have favored Google, which had requested an instruction defining "transformative" as the incorporation of
     copyrighted material "as part of a broader work," relying on a parenthetical snippet in the Federal Circuit
27   opinion.  This Court denied Google's request and explained why (Dkt. 1780).  In brief, the parenthetical snippet
     was taken from our court of appeal's decision in *Monge v. Maya Magazines*, 688 F.3d 1164, 1176 (9th Cir.
28   2012).  But as our court of appeals there explained, the incorporation of a copyrighted material into a larger
     work, such as the arrangement of a work in a photo montage, *could be* transformative and fair use, not that it
     *must be*.  Please see the order at Docket Number 1780 for the reasoning.

*[left margin, rotated]* United States District Court
For the Northern District of California

1    generally more difficult to establish for copying of traditional literary works than for copying

2    of informational works" (Dkt. No. 1981 ¶ 28); *see also Campbell*, 510 U.S. at 586.[10]

3        The Java programming language itself requires the package-class-method hierarchy, an

4    idea on which Oracle does not claim any copyright.  Oracle instead argues that because there

5    were countless ways to name and organize the packages in Java and because Google could have

6    used a completely new taxonomy in Android (except as to the 62 "necessary" classes), our jury

7    should have concluded that the process of designing APIs must have been "highly creative" and

8    thus at the core of copyright's protection.  Of course, such a conclusion would have been within

9    the evidence, but our jury could reasonably have gone the other way and concluded that the

10    declaring code was not highly creative.

11        Oracle highlights Google's own witness, Joshua Bloch, who designed many of the Java

12    APIs while working at Sun and who later worked at Google on the Android team.  Bloch

13    testified that one of the challenges he faced in designing API was "the complexity of figuring out

14    how best to express what it is that the programmer wants done" (Tr. 1007).  Oracle focuses on

15    Bloch's use of the word "express" to demonstrate the expressive nature of API design but it

16    ignores the fact that he addressed the challenge of expressing a particular *function*.  Similarly,

17    Oracle notes that Bloch described API design as "an art not a science" and cites his eloquence

18    regarding "design principles" (Tr. 971).

19        In citing this, Oracle resorts to the time-honored tactic of emphasizing a concession by

20    one of the other side's witness.  But other witnesses (*e.g.*, Dr. Owen Astrachan, among others)

21    emphasized the functional role of the declaring lines of code and their SSO and minimized the

22    "creative" aspect.  Our jury could reasonably have found that, while the declaring code and SSO

23    were creative enough to qualify for copyright protection, functional considerations predominated

24    in their design, and thus Factor Two was not a strong factor in favor of Oracle after all.

25

26

27        [10]   "[I]f a work is largely functional, it receives only weak protection.  'This result is neither unfair nor
unfortunate.  It is the means by which copyright advances the progress of science and art.'"  *Sega Enterprises,*

28    *Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1527 (9th Cir. 1992) (quoting *Feist Publications, Inc. v. Rural Tel. Serv.
Co., Inc.*, 499 U.S. 340, 350 (1991)).

16

United States District Court

For the Northern District of California

8.      With respect to Factor Three, our jury could reasonably have found that Google duplicated the bare minimum of the 37 API packages, just enough to preserve inter-system consistency in usage, namely the declarations and their SSO only, and did not copy any of the implementing code, thus finding that Google copied only so much as was reasonably necessary for a transformative use.  The number of lines of code duplicated constituted a tiny fraction of one percent of the copyrighted works (and even less of Android, for that matter).

9.      With respect to Factor Four, our jury could reasonably have found that use of the declaring lines of code (including their SSO) in Android caused no harm to the market for the copyrighted works, which were for desktop and laptop computers.  As to Java ME, our jury could reasonably have found that Java ME eventually declined in revenue just as predicted by Sun before Android was even released, meaning that Android had no further negative impact on Java ME beyond the tailspin already predicted within Sun.

Also, before Android was released, Sun made all of the Java API available as free and open source under the name OpenJDK, subject only to the lax terms of the General Public License Version 2 with Classpath Exception.  This invited anyone to subset the API. Anyone could have duplicated, for commercial purposes, the very same 37 packages as wound up in Android with the very same SSO and done so without any fee, subject only to lenient "give-back" conditions of the GPLv2+CE.  Although Google didn't acquire the 37 packages via OpenJDK, our jury could reasonably have found that Android's impact on the market for the copyrighted works paralleled what Sun already expected via its OpenJDK.

10.      Stepping back, it seems hard to reconcile Oracle's current position with the one it took just as the trial was getting underway, namely, that fair use is an equitable rule of reason and each case requires its own balancing of factors.  In its critique of the first proposed jury instructions on fair use (Dkt. No. 1663 at 1), Oracle argued that the Court's draft characterization of the policy of fair use contravened the legislative history, and Oracle cited the following language from a Senate report on the 1976 Copyright Act (which language was repeated in the House Report):

> Although the courts have considered and ruled upon the fair use
> doctrine over and over again, no real definition of the concept has

United States District Court

For the Northern District of California

1    ever emerged.  Indeed, since the doctrine is an equitable rule of
2    reason, no generally applicable definition is possible, and each
     case raising the question must be decided on its own facts.

3    S.Rep. No. 94-473 at 62 (1975).  The Court adopted Oracle's proposed instruction in the next

4    draft as well as in the final charge to the jury, stating:  "Since the doctrine of fair use is an

5    equitable rule of reason, no generally accepted definition is possible, and each case raising the

6    question must be decided on its own facts" (Dkt. No. 1981 ¶ 21).

7        Now, Oracle argues instead that this case must be decided as a matter of law, and not

8    "on its own facts."  Oracle argues that Google's copying fails to resemble any of the statutory

9    examples of fair use listed in the precatory language of Section 107, again contradicting its

10   earlier position that "no generally applicable definition is possible."

11       In applying an "equitable rule of reason," our jury could reasonably have given weight

12   to the fact that cross-system confusion would have resulted had Google scrambled the SSO

13   and specifications.  Java programmers and science and the useful arts were better served by

14   a common set of command-type statements, just as all typists are better served by a common

15   QWERTY keyboard.

16       11.    In summary, on Factor One, our jury could reasonably have found that while the

17   use was commercial, the commercial use was outweighed by a transformative use, namely use

18   of the declaring code as one component in a full stack platform for highly advanced

19   smartphones, a different context in which (i) 37 of the 166 API packages were selected, (ii) all of

20   the implementing code was re-implemented for a mobile low-power platform, and (iii) many

21   new packages original with Android were added.  Despite Google's internal e-mails, our jury

22   could reasonably have found that most of them pertained to earlier negotiations for a joint

23   venture to use the *entire* Java system, including the implementing code, and that, after those

24   discussions failed, Google acted in good faith by duplicating only the declarations to 37

25   packages to maintain inter-system consistency in usage and by supplying its own implementing

26   code.  On Factor Two, our jury could reasonably have found that the code copied was not highly

27   creative, was mainly functional, and was less deserving of protection.  On Factor Three, our jury

28   could reasonably have found that Google duplicated only the declaring code, a tiny fraction of

the copyrighted works, duplicated to avoid confusion among Java programmers as between the Java system and the Android system. On Factor Four, our jury could have found that Android caused no harm to the desktop market for the copyrighted works or to any mobile derivative, as borne out by Sun's own records. Of course, Oracle had arguments going the other way, but the jury was reasonably within the record in finding fair use.

This order cannot cover all the myriad ways that the jury could reasonably have balanced the statutory factors and found in favor of fair use. The possibilities above represent but one take on the evidence. Witness credibility was much challenged. Plainly, many more variations and balancings could have reasonably led to the same verdict.

12.  A final word about a separate issue that arose during trial. In their joint final pretrial submission, both sides agreed that no reference would be made before the jury to the prior proceedings in this case (Dkt. No. 1709 at 8). As this trial developed, however, Oracle left the impression before the jury that all the way up to the present, Google had uniformly acted in bad faith. Problem was, during a substantial part of this period (2012–2014), Google had been entitled to rely on the judgment of the district court that the material asserted was not copyrightable. *Kamar Int'l, Inc. v. Russ Berrie & Co.*, 752 F.2d 1326, 1330 (column two) (9th Cir. 1984) stated (emphasis added):

> We affirm the district court's holding that the sales by Russ Berrie of its stuffed animals immediately following the first judgment do not count as infringements after notice. *Kamar's* supposed citation to the contrary . . . is wholly inapposite. In its first judgment, the district court held Russ Berrie's animals noninfringing. Kamar did not obtain any stay pending appeal. *Russ was entitled to rely on the judgment at that time*.

In response, Oracle contended that Judge Alex Kozinski's opinion for our court of appeals in *Micro Star v. Formgen, Inc.*, 154 F.3d 1107 (9th Cir. 1998), had been so at odds with the decision by this Court holding the declaring code and their structure, sequence and organization were not copyrightable that Google could not reasonably have believed that this Court's holding on uncopyrightability was correct (Trial Tr. at 1591). The short answer was that *Micro Star* provided no holding or dictum whatsoever on copyrightability — none. Copyrightability was not there raised. (It was a fair use case.) Indeed, in our earlier trial when

19

**Appx47**

1    copyrightability was debated, no one, including Oracle, ever cited *Micro Star* on

2    copyrightability.  Nor was it raised on appeal.

3        To resolve this problem of the 2012-2014 interregnum period as best as could be done

4    with minimal strain on the parties' stipulation, the Court gave the following instruction:

> In evaluating the question of the propriety of Google's conduct,
> meaning good faith or not, you may only consider evidence up to
> the commencement of this lawsuit on August 12, 2010, and may
> not consider events thereafter.  Your decision as to fair use,
> however, will govern as to all versions of Android at issue in this
> case, regardless of their date of issue.  Again, in evaluating good
> faith or not, you should limit your consideration to events before
> August 12, 2010, and disregard any evidence you have heard after
> that date.  This evidence cut-off date applies only to the issue of
> good faith or not.

10        No mention was made to the jury about the earlier judgment rejecting copyrightability.

11   The problem was largely solved by the date cut-off, which allowed Oracle to use all of Google's

12   "bad" e-mails.  To mitigate the problem of speculation regarding prior testimony read in at the

13   second trial, the following instruction was given:

> You may have heard from a witness that there was a prior trial in
> this case.  It is true that there was a prior trial.  We have heard
> evidence in this trial of a prior proceeding, which is the earlier trial
> that occurred in this case.  Do not speculate about what happened
> in the prior trial.  No determination on fair use was made one way
> or the other in that trial.  It is up to you, the jury, to determine fair
> use based on the evidence you have heard in this trial and my
> instructions of the law.

19   Unfortunately, this might not have eliminated all of the prejudice to Google from the suggestion

20   made before the jury by Oracle, but it went most of the way and was the best the Court could do

21   in light of the stipulation made by the parties at the outset.

22                        *                *                *

23        All Rule 50 motions are **DENIED**.  Judgment will be entered in accordance with the jury's

24   verdict.

25        **IT IS SO ORDERED.**

27   Dated:  June 8, 2016.                    _____
                                              WILLIAM ALSUP
28                                            UNITED STATES DISTRICT JUDGE

20

# Order Regarding Google's Motion to Strike, Dated February 5, 2016 (Dkt. 1479)

1

2

3

4

5

6            IN THE UNITED STATES DISTRICT COURT

7

8        FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10 ORACLE AMERICA, INC.,               No. C 10-03561 WHA

11       Plaintiff,

12   v.

13 GOOGLE INC.,             **ORDER RE GOOGLE'S**
                             **MOTION TO STRIKE**

14       Defendant.

15 _____/

16     The parties could not agree to a stipulated form of order following the hearing on

17 Google's motion to strike.  Accordingly, the Court now rules as follows.  The upcoming trial

18 will proceed as if we were back in the original trial, but now with the instructions on fair use

19 handed down by the court of appeals.  No new copyrighted works will be allowed.  Oracle's

20 claims of copyright infringement in the upcoming trial are limited to infringement of Java SE

21 1.4 and Java SE 5.0.  The only Android versions that will be in play in the upcoming trial will

22 be the Android versions presented to the jury in the first trial plus the following (by Google's

23 agreement to be subject to the prior jury's adverse finding that Google has infringed the overall

24 structure, sequence, and organization of the 37 Java API packages in question):

25     •   Gingerbread (released Dec. 2010);

26     •   Honeycomb (released Feb. 2011);

27     •   Ice Cream Sandwich (released Oct. 2011);

28

1    •    Jelly Bean (released July 2012);

2    •    KitKat (released Oct. 2013); and

3    •    Lollipop (released Nov. 2014).

4    These six named Android releases comprise approximately 40 major and minor releases of Android.

As to all other versions and implementations of Android since the last operative complaint preceding the last trial, Oracle will retain the right to sue Google for infringement in a separate trial or proceeding.  Among possibly others, our trial will *not* include implementations of Android in Android TV, Android Auto, Android Wear, or Brillo. Nevertheless, if Oracle prevails at the trial and if an injunction is warranted, the equitable remedy might extend beyond the versions expressly in play in the trial pursuant to the ordinary scope of equitable relief.

The following portions of Oracle's expert reports served on January 8, 2016, are stricken:  Dr. Chris Kemerer:  ¶¶ 47–50 (including heading E) and 208 (references to Java SE 6 and SE 7); Mr. Robert Zeidman:  ¶¶ 45, 106 (all text after "Java SE 5"), 120–125 (including heading D), 146, and Exhibits V and W.

This order is without prejudice to possible admissibility of references to Java SE 6.0 and Java SE 7.0 as they relate to other issues in this case.

**IT IS SO ORDERED.**

Dated:   February 5, 2016.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

2

**Appx50**

# Opinion Regarding Google's Motion in Limine No. 2, Dated May 2, 2016 (Dkt. 1781)

Case 3:10-cv-03561-WHA    Document 1782    Filed 05/02/16    Page 1 of 5

1

2

3

4

5                    IN THE UNITED STATES DISTRICT COURT

6

7              FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9    ORACLE AMERICA, INC.,

10              Plaintiff,                          No. C 10-03561 WHA

11        v.

12                                          **MEMORANDUM OPINION RE**
     GOOGLE INC.,                           **GOOGLE'S MOTION** *IN LIMINE* **NO. 2**
13                                          **REGARDING NEW PRODUCTS**
              Defendant.
14    _____/

15                              **INTRODUCTION**

16          In this copyright infringement action, the accused infringer seeks to exclude evidence

17   relating to new implementations of its software platform that are not accused herein.  The final

18   pretrial order **GRANTED** defendant Google Inc.'s motion and ruled that evidence regarding

19   Android Wear, Android Auto, Android TV, and Brillo would be excluded from the forthcoming

20   trial.  Now this memorandum explains the reasoning for that decision.

21                               **STATEMENT**

22          Plaintiff Oracle America, Inc., commenced this action against defendant Google Inc. in

23   2010, asserting claims that certain versions of Google's Android operating system infringed its

24   copyrights in Java 2 Standard Edition versions 1.4 and 5.0.  The case proceeded to trial and the

25   jury found that Google infringed Oracle's copyrights but did not infringe its patents.  The jury

26   deadlocked on Google's fair use defense.  The undersigned granted Google's motion for

27   judgment as a matter of law, holding that the declaring code and the SSO of the 37 API

28   packages were not entitled to copyright protection.  The Court of Appeals for the Federal

**United States District Court**
For the Northern District of California

**Appx51**

1  Circuit reversed and remanded the case for further proceedings regarding Google's fair use

2  defense and Oracle's damages.

3  During the pendency of the appeal, Google's Android business expanded significantly.

4  Not only did Anrdoid gain more users, applications, and developers, but it also released

5  modified implementations and derivatives of Android for use in numerous device categories,

6  including wearable devices with small screens (Android Wear), dashboard interfaces in cars

7  (Android Auto), television sets (Android TV), and everyday devices with Internet connectivity,

8  such as household appliances or medical sensors, that comprise the so-called "Internet of

9  Things" (Brillo).

10  Google now moves to exclude evidence of Android Auto, Android TV, Android Wear,

11  and Brillo from the trial on remand, which will evaluate Google's fair use defense and, failing

12  that, Oracle's remedies. This order follows full briefing and oral argument.

### ANALYSIS

14  When this case returned on remand, Oracle sought to file a supplemental complaint for

15  the limited purpose of adding allegations concerning market harm and damages resulting from

16  new versions of Android released in the time since the first trial. Oracle's supplemental

17  complaint, which Google did not oppose, alleged, *inter alia*, that Google had launched new

18  versions of Android for phones and tablets and expanded Android's adoption into new device

19  categories such as wearable devices, televisions, automobiles, and household appliances (Supp.

20  Compl. ¶¶ 5–9).

21  After the parties served their initial expert reports, Google moved to strike references in

22  Oracle's expert reports to additional versions of the Java platform that Oracle had not addressed

23  in any of the operative pleadings. After a hearing on that motion, the Court ruled that this case

24  would proceed only with the versions of Java SE and Android addressed in the first trial plus

25  the Gingerbread, Honeycomb, Ice Cream Sandwich, Jelly Bean, KitKat, and Lollipop versions

26  of Android that had been released since the first trial, which Google had agreed would be

27  subject to the prior jury's adverse finding of infringement and which Oracle identified in its

28  supplemental complaint. (The parties later stipulated to add the Marshmallow version of

2

**Appx52**

Android, which Google released after Oracle filed its supplemental complaint.)  The order on
Google's motion to strike expressly held, "[a]mong possibly others, our trial will *not* include
implementations of Android in Android TV, Android Auto, Android Wear, or Brillo.
Nevertheless, if Oracle prevails at the trial and if an injunction is warranted, the equitable
remedy might extend beyond the versions expressly in play in the trial pursuant to the ordinary
scope of equitable relief" (Dkt. No. 1479 at 2).

In light of the prior order on the new implementations of Android, Google's second
motion *in limine* seeks to exclude evidence of Android TV, Android Auto, Android Wear, and
Brillo, as well as expert testimony about those products.  Oracle contends that evidence of those
products is relevant to the first fair use factor, which considers "the purpose and character of the
use."  17 U.S.C. 107(1).  Specifically, Oracle contends that Google's use of Android in new
product categories in which Oracle already licensed derivatives of the copyrighted works
demonstrates that Android was not a transformative use of the declaring code and SSO of the
37 API packages under the first fair use factor because it served the same function as Oracle's
derivative works.  Oracle also contends that evidence of the new products is relevant to the
fourth fair use factor, which considers "the effect of the use upon the potential market for or
value of the copyrighted work," because Oracle allegedly lost licensing revenue in those
markets due to competition from Android.  17 U.S.C. 107(4).

Thus, Oracle argues, if it is unable to present evidence of Google's entrance into new
product markets, the jury may overestimate the transformative nature of Android and
underestimate the effect of Android on the market for Oracle's copyrighted works.  Not so.

The issue in the first phase of this limited retrial is whether Google's use of 37 API
packages from Java 2 SE 1.4 and 5.0 in its implementations of Android in phones and tablets
constituted a fair use.  There has been no determination that the implementations of Android in
other product categories infringe, and the jury will not be asked to consider that question in our
trial.  Similarly, there will be no analysis of whether those new implementations constituted fair
use (assuming they infringe).  The market effect attributable to works that are not the subject of
this action is irrelevant to the fair use analysis of the accused works.  Similarly, any evidence

3

**Appx53**

1    that the new implementations of Android superseded the copyrighted works (thus undermining

2    transformativeness) has no bearing on whether the accused works superseded the copyrighted

3    works.

4        Oracle cites *Frank Music Corp. v. Metro-Goldwyn Mayer, Inc.*, 772 F.2d 505, 510

5    (9th Cir. 1985), for the position that the fourth fair use factor may consider "the consequence

6    of Google's infringement, regardless of whether Android Auto, TV, or Wear infringe[]"

7    (Pl.'s Opp. to Def.'s MIL No. 2 at 7).  There, the accused infringer used the copyright owner's

8    music in a ten-act revue but later removed the infringing act from the show.  The accused

9    infringer saw no decrease in revenue after removing the infringing act and thus contended its

10   profits could not be attributable to the infringement.  *Frank Music* held that the fact that the

11   infringing act could be omitted without appreciable effect did not establish that the act was

12   unimportant to the interest in the revue.

13       *Frank Music* did not involve fair use at all.  Nor did it concern the copyright owner's

14   actual damages.  It concerned disgorgement of the accused infringer's profits attributable to the

15   infringement.  Here, Oracle seeks to introduce *de novo* evidence of harm in an entirely different

16   set of product markets where there has been no determination that it suffered any harm in those

17   markets due to the original implementations of Android at issue in this action.  Neither *Frank*

18   *Music* nor the plain language of Section 107 can be read to reach that far.

19       Oracle also cites Judge Richard Posner's decision in *Bucklew v. Hawkins, Ash Baptie &*

20   *Co., LLP*, 329 F.3d 923, 933 (7th Cir. 2003), for the position that the calculation of the harm

21   attributable to the infringement "will sometimes require tracing those profits into another

22   [non-infringing] product."  Like *Frank Music*, *Bucklew* concerned disgorgement, not fair use.

23   Moreover, the tracing contemplated in *Bucklew* is not analogous to our case.  In *Bucklew*,

24   Judge Posner offered the example of an accused infringer that offered a verbatim copy of a book

25   for free to anyone who paid $25 for a bookmark with a market value of fifty cents.  In such a

26   case, he noted, there may be a need to determine whether an accused infringer had shifted his

27   profits to sales of a separate noninfringing product.  Here, there is no indication that Google

28

**Appx54**

United States District Court
For the Northern District of California

1   launched its new products in an attempt to conceal the harm its initial Android products caused

2   to the potential markets for Java 2 SE 1.4 and 5.0.  Thus, *Bucklew* offers Oracle no support.

3      Oracle contends that it could demonstrate that the implementations of Android in these

4   new products also include the 37 API packages at issue in a three to five page motion for

5   summary judgment, so their inclusion in this case will not require a mini-trial.  Oracle will be

6   free to sue on these new products in the future, but for now we already have a long list of

7   infringing products to impose on our jury and a line must be drawn somewhere to cabin

8   the universe under consideration.  At all events, those new products remain irrelevant to

9   consideration of whether Google's initial implementation of the declaring code and SSO of the

10  37 API packages constituted a fair use.  Oracle also contends that it would be odd to require it

11  to present evidence of potential harm in the markets occupied by these new products regarding

12  the fourth fair use factor when it has evidence of actual harm.  The strangeness of such evidence

13  does not result from the exclusion of these implementations of Android, but rather from

14  Oracle's attempt to draw in attenuated examples of market harm in product categories

15  unaffected by the works accused herein.  Thus, limiting Oracle's contentions of harm in those

16  markets to the effect of copying like Google's "if it should become widespread" is appropriate.

17  *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984).

18     Google also may not refer to those implementations of Android or otherwise argue for

19  the inference that the use of the declaring code and SSO of the 37 API packages was

20  transformative because of the potential to reach those product categories.

21     Oracle will be free to sue on those new products in a future trial after they have been

22  shown to infringe.

23                          **CONCLUSION**

24     For the reasons stated above, the final pretrial order **GRANTED** Google's motion to

25  exclude any evidence or expert testimony relating to Android Wear, Android Auto, Android

26  TV, Brillo, or any other new implementations of Android in devices other than phones or

27  tablets.

28

Dated:   May 2, 2016.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

# Order Denying Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial, Dated September 27, 2016 (Dkt. 2070)

Case 3:10-cv-03561-WHA   Document 2079   Filed 09/27/16   Page 1 of 26

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ORACLE AMERICA, INC.,

              Plaintiff,

   v.

GOOGLE INC.,

              Defendant.

_____/

No. C 10-03561 WHA

**ORDER DENYING RENEWED
MOTION FOR JUDGMENT
AS A MATTER OF LAW AND
MOTION FOR A NEW TRIAL**

**INTRODUCTION**

      In this copyright infringement action, the jury found the accused infringement constituted fair use. The copyright owner now renews its motion for judgment as a matter of law and separately moves for a new trial. For the reasons stated below, both motions are **DENIED**.

**STATEMENT**

      The history of this case appears earlier (Dkt. No. 1988). In brief, Oracle America, Inc., formerly Sun Microsystems, Inc., has sued Google Inc. for copyright infringement with respect to Google's "reimplementation" of certain API packages in copyrighted Java 2 Standard Edition Versions 1.4 and 5. Following remand from the Federal Circuit, this action proceeded to a second jury trial on fair use, infringement otherwise having been established in the first trial as to certain uses. A pretrial order divided the second trial into phases. Phase one addressed defendant Google's fair use defense. Had the jury found for Oracle during phase one, the same jury would have determined willfulness and monetary remedies in phase two. A third phase,

before the judge only, would have determined whether Oracle deserved equitable remedies, including whether Google had equitable defenses.

In phase one, the ten-person jury returned a unanimous verdict finding that Google had carried its burden on the defense of fair use. A comprehensive order denied both sides' motions for judgment as a matter of law, so judgment was entered in Google's favor (Dkt. No. 1988).

Oracle now repeats its motion for judgment, adding a further motion for a new trial under Rule 59. This order follows full briefing, oral argument, and supplemental declarations addressing discovery issues raised in support of a new trial request.

## ANALYSIS

### 1.    RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW.

Oracle's new Rule 50 motion is denied for the same reasons as its old one (Dkt. No. 1988).[1]

### 2.    MOTION FOR A NEW TRIAL.

Pursuant to Rule 59(a)(1)(A), a court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law." Rule 61 provides that "no error in admitting or excluding evidence" constitutes a ground for granting a new trial "unless justice so requires." A district court has broad discretion in deciding whether to admit or exclude evidence. *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995). A district court also has broad discretion in deciding whether to bifurcate a trial. *See Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 961–62 (9th Cir. 2001). To warrant a new trial on these grounds, the movant must show that the Court's rulings constituted an abuse of discretion plus caused it substantial prejudice.

Oracle's motion for a new trial challenges several discretionary decisions made at trial. Oracle's primary argument, however, is that Google perpetrated discovery-concealment misconduct. The charged misconduct, Oracle says, rates as a "game changer." For important context, however, this order first addresses Oracle's related contention that the Court abused its

---

[1] Oracle's argument that it is entitled to a new trial because the verdict was against the weight of the evidence, which incorporates by reference its brief on the motion for judgment as a matter of law, fails for the same reason.

2

discretion in limiting the trial to Android as used in smartphones and tablets, postponing all other uses to later trials.

### A. New Device Categories and Scope of Trial.

The original trial in 2010 covered Android versions called 1.0, 1.1, Cupcake, Donut, Eclair, and Froyo, as used in smartphones and tablets. The original jury found those versions infringed but deadlocked over fair use. On remand, the issue arose whether to retry that same case taking the infringement verdict as a given and postponing later developments to a future trial versus whether to expand the retrial to include post-2010 developments, a question that came into focus as follows.

After the remand, Oracle sought leave to file a supplemental complaint. Oracle's eventual motion for leave to file a supplemental complaint drew no opposition, and the motion was granted. The supplemental complaint identified six further versions of Android released since the original complaint. It further alleged that Google had implemented Android in various new device categories, including automobiles, wristwatches, televisions, and household appliances (Dkt. No. 1292).

Disagreement surfaced when the parties served their new expert reports. Oracle's expert reports evaluated Google's alleged use of new API packages from Java 2 Standard Edition Versions 6 and 7. But those versions had never been asserted in any operative pleading, including even the supplemental complaint. Only versions 1.4 and 5 had been asserted. Only versions 1.4 and 5 had been presented to the original jury and found to have been infringed. Google moved to strike the overreaching passages of Oracle's expert reports. This led to a hearing that featured the peril of the retrial spinning out of control via a piling on of ever-expanding "updating" issues. The Court expressed concern over the ever-mounting prolixity of this case and the need for a cutoff of new device implementations to be tried (without prejudice to trying the rest later). The Court observed (Dkt. No. 1470 at 9–10):

> There's a much cleaner way to deal with this. We can roll back the clock to the moment that that [earlier] trial took place, and try it on that set of facts and the circumstances then. And then all these new products by [Oracle] and these new products by Google would not be in play.

> And what that means is, over there on the Google side, that you're
> going to have to face another lawsuit downstream . . . .

In other words, the practical approach remained retrying the very trial revived by the Federal Circuit, complicated as it already was, preserving the infringement verdict, and saving for a later day all of the subsequent developments.

Nevertheless, the retrial expanded in two important ways. First, in light of Google's stipulation that the earlier jury's finding of infringement should apply to all later versions of Android up through Lollipop, a pretrial order eventually held that our retrial would cover those versions. A later stipulation included Marshmallow as well, adding a total of seven new major releases of Android to the original six. The second expansion was to include the post-2010 time period covered by these versions.

These expansions, by themselves, led to a vast inflation of Oracle's claimed recovery. At the first trial, Oracle's claim for monetary remedies clocked in at much less than a billion dollars, but now they rose to nine billion. The vast inflation flowed from the longer time period of sales of smartphones and tablets as well as the longer list of implicated versions of Android. The vast inflation resulted even though the uses on trial for the fair use defense remained, as before, smartphones and tablets.

The trial was not, however, expanded to include certain other more recent uses like Android TV, Android Auto, Android Wear, or Brillo. They presented a messier problem and were excluded from the scope of the upcoming trial (without prejudice to a later trial to cover them). Notably, the parties couldn't agree on whether the original verdict of infringement would have covered those uses (since they arose after the original verdict, and no evidence on them was presented at the original trial). Had those uses been included in the retrial, Oracle would have had the burden, Google urged, to prove that those uses infringed, rather than relying, as Oracle wished to do, solely on the original verdict of infringement and imposing on Google the burden to prove fair use. Oracle offered to move for summary judgment to establish that the original finding of infringement should be extended to these new implementations, but by the time of that offer, there wasn't sufficient time for the Court to pursue that alternative while sorting out the superabundance of pretrial issues.

4

To repeat, all agree that under the pretrial orders, Oracle remained (and remains) free to pursue its claims for infringement arising from Google's implementations of Android in devices other than smartphones and tablets in a separate proceeding and trial.

The scope-of-trial issue surfaced in a second way. Oracle sought to introduce evidence of the excluded device categories at trial as part of its evidence of market harm under the fourth fair use factor. An order *in limine*, however, held that the only uses set for trial were smartphones and tablets (again without prejudice to a separate future trial as to other uses) (Dkt. No. 1781).

In its new trial motion, Oracle now argues that it was error to limit the device uses in play to smartphones and tablets. We should have had one mega-trial on all uses, it urges. This, however, ignores the fact that Oracle's earlier win on infringement in 2010 — the same win it wished to take as a given without relitigation — concerned only smartphones and tablets. And, it ignores the obvious — one use might be a fair use but another use might not, and the four statutory factors are to be applied on a use-by-use basis. Significantly, the language of Section 107(4) of Title 17 of the United States Code directs us to consider "the effect of *the use* upon the potential market for or value of the copyrighted work." Oracle cites no authority whatsoever for the proposition that all uses must stand or fall together under the fair use test of Section 107.

True, the fourth fair use factor must consider "whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994). The concern with widespread use, however, is *not* whether uses *distinct from* the accused uses — each of which must be subject to distinct transformativeness analyses — might harm the market for the copyrighted works. Rather, the concern is whether a use of the *same* sort, if multiplied via use by others, would cause market harm, even though the actual use by the infringer caused only minimal harm. That is not our case. Again, our trial concerned two very important uses — smartphones and tablets — uses that implicated many billions of dollars. All other uses remained open for litigation in further trials.

**Appx60**

United States District Court
For the Northern District of California

Oracle relies on decisions from our court of appeals holding that supplementation of a complaint "is favored." *E.g.*, *Planned Parenthood of Southern Arizona v. Neely*, 130 F.3d 400, 402 (9th Cir. 1997). It argues that postponing its claims relating to devices other than smartphones and tablets contravened the purpose of "promot[ing] as complete an adjudication of the dispute between the parties as is possible." *LaSalvia v. United Dairymen*, 804 F.2d 1113, 1119 (9th Cir. 1986). Oracle provides a five-page description of the various markets such as automobiles, healthcare devices, "Internet of Things," appliances, and machine-to-machine communication — all involving vastly different technology and functionality from smartphones and tablets — in which Oracle has allegedly suffered harm due to Google's Android-related offerings.

Allowing complaints to be supplemented is favored, but a district judge still has a separate responsibility to manage complex cases, including to decide which issues should be tried in which trial. Good reasons rooted in case and trial management favored the eventual scope of our trial.

Oracle itself, it must be said, successfully excluded at least one post-2010 development that would have helped Google. Specifically, a pretrial ruling obtained by Oracle excluded evidence tendered by Google with respect to Android Nougat. Significantly, this evidence would have shown that (back in 2008) all of the accused APIs could simply have been taken from OpenJDK, Sun's own open-source version of Java, apparently in full compliance with the open-source license. Put differently, Sun itself had given away Java (including all of the lines of code in suit) in 2008 via its open-source OpenJDK. In 2015, Google used OpenJDK to reimplement the Java APIs for the latest release of Android, which it called Nougat. Google wished to use this evidence under the fourth fair use factor to show that its infringement did no more market harm than Sun itself had already invited via its own OpenJDK release. Despite its importance, the Court excluded this development because it had not been presented by Google in time for effective rebuttal by Oracle. This exclusion was a major win for Oracle in the weeks leading up to trial.

United States District Court

For the Northern District of California

1    Oracle also argues that the first trial was not expressly limited to smartphones and

2    tablets, so it was inappropriate to impose that limitation for the retrial.  This isn't correct.  In

3    2012, at our first trial, Oracle presented no evidence of any uses beyond smartphones and

4    tablets.  The other alleged uses lay in the future and were not considered by our first jury.

5    Google simply had not yet implemented any aspect of Android on any of the new devices at that

6    time.

7    After considerable deliberation, the Court exercised its discretion to limit the scope of

8    our trial to address the issue of whether the uses of the copyrighted materials considered at the

9    first trial — smartphones and tablets — including all thirteen versions of Android enabling

10   those uses were fair or not, saving for a future trial new and different uses.  In this way, Oracle

11   was allowed to take unquestioned advantage of the infringement verdict in the first trial while

12   also taking full advantage of the subsequent revenue derived from those very device

13   implementations — smartphones and tablets.  That limitation also protected our second jury

14   from needing to absorb ever greater complexity in technology and the business models of new

15   and different uses.  Oracle remains free to pursue those new and later uses in a future lawsuit,

16   but it is not entitled to a new trial as to smartphones and tablets.[2]

17              **B.       The Charge of Discovery Misconduct and ARC++.**

18   With the benefit of the foregoing history of the smartphones and tablets limitation, we

19   turn to Oracle's charge of discovery misconduct.  This charge is not anchored in any claimed

20   error by the judge but is anchored in claimed misconduct by Google and its counsel.

21   At both trials, Google argued that Android's use of the copyrighted lines of code

22   qualified as "transformative" (under the first fair use factor) because Java had been designed

23   for desktops and laptops whereas Android transformed the code at issue to work in the then

24   newly-emerging world of smartphones and tablets.  Thus, Google drew a significant distinction

25   between desktops and laptops (Java) and smartphones and tablets (Android).  Oracle now

26

27              [2]  After the verdict, the Court invited counsel to propose scheduling for exactly such a trial on the
     alleged new and different uses, but both sides preferred to enter a final judgment and proceed to appeals with
28   the understanding that the alleged new and different uses were still open for future lawsuits (Dkt. Nos.
     2049–50).

**Appx62**

United States District Court
For the Northern District of California

1  accuses Google of withholding evidence in discovery that allegedly would have shown that

2  Google was, by the close of our retrial, expecting soon to implement Android on desktops and

3  laptops too. This argument will now be set out in detail.

4       Throughout the supplemental discovery period following the remand, Oracle

5  sought discovery into all Google products that incorporated the copyrighted lines at issue.

6  In response, Google identified its App Runtime for Chrome ("ARC"), which enabled laptops

7  and desktops running Google's computer operating system, Chrome OS, to run certain

8  Android applications. Chrome OS was and remains a different operating system from Android

9  (Lin Dep. at 14–19, 107–09). ARC operated on top of Chrome OS and offered all of the

10 Android APIs reimplemented from the Java code at issue. A related project, ARC Welder,

11 enabled Android app developers to repackage the code in their apps for use on Chrome OS

12 devices via ARC.

13      One of Oracle's own technical experts, Robert Zeidman, addressed ARC in detail in his

14 opening report (Zeidman Rep. ¶¶ 126–43). Oracle's damages expert, James Malackowski,

15 opined in his opening report that Google's release of ARC and ARC Welder and the

16 availability of some Android functionality on Chrome OS devices "means Google is now using

17 Android to occupy the original, traditional market of the Java Platform" (Malackowski Rep.

18 ¶ 172). Oracle, however, never sought to introduce any of the evidence on which these

19 comments were based (or to introduce the expert testimony). Oracle does not accuse anyone of

20 misconduct as to ARC, but ARC supplies relevant background.

21      Now we come to the crux of the matter. In 2015, Google began a new project, which it

22 internally called "ARC++." Among the goals of ARC++ was to "[p]rovide Chrome OS users

23 with Play Android apps on Chrome OS without developer action" (Anderson Decl., Exh. 7 at

24 *785). That is, Google intended for ARC++ to make the "entire Android app ecosystem"

25 available on Chrome OS devices, so that Android apps would "appear alongside Chrome apps"

26 in the Chrome OS program menu (*id.*, Exh. 8 at *404, Exh. 10 at *396). With ARC++, Google

27 planned to run "Android in an isolated container inside Chrome OS," and "[i]nside the

28 container should be effectively another Linux environment, similar to on an actual device"

**Appx63**

United States District Court

For the Northern District of California

(*id.*, Exh. 9 at \*417). That is, ARC++ would run an isolated instance of Android (with *all* of Android's public APIs, including those reimplemented from Java) in order to allow users to run all Android apps on Chrome OS devices. Google planned to include its "Play Store" — Google's app wherein users could purchase and download other Android apps — as part of ARC++ to facilitate access to those apps.

In 2015, Google produced to Oracle at least nine documents relating to ARC++ setting forth the information in the preceding paragraph (along with more extensive technical details) and tracking the development of the project (Anderson Decl. ¶¶ 16–20, Exhs. 6–14). This is a key fact in resolving the accusation at hand.

Our trial began on May 9, 2016. Our last day of evidence was May 19, which happened also to be the second day of Google's annual developer conference. On that day, Google announced via a blog post that it would make all Android apps available for use on Chrome OS devices via the Play Store (*id.*, Exh. 15). Although the announcement did not refer to this new feature as ARC++ (no name was given), it reflected the same goals and technical details as the ARC++ project. The announcement stated the feature would first roll out on the experimental developer channel, though over time it would become generally available. The same day at the developer conference, Google demonstrated the use of the Play Store with several Android apps on Chrome OS devices. The presenters acknowledged the technical limitations of the earlier ARC, stating that Google was "building a whole new platform to run Android apps on Chromebooks," *i.e.*, on laptops and desktops (Bush Decl., Exh. J at 3:30). One presenter explained that the new feature ran Android "directly on top of the Linux kernel [of Chrome OS]." Users could "run all of Android Marshmallow within Chrome OS. This includes the Google Play Store" (*id.* at 7:10).

In short, the announcement indicated that the full functionality of Android would soon be working on desktops and laptops, not just on smartphones and tablets.

Oracle now contends that Google's failure to supplement several responses to interrogatories, requests for admission, and requests for production of documents, as well as

<div align="center">9</div>

the deposition testimony of two witnesses to reflect developments in the ARC++ project

constituted discovery misconduct warranting a new trial.

"The test to be applied when discovery misconduct is alleged in a Rule 59 motion must

be borrowed from cases interpreting Rule 60(b)(3) . . . ." *Jones v. Aero/Chem Corp.*, 921 F.2d

875 (9th Cir. 1990). Rule 60(b)(3) provides for relief from judgment for "fraud (whether

previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing

party . . . ." To establish misconduct under Rule 60(b)(3), a moving party must:

> (1) prove by clear and convincing evidence that the verdict was
> obtained through fraud, misrepresentation, or other misconduct.
>
> (2) establish that the conduct complained of prevented the losing
> party from fully and fairly presenting his case or defense.
> Although when the case involves the withholding of information
> called for by discovery, the party need not establish that the result
> in the case would be altered.

*Ibid.* (quoting *Bunch v. United States*, 680 1271, 1283 (9th Cir. 1982)). A movant need not

show that there would have been a different outcome without the alleged misconduct but need

only demonstrate "'substantial interference' by showing 'the material's likely worth as trial

evidence or by elucidating its value as a tool for obtaining meaningful discovery.'" *Ibid.*

(quoting *Anderson v. Cryovac, Inc.*, 862 F.2d 910 (1st Cir. 1988)).

Our court of appeals has recognized a "presumption of substantial interference if [the

moving party] can demonstrate the misconduct was sufficiently knowing, deliberate or

intentional." *Ibid.* Although *Jones* did not expressly lay out the framework for applying that

presumption, it stated that *Anderson*, a decision from the First Circuit, "summarized the

applicable standards and burdens of proof." *Ibid. Anderson*, 862 F.2d at 925, held that the

presumption of substantial interference "may be refuted by clear and convincing evidence

demonstrating that the withheld material was in fact inconsequential."

The oral argument on Oracle's motion for a new trial, which lasted two hours, focused

almost exclusively on Oracle's "game changer" allegation of discovery misconduct. Following

the hearing, counsel for both sides were ordered to file sworn declarations detailing Oracle's

discovery requests on this point and Google's responses. After reviewing the parties'

submissions, the Court called for sworn replies.

10

United States District Court

For the Northern District of California

1    Throughout the briefing and argument on this motion, Oracle left the distinct

2    impression — more accurately distinct misimpression — that Google had stonewalled and had

3    completely concealed the ARC++ project.  This was an unfair argument.

4    In fact, Google timely produced at least nine documents discussing the goals and

5    technical details of ARC++ and did so back in 2015, at least five months before trial.  Counsel

6    for Oracle now acknowledges their legal team never reviewed those documents until the

7    supplemental briefing on this motion (Hurst Reply Decl. ¶ 12).  The Court is disappointed that

8    Oracle fostered this impression that no discovery had been timely provided on the ARC++

9    project eventually announced on May 19.[3]

10    Rule 26(e) requires a party to supplement discovery responses in a timely manner only

11    "if the additional or corrective information has not otherwise been made known to the other

12    parties during the discovery process or in writing" (or if otherwise ordered by the Court).  This

13    creates a "'duty to supplement,' not a right."  *Luke v. Fam. Care and Urgent Med. Clinics*, 323

14    Fed. Appx. 496, 500 (9th Cir. 2009).  Nevertheless, Google had no duty to supplement

15    responses with new information that had already been disclosed in the ARC++ documents

16    already produced.

17    Oracle should have known that items produced in response to its own document

18    requests potentially contained information that supplemented Google's earlier written

19    discovery responses.  Oracle's failure to review the ARC++ documents is its own fault.

20    It's important, most of all, to step back and remember the scope of our trial.

21    Significantly, any evidence relating to implementations of Android on devices *other than*

22    smartphones and tablets fell outside the scope of our trial, which was limited to uses on

23

24        [3] Oracle contends that Google should have produced source code for the ARC++ project in response to
a request for source code that "can be used to facilitate use of Android" on devices other than smartphones and
25    tablets or that it should have identified ARC++ in an interrogatory seeking identification of "any software based
on or derived from" Android that incorporated the 37 reimplemented Java API packages, among other similar
26    requests.  Google objected to vague language in those requests, and it was not clear to Google whether ARC++,
which was in its early stages of development, would have been responsive to requests for information about
27    "products," "software," or versions that were "developed or released," all of which are directed to completed
projects.  Indeed, the parties met and conferred about discovery responses and discussed Google's objections to
28    Oracle's vague references to efforts to "port Android to desktop," but Oracle did not follow up on Google's
objections (Anderson Decl. ¶¶ 30–39).

**Appx66**

United States District Court

For the Northern District of California

1    smartphones and tablets. Within the scope of our trial, therefore, Google fairly argued that

2    Android was transformative because it took the declaring code in question, which had been

3    designed for desktops and laptops, and reimplemented it for use in a new context, smartphones

4    and tablets. It may well be true that the use of the copyrighted APIs in ARC++ (or any other

5    later use) will not qualify as a fair use, but that will not and does not mean that Google's

6    argument on transformative use as to the original uses on trial (smartphones and tablets) was

7    improper. That Oracle failed to detect the ARC++ documents in its possession had no

8    consequence within the defined scope of our trial.

9         Google committed a "fraud on the court," Oracle contends, by eliciting testimony that

10   Android had not caused any harm to the market for the copyrighted works because it was not

11   used on laptops and desktops. As stated, however, this remained a fair argument so long as the

12   trial was focused, as it was, on the original uses — smartphones and tablets — and it remained

13   a fair argument for the time period on trial (the blog announcement came later). The testimony

14   and argument in question fell within the defined scope of our trial. Had Oracle brought up

15   ARC or ARC++, the witnesses would plainly have clarified that their testimony related to the

16   *accused* uses on trial.

17        Oracle further notes that the order denying its motion for judgment as a matter of law

18   held that the jury could reasonably have found that "Android caused no harm to the market for

19   the copyrighted works, which were for desktop and laptop computers" (Dkt. No. 1988 at 17).

20   Again, "Android" in that context plainly referred to the accused original implementations of

21   Android within the defined scope of our trial.

22        Google's launch of the full Android system on Chrome OS also remains, even now, in

23   preliminary stages, available only to developers and on a limited set of devices. Oracle

24   *already had evidence* of ARC++, but didn't realize it. Thus, to the extent Google's recent

25   announcement had any value at our trial (or in discovery), Oracle already had evidence of the

26   same project (and its predecessor), and it passed on any opportunity to introduce that evidence.

27        Nor would evidence of ARC++ have caused any interference relating to the Court's

28   rulings limiting the scope of the trial. Indeed, in the briefing and argument on the scope of

**United States District Court**
For the Northern District of California

1    trial, Oracle never once mentioned ARC, ARC++, or any other use on laptop and desktop

2    computers (neither did Google) (Dkt. Nos. 1559, 1612-3, 1643, 1682).  This was so even

3    though Oracle Expert Malackowski had already opined that the release of ARC "means Google

4    is now using Android to occupy the original, traditional market of the Java Platform"

5    (Malackowski Rep. ¶ 172).  Instead, at oral argument, Attorney Lisa Simpson for Oracle

6    identified "Android Auto" (not ARC or ARC++) as the most important implementation (to

7    Oracle) that Oracle wished to add (Dkt. No. 1682, Tr. at 123).  Oracle contends that the

8    technical differences between ARC and ARC++ meant the latter presented a more compelling

9    narrative both in pretrial motion practice and at trial, but both projects made the same 37

10   reimplemented Java API packages available for use on Chrome OS; any differences between

11   ARC and ARC++ remained peripheral to Oracle's interest in the projects.

12           Oracle's purported "game changer" would not have changed anything at all, because

13   the scope of the "game" was smartphones and tablets, postponing new and later uses to a later

14   contest.  ARC++ was not yet on trial.  Thus, any failure to produce such evidence could not

15   have substantially interfered with Oracle's preparation for our trial.  On the contrary, it clearly

16   and convincingly would have been inconsequential.[4]

17           Oracle insists on taking depositions and document discovery into Google's failure to

18   supplement all discovery responses to reflect the imminent release of a developer version of

19   ARC++ and to present its findings at an evidentiary hearing.  Oracle cites *Jones v. Aero/Chem

20   Corp.*, 921 F.2d 875 (9th Cir. 1990), for the proposition that failure to hold an evidentiary

21   hearing on this issue would be reversible error.  This type of fishing expedition will not be

22   allowed, and *Jones* in no way requires such a course.

23           In *Jones*, two days after a jury found there had been no defect in the defendants'

24   product, a third-party defendant produced a letter it received from one of the primary

25   defendants nearly a decade earlier indicating that the primary defendant had known of the

26   claimed defect and had explored remedial measures.  The plaintiff moved for a new trial,

27   _____

28          [4]  Out of caution, this order makes clear that the test under Rule 59 is "substantial interference," not
     "game changer."  The phrase "game changer" is Oracle's phrase, even if it expresses a less favorable test than
     here applicable.  This order applies the correct test, "substantial interference."

13

**Appx68**

1    claiming, *inter alia*, that the defendants had engaged in prejudicial discovery misconduct by

2    withholding the correspondence.  "At the hearing on the motion [for a new trial], the district

3    court indicated it might later hold a hearing to determine whether [the] failure to produce the

4    documents involved misconduct." *Id.* at 877.

5         Our court of appeals held that the district court improperly decided the motion based on

6    whether the withheld evidence would have resulted in a "different outcome," rather than

7    whether it caused "substantial interference," as required by decisions interpreting Rule

8    60(b)(3).  The failure to hold a separate "hearing" — the court of appeals never referenced an

9    "evidentiary hearing," contrary to Oracle — on the issue was a background circumstance.  The

10   actual error was in the *standard* applied, not the procedure for applying that standard.  Notably,

11   the court of appeals did not even *require* the district court to hold a subsequent hearing, but

12   rather directed it to hold "appropriate proceedings to determine" whether discovery misconduct

13   had occurred according to the proper standard.

14        In our case, the Court did hold "appropriate proceedings" and did hold a hearing at

15   which the proper standard — Rule 60(b)(3) — was considered, and it further required sworn

16   statements from counsel for both sides and then invited and considered sworn replies, all

17   detailing the discovery conduct at issue.  After reviewing many pages and exhibits, the Court

18   finds that no misconduct has been shown (or would likely be shown even with the benefit of a

19   fishing expedition).  Nor could any omission of evidence relating to ARC++ have interfered

20   with Oracle's case *at all*, much less substantially.  Contrary to Oracle, ARC++ documents were

21   in fact timely produced.  They laid out the basic goals and technical details of the very product

22   referenced on May 19.  Since Oracle had that information, there was no need to supplement the

23   written discovery to the extent evidence of ARC++ was responsive at all.  Moreover, any

24   further disclosure of ARC++ would have been of no consequence in Oracle's preparation for

25   our trial or its presentation at trial, which later became limited in scope to smartphones and

26   tablets.  This ground for a new trial is rejected.

27

28

14

**Appx69**

## C.    Stefano Mazzocchi.

Oracle next contends that a new trial is warranted due to the exclusion of minor evidence and testimony from Stefano Mazzocchi, a member of the board of directors of the Apache Software Foundation in 2008.  Back then, Mazzocchi volunteered as a mentor overseeing the Apache Harmony Project and as a member of its Project Management Committee, which sought to create and offer an open-source reimplementation of the Java API. Google eventually used portions of the Harmony project in its reimplementation of 37 Java API packages in Android.  Later on, Mazzocchi went to work for Google, but at the relevant time, he worked for neither side.

At our trial, Google presented evidence first (having the burden of proof), but it did not call Mazzocchi as a witness.  Nevertheless, Google otherwise introduced evidence of Harmony to support its position that reimplementation of APIs without licenses flowered in the industry.

Oracle never properly designated Mazzocchi as a trial witness under Rule 26(a). Oracle wished to lay before the jury an email that Mazzocchi had sent in April 2008 during the development of Apache Harmony.  (In fact, the exhibit was an email from the vice president of legal affairs at Apache and incorporated and responded to an email from Mazzocchi.)  Despite Oracle's Rule 26 violation, the Court acquiesced in allowing Oracle to present almost everything it wished to present, including Mazzocchi and the email, save and except for two minor items.

Mazzocchi's email went to a mailing list of members of Apache (TX 5046).  It expressed concern that Apache could not distribute Harmony without a license from Sun, even with new implementing code, because "the copyright on the API is real and hard to ignore." Mazzocchi added, "[s]o, we are, in fact, infringing on the spec lead copyright if we distribute something that has not passed the TCK and *we know that*."  Our jury heard Mazzocchi's testimony regarding this email, and the entire email itself, including the quotations above, went into evidence, subject to one redaction.

United States District Court
For the Northern District of California

1    That redaction is now the basis for Oracle's first assignment of error. Its second is that

2 Oracle was precluded from eliciting testimony that Mazzocchi worked for Google at the time

3 of the *trial*, though he had worked elsewhere when he sent the email.

4    *(i)    **Redaction.***

5    The Court held that Mazzocchi could testify and that his emails would be admitted,

6 over Google's objection, subject to redaction of the following sentence in the email (TX 5046):

7    This makes us *already* doing illegal things (in fact, Android
     using Harmony is illegal as well).

8

9 An exchange regarding that redaction occurred (outside the presence of the jury) as follows

(Tr. at 1588):

10

11    THE COURT: However, the one sentence that I think is too
      inflammatory and without foundation and should come out is the
12    one sentence that says "This makes us *already* doing illegal
      things (in fact, Android using Harmony code is illegal as well)."
13    That should not be used. But the two paragraphs that I think
      you're more interested in, they can be used.

14    So that one sentence about "This makes us *already* doing illegal
      things (in fact, Android using Harmony code is illegal as well)"
15    that should be deleted or at least redacted.

16    MS. HURST (for Oracle): We'll redact that, Your Honor.

17    Although, as just shown, Oracle's counsel readily accepted that redaction and the email,

18 as redacted, went before the jury, Oracle later — only after Mazzocchi had finished his

19 testimony and had been excused — requested that the Court remove the redaction (Dkt. No.

20 1925). This was denied, a denial that forms a basis for the new trial motion.

21    Oracle now argues that sufficient foundation existed because Mazzocchi had

22 "corresponded with the Apache Foundation's VP of Legal Affairs regarding legal issues related

23 to use of copyrighted Java APIs in the Harmony Project" (Pl.'s Mtn. at 16) (citing Tr. at

24 1712–13).

25    The so-called "correspondence" with the lawyer, it turns out, went into evidence as the

26 thread leading up to the "Mazzocchi email" (TX 5046; Tr. at 1715). So, whatever foundation

27 existed for the redacted sentence made its way to the jury anyway. (Perhaps this hearsay from

28 the lawyer shouldn't have been admissible at all, but no objection on that ground was made.)

Significantly, nowhere in any passage written by any lawyer did anything come close to what Mazzocchi said in the redacted sentence. So, the thread itself supplied inadequate foundation. Even if Mazzocchi had consulted a lawyer beyond the thread itself (and no such consultation was ever intimated), Mazzocchi himself was *not* a lawyer, so merely repeating what some lawyer might have told him would have been hearsay (within hearsay).

Indeed, Mazzocchi's testimony before the jury demonstrated that his legal conclusion was utterly without qualification (Tr. at 1727–28):

> [MR. KWUN (for Google)].    So thinking back to April of 2008, what, if anything, did you know about fair use in copyright law?
>
> A.    I don't recall knowing anything about that.
>
> Q.    Did you know what the legal standard is for fair use?
>
> A.    I don't — didn't and still don't.
>
> Q.    After the email exchange with Mr. Ruby, did you resign as a member from the Apache Software Foundation?
>
> A.    No.
>
> Q.    And what, if anything, do you conclude from the fact that you did not resign your membership after that email?
>
> A.    I really cared about my involvement in Apache. I mean, this was all volunteer work, and I really wanted the foundation to do the right thing for protection of the membership and also for protection of the users.
>
> I would have left slamming the door if I thought that what the foundation was doing was causing harm or doing any illegal things.
>
> So since I wrote these email [sic], I must have changed my mind, something must have changed my mind whether that was the case. And I didn't leave.

Notwithstanding Mazzocchi's lack of training in the law, the Court allowed Oracle to make hay with "the copyright on the API is real and hard to ignore" and that releasing Harmony's

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    reimplementation of the Java API code without passing the compatibility test would have

2    constituted "infringing on the spec lead." [5]

3         It is worth stressing that the email made no mention of "fair use." It had nothing to do

4    with the fair use issue our jury had to decide. Mazzocchi admitted that he knew nothing about

5    fair use. The Court had already told the jury that Android infringed the copyright subject only

6    to the fair use defense, so a good case existed for excluding the entire email. Nevertheless,

7    virtually all of it came in.

8         Nor did Mazzocchi's testimony, elicited by Google, that he "would have left slamming

9    the door [at Apache] if [he] thought that what the foundation was doing was causing harm or

10   doing any illegal things" open the door to using the redaction. Mazzocchi's testimony already

11   responded to his understanding that Apache was infringing on Oracle's copyright, and by noting

12   that something "changed [his] mind," he acknowledged that his email reflected initial concern

13   about the legality of Apache's work anyway. Admission of the redaction would have been

14   cumulative.

15              *(ii)*    ***Mazzocchi's Employment.***

16        Oracle also contends that it should have been permitted to cross-examine Mazzocchi

17   based on his alleged bias as a current employee of Google. When the Court initially allowed

18   Oracle, despite its inadequate Rule 26 disclosure and over Google's strenuous objection, to call

19   Mazzocchi as a witness, the Court did so to allow presentation of his views when he worked for

20   Apache in 2008 and ruled as follows (Tr. at 1589):

21           And don't bring up that he works at Google now unless bias
        becomes a problem. If it appears he's been coached to say things
22           that may not be true, possibly then I would allow you to bring up
        that he works for Google and that Google — he has met with the
23           lawyers and so forth. But for the time being, you should steer clear
        of that. And you may treat him as an adverse witness.

24

25

26   _____

27       [5] The Court similarly restricted Google from eliciting legal conclusions from former Sun CEO,
Jonathan Schwartz, about whether Sun had any legal claim against Google. After his testimony veered too close
to that conclusion, the Court issued a corrective instruction and allowed Oracle to question Schwartz about a
28   document that Oracle had improperly clawed back as privileged (Tr. at 508–10, 526). (Schwartz could not
recall the document, so it was not admitted into evidence.)

United States District Court
For the Northern District of California

During direct examination before the jury, and without seeking leave to address the issue, counsel for Oracle asked Mazzocchi (after he denied recollection of the email containing the "illegal things statement") whether he had met with Google's trial lawyers, which he confirmed he had (Tr. at 1724). The Court allowed the questions over Google's objection.

On cross-examination by Google, as stated, Mazzocchi testified that following the email addressing the issue of Oracle's copyright in the Java APIs with regard to Harmony "something must have changed my mind whether that was the case" (Tr. at 1727). When Google passed the witness back for redirect, Oracle requested a sidebar to be allowed to elicit the fact that Mazzocchi became employed at Google the following year, in order to suggest it was his later employment with Google that had "changed his mind" about the legal status of the Apache Harmony project.

At the sidebar, the Court reviewed Mazzocchi's testimony and concluded that he testified that he would have left Apache sooner than 2009 if he had believed it had been doing something illegal, while he didn't begin his employment with Google until 2010. Contrary to Oracle, Mazzocchi's testimony suggested that something changed his mind *before* he began working at Google.

Even so, Oracle was able to offer evidence of Mazzocchi's purported bias by eliciting testimony that Mazzocchi spoke with Google's counsel before testifying (Tr. at 1724). Thus, the probative value of evidence of Mazzocchi's then-current employment was minimal, particularly in light of the substantial risk that the jury would mistakenly ascribe Mazzocchi's state of mind while at Apache to Google. (Indeed, Oracle sought to ascribe Mazzocchi's *shift* in his state of mind to Google, although it predated his employment with Google.)

In the larger picture, the jury heard evidence, pro and con, from both Sun (Oracle) and Google personnel concerning the extent to which reimplementation of APIs occurred in the industry. In view of this sea of evidence, the Mazzocchi email was cumulative. Nevertheless, virtually all of the email came into evidence, including his statement that reimplementing the Java API in particular constituted infringement of the copyright.

19

**Appx74**

Thus, Oracle's contention that it is entitled to a new trial on the basis of the excluded evidence relating to Mazzocchi is rejected.

### D. European Commission Response.

Oracle next contends that the Court improperly excluded a document containing responses to questions posed by the European Commission in connection with its 2009 review of Oracle's acquisition of Sun. The question called for an explanation of "the conflict between Sun and Google with regard to Google's Android" (TX 5295 at 39). Oracle sought to admit its response, which read, "Sun believes that the Dalvic [sic] virtual machine plus class libraries, which together constitute Android runtime environment, are an unauthorized derivative work of Java SE" (*ibid.*). Oracle wished to lay this response before the jury to meet testimony by Sun's former CEO, Jonathan Schwartz, that Sun had welcomed Google's then-recent announcement of Android as part of the Java community, and that industry reimplementations of the Java API had promoted rather than hindered Sun's business plan.

To avoid the self-serving hearsay problem, Oracle attempted to lay foundation for the response through the testimony of its CEO, Safra Catz, who oversaw the acquisition and testified that Sun (not Oracle) had supplied the answer. Out of the presence of the jury, the Court stated it would consider allowing Oracle to admit the response if it had originated with Sun rather than Oracle (Tr. at 1314).

The next morning, out of the presence of the jury, Oracle proffered several drafts of the response to the European Commission. These drafts purportedly traced earlier versions of the response. They originated from Sun's in-house intellectual property counsel. Google protested that these drafts had long been withheld from Google as privileged until the previous night, so that it had had no opportunity to vet Oracle's representations about the drafts. Counsel for Oracle responded that Oracle would waive the privilege. This after-the-deadline waiver, Google replied, failed to cure the prejudice. Temporizing, the Court warned Oracle that its disclosure of privileged documents would constitute an extraordinary waiver (Tr. at 1328).

Nevertheless, still out of the presence of the jury and using the privileged documents, counsel for Oracle traced the internal development of the response to the European Commission.

**United States District Court**
For the Northern District of California

1  One draft stated, colorfully, "[a] recidivist bank robber should not complain, at least to the

2  authorities, that the bank's new owner might increase security measures around the bank" (Tr. at

3  1330).  A subsequent email from Sun's in-house counsel noted that Oracle's corporate counsel

4  had removed the colorful language and stated "Re Android, we liked our recidivist bank robber

5  analogy" (Tr. at 1331).  In light of its document tracing, Oracle proposed that Catz be permitted

6  to testify that the response to the European Commission originated with Sun (how she would

7  have known that on her own was never explained).

8      The Court rejected that proposal, a rejection that now serves as a ground for the Rule 59

9  motion.

10      It is true that Google presented evidence at trial that Sun had embraced a custom of

11  reimplementation of APIs and that Sun's CEO had welcomed Android to the Java community.

12  It is further true that Google argued to the jury that this welcoming attitude reversed only after

13  Oracle took over Sun and brought this suit.  Oracle was free to present counterevidence (and did)

14  but the extraordinary after-the-deadline waiver of privilege was too timewise prejudicial to

15  Google, should not have been allowed, and was not.[6]

16      Oracle's gamesmanship deprived Google of a fair opportunity to vet the privileged

17  documents and to verify the supposed chain of authorship.  Anyway, the timing of the emails

18  (at a time when Sun's employees had cause to curry favor with their new boss) suggested that

19  any response "from Sun" was really "from Oracle."  This ground for a new trial is rejected.

**E.    Self-Serving In-House Presentations.**

21      Oracle was barred from placing in evidence certain self-serving in-house materials,

22  offered supposedly to show how Android had hurt Oracle's markets for Java.  Specifically, as

23  part of its evidence on market harm under the fourth fair use factor, Oracle sought to admit Trial

24  Exhibits 5961, 6431, and 6470, which were in-house slide show presentations at Oracle.  They

25  were used "as [Oracle's] way of planning for [the] next year.  They're also used to educate

---

[6]  Counsel for Oracle contended they could offer an email from 2008 in which someone internal to Sun stated Google's conduct constituted copyright infringement, but no such document was ever shown to the Court or offered into evidence.

*United States District Court*
For the Northern District of California

21
**Appx76**

[Oracle's executives] about what is going on in the business" (Tr. at 1356). The presentations included slides that discussed the purported impact of Android on Oracle's revenue.

Oracle invoked Rule 803(6) of the Federal Rules of Evidence, which provides an exception to the rule excluding hearsay evidence for records of a regularly conducted activity, as follows:

> A record of an act, event, condition, opinion, or diagnosis if:
>
> (A) the record was made at or near the time by — or from information transmitted by — someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

The Oracle-made documents contained slides with "highlights" and "lowlights" of certain fiscal years, identified "priorities and key messages," summarized revenue data, forecasts, and budgets, identified market challenges, and mapped out product strategies (Bush Decl., Exhs. 26, 27, 29). As to Trial Exhibit 5961, Oracle offered the testimony of its CEO, Safra Catz, to lay the foundation that the presentation had been prepared as part of Oracle's annual budget review (Tr. at 1357). When Oracle moved to admit that exhibit into evidence, Google objected, and the Court sustained the objection because it remained simply a slide show of internal self-serving propositions (even worse, created pending this lawsuit). The Court stated, "if it was just a financial statement, I would allow it, but there are too many slide shows in that document to qualify it as a business record" (Tr. at 1357). Counsel for Oracle sought to admit just page 21 of the exhibit, but that page, titled "FY11 Priorities and Key Messages — Java" suffered from the same self-serving problems. Indeed, that page addressed "integration-

22

**Appx77**

specific concerns" regarding the integration of Sun into Oracle — hardly a regularly-conducted

activity.[7]

Oracle sought to admit similar presentations, Trial Exhibits 6431 and 6470, through the

testimony of its former vice president of worldwide original electronic manufacturer sales, Neal

Civjan, but those presentations were excluded on similar grounds.

Rule 803(6) is not an open window through which any self-serving in-house internal

hearsay sails into evidence at the author's behest:

> The element of unusual reliability of business records is said
> variously to be supplied by systematic checking, by regularity and
> continuity which produce habits of precision, by actual experience
> of business in relying upon them, or by a duty to make an accurate
> record as part of a continuing job or occupation.

*N.L.R.B. v. First Termite Control Co., Inc.*, 646 F.2d 424, 427 (9th Cir. 1981), *opinion amended*

*on reh'g sub nom. Natl. Lab. Rel. Bd. v. First Termite Control Co. Inc.* (9th Cir. Aug. 5, 1981);

*see also* Advisory Committee Notes, 1972 Proposed Rules, Note to Paragraph (6).

The Oracle presentations sought to be admitted were not the kinds of records that could

be assured of their reliability due to systematic checking or habits of precision. On the contrary,

the documents contained narrative, analysis, and commentary — *i.e.*, self-serving argument. The

only "regularity" of the self-serving presentations was that they arose as part of an annual budget

review, but the statements themselves had not derived from such a systematic habit of precision.

They otherwise lacked the indicia of trustworthiness sought by Rule 803(6). They were properly

excluded as hearsay.

**F.    Bifurcation.**

A pretrial order bifurcated the issues of fair use from willfulness and monetary remedies

(Dkt. No. 1321 at 13). This prejudiced Oracle, it asserts, because "important market harm

testimony never made it to the jury because it was relegated to the damages phase" and because

---

[7] In its brief, Oracle describes this page as "a spreadsheet of revenue and expenses for the first two quarters of fiscal year 2011 for Java embedded and forecasts for the third quarter" (Pl.'s Mtn. at 23). Page 21 does not meet that description. It is possible, it now appears, that counsel for Oracle intended to direct Catz and the Court to page 23, but that error by Oracle then would not now be a reason to grant a new trial.

**Appx78**

"bifurcation provided a structural incentive for the jury to return a defense verdict" (Pl.'s Mtn. at 20).

Oracle's argument that bifurcation precluded it from presenting its market harm evidence is simply untrue. Nothing about the bifurcation precluded Oracle in phase one from presenting evidence of Oracle's lost revenue attributable to Android. Indeed, Oracle presented extensive evidence in phase one directed at the issue of market harm to the copyrighted works, the fourth fair use factor.

Although there was some overlap in the evidence relevant to market harm and Oracle's actual damages (and Oracle remained free to present it in phase one and did), the most complex evidence on Oracle's remedies — *the disgorgement of Google's profits* — had virtually no relevance to the market harm/fair use inquiry. Section 107(4) on fair use focuses on the "effect of the use upon the potential market for or value of the copyrighted work" (*i.e.*, harm to Oracle). Section 504(b) on remedies allows a copyright owner to recover "the actual damages suffered . . . as a result of the infringement" (again, harm to Oracle) *as well as* "any profits of the infringer that are attributable to the infringement" (*Google's* profits from infringement) — to the extent the awards are not duplicative. Put differently, phase one focused on market harm to the copyrighted work whereas phase two focused on Oracle's damages from that market harm *and* possible disgorgement of Google's profits attributable to the infringement. *Oracle's claim for disgorgement of Google's profits totaled more than ten times Oracle's claimed actual damages and thus would have dominated Oracle's case in phase two.*[8]

The disgorgement issue presented extraordinary complexity — complexity unrelated to market harm to the copyrighted works. For one, Google never directly *sold* Android. Instead, Google offered it free to all comers as open source. Google benefited indirectly. It used Android as a platform for its *other* services, which earned revenue from advertisements and sales of apps and media. But these other services (like its popular search engine) had already been operating and earning revenue well before Android. Oracle conceded this but contended that Android had multiplied that revenue. Thus, to isolate profits attributable to use of Oracle's

---

[8] Google contended that the issue of disgorgement should not be presented to a jury. An order held that the jury would rule on disgorgement, but the Court would resolve Google's argument after the verdict, possibly treating the jury's verdict as advisory, if not conclusive (Dkt. No. 1769).

United States District Court
For the Northern District of California

1     copyrighted code, the jury would have been required to apportion, first of all, the revenue

2     between the pre-existing technology already in place versus Android.

3         Next the jury would have had to further apportion between the accused lines of code

4     versus the unaccused lines of code within Android. The infringing part of Android constituted

5     only a small fraction of one percent of Android. Oracle conceded this but contended that this

6     sliver held the key to the success of Android. These apportionment difficulties were just two

7     examples of many posed by the disgorgement claim for our jury.

8         Thus, phase two was poised to present bone-crushing analytics on how to apportion any

9     Android profits attributable to the infringement versus profits attributable to non-infringement.

10    To meet this challenge, the parties presented dueling economic models yielding massively

11    different answers. Again, unlike Oracle's lost profits segment, the apportionment/disgorgement

12    problems had virtually no relevance to market harm and fair use.

13         In the Court's judgment and discretion, our trial was best managed by postponing that

14    mind-bender to phase two, so that the jury could give its undivided attention in phase one to the

15    critical issue of fair use. Dividing the trial further served the important purpose of saving the

16    resources of the Court and the jury (and the parties) in the event that the jury decided against

17    Oracle on fair use.

18         To repeat, Oracle was free to present its lost profits and other market harm evidence in

19    phase one — and it did so at length. (In phase two, all previously admitted evidence would still

20    have been deemed in evidence.)

21         Turning to Oracle's structural incentive argument, the Court instructed the jury not to

22    allow any desire to conclude the trial sooner to influence its decision. We must presume the

23    jurors followed the instruction, and there is nothing to indicate otherwise. *Richardson v. Marsh*,

24    481 U.S. 200, 206 (1987). Oracle's structural incentive argument, such as it is, would

25    undermine every bifurcation of damages from liability. Yet the law plainly allows bifurcation.[9]

26

---

27       [9] The Court instructed the jury as follows (Dkt. No. 1950 ¶ 46):

28            Once you render a verdict on the fair use question, we may proceed to the
              shorter and final phase of the trial on damages issues, depending on your answer

**Appx80**

United States District Court

For the Northern District of California

1    It deserves to be said, in favor of our jury, that the ten who served were as punctual,

2    attentive, and diligent in note-taking as any jury this district judge has seen in seventeen years of

3    service.  They had all cleared their calendars.  We were on target to meet or beat the time

4    estimate given to the jury.  Those with hardships had already been excused during jury selection.

5    It is impossible to even suspect that bifurcation somehow steered the jury to rule as it did.  The

6    Court remains completely convinced that the verdict rested, after three days of deliberation,

7    solely on the jury's sincere assessment of the evidence and the instructions of law.

8    **CONCLUSION**

9    For the reasons stated above, Oracle's motion for a new trial and its motion for judgment

10    as a matter of law are **DENIED**.

11

12    **IT IS SO ORDERED.**

13

14    Dated:   September 27, 2016.

15    WILLIAM ALSUP
     UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27    to the fair use question.  This would still be within the June 10 end date stated
     earlier.  Please do not allow any desire to complete trial sooner to influence your
28    thinking.  Once you render your verdict on the fair use issue, it will be final and
     may not be re-visited or modified during the second phase.

26

**Appx81**

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on February 10, 2017.

I hereby certify that on February 10, 2017, by agreement of the parties, the confidential version of the Opening Brief and Addendum for Oracle America, Inc. was served by email on the following counsel of record:

> Daryl L. Joseffer
> King & Spalding LLP
> 1700 Pennsylvania Avenue, NW
> Washington, DC  20006
> djoseffer@kslaw.com
>
> *Counsel for Defendant-Cross-Appellant*

<div align="right">

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ E. Joshua Rosenkranz*

E. Joshua Rosenkranz
*Counsel for Plaintiff-Appellant*

</div>

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 13,964 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in Century Schoolbook 14-point font.

Orrick, Herrington & Sutcliffe LLP

*/s/ E. Joshua Rosenkranz*
E. Joshua Rosenkranz
*Counsel for Plaintiff-Appellant*

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE MOTIONS OR BRIEFS CONTAINING MATERIAL SUBJECT TO A PROTECTIVE ORDER

**Motion / Response / Reply** Containing Material Subject to a Protective Order

☐     This motion, response, reply complies with the limitations set forth in Fed. Cir. R. 27(m) and contains [*state the number of*] _____ words (including numbers) marked as confidential, or

☐     This motion, response, reply does not comply with the word count limitations set forth in Fed. Cir. R. 27(m) and a motion requesting permission to exceed the maximum word count limitation is being filed contemporaneously with the filing of this motion, response, or reply.

---

**Briefs** Containing Material Subject to a Protective Order

☑     This brief complies with the limitations set forth in Fed. Cir. R. 28(d) and contains [*state the number of*] 3_____ words (including numbers) marked as confidential, or

☐     This brief does not comply with the word count limitations set forth in Fed. Cir. R. 27(m) and a motion is requesting permission to exceed the maximum word count limitation is being filed contemporaneously with the filing of this brief.

---

/s/ E. Joshua Rosenkranz
_____
(Signature of Attorney)

E. Joshua Rosenkranz
_____
(Name of Attorney)

Counsel for Appellant
_____
(State whether representing appellant, appellee, etc.)

February 10, 2017
_____
(Date)