17-1118, -1202

# United States Court of Appeals for the Federal Circuit

---

ORACLE AMERICA, INC.,

*Plaintiff - Appellant*,

v.

GOOGLE INC.,

*Defendant - Cross-Appellant*.

---

Appeal from the United States District Court for the Northern District of California in Case No. 3:10-cv-03561, Judge William H. Alsup.

---

BRIEF OF *AMICUS CURIAE* RALPH OMAN IN SUPPORT OF APPELLANT

---

Marc R. Lewis
Evangeline A.Z. Burbidge
LEWIS & LLEWELLYN LLP
505 Montgomery Street
Suite 1300
San Francisco, CA  94111
(415) 800-0590
mlewis@lewisllewellyn.com
eburbidge@lweisllwellyn.com

February 17, 2017

*Counsel for* Amicus Curiae *Ralph Oman*

# CERTIFICATE OF INTEREST

Counsel for *Amicus Curiae* certifies the following:

1. Full Name of Party represented by me:

    Ralph Oman.

2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is:

    Ralph Oman is the real party in interest.

3. Parent corporations and publicly held companies that own 10 percent or more of stock in the party:

    N/A.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

    None.

Respectfully submitted,

/s/ *Marc. R Lewis*

Marc R. Lewis
Evangeline A.Z. Burbidge
LEWIS & LLEWELLYN LLP
505 Montgomery Street
Suite 1300
San Francisco, CA 94111
(415) 800-0590
mlewis@lewisllewellyn.com
eburbidge@lewisllewllyn.com

*Counsel for* Amicus Curiae
*Ralph Oman*

February 17, 2017

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ..................................................................................i

TABLE OF AUTHORITIES ................................................................................ iii

INTEREST OF *AMICUS* ...................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................2

ARGUMENT ...................................................................................................5

I.    THE FAIR USE DOCTRINE DEVELOPED TO PROMOTE
      CREATIVITY, NOT ENABLE FREE-RIDING ON ANOTHER'S
      CREATION ..............................................................................................5

      A.    Courts Developed The Doctrine Of Fair Use To Further The
            Goals Of Copyright .......................................................................5

      B.    Congress Codified The Fair Use Defense To Further The Same
            Goals.............................................................................................11

      C.    Modern Fair Use Doctrine Remains Consistent With These
            Historical Goals ...........................................................................14

II.   GOOGLE'S COPYING OF THE JAVA APIS IS
      IRRECONCILABLE WITH THE PURPOSE AND HISTORY OF
      FAIR USE...............................................................................................17

      A.    Google's Copying Of The Java APIs Is Inconsistent With The
            Historical Goals Of The Fair Use Doctrine.........................................17

      B.    The Modern Fair Use Factors Support This Conclusion ....................20

CONCLUSION ...............................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Atari Games Corp. v. Nintendo of America Inc.*,
  975 F.2d 832 (Fed. Cir. 1992) ..........................................................................21

*Berlin v. E.C. Publications, Inc.*,
  329 F.2d 541 (2d Cir. 1964) ...............................................................................9

*Bloom & Hamlin v. Nixon*,
  125 F. 977 (C.C.E.D. Pa. 1903) ..........................................................................9

*Broadway Music Corp. v. F-R Publishing Corp.*,
  31 F. Supp. 817 (S.D.N.Y. 1940) .......................................................................9

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)...............................................................................*passim*

*Chapman v. Ferry*,
  18 F. 539 (C.C.D. Or. 1883) ..............................................................................11

*Chicago Record-Herald Co. v. Tribune Ass'n*,
  275 F. 797 (7th Cir. 1921) .................................................................................10

*College Entrance Book Co. v. Amsco Book Co.*,
  119 F.2d 874 (2d Cir. 1941) ..............................................................................10

*Eldred v. Ashcroft*,
  537 U.S. 186 (2003).............................................................................................17

*Emerson v. Davies*,
  8 F. Cas. 615 (C.C.D. Mass. 1845).......................................................................6

*Folsom v. Marsh*,
  9 F. Cas. 342 (C.C.D. Mass. 1841).............................................................*passim*

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
  471 U.S. 539 (1985).................................................................6, 15, 16, 21, 22

*Hill v. Whalen & Martell, Inc.*,
  220 F. 359 (S.D.N.Y. 1914)..................................................................................9

**Page(s)**

*Karll v. Curtis Publishing Co.*,
  39 F. Supp. 836 (E.D. Wis. 1941) .......................................................9

*Lawrence v. Dana*,
  15 F. Cas. 26 (C.C.D. Mass. 1869) ....................................................8

*Lewis v. Fullarton*,
  2 Beav. 6 (1839)....................................................................8, 19

*Mathews Conveyor Co. v. Palmer-Bee Co.*,
  135 F.2d 73 (6th Cir. 1943) .............................................................8

*Oracle America, Inc. v. Google Inc.*,
  750 F.3d 1339 (Fed. Cir. 2014) ...............................................2, 3, 22

*Oracle America, Inc. v. Google Inc.*,
  No. C 10-03561 WHA, 2016 WL 3181206
  (N.D. Cal. June 8, 2016) ................................................................18

*Sega Enterprises Ltd. v. Accolade, Inc.*,
  977 F.2d 1510 (9th Cir. 1992) .........................................................21

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
  81 F.2d 49 (2d Cir. 1936) ...............................................................21

*Sony Computer Entertainment, Inc. v. Connectix Corp.*,
  203 F.3d 596 (9th Cir. 2000) ..........................................................21

*Sony Corp. of America v. Universal Studios, Inc.*,
  464 U.S. 417 (1984)...................................................................5, 17

*Wall Data Inc. v. Los Angeles County Sheriff's Department*,
  447 F.3d 769 (9th Cir. 2006) ...............................................15, 16, 20

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
  227 F.3d 1110 (9th Cir. 2000) ..............................................16, 20

## STATUTES

17 U.S.C. § 107 ................................................................................14

17 U.S.C. § 107(1) ...........................................................................15

**Page(s)**

17 U.S.C. § 107(4) ....................................................................................16

17 U.S.C. § 701(b)(1).................................................................................1

Pub. L. No. 94-553, 90 Stat. 2541 (1976).......................................5, 13, 14

## OTHER AUTHORITIES

2 Howard B. Abrams, *The Law of Copyright* (Oct. 2016 update)...........................8

*Copyright Law Revision: Hearings Before Subcomm. No. 3 of the H. Comm. on the Judiciary*, 89th Cong. (1965) ......................................13

The Federalist No. 43 (James Madison) ...................................................5

H.R. Rep. No. 94-1476 (1976)................................................................14

Alan Latman, U.S. Copyright Office, Study No. 14:
    *Fair Use of Copyrighted Works* (1958),
    http://www.copyright.gov/history/studies/study14.pdf ................11, 12

Pierre N. Leval, *Toward a Fair Use Standard*,
    103 Harv. L. Rev. 1105 (1990)..........................................6, 14, 15, 18

William F. Patry, *Patry on Fair Use* (May 2016 update).....................6, 8

S. Rep. No. 94-473 (1975) ......................................................................14

U.S. Const. art. I, § 8, cl. 8.......................................................................5

U.S. Copyright Office, Copyright Law Revision:  Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law at IV (1961),
    http://www.copyright.gov/history/1961_registers_report.pdf....................12, 13

U.S. Copyright Office, Copyright Law Revision:  Studies 14-16 Prepared for the Subcomm. On Patents, Trademarks & Copyrights of the S. Comm. of the Judiciary (1960),
    http://www.copyright.gov/history/studies/study14.pdf .....................11

## INTEREST OF *AMICUS*[1]

From 1985 to 1993, *amicus curiae* Ralph Oman was the Register of Copyrights of the United States—the title accorded the head of the U.S. Copyright Office. He has spent nearly his entire career implementing and studying U.S. copyright policy. In the 1970s and 1980s, Mr. Oman served on the staff of the Senate Subcommittee on Patents, Copyrights, and Trademarks (the Senate Judiciary subcommittee responsible for federal copyright policy), including as its Chief Counsel. As the Register of Copyrights, Mr. Oman led an agency with the statutory mandate to "[a]dvise Congress on national and international issues relating to copyright." 17 U.S.C. § 701(b)(1). Today, Mr. Oman is the Pravel, Hewitt, Kimball and Kreiger Professorial Lecturer in Intellectual Property and Patent Law at The George Washington University Law School, where he has taught copyright law for twenty-five years.

In this appeal, the Court must decide how the fair use doctrine, a longstanding and essential principle of copyright law, applies to the use of computer software by a competitor of the software's creator—specifically, to Google's use of copyrighted material from Oracle's Java software development platform. In the prior appeal in this case, Mr. Oman explained to this Court how

---

[1] All parties consent to the filing of this brief. *Amicus* certifies that no counsel for either party authored this brief in whole or in part, and that no party or other person made a monetary contribution to the brief's preparation or submission.

the district court had strayed from prevailing copyright principles when it held that copyright protection was not available at all for the elements of Oracle's product that Google concededly took. This Court agreed and reversed, remanding the case to the district court for a trial on Google's fair use defense. *See Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339 (Fed. Cir. 2014).

In this appeal, Mr. Oman writes to address the district court's resulting misapplication of the fair use doctrine. As this brief explains, Google's use of Oracle's Java APIs is inconsistent with the history and purpose of fair use. The doctrine has never abided uses that merely supersede or substitute for the original expression—particularly where they enable "free-riding" on the creative efforts of another to the detriment of the original author. Because that is precisely what Google has done here, Mr. Oman urges this Court to reverse.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Fair use is an essential pillar of copyright law. It allows individuals and businesses in certain circumstances to build off of the creativity of others by using existing copyrighted material to create their own original works. Without the fair use limitation, copyright would not serve its core purpose of promoting authorship.[2] The parodist and the critic must be allowed to make some meaningful

---

[2] This is a universal principle. Virtually all other countries' copyright regimes have either a catch-all doctrine that approximates fair use, or reasonably

reference to the works they intend to attack. More broadly, any secondary use that "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message," often deserves equal reward and protection. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578-79 (1994).

But fair use is not unbounded. Chief among its limits is the critical proposition that free-riding on a prior author's creative efforts is not fair. Copyright promotes creativity by promising creators of new works a powerful financial incentive in the form of exclusive rights to their creations. If secondary users can co-opt a creator's original work for a nearly identical but competing purpose, those exclusive rights have little value. And without the reward of meaningful exclusive rights, creators would tend, at least on some occasions which the law seeks to avoid, to either closely guard their original works, or forego creating them in the first place. Either way, the social benefits afforded by a well-balanced copyright system would be diminished. Historical and prevailing limits on fair use prevent those suboptimal outcomes and thus advance copyright's core purpose.

Getting fair use right is not easy. Indeed, this Court has called the fair use doctrine "the most troublesome in the whole law of copyright." *Oracle*, 750 F.3d at 1372 (citation omitted). Ever-evolving technologies and associated uses of

comprehensive categories of specifically enumerated permitted uses of protected works, which serve the same role.

copyrighted works have, at times, presented difficult questions for the courts. And judicial balancing of the four modern non-exclusive fair-use factors has produced precedents that are sometimes hard to reconcile. But none of that confusion should affect the Court's analysis here.

Amidst all of these competing precedents and the fervent and creative advocacy by the parties, Mr. Oman urges the Court not to miss the forest for the trees. The framework that governs the fair use analysis has remained largely unchanged since 1841. And its history is remarkably consistent on one basic point: commercial free-riding has never been considered fair use. It is antithetical to copyright's purpose, and the fair use doctrine has rejected it from the very beginning. Faithful application of that framework and principle to the undisputed facts of this case shows that the jury and district court erred. Google copied Oracle's Java APIs not for some new or different purpose but for the *same* purpose for which Oracle created and licensed them all along. Google did so for its own financial reward, and to the financial detriment of Oracle. As both history and modern practice make clear, that is not fair use. No reasonable jury could find otherwise, and this Court should say so.

## ARGUMENT

## I.    THE FAIR USE DOCTRINE DEVELOPED TO PROMOTE CREATIVITY, NOT ENABLE FREE-RIDING ON ANOTHER'S CREATION

The modern fair use inquiry is governed by four statutory factors, first codified by Congress in the Copyright Act of 1976.  Act of Oct. 19, 1976, Pub. L. No. 94-553, § 107, 90 Stat. 2541, 2546 ("1976 Act").  Those factors reflect more than a century's worth of judicial decisions through which the fair use doctrine had developed at the time.  And that history, in turn, explains why fair use exists and the principles that should guide its application today.

### A.    Courts Developed The Doctrine Of Fair Use To Further The Goals Of Copyright

Copyright's purpose is "to create incentives for creative effort."  *Sony Corp. of Am. v. Universal Studios, Inc.*, 464 U.S. 417, 450 (1984).  That much is clear from the Copyright Clause itself, which grants Congress the power to "promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."  U.S. Const. art. I, § 8, cl. 8.  While founding era documents contain little discussion about the Clause's origin, that is likely because its "utility ... [could] scarcely be questioned."  The Federalist No. 43 (James Madison).  "[T]he Framers intended copyright itself to be the engine of free expression.  By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to

create and disseminate ideas." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985).

The fair use doctrine derives from that same objective. Neither the Copyright Clause itself nor early federal copyright statutes explicitly included such an exception, but "from the infancy of copyright protection, some opportunity for fair use of copyrighted materials [was] thought necessary to fulfill copyright's very purpose" of promoting creativity. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575, 577 (1994). After all, no matter the field, "all intellectual creativity is in part derivative." Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1109 (1990); *see also Campbell*, 510 U.S. at 575 (citing *Emerson v. Davies*, 8 F. Cas. 615, 619 (C.C.D. Mass. 1845) (Story, J.)). And certain kinds of creative works—critiques and parodies, for example—*require,* by their very nature, at least some use of prior works. *See* Leval, *supra*, at 1109 & n.21; William F. Patry, *Patry on Fair Use* § 3:55 (May 2016 update). From the earliest days of copyright, judges thus recognized that providing "excessively broad protection" to existing expressions "would stifle, rather than advance" copyright's creative purpose. Leval, *supra*, at 1109. The challenge was how to distinguish the "fair" use from the infringing.

Among the first—and most enduring—answers to this "intricate and embarrassing question[]" came from Justice Joseph Story, who, in 1841, offered a

framework for "dividing [the] middle line which separates … a fair ... abridgement of an original work" from "piracy of the copyright of the author." *Folsom v. Marsh*, 9 F. Cas. 342, 344-45 (C.C.D. Mass. 1841). In *Folsom*, the publishers of a twelve-volume work on George Washington's life and writings sued a rival bookseller for publishing a two-volume work, also on Washington, that copied hundreds of letters appearing in the original. *Id.* at 345, 349. Justice Story's canonical opinion addressed whether that copying was infringement.

In approaching "questions of this sort," Justice Story opined, courts must "look to the nature and objects of the selections made, the quantity and value of the materials used, and the degree in which the use may prejudice the sale, or diminish the profits, or supersede the objects, of the original work." *Id.* at 348. Whether or not the entire, or even a large portion, of the original work is used matters less than if "the value of the original is sensibly diminished, or the labors of the original author are substantially to an injurious extent appropriated by another." *Id.* "[A] considerable portion of [an] original work may be fused … into another," Justice Story explained, if it has "other professed and obvious objects" from the original. *Id.* But an author cannot "largely copy[] from the work in another book having a similar object," even though "the same information might have been (but, in fact, was not) obtained from common sources, open to all persons." *Id.* at 349. "None are entitled to save themselves trouble and expense, by availing themselves, for

their own profit, of other men's works ...." *Id.* at 349 (quoting *Lewis v. Fullarton*, 2 Beav. 6 (1839)).  Because the defendants had done just that, the court held, their copying was a "clear invasion" of the original publishers' copyright. *Id.*

Justice Story's framework would not be known by its enduring "fair use" name for almost another three decades. *See Lawrence v. Dana*, 15 F. Cas. 26, 60 (C.C.D. Mass. 1869) (Clifford, J.).  But that did not stop the *Folsom* decision from leaving "a most lasting impression on the fair use doctrine."  2 Howard B. Abrams, *The Law of Copyright* § 15:2 (Oct. 2016 update).  Indeed, it served as the "bedrock for future decision making and legislation" on fair use, Patry, *supra*, § 1:3, and courts applied Justice Story's reasoning, nearly verbatim, for more than a century. *See, e.g.*, *Mathews Conveyor Co. v. Palmer-Bee Co.*, 135 F.2d 73, 85 (6th Cir. 1943) ("Whether a particular use of a copyrighted article, without permission of the owner, is a fair use, depends upon the circumstances of the particular case, and the court must look to the nature and objects of the selections made, the quantity and value of material used, and the degree in which the use may prejudice the sale, diminish the profits, or supersede the objects of the original work.").

As courts applied the *Folsom* framework to an ever wider array of facts and circumstances, a clearer line developed between uses with "other professed and obvious objects" than the original creative expression, and those that merely "supersede[d]" it. *Folsom*, 9 F. Cas. at 348.  Courts began to recognize, for

example, that "[a] copyrighted work is subject to fair criticism, serious or humorous," and such criticism may necessarily require quotations from the original. *Hill v. Whalen & Martell, Inc.*, 220 F. 359, 360 (S.D.N.Y. 1914). Similarly, parodies were permitted because the parodic use was "distinct and different" from the work being parodied. *Bloom & Hamlin v. Nixon*, 125 F. 977, 978-79 (C.C.E.D. Pa. 1903). In both cases, the secondary use was permissible as long as it had "neither the intent nor the effect of fulfilling the demand for the original," and did "not appropriate a greater amount of the original work than … necessary to 'recall or conjure up' the object" of the criticism or parody. *Berlin v. E.C. Publ'ns, Inc.*, 329 F.2d 541, 545 (2d Cir. 1964).

Newspaper and magazine articles were another frequent subject of the doctrine. Again, some references to copyrighted works in published articles were deemed fair use where the use of the copyrighted material served a different *purpose* than in the original work, and was thus unlikely to undermine the original work's value. *See, e.g.*, *Broadway Music Corp. v. F-R Publ'g Corp.*, 31 F. Supp. 817, 818 (S.D.N.Y. 1940) (fair use to publish a portion of lyrics from a copyrighted song in a news item about a movie star's death because the movie star was associated with the song, its use "was only incidental," and it would not impair the value of the plaintiff's copyright); *Karll v. Curtis Publ'g Co.*, 39 F. Supp. 836, 837-38 (E.D. Wis. 1941) (fair use for an article about the history of the Green Bay

9

Packers to quote from a copyrighted Packers-themed song because the use was incidental to the article and the article did not compete with the original work). But when the copied material consisted of the precise words and commentary from *another news article*—an attempt by a later publisher to reap the benefits of an earlier publisher's creative efforts, thereby reducing the value of the original— courts jealously guarded the original author's exclusive rights. *See, e.g.*, *Chicago Record-Herald Co. v. Tribune Ass'n*, 275 F. 797, 799 (7th Cir. 1921) (finding copyright infringement where an article simply repackaged another article's words "with the same evident purpose of attractively and effectively serving them to the reading public").

In essence, courts adhered to and implemented the line Justice Story first articulated in *Folsom*: a use that *transformed* an original expression, employing it for other purposes entirely, was permissible; such a use, after all, represents an *extension* of the creative efforts copyright is intended to promote. 9 F. Cas. at 349. By contrast, a use that merely *substituted* for the original—offering the new user a free ride on the creative efforts of the original author—was simple "piracy." *Id.* at 348-49; *see also, e.g.*, *Coll. Entrance Book Co. v. Amsco Book Co.*, 119 F.2d 874, 876 (2d Cir. 1941) (no fair use where defendant sold French lesson books that copied the plaintiff's list of French words because "[b]oth plaintiff's and defendant's books met exactly the same demand on the same market, and

10

defendant's copying was unquestionably to avoid the trouble or expense of independent work"); *Chapman v. Ferry*, 18 F. 539, 541-42 (C.C.D. Or. 1883) (citing *Folsom*) (no fair use where defendant sold copies of plaintiff's map with minor alterations because "no person has a right to sit down and copy the map of another, and thereby defraud the latter of the profit of his labor and skill").

### B.    Congress Codified The Fair Use Defense To Further The Same Goals

In the 1950s, Congress began weighing the need to reexamine and update the federal copyright law.  To that end, Congress commissioned the U.S. Copyright Office to study certain important copyright topics, to aid it in considering potential revisions to the law.  *See* U.S. Copyright Office, Copyright Law Revision:  Studies 14-16 Prepared for the Subcomm. On Patents, Trademarks & Copyrights of the S. Comm. of the Judiciary at III (1960), http://www.copyright.gov/history/studies/study14.pdf (foreword of Senator Joseph C. O'Mahoney).  One such study focused on fair use.  *See* Alan Latman, U.S. Copyright Office, Study No. 14:  *Fair Use of Copyrighted Works* (1958), http://www.copyright.gov/history/studies/study14.pdf.

The resulting report described the fair use doctrine as a "rule of reason," which courts developed to resolve the conflict that arises "where [a] copyrighted work is used in the production of a new work by the user."  *Id.* at 5.  The study provided Congress with several concrete examples of potential fair uses, including, among others, "the use of extracts from copyrighted material for illustrative

purposes," criticism, and parodies. *Id.* at 7-14. Citing the "oft-quoted criteria set forth by Mr. Justice Story in *Folsom v. Marsh*," the report summarized the fair use test as measuring the "importance of the material copied or performed from the point of view of the reasonable copyright owner. In other words, would the reasonable copyright owner have consented to the use?" *Id.* at 15. "[A] use which competes with his own work," the study suggested, would not pass that test. *Id.*

Three years later, in 1961, the Copyright Office offered its formal, yet tentative, recommended revisions to U.S. copyright law. *See* U.S. Copyright Office, Copyright Law Revision: Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law at IV (1961), http://www.copyright.gov/history/1961_registers_report.pdf (transmittal letter of L. Quincy Mumford) (the "1961 Report"). Among other recommendations, it proposed revising the federal copyright law to codify fair use. *Id.* at 25.

The Copyright Office explained that fair use "means that a reasonable portion of a copyrighted work may be reproduced without permission when necessary for a legitimate purpose which is not competitive with the copyright owner's market for his work." *Id.* at 24. After citing several specific examples,[3] it

---

[3]    These examples included: (1) "Quotation of excerpts in a review or criticism for purposes of illustration or comment;" (2) "Use in a parody of some of the content of the work parodied;" (3) "Summary of an address or article, with brief quotations, in a news report;" and (4) "Reproduction by a teacher or student of a small part of a work to illustrate a lesson." *See* 1961 Report at 24.

identified four "interrelated" criteria for assessing fair use's application: "(1) the purpose of the use, (2) the nature of the copyrighted work, (3) the amount and substantiality of the material used in relation to the copyrighted work as a whole, and (4) the effect of the use on the copyright owner's potential market for his work." *Id.* These criteria, however, were merely a distillation of then-prevailing doctrine: As the Deputy Register of Copyrights explained to the House Judiciary Committee, the Copyright Office's proposal was not intended to "expand or contract the principle of fair use as applied by the courts." *Copyright Law Revision: Hearings Before Subcomm. No. 3 of the H. Comm. on the Judiciary*, 89th Cong., pt. 1, at 38-39 (1965) (remarks of George D. Cary, Deputy Register of Copyrights).

In 1976, Congress acted on the Copyright Office's recommendation. As part of a significant overhaul of the federal copyright statute, it codified the fair use doctrine for the first time. *See* 1976 Act § 107, 90 Stat. at 2546. The 1976 Act captured the recommendations of the Copyright Office by including examples of fair use in its preamble, including uses "for purposes such as criticism, comment, news reporting, [and] teaching." *Id.* And it enumerated four, non-exclusive factors for courts to consider when assessing the fairness of a use, closely tracking the four interrelated criteria identified by the Copyright Office in the 1961 Report. *Id.*

13

The relevant House and Senate Reports help contextualize the Act's provisions, and both bear the imprint of the Copyright Office's recommendations. Both reports referred back to the 1961 Report's examples of protected fair use. H.R. Rep. No. 94-1476, at 65 (1976) ("House Report"); S. Rep. No. 94-473, at 61 (1975) ("Senate Report").  Both reports also indicated that Congress never intended to "freeze the doctrine in the statute," noting that, instead, Congress intended to "endorse[] the purpose and general scope of the judicial doctrine of fair use," and "to restate the present judicial doctrine"—"not to change, narrow, or enlarge it in any way."  House Report at 66; Senate Report at 62.

Precisely because it codified the prevailing common law doctrine, the 1976 Act also necessarily embraced Justice Story's framework from *Folsom*.  *See* Leval, *supra*, at 1105; *see also Campbell*, 510 U.S. at 576.  Indeed, the Senate Report essentially paraphrased his guidance from more than a century before:  as it explained, "a use that supplants any part of the normal market for a copyrighted work would ordinarily be considered an infringement."  Senate Report at 65.

## C.    Modern Fair Use Doctrine Remains Consistent With These Historical Goals

Today, the fair use doctrine is typically applied by balancing the four non-exclusive factors established by the 1976 Act.  *See* 17 U.S.C. § 107.  But as the Supreme Court has emphasized, these factors must always be weighed with reference to copyright's underlying purpose.  *See Campbell*, 510 U.S. at 578.  For

that reason, the modern case law has (largely) remained true to its historical roots, including the longstanding view that merely "supersed[ing]" uses are not fair. *Folsom*, 9 F. Cas. at 344-45. The contemporary doctrine recognizes, no less than the historical one, that permitting a follow-on user to "free rid[e] on another's creation" without compensating the original author would hinder, rather than promote, copyright's purpose. Leval, *supra*, at 1116.

The two most important statutory factors, in particular, bear this out. The first factor—"the purpose and character of the use"—considers whether a work is commercial or noncommercial and whether its purpose is different from the original's. 17 U.S.C. § 107(1). "The central purpose of this investigation is to see, in Justice Story's words, whether the new work merely 'supersede[s] the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message …." *Campbell*, 510 U.S. at 578-79 (alteration in original) (quoting *Folsom*, 9 F. Cas. at 348); *see also Harper & Row*, 471 U.S. at 562 (finding no fair use where the new work had "the *intended purpose* of supplanting" the original).

Applying the first factor, courts regularly reject the fair use defense when a defendant attempts to "free-ride" on the creative endeavors of another— particularly when it harms the original author. For example, in *Wall Data Inc. v. Los Angeles County Sheriff's Department*, the Ninth Circuit held that making exact

15

copies of software and "put[ting] those copies to the identical purpose as the original software ... cannot be considered transformative" use. 447 F.3d 769, 778 (9th Cir. 2006). And, in *Worldwide Church of God v. Philadelphia Church of God, Inc.*, the Ninth Circuit rejected a fair use defense where the defendant church copied and freely distributed a religious text to current and prospective members for the "same intrinsic purpose" as the copyright holder, to enable its existing members' religious observance and attract new members. 227 F.3d 1110, 1117 (9th Cir. 2000) (citation omitted).

The fourth statutory factor reinforces the same policy goals. That factor considers whether the use is likely to cause market harm—that is, "'whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 590 (alteration in original) (citation omitted); *see also* 17 U.S.C. § 107(4). This factor is "the single most important element of fair use," *Harper & Row*, 471 U.S. at 566, and it, too, openly embraces Justice Story's analysis in *Folsom*, reflecting his concern for the "*injurious* … appropriat[ion] by another" of an original author's work. 9 F. Cas. at 348 (emphasis added); *id.* at 349 (noting that "if the defendants may take [319] letters, included in the plaintiffs' copyright, and exclusively belonging to them, there is no reason why another bookseller may not take the other five hundred letters, and a third, one thousand

letters, and so on, and thereby the plaintiff's copyright be totally destroyed"). Where a commercial use is *not* transformative, courts on some occasions have thus effectively *presumed* market harm. *See Campbell*, 510 U.S. at 591; *Sony Corp. of Am.*, 464 U.S. at 451.

\*    \*    \*    \*    \*

Oftentimes, and perhaps especially in the area of copyright, "a page of history is worth a volume of logic." *Eldred v. Ashcroft*, 537 U.S. 186, 200 (2003) (citation omitted). Here, history shows that fair use began as an important tool to further copyright's goal of incentivizing creativity, and it continues to serve that essential function today. Consistent with that principle, fair use has never been understood to allow the taking of copyrighted material for what amounts to nothing more than a substitute use. On the contrary, a genuinely *transformative* use—one with a purpose orthogonal to the original's—generally is required, and always has been.

## II.    GOOGLE'S COPYING OF THE JAVA APIS IS IRRECONCILABLE WITH THE PURPOSE AND HISTORY OF FAIR USE

### A.    Google's Copying Of The Java APIs Is Inconsistent With The Historical Goals Of The Fair Use Doctrine

Google's conceded copying of Oracle's copyrighted material is irreconcilable with the purpose and history of the fair use doctrine. Google has copied Oracle's software—specifically, the declaring code and "structure,

sequence and organization," or "SSO," of 37 Java API packages—to use that code precisely how it has always been used, and for precisely the same purpose.

Google has hardly argued otherwise.  Below, Google acknowledged that its purpose for copying the Java code "was for the benefit of developers, who—familiar with the Java programming language—had certain expectations regarding the language's API."  Google's Opp'n to Oracle's Rule 50(a) Mot. at 15, *Oracle Am., Inc. v. Google Inc.*, No. 3:10-cv-03561-WHA (N.D. Cal. May 21, 2016), ECF No. 1935.  In essence, Google capitalized on Java's innovative design and leveraged Sun's and Oracle's efforts to promote familiarity with it among developers—but did so for the benefit of *Google's* own competing Android platform.  As the district court acknowledged, the copied code "serve[d] the same function" in both Java and Android: to organize and call upon precisely the same kinds of pre-written programs.  *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2016 WL 3181206, at *8 (N.D. Cal. June 8, 2016).  At bottom, then, Google has simply "repackage[d]" aspects of Oracle's code to "free rid[e] on [its] creations."  Leval, *supra*, at 1116.  Not because it *had* to.  But because it made things easier for Google in the commercial marketplace, to Oracle's detriment.

Most directly, by copying Oracle's source code and Java's SSO, Google avoided paying Oracle for a license.  More important, however, it also harmed Oracle's competitive standing.  In easing the transition of developers and

18

investment toward Google's own Android platform—that is, by offering developers the same features and functionalities in the exact same terms with which they were already familiar—Google pulled them *away* from Oracle's Java platform, which Oracle licenses in the same mobile market in which Android competes. That it did so by effectively "free-riding" on Oracle's creative efforts makes Google's use of the Java copyrighted content paradigmatically unfair.

Indeed, treating Google's use of Oracle's code as fair use would turn the doctrine on its head. Far from *promoting* creative expression—as copyright has always been intended to do—it would only *hinder* creative investment. Future innovators, like Sun and Oracle, for instance, would have a comparatively reduced incentive to expend resources developing new products if the fruits of those labors could simply be purloined by their competitors. Nor, for that matter, does blessing Google's use of Oracle's code even promote *Google's* creative efforts. After all, Google *could have* leveraged its thousands of expert computer scientists and nearly unlimited investment capital to develop *better* APIs from the ground up, enticing developers to dedicate time and attention to an even *more* appealing platform. Instead, it chose to copy Oracle's, for its own business expedience.

As Justice Story recognized over 150 years ago "[n]one are entitled to save themselves trouble and expense, by availing themselves, for their own profit, of other men's works." *Folsom*, 9 F. Cas. at 349 (quoting *Lewis*, 2 Beav. 6). Yet

Google's use in this case cannot be explained any other way. In fact, it is hardly distinguishable from the defendants' conduct in *Folsom* itself: like the publishers who "largely cop[ied] from the work in another book having a similar object," Google has copied Oracle's Java APIs for their very intended purpose. *Id.* at 349. And by repackaging the APIs for use in its own competing platform, it has "injurious[ly] … appropriate[ed]" Oracle's "labors." *Id.* at 348. Historically, such conduct has never found cover under the fair use doctrine.

## B. The Modern Fair Use Factors Support This Conclusion

Nor do the modern statutory fair use factors offer Google salvation. As explained above, those factors embody longstanding common law doctrine, and they therefore yield the same result: Google's copying in this case cannot be fair use.

First, with respect to the purpose and character of Google's use, it is undisputed that Google's use is commercial. And as explained above, the copied software serves the same function and purpose that Oracle intended for it. That is not a "transformative" use under the doctrine, properly understood. *See Wall Data*, 447 F.3d at 778; *Worldwide Church of God*, 227 F.3d at 1117. In the language of the oldest fair use precedents, Google's use of the Java APIs simply "supersede[s] the objects[] of the original work." *Folsom*, 9 F. Cas. at 348.

Google's arguments about transformative use miss the mark.  Its selection of part, rather than all, of Oracle's Java platform and its addition of some of its own original code does not change the fact that Google copied substantial parts of Java—parts that served its interest in meeting the expectations of Java application developers—and is using them for the same *purpose* Oracle intended for them. That has always been fatal to fair use, and modern cases say nothing different. *See, e.g.*, *Folsom*, 9 F. Cas. at 348 (observing that portions of original work "inserted … into the general texture of the second work," "as a sort of distinct and mosaic work" may still "be a clear piracy" if the "objects" are the same); *Harper & Row*, 471 U.S. at 565-66 (rejecting lower court's reliance on the "infinitesimal amount" of original language copied and instead relying on its "qualitative value" to both the originator and infringer); *cf. Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir. 1936) (Hand, J.) ("[N]o plagiarist can excuse the wrong by showing how much of his work he did not pirate.").

Nor can Google rely on modern cases protecting "intermediate" copying of another's work—specifically, to reverse engineer it so that the secondary work will be compatible with the plaintiffs' platform.  *See, e.g.*, *Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 607 (9th Cir. 2000); *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1519 (9th Cir. 1992); *Atari Games Corp. v. Nintendo of Am. Inc.*, 975 F.2d 832, 843 (Fed. Cir. 1992).  Google's use is not

intended to create compatibility with Oracle's Java platform at all. In fact, this Court has already found that "Google designed Android so that it would *not* be compatible with the Java platform, or the JVM [Java virtual machine] specifically." *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1371 (Fed. Cir. 2014); *see id.* at 1351. Unlike in *Sony* and *Sega*, where the alleged infringer sought to make its products fully compatible with the original authors' products, Google expressly intended Android to serve as a substitute for the Java platform. Google copied *components* of Oracle's Java APIs—knowing that developers' familiarity with them would attract adoption and investment—to aid that illicit purpose.

The fourth factor—market harm to Oracle—also weighs heavily against fair use. To see why, the Court need look no further than Google's stated intentions for the copying in this case. As explained above, Google copied the Java APIs to meet *developers' expectations with respect to the use of Java.* Google is therefore trying to capture and divert the software developer community that Sun, and now Oracle, created through hard work and ingenuity to make Java the ubiquitous software platform it is today. If Google is permitted to build its Android platform by taking advantage of its target users' familiarity with Oracle's copyrighted works, Google's use will have, in several key respects, "supplant[ed]" what Oracle has to offer that community. *See Harper & Row*, 471 U.S. at 568-69. No case, since the

22

very advent of the fair use doctrine, has found such blatant commercial free-riding to be fair.  *See Folsom*, 9 F. Cas. at 344-35 ("[I]f he thus cites the most important parts of the work, with a view, not to criticize, *but to supersede the use of the original work*, … such use will be deemed in law a piracy." (emphasis added)).

## CONCLUSION

For the foregoing reasons, Mr. Oman respectfully urges this Court to reverse the judgment below and direct that judgment be entered in Oracle's favor.

Respectfully submitted,

*/s/ Marc R. Lewis*
Marc R. Lewis
Evangeline A.Z. Burbidge
LEWIS & LLEWELLYN LLP
505 Montgomery Street
Suite 1300
San Francisco, CA  94111
(415) 800-0590
mlewis@lewisllewellyn.com
eburbidge@lewisllewllyn.com

February 17, 2017

*Counsel for* Amicus Curiae *Ralph Oman*

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2017, I caused the foregoing Brief of *Amicus Curiae* Ralph Oman in Support of Appellant to be served by electronic means through the Court's CM/ECF system on counsel for all parties who are registered CM/ECF users.

*/s/ Marc R. Lewis*
Marc R. Lewis

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 29(d) and 32(a)(7)(B) because it contains 5,468 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because this brief was prepared using Microsoft Word 2010 in 14-point Times New Roman font.


Dated: February 17, 2017          */s/ Marc R. Lewis*
                                   Marc R. Lewis