**Nos. 17-1118 & 17-1202**

# United States Court of Appeals
# for the Federal Circuit

---

ORACLE AMERICA, INC.,

*Plaintiff-Appellant*,

v.

GOOGLE, INC.

*Defendant-Appellee*.

---

*Appeal from the United States District Court for the Northern District of California in Case No. 10-CV-3561, Judge William H. Alsup*

---

**BRIEF OF THE RECORDING INDUSTRY ASSOCIATION OF AMERICA AND THE ASSOCIATION OF AMERICAN PUBLISHERS AS AMICI CURIAE IN SUPPORT OF APPELLANT**

---

GEORGE M. BORKOWSKI
RECORDING INDUSTRY
   ASSOCIATION OF AMERICA
1025 F Street, N.W.
10th Floor
Washington, D.C. 20004
(202) 775-0101

*Counsel for Amicus Curiae RIAA*

WILLIAM M. JAY
ANDREW KIM
GOODWIN PROCTER LLP
901 New York Avenue
Washington, D.C. 20001
(202) 346-4000
*wjay@goodwinlaw.com*

*Counsel for Amici Curiae*

---

February 17, 2017

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## ORACLE AMERICA, INC. v. GOOGLE, INC.

Nos. 17-1118 & 17-1202

## **CERTIFICATE OF INTEREST**

Counsel for the <u>Recording Industry Association of America</u> certifies the following (use "None" if applicable; use extra sheets if necessary):

1.  The full name of every party or amicus represented by me is:

> Recording Industry Association of America, Inc., and Association of American Publishers, Inc.

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

> N/A

3.  All corporations and publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

> None.

4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

> None.

| | |
|---|---|
|     February 17, 2017     |     /s/ William M. Jay     |
| Date | William M. Jay |

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................. i

TABLE OF AUTHORITIES ............................................................. iii

INTEREST OF AMICI CURIAE ........................................................1

SUMMARY OF ARGUMENT ...........................................................4

ARGUMENT ...................................................................................6

I.  **The district court misapplied the standard for weighing "the purpose and character" of the claimed fair use.**.......................7

    A.  The "transformative" factor of fair-use analysis is a judge-made consideration that courts have misapplied to the detriment of copyright owners. ...................................................................8

    B.  The "purpose" of a work is not transformed merely because additional material is layered on top of existing copyrighted material. ..........9

    C.  Adding new material that transforms only the expression (but not the purpose) creates only an infringing derivative work, not a fair use...........................................................................13

    D.  To the extent that the district court gave any attention to the purpose of the two works, it did so in too narrow a manner..................16

    E.  Using the same material in different media is not "transformation" under the first factor. ...........................................................20

II.  **The district court misapplied the standard for evaluating potential markets.** ....................................................................22

    A.  The district court's construction of the fourth factor undermines the copyright owner's ability to withhold entry into a market for "creative and economic" reasons. ........................................23

    B.  Any analysis of potential markets must be sensitive to technological advancements................................................25

CONCLUSION ...............................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ..........................................................................28

*Am. Geophysical Union v. Texaco, Inc.*,
60 F.3d 913 (2d Cir. 1994) ..........................................................................4, 23

*Balsley v. LFP, Inc.*,
691 F.3d 747 (6th Cir. 2012) ......................................................................20, 21

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994)..............................................................................*passim*

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*,
150 F.3d 132 (2d Cir. 1998) .................................................................15, 16, 23

*Castle Rock Entm't v. Carol Publ'g Grp., Inc.*,
955 F. Supp. 260 (S.D.N.Y. 1997) ....................................................................15

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985)..................................................................................12, 22

*Kelly v. Arriba Soft Corp.*,
336 F.3d 811 (9th Cir. 2002) ...............................................................17, 20, 21

*Kienitz v. Sconnie Nation LLC*,
766 F.3d 756 (7th Cir. 2014) ............................................................................14

*Leibovitz v. Paramount Pictures Corp.*,
137 F.3d 109 (2d Cir. 1998) ...............................................................................6

*L.A. News Serv. v. CBS Broad., Inc.*,
305 F.3d 924 (9th Cir. 2002) ...................................................... 10, 11, 12, 17-18

*Micro Star v. Formgen, Inc.*,
154 F.3d 1107 (9th Cir. 1998) ..........................................................................13

*Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*,
856 F.2d 1341 (9th Cir. 1988) ..........................................................................13

*Monge v. Maya Magazines, Inc.*,
   688 F.3d 1164 (9th Cir. 2012) ..............................................................6

*Oracle Am., Inc. v. Google Inc.*,
   750 F.3d 1339 (Fed. Cir. 2014) ...................................................17, 22

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ............................................................12

*Salinger v. Random House*,
   811 F.2d 90 (2d Cir. 1987) .........................................................23, 24

*Seltzer v. Green Day, Inc.*,
   725 F.3d 1170 (9th Cir. 2013) .............................................................9

*SOFA Entm't, Inc. v. Dodger Prods., Inc.*,
   709 F.3d 1273 (9th Cir. 2013) ...........................................................21

*Worldwide Church of God v. Phila. Church of God, Inc.*,
   227 F.3d 1110 (9th Cir. 2000) ...................................................23, 24

## Statutes

17 U.S.C. § 101 .......................................................................................13

17 U.S.C. § 106(2) ...........................................................................13, 14

17 U.S.C. § 107 .................................................................6, 14, 17, 18

17 U.S.C. § 107(1) .......................................................................7, 10

17 U.S.C. § 107(4) .....................................................................22, 30

## Other Authorities

*Copyright Law Revision:  Hearings on H.R. 4347 Before Subcomm.*
   *No. 3 of the H. Comm. on the Judiciary*, 89th Cong., 1st Sess.
   (1965) ...............................................................................................26

Keith Caulfield, *Michael Jackson's 'Thriller' Extends Reign as*
   *Highest Certified Album in U.S. History*, Billboard, Feb. 16, 2017,
   http://www.billboard.com/articles/news/7693419/michael-jackson-
   thriller-highest-certified-album...........................................................29

Jay Cocks, *Why He's a Thriller*, Time, Mar. 19, 1984, *available at* http://content.time.com/time/subscriber/article/0,33009,950053-1,00.html .................................................................................................29

Robert Hilburn, *Beatles Sue Nike Over Use of Song,* L.A. Times, July 29, 1987, *available at* http://articles.latimes.com/1987-07-29/entertainment/ca-4364_1_beatles-song ..........................................25

Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990) .......................................................................................... 8-9

Jacqueline D. Lipton & John Tehranian, *Derivative Works 2.0: Reconsidering Transformative Use in the Age of Crowded Creation*, 109 Nw. U. L. Rev. 383 (2015) .................................... 19-20

Michael J. Madison, *A Pattern-Oriented Approach to Fair Use*, 45 Wm. & Mary L. Rev. 1525 (2004) .......................................................9

R. Anthony Reese, *Transformativeness and the Derivative Work Right*, 31 Colum. J.L. & Arts 467 (2008) ..........................................15

Christopher Reid, Note, *Fair Game: The Application of Fair Use Doctrine to Machinima*, 19 Fordham Intell. Prop. Media & Ent. L.J. 831 (2009) ...................................................................................19

Thomas D. Selz et al., *Entertainment Law: Legal Concepts and Business Practices* § 4:28 (3d ed. 2016).............................................24

Ben Sisario, *In Death as in Life, Michael Jackson Sets Music Sales Records*, N.Y. Times, July 1, 2009...................................................29

Ethan Smith, *Music Services Overtake CDs for First Time*, Wall St. J. (Apr. 14, 2015, 6:53 PM), https://www.wsj.com/articles/digital-music-sales-overtake-cds-for-first-time-1429034467 ......................................28

Staff of the H. Comm. on the Judiciary, 89th Cong., *Copyright Law Revision, Part 6: Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill* (Comm. Print 1965) ...........................................26

# INTEREST OF AMICI CURIAE[1]

The **Recording Industry Association of America** (RIAA) is a nonprofit trade organization representing the American recording industry.  RIAA members create, manufacture, and/or distribute approximately 85% of all legitimate recorded music produced and sold in the United States.  The RIAA works to protect the intellectual-property and First Amendment rights of artists and music labels; conducts consumer, industry and technical research; and monitors and reviews state and federal laws, regulations, and policies.  The RIAA also promotes the ability of the record industry to invest in new artists and new music and, in the digital arena, to collaborate with online services to promote the continued expansion of legitimate markets for music.

Despite the best efforts of RIAA members to increase the availability of their works through authorized services and alternative formats, unlawful competition from infringers continues to inhibit growth of legitimate online music services.  Infringement deprives RIAA members (and other copyright owners) of important sources of revenue, undermines the value of American intellectual property, hinders expansion into new markets, and unfairly disadvantages service providers that cooperate to limit infringement.

---

[1] All parties have consented to the filing of this brief.  No party's counsel authored the brief in whole or in part, and no party or party's counsel contributed money intended to fund preparing or submitting the brief.  No person other than the RIAA, its members, and its counsel made such a monetary contribution.

With increasing frequency, RIAA members must contend with over-expansive claims of "fair use" asserted by entities that exploit copyrighted music for their own profit without authorization from, or compensation to, the copyright owners. These entities build their businesses on the backs of content creators and owners of copyright to the severe detriment of the record industry.

In addition, this case calls upon the Court to apply Ninth Circuit precedent on fair use, which directly affects the RIAA and its members. RIAA member Universal Music Group, the world's largest record company, has its headquarters in Santa Monica, California (as does Universal Music Publishing Group), as well as offices in the iconic Capitol Records Tower in Hollywood. RIAA member Sony Music Entertainment has offices in Culver City, California—on the Sony Pictures lot. RIAA member Warner Music Group has offices in Los Angeles (as does Warner/Chappell Music, Inc.). RIAA members frequently bring copyright-infringement cases in federal courts in California.

The **Association of American Publishers** (AAP) is the largest national trade organization of U.S. book and journal publishers, representing over 400 members, including most major commercial publishers in the U.S., as well as smaller and non-profit publishers, university presses, and scholarly societies, that publish works in every field and format. AAP seeks to promote the effective and efficient protection of copyright to enable publishers and our technology partners

2

to create and disseminate literary, scholarly, and educational works in new and convenient formats for consumers around the world to enjoy.  AAP's members have an interest in ensuring that courts maintain the proper scope and application of "fair use" and that, as copyright owners, their exclusive right to prepare, and to authorize preparation of, derivative works based upon their copyrighted works is not diluted by the misapplication of the judicially-created concept of "transformative use."

For these reasons, amici have a significant interest in this case.

## SUMMARY OF ARGUMENT

The statutory test for fair use contains four factors. The first is the "purpose and character of the use": if the copy shares the same purpose as the copyrighted work that is copied, that weighs against fair use. Another key factor is "the effect of the use upon the potential market" for the copyrighted work: if the copy threatens to cannibalize either the existing markets for the copyrighted work *or* markets "likely to be developed," that also weighs against fair use. *Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 930 (2d Cir. 1994).

The district court misapplied these well-established principles in holding that Google's copying and commercial exploitation of Oracle's copyrighted Java API was fair use. Instead of considering the "purpose and character of the use," the district court focused its attention on whether the *expression* had "transformed." Such an approach is fraught with problems. Both the statute's plain text and the cases interpreting it make clear that *purpose* is the touchstone of this fair-use factor, and that focusing on "transformation" disconnected from purpose is an error. Here the district court *acknowleged* that Google's code and Oracle's served the same basic purpose. Appx42. The court nonetheless found Google's use "transformative" essentially because it thought "providing software for the desktop and laptop markets" and "providing software for the mobile device market" were distinct purposes. In fact, the two are not legally distinct, and treating them as if

they were risks treating an infringing derivative work as a non-infringing fair use *because of the very characteristics that made it derivative*.

While the district court went too far on "purpose and character," it did not go far enough in evaluating the effect of Google's use. The district court looked only to the actual markets for Oracle's work at the time it was created. But the statute states plainly (and this Court previously emphasized) that "the effect . . . upon the *potential* market" must be assessed as well. Copyright protects creative works even as the technology presenting those works evolves—hence the emphasis on *potential* markets. Capturing an emerging market with copies, before the copyrighted work gets there, is not fair use.

Validating the district court's decision could radically diminish the copyright protection available to recording artists and record companies, book publishers, and others. Under the district court's approach, a copier could successfully assert fair use even if it takes the "heart" of a copyrighted sound recording or literary work unchanged, adds some new material around the copied portion to provide "fresh context," and sells the resulting dressed-up copy commercially. The district court's focus on actual markets would limit copyright protection to the media that existed at the time of the work's inception; classic songs originally recorded on vinyl, 8-track, or cassette would be unprotected from digital infringement, and popular novels would be susceptible to unauthorized ebook versions. The Court

should correct these errors lest the fair-use exception swallow the general rule of copyright protection.

## ARGUMENT

"The fair use doctrine has been called 'the most troublesome in the whole law of copyright.'" *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1170 (9th Cir. 2012). In the Copyright Act of 1976, Congress specified four factors for courts to consider in deciding whether a person who has copied a work may successfully assert the affirmative defense of fair use:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work

17 U.S.C. § 107. Although all four factors are "explored [and] . . . weighed together, in light of the purposes of copyright," *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994), the first and fourth factors have been described as the most important, *see, e.g.*, *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 116 (2d Cir. 1998).

In this case, the district court misapplied both the first and fourth factors and thereby expanded fair use beyond what Congress created. The district court's reading of the first factor stripped the "purpose" element out of the statute, supplanting it with the question of whether Oracle's declaring code had taken on a different expression in Google's subsequent work. In addition, the district court unduly narrowed the fourth factor to permit consideration of just the actual markets for which Oracle's Java product had been intended, disregarding the potential markets in which the Java API could have been used.

## I.    The district court misapplied the standard for weighing "the purpose and character" of the claimed fair use.

17 U.S.C. § 107(1) instructs courts to consider "the purpose and character" of the infringing work in evaluating a claim of fair use. In applying that factor, the Supreme Court has considered whether the supposedly fair use is "transformative." *Campbell*, 510 U.S. at 579. As the Court recognized, there is more to the statutory consideration of "purpose and character" than the question of "transformative" use. But some courts, including the district court here, have focused unduly on the ambiguous "transformative" language from *Campbell*—and have misapplied it. Here, the district court misconstrued the first factor, focusing on expression, not purpose, as the relevant touchstone. That approach wrongly sidelined a key element of the statutory inquiry (consideration of "purpose"), trammeled copyright owners' exclusive rights preventing the unauthorized creation and sale of

derivative works, and ignored well-settled fair-use precedent holding that presenting the same work in a new medium does not transform the work's purpose.

A. **The "transformative" factor of fair-use analysis is a judge-made consideration that courts have misapplied to the detriment of copyright owners.**

As set out in the statute, the first factor focuses on the purpose and character of the work, and mentions nothing about whether a work is "transformative." It certainly does not make the "transformative" inquiry outcome-determinative. Courts began focusing heavily on "transformative" use following *Campbell v. Acuff-Rose Music*, 510 U.S. 569 (1994). But some cases have lost sight of how the "transformative" inquiry properly fits into the statutory test. In applying the law of the Ninth Circuit, this Court should not perpetuate that misreading.

The Supreme Court concluded in *Campbell* that 2 Live Crew's song "Pretty Woman," a purported parody of the Roy Orbison song "Oh, Pretty Woman," could qualify as fair use, despite the fact that 2 Live Crew had marketed its song commercially. In making that determination, the Court asked "whether the new work merely 'supersedes the objects' of the original creation or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Id.* at 579 (citations and alterations omitted). "[I]t ask[ed], in other words, whether and to what extent the new work is 'transformative.'" *Id.* (quoting Pierre N. Leval, *Toward a Fair Use Standard*, 103

8

Harv. L. Rev. 1105, 1111 (1990)).  Noting that "such transformative use is not absolutely necessary for a finding of fair use," the Court nevertheless divined the consideration from the statutory preamble and "the goal of copyright[] to promote science and the arts," as that goal "is generally furthered by the creation of transformative works." *Id.* at 578-79.

*Campbell*'s reference to "transformative" use has proved difficult to apply predictably in practice, and in some courts the inquiry has come unmoored. Because of the inconsistent application of the *Campbell* Court's "transformative use" doctrine, the standard "has become all things to all people."  Michael J. Madison, *A Pattern-Oriented Approach to Fair Use*, 45 Wm. & Mary L. Rev. 1525, 1670 (2004).  Indeed, the Ninth Circuit has recognized that the topic is "highly contentious" and requires navigation of "treacherous waters."  *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1176 (9th Cir. 2013).  This Court should take this opportunity to provide some clarity and help calm those waters.

## B.  The "purpose" of a work is not transformed merely because additional material is layered on top of existing copyrighted material.

The Ninth Circuit's precedents establish that transformation of *purpose*, not expression, is the touchstone of the first fair-use factor.  The district court therefore erred when it held that the first factor weighed in Google's favor despite the fact that "the copied declarations serve the same function in both works."  Appx42.  To

the extent that the district court discussed a "transformative purpose," it defined "purpose" too narrowly, which in turn lowered the bar to finding "transformation." Under a correct analysis, merely juxtaposing the copyrighted work or an excerpt with additional material does not suffice where the purpose remains the same.

The text of the Copyright Act commands courts to consider "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). *Campbell* teaches that transformation of a work's purpose supports fair use, but that for a work to be adequately "transformed" under § 107(1), the unlicensed user must "add[] something new, with a further purpose or different character." 510 U.S. at 579. While "further purpose" or "different character" may occasionally involve "altering the first [work] with new expression, meaning, or message," *id.*, the focus remains on purpose. If the alteration does not change the purpose of the work, then it is not sufficiently "transformed." Combining the work with "new expression" does not suffice *by itself*; for instance, taking a copyrighted sound recording from one album and putting it on another is not transformative, because the purpose is the same even if the new album contains additional new tracks.

The Ninth Circuit's decision in *Los Angeles News Service v. CBS Broadcasting, Inc.*, 305 F.3d 924 (9th Cir. 2002), illustrates when an alteration does (and does not) transform the purpose of a work. The plaintiff in that case, a

"newsgathering organization that [made] and [licensed] video and audio recordings of breaking news events," had captured video footage of beatings that had taken place during the Los Angeles riots and had registered copyrights for that footage. *Id.* at 929. Court TV used the footage without permission in two ways: first, it showed excerpts to provide context to in-court testimony by one of the beating victims; second, it wove another part of the footage into the introductory montage for a Court TV show called *Prime Time Justice*. *Id.* at 939. The court held that the first use was not fair use because it was not sufficiently transformative, but that the second use was fair use. For the first use, the Ninth Circuit observed that "[m]erely plucking the most visually arresting excerpt from [the] footage cannot be said to have added anything new." *Id*. at 938-39. Although the video footage had been "juxtapose[ed] . . . with a clip from [the beating victim's] testimony updates," that did not "change[] the purpose of depicting the attack," *i.e.*, "its newsworthiness." *Id.* at 939. On the other hand, using the footage for an introductory montage met the standard for transformation—"[t]he development of the montage . . . plausibly incorporate[d] the element of creativity beyond mere republication, and it serve[d] some purpose beyond newsworthiness"— specifically, "promot[ing] the program and . . . retain[ing] the attention of any channel-surfer who happened to see it." *Id.*

11

Just as Court TV did not sufficiently "transform" footage of the Los Angeles riots merely by combining it with court coverage, Google's use of the declaring code did not sufficiently "transform" Oracle's work merely by "combin[ing it] with brand new methods, classes, and packages written by Google for the mobile smartphone platform," Appx42. *See L.A. News Serv.*, 305 F.3d at 939. Where a work or excerpt is copied without alteration, any claim to "transformation" must rest on an argument that "the copy serves a different function than the original work." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007). A copying party should not succeed on a claim of fair use when the party uses the "heart" of the work in its identical form and incorporates it as part of a potentially competitive work. *See, e.g.*, *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562, 565 (1985).

Here, by the district court's own observation, "the copied declarations serve the same function in both works." Appx42. Indeed, the declaring code at issue served as the "heart" of Oracle's work and was used to create a work serving a market in which Oracle could potentially compete. That is a classic case of what is *not* fair use. *See Harper & Row*, 471 U.S. at 563 ("Fair use distinguishes between a true scholar and a chiseler who infringes a work for personal profit." (citation and internal quotation marks omitted)). The district court therefore missed the mark when it found the first factor was satisfied because Google's additions "constituted

a fresh context giving new expression, meaning, or message to the duplicated code." Appx42. Serving the same function in a different context is not transformation, particularly when the purpose of the secondary work is to compete, actually or potentially, with the copied work.

## C. Adding new material that transforms only the expression (but not the purpose) creates only an infringing derivative work, not a fair use.

The district court's expression-based test further conflicts with copyright owners' "exclusive rights" to "prepare derivative works." 17 U.S.C. § 106(2). It is plain from the statute that some transformations result in not a fair use, but a derivative work. Indeed, the *only* place the statute refers to "transform[ation]" is in the definition of "derivative work" to include a preexisting work "transformed" into another form. *Id.* § 101. And a transformation that produces only an unauthorized derivative work infringes the owner's copyright. *See, e.g.*, *Micro Star v. Formgen, Inc.*, 154 F.3d 1107, 1112-13 (9th Cir. 1998). Indeed, the test for whether a work is derivative considers whether the work would otherwise be considered infringing. *See Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*, 856 F.2d 1341, 1343 (9th Cir. 1988) ("A work will be considered derivative . . . if it would be considered an infringing work if the material which it has derived from a preexisting work had been taken without the consent of a copyright proprietor of such preexisting work." (citation and internal quotation marks omitted)). The

13

district court's approach—under which mere addition of expression could be enough to constitute transformation, and make the new work a fair use—threatens to drastically reduce the scope of copyright owners' protection against unauthorized derivative works.

The Seventh Circuit, which has opted to "stick with the statutory list [of § 107]," *Kienitz v. Sconnie Nation LLC*, 766 F.3d 756, 758 (7th Cir. 2014), has highlighted the problem with the expansive approach used by the district court here:  it treats this sort of re-situating as transformation, and then allows that treatment to drive the fair-use analysis.  That approach not only subverts the plain text of the fair-use provision "but also could override 17 U.S.C. § 106(2), which protects derivative works.  To say that a new use transforms the work is precisely to say that it is derivative and thus, one might suppose, protected under § 106(2)." *Id.*

Put differently, it is difficult to see the difference between derivative (infringing, requiring an authorization) and transformative (fair use, requiring no authorization) under the district court's expression-based standard.  Indeed, as noted above, the Copyright Act's definition of a derivative work contemplates that the preexisting work may have been "transformed" to some degree.  If transforming content could be enough to give rise to fair-use protection, the boundary between an unauthorized derivative work and a permissible fair use

would be completely obscured. Courts have managed to avoid setting that boundary by focusing instead on the transformation of the *purpose* of the work. *See* R. Anthony Reese, *Transformativeness and the Derivative Work Right*, 31 Colum. J.L. & Arts 467, 484-85 (2008).

The Second Circuit confronted this boundary-setting issue in *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 143 (2d Cir. 1998). The district court in that case held that a *Seinfeld* trivia book was transformative, but not protected under fair use, and thus derivative. *Castle Rock Entm't v. Carol Publ'g Grp., Inc.*, 955 F. Supp. 260, 268, 272 (S.D.N.Y. 1997). In so holding, the district court recognized a tension between the transformative use standard and protection for derivative works, acknowledging that "to hold that the transformative nature of a work automatically shields it from a successful claim would be to reject an unassailable proposition—i.e., that the unauthorized production of a derivative can support a claim for infringement." *Id.* at 268. Because it was unsure as to how to resolve the tension, it relied on the other fair-use factors to dispose of the case.

The Second Circuit resolved the tension by clarifying that transformation of *purpose*, and not *expression* (which overlapped with derivative works) was the determinant of whether a work had been transformed. The court noted that while the trivia book did require some additional "creative" and thus "transformative"

15

expression, the first fair-use factor had not been satisfied because the *purpose* had not changed. *See Castle Rock*, 150 F.3d at 142-43. The court clarified that "transform[ing] an original work into a new mode of presentation," used copyrighted "expression for purposes that are not 'transformative,'" but instead derivative. *Id.* at 143. In a footnote, the court left open the possibility that a change could "sufficiently transform[] the expression of the original work such that the two works cease to be substantially similar," and therefore not a derivative work, but that would go to infringement, not fair use. *Id.* at 143 n.9. The Second Circuit correctly recognized that in analyzing fair use, there is no transformation where the purpose of the use has not changed.

### D.    To the extent that the district court gave any attention to the purpose of the two works, it did so in too narrow a manner.

To the extent the district court considered purpose at all, it construed the purpose of Oracle and Google's works too narrowly. And in doing so, it conflated a work's purpose with a work's potential market, which should have been considered separately under the fourth statutory factor.

The district court incorrectly construed this Court's silence on the first factor in the previous iteration of this case as a sign that the declaring code must have had different purposes in Oracle and Google's respective products. *See* Appx42 ("[T]he copied declarations serve the same function in both works . . . If this were enough to defeat fair use, it would be impossible ever to duplicate declaring code

16

as fair use and presumably the Federal Circuit would have disallowed this factor on the first appeal rather than remanding for a jury trial."). Accordingly, the district court labeled the same code with two different purposes. When *Oracle* used the declaring code, the district court thought, the code had the purpose of serving the desktop and laptop markets. *Id.* ("The copyrighted works were designed and used for desktop and laptop computers."). But when *Google* used the declaring code, it was part of a "mobile operating system for smartphones." Appx43. Because Google had integrated only "select elements" of the declaring code and "added entirely new Java packages written by Google itself," "[t]his enabled a purpose distinct from the desktop purpose of the copyrighted works." *Id.* In the district court's view, a jury "could reasonably have concluded that Google's use of the declaring code . . . was transformative." *Id.*

There are at least two problems with this analysis. First, the district court failed to recognize that purpose is to be construed broadly and in a categorical manner, rather than at the level of individual products and markets. The fair-use statute itself gives an idea of the level of generality: "criticism, comment, news reporting, teaching . . . , scholarship, or research." 17 U.S.C. § 107. In discussing purpose under the first fair-use factor, courts speak of "aesthetic purpose" and "access to information," *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 819 (9th Cir. 2002); or "newsworthiness" and "promotional use," *L.A. News Serv.*, 305 F.3d at

17

939-40. "Purpose" under the first fair-use factor should be painted with a broad stroke. The district court used pointillism instead. Its description of the two works' purposes was tailored to the products the works ultimately served: declaring code for desktops and laptops, and declaring code for mobile devices. If purpose were intended to be examined in such extreme close-up view, then a court can conceivably find transformative use in almost any case where fair use is claimed.

Contrary to the district court's view, *Campbell* does not teach differently. The district court read *Campbell* as a case in which the parody lyrics "served the same function in the accused work as in the original." Appx43. But that is not what *Campbell* held at all. The purpose of Roy Orbison's classic was to provide an "entertainment function." *Campbell*, 510 U.S. at 599. 2 Live Crew's parody was "clearly intended to ridicule the white-bread original," providing a separate purpose recognized explicitly in the fair-use statute: "commenting on and criticizing the original work." *Id.* at 582; *see also* 17 U.S.C. § 107 (recognizing "criticism" and "comment" as a purpose of fair use).

Ambiguity in the Supreme Court's decision in *Campbell* gave rise to the second problem with the district court's decision: conflation of the work's purpose with the market that is (or may potentially be) served by the work. The *Campbell* Court explained that the fourth factor "requires courts to consider not only the

extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by defendant . . . would result in a substantially adverse impact on the potential market' for the original." 510 U.S. at 590 (citation and internal quotation marks omitted). But in discussing the effect on the market under the fourth factor, the Court made some observations that have since been read to suggest that the transformative purpose of the new work and its effect on the market for the original work should be considered together. *See id.* at 593 (noting that "the law recognizes no derivative markets for critical works, including parody," but also acknowledging that "the later work may have a more complex character, with effects not only in the arena of criticism but also in protectible markets for derivative works, too"). If that were really the Court's holding, it would effectively blend the first and fourth factors together, "creating a sliding scale" in which "the [secondary] use moves out of the market for derivatives (where the fourth factor recognizes harm) . . . as the degree of its transformative purpose under the first factor increases." Christopher Reid, Note, *Fair Game: The Application of Fair Use Doctrine to Machinima*, 19 Fordham Intell. Prop. Media & Ent. L.J. 831, 854 (2009). Courts that incorrectly read *Campbell* that way are "effectively 'double count[ing]' or at least overemphasiz[ing] elements of a defendant's conduct that might implicate both factors." Jacqueline D. Lipton &

John Tehranian, *Derivative Works 2.0:  Reconsidering Transformative Use in the Age of Crowded Creation*, 109 Nw. U. L. Rev. 383, 414 (2015).

The district court improperly double-counted here.  The court allowed its perception of potential market harm (or lack thereof) to bleed into its assessment of whether the purpose had transformed in Google's work.  By failing to analyze the purpose of the two works independently of the market served, the district court erred even under the transformative-use framework it erroneously sought to apply.

### E.    Using the same material in different media is not "transformation" under the first factor.

Transformative use requires more than putting the same wine into a new bottle.  The district court's determination on the first fair-use factor failed to recognize this well-settled principle—that using the same work in a different medium is not enough by itself to show a transformative purpose.  As the Ninth Circuit recognized in *Kelly*, "[c]ourts have been reluctant to find fair use when an original work is merely transmitted in a different medium."  336 F.3d at 819 & n.19; *see also Balsley v. LFP, Inc.*, 691 F.3d 747, 759 (6th Cir. 2012) ("Where an original work is merely retransmitted in a different medium, or where the resulting use of the copyrighted work is the same as the original use, the new work is not transformative.").

While there may hypothetically be circumstances in which an identical copy of a work can be placed into a "fresh context" and have its purpose transformed,

20

that is certainly not this case. Google's use of Oracle's declaring code does not have the quality identified as transformative in *Kelly*: there, a search engine's use of a low-resolution thumbnail of a copyrighted photograph was held to have a transformative purpose, as the thumbnail's purpose of "improving access to information on the internet" was distinct from "engag[ing] the viewer in an aesthetic experience." 336 F.3d at 818-19. Nor is Google's use of the declaring code like the splicing in *SOFA Entertainment, Inc. v. Dodger Productions, Inc.*, 709 F.3d 1273 (9th Cir. 2013). In that case, a seven-second clip from the *Ed Sullivan Show* was used in the musical *Jersey Boys* to showcase the Four Seasons' "enduring prominence in American music." *Id.* at 1278. Although the clip had been unaltered but for its duration, the Ninth Circuit considered the different context in which the clip had been shown sufficient to transform the clip's purpose, from entertainment to providing a "biographical anchor." *Id.*

The district court had all but found that the "fresh context" did not change the function of the duplicated code, only what was expressed through that function. *See* Appx42 ("[T]he copied declarations serve the same function in both works . . . ."). Because "the resulting use of the copyrighted work is the same as the original use, the new work is not transformative," and the district court erred in concluding otherwise. *Balsley*, 691 F.3d at 759.

## II.    The district court misapplied the standard for evaluating potential markets.

Under the fourth fair-use factor, a court must consider "the effect of the use upon the potential market for or value of the copyrighted work."   17 U.S.C. § 107(4).   This requires not only consideration of "the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether the unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the *potential* market' for the original."   *Campbell*, 510 U.S. at 590 (emphasis added).   This factor is "the single most important element of fair use."   *Harper & Row*, 471 U.S. at 566.

Although there is no ambiguity in what the statute requires—consideration of "potential" markets—the district court refused to consider that full scope. Instead, the court erroneously limited its analysis to the *actual* market in which Oracle had (thus far) put its copyrighted works:   that of desktop and laptop computers.   Indeed, the word "potential" is completely missing from the district court's decision, even though in its previous opinion, this Court specifically focused on potential markets in remanding on this factor.   *See, e.g.*, *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1377 (Fed. Cir. 2014) (noting Oracle's evidence with respect to potential smartphone markets).   If allowed to stand, the district court's decision could run roughshod over a copyright owner's ability to make a "creative and economic" choice as to whether to enter a market at all.

22

Moreover, the district court's reasoning ignores the principle that copyright protection endures even as technology advances—a principle that recording artists have long relied upon in creating their work.

### A. The district court's construction of the fourth factor undermines the copyright owner's ability to withhold entry into a market for "creative and economic" reasons.

A market can be a "potential" one for several reasons. One is that the copyright owner may have the capacity to enter an available market, but chooses not to. The Copyright Act protects the "opportunity" to enter into markets that either exist or are "likely to be developed," *Am. Geophysical Union*, 60 F.3d at 929-30. *Salinger v. Random House*, 811 F.2d 90, 99 (2d Cir. 1987). Even if the owner has no "concrete plan" or even disavows any intention to take advantage of an existing market with its copyright, the law respects the owner's "right to change [its] mind." *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1119 (9th Cir. 2000). In protecting the "potential markets" of a work, a court must respect the "creative and economic choice" that the copyright owner makes in choosing not to enter into a market at a particular time, even if entry into that market is feasible. *See Castle Rock*, 150 F.3d at 146 ("It would not serve the ends of the Copyright Act—*i.e.*, to advance the arts—if artists were denied their monopoly over derivative versions of their creative works merely because they

23

made the artistic decision not to saturate those markets with variations of their original.").

The district court extrapolated too much from Oracle's decision to release the Java API under the OpenJDK license. Even if the open-source license could be construed as a disavowal of plans to use the API for any commercial purpose (a dubious assumption in any event), the copyright laws respect Oracle's "right to change [its] mind." *Worldwide Church*, 227 F.3d at 1119. After all, Oracle's predecessor, in open-sourcing the Java API, did not relinquish its copyright; its "*opportunity*" to commercialize its API further remained intact. *Salinger*, 811 F.2d at 99 (emphasis added).

If the district court were correct that an economic choice not to enter a particular commercial market essentially surrenders the ability to enforce the copyright in that market, the consequences would be severe and adverse for the recording industry. Many recording artists and record companies have made deliberate choices not to develop a potential market at a given time, particularly by commercializing their songs. *See* Thomas D. Selz et al., *Entertainment Law: Legal Concepts and Business Practices* § 4:28 (3d ed. 2016) ("In the 1970s and 1980s, many recording artists refused to allow their music in advertisements and would litigate if such use occurred. This concern for 'selling out' has been a problem primarily for rock musicians."). The Beatles, for instance, famously

guarded their music from commercial use, going so far as to sue Nike over use of their song *Revolution* even after Nike had paid for a license. *Id.*; *see also* Robert Hilburn, *Beatles Sue Nike Over Use of Song,* L.A. Times, July 29, 1987, *available at* http://articles.latimes.com/1987-07-29/entertainment/ca-4364_1_beatles-song. Under the district court's decision, if an artist decides to avoid commercialization of his or her music, or even gives away promotional copies of his or her record to generate interest, those actions could be taken as a relinquishment of copyright protection. The artist's recordings could be exploited commercially by others simply because the artist has not yet done so herself, even if she has reserved her right to do so in the future. That is contrary to how the Ninth Circuit and other courts have construed the fourth fair-use factor, including the statutory obligation to consider the effects on "potential markets."

### B. Any analysis of potential markets must be sensitive to technological advancements.

A market may also be considered a "potential" one not only because a copyright owner intentionally refrains from entry into it, but because technology has not yet opened access to the market, or because the copyright owner is assessing whether to take the very real risk of trying to enter a new market. Congress was aware of this reality when it identified "potential markets" as the baseline for measuring the harm of a potentially infringing work claiming fair use.

Congress selected that baseline in light of the "real danger . . . of confining the scope of an author's rights on the basis of the present technology," because "as the years go by his copyright [could] lose[] much of its value because of unforeseen technical advances." *Copyright Law Revision: Hearings on H.R. 4347 Before Subcomm. No. 3 of the H. Comm. on the Judiciary*, 89th Cong., 1st Sess. 33 (1965) (prepared testimony of George Cary, Deputy Register of Copyrights). The Copyright Office strongly advocated a potential-markets approach because "no one can foresee accurately and in detail the evolving patterns in the ways authors' works will reach the public 10, 20 or 50 years from now." That lack of foresight, the Copyright Office reasoned, favored "a general approach aimed at providing compensation to the author *for future as well as present uses of his work* that would materially affect the value of his copyright." Staff of the H. Comm. on the Judiciary, 89th Cong., *Copyright Law Revision, Part 6: Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill* 13 (Comm. Print 1965) (emphasis added).

Because the Java API had been developed primarily for desktop and laptop use, predating mass availability of mobile technology, the district court gave short shrift to the smartphone market as a source of potential harm in analyzing the fourth fair-use factor. Congress and the Copyright Office appreciated what the

district court did not—the reach of a work covers not only the market it currently serves, but other markets that may develop as technology evolves.

The recording industry is one area where the disregarding of potential, currently inchoate markets can pose a serious danger to copyright protection. The ability to open up new markets through technological advancements has been a hallmark of the recorded music industry since its inception. Wax cylinders played on a phonograph—invented by Thomas Edison in 1877—gave way to vinyl records, which were first introduced with the gramophone in 1897 and later the Victrola in 1901. As technology evolved, sound quality improved.

Vinyl reigned supreme for several decades, until the advent of 8-track tapes and personal cassette tapes in the 1960s. Those, in turn, gave way to compact discs starting in the early 1980s, with Bruce Springsteen's *Born in the U.S.A.* the first CD manufactured for U.S. commercial release in 1984.

The internet made possible what was unfathomable even in the 1980s— playing music without physical media. Apple's iTunes Store, which launched in 2001, became one of the largest retailers of digitally downloaded music. By the mid-2000s, instead of waiting for music to download onto a hard drive, consumers could listen to music as it was streaming off the internet, using services such as Pandora and Rhapsody. By the end of 2014, the combination of digital downloads and streaming subscriptions had overtaken CDs as the preferred means of listening

to music.  *See* Ethan Smith, *Music Services Overtake CDs for First Time*, Wall St. J. (Apr. 14, 2015, 6:53 PM), https://www.wsj.com/articles/digital-music-sales-overtake-cds-for-first-time-1429034467.  And the transition away from physical media has continued rapidly since: by the middle of 2016, only 20% of recorded music was sold in physical form.  Streaming was the dominant choice (47%), followed by permanent digital downloads (31%).

Recording artists rely on the ability to protect their creative works notwithstanding these changes.  *See, e.g.*, *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1016 (9th Cir. 2001) (fourth fair-use factor weighed against Napster because use of the program "reduce[d] audio CD sales among college students and . . . raise[d] barriers to plaintiffs' entry into the market for the digital downloading of music").  However technologically commonplace the digital-download or streaming market may seem today, at one point those markets were potential ones.  But they were no less a basis for discerning market harm then than they are today.  Bruce Springsteen did not lose his right to stop unauthorized streaming or digital downloading of *Born in the U.S.A.* simply because the internet was nascent technology when he released his album.  The protections of copyright persist through time and across media.

Michael Jackson perhaps best illustrates the need for such persistence.  When *Thriller* hit its stride in 1983, it stayed atop the *Billboard* charts for 37

28

weeks, selling more than a million copies a week worldwide. *See* Jay Cocks, *Why He's a Thriller*, Time, Mar. 19, 1984, *available at* http://content.time.com/time/subscriber/article/0,33009,950053-1,00.html.   The King of Pop's unexpected passing in 2009 sparked a revived interest in his albums: *Thriller* sold 101,000 albums the week of his death.   As explained above, the once-dominant CD was then on the verge of yielding its crown to digital downloads.   The transition showed in Jackson's album sales.   Retail stores ran out of physical copies, so consumers turned to the internet—57% of *Thriller* album sales were digital downloads.   *See* Ben Sisario, *In Death as in Life, Michael Jackson Sets Music Sales Records*, N.Y. Times, July 1, 2009, at C1.   Digital downloads have helped keep *Thriller* atop the all-time sales charts.   Keith Caulfield, *Michael Jackson's 'Thriller' Extends Reign as Highest Certified Album in U.S. History*, Billboard, Feb. 16, 2017, http://www.billboard.com/articles/news/7693419/michael-jackson-thriller-highest-certified-album.   And *Thriller* remains popular today in streaming form.   As of February 2017, two songs from *Thriller* ("Billie Jean" and "Beat It") have more than 330 million streams on Spotify.

If the district court's approach to the fourth factor were correct—that evaluation of market harm is largely limited to existing markets at the time of the copyrighted work's creation—then Michael Jackson's ability to defend his creation would have been limited to vinyl and cassettes.   At the time he released *Thriller*,

the American CD market was merely a "potential" market with no guarantee of success,[2] and digital media were even further away.   Under the district court's calculus of market harm, *Thriller* would have been fair game for fair use by anyone who wanted to copy the album without permission onto a CD or in a digital download—all because *Thriller* had served only vinyl and cassette-tape markets when it was released (much as the Java API had only served desktop and laptop markets when it was conceived).   This would be contrary to the plain language of section 107(4) and the intent of Congress, which explicitly identified *potential* market harm as a significant fair-use consideration.

---

[2] Billy Joel had just released the first commercially marketed CD, *52nd Street*, two months before—in Japan.

## CONCLUSION

This Court should apply the first fair-use factor in accordance with the Copyright Act by focusing on the purpose and character of the use, not the transformation of expression.  The Court should also apply the fourth factor in a manner that preserves the copyright owner against harm from infringement in potential markets as well as existing ones.

<table>
<tr><td></td><td>/s/ William M. Jay</td></tr>
<tr><td>George M. Borkowski</td><td>William M. Jay</td></tr>
<tr><td>RECORDING INDUSTRY</td><td>Andrew Kim</td></tr>
<tr><td>   ASSOCIATION OF AMERICA</td><td>GOODWIN PROCTER LLP</td></tr>
<tr><td>1025 F Street, N.W.</td><td>901 New York Ave., NW</td></tr>
<tr><td>10th Floor</td><td>Washington, DC  20001</td></tr>
<tr><td>Washington, D.C. 20004</td><td>(202) 346-4000</td></tr>
<tr><td>(202) 775-0101</td><td>*wjay@goodwinlaw.com*</td></tr>
<tr><td></td><td></td></tr>
<tr><td>*Counsel for Amicus Curiae RIAA*</td><td>*Counsel for Amici Curiae*</td></tr>
</table>

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B) because this brief contains 7000 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).  I further certify that the brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, 14-point Times New Roman, using Microsoft Word.

Dated:  February 17, 2017                                    /s/ William M. Jay
                                                                          William M. Jay

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2017, I electronically filed the

foregoing brief using the Court's CM/ECF system, which will send notice of such

filing to counsel for all parties.

/s/ William M. Jay
William M. Jay