Case Nos. 17-1118, -1202

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

—————————————

ORACLE AMERICA, INC.,
                                        *Plaintiff-Appellant,*
            v.

GOOGLE INC.,
                                        *Defendant-Cross-Appellant.*

—————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 3:10-CV-03561-WHA HON. WILLIAM H. ALSUP

—————————————

**BRIEF FOR *AMICUS CURIAE*
COMPETITIVE CARRIERS ASSOCIATION
IN SUPPORT OF PLAINTIFF-APPELLANT**

—————————————

Rebecca Murphy Thompson
EVP & General Counsel
COMPETITIVE CARRIERS ASSOCIATION
805 15th Street, NW
Suite 401
Washington, DC 20005
(202) 747-0711

*Counsel for Amicus Curiae*

February 17, 2017

## CERTIFICATION OF INTEREST AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 47.4 of the Federal Circuit Rules, counsel for *amicus curiae* Competitive Carriers Association ("CCA") certifies to the following:

Competitive Carriers Association is the full name of the party and the real party in interest represented by me. CCA has no parent company. No publicly held company has a ten percent or greater ownership interest in CCA. The following are the names of all the law firms and attorneys expected to appear for CCA in this Court: Rebecca Murphy Thompson. CCA did not participate in this case in the district court.

*/s/ Rebecca Murphy Thompson*

Rebecca Murphy Thompson
Attorney for *Amicus Curiae*
Competitive Carriers Association

i

# TABLE OF CONTENTS

CERTIFICATION OF INTEREST AND CORPORATE DISCLOSURE STATEMENT ............................................................................... i

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE AS AMICUS CURIAE ..................................... 1

BACKGROUND/SUMMARY OF ARGUMENT .................................... 2

ARGUMENT ...................................................................................... 4

I.    GOOGLE'S APPROPRIATION OF JAVA CODE FOR USE IN ITS "FREE" ANDROID PLATFORM WAS A COMMERCIAL ACT BY A COMMERCIAL ACTOR. ............................................... 4

    A.    It is Undisputed by Google that Its Use of Java was Purely Commercial. .................................................................... 5

    B.    Google Is a For-Profit, Commercial Entity Utilizing a Common Business Model That Does Not Rely On Directly Charging Its Users a Fee. ................................................ 7

    C.    Given Google's Ad-Based Business Model, Its Appropriation of Java Code to Build the "Free" Android Platform Was Wholly Commercial. ........................................................ 11

II.   GOOGLE'S BEHAVIOR HERE IMPOSED GREAT MARKETPLACE HARM AND THUS CANNOT BE DEEMED FAIR USE. ................................................................................. 15

    A.    Google's Behavior Harmed Competition in the Mobile Device Marketplace, to the Benefit of Its Android Platform. ........................ 16

    B.    Google's Behavior Badly Distorted the Marketplace for Mobile Advertising In Which CCA Members Also Participate. ........ 18

CONCLUSION ................................................................................. 22

# TABLE OF AUTHORITIES

## CASES

*A&M Records v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001)............................. 13

*Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913 (2d Cir. 1994) ............... 7, 13

*Banks v. United States*, 741 F.3d 1268 (Fed. Cir. 2014) ......................................... 5

*Cambridge Univ. Press v. Patton*, 769 F.3d 1232 (11th Cir. 2014) ........................ 7

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994).................................... 16

*Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800 (1988)........................ 5

*Harper & Row Publ'rs. v. Nation Enterprs.*, 471 U.S. 539 (1985).................. 5, 16

*In re Family Dollar Stores, Inc.*, 2014 Del. Ch. LEXIS 263 (Del. Ch. Dec. 19, 2014) ............................................................................................................. 9

*L.A. News Serv. v. KCAL-TV Channel 9*, 108 F.3d 1119 (9th Cir. 1997) ............. 18

*Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522 (9th Cir. 2008)................. 16

*Mendenhall v. Barber-Greene Co.*, 26 F.3d 1573 (Fed. Cir. 1994) ....................... 5

*Messenger v. Anderson*, 225 U.S. 436 (1912) ........................................................ 6

*Momenta Pharms, Inc. v. Teva Pharms. USA Inc.*, 809 F.3d 610 (Fed. Cir. 2015) 5

*Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339 (Fed. Cir. 2014) .......................... 6

*Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2016 U.S. Dist. LEXIS 74931 (N.D. Cal. June 8, 2016) ................................................................... 4, 6

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ................... 8

*Revlon, Inc. v. Macandrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986). 9

*Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29 (1st Cir. 2012) ........................................................................................................... 14

*Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ......................... 16

*United States v. ASCAP*, 559 F. Supp. 2d 332 (S.D.N.Y. 2008) .......................... 11

*Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110 (9th Cir. 2000).................................................................................. 14

**STATUTES**

17 U.S.C. § 107(1) ........................................................................ 3, 4

17 U.S.C. § 107(2) ........................................................................... 3

17 U.S.C. § 107(4) ...................................................................... 3, 15

**OTHER AUTHORITIES**

*Alphabet Inc. CL C*, Wall St. J. (Feb. 13, 2017, 3:10p), http://quotes.wsj.com/GOOG ............................................................ 3

Alphabet, Annual Report (Form 10-K) (Feb. 2, 2017), https://goo.gl/5iFnrd. 3, 8, 9

*Alphabet: Fortune 500 Rank History*, Fortune, http://for.tn/2lHkE7h (last visited Feb. 15, 2017) ........................................................................ 8

Andy Rubin, *Where's my Gphone?*, Official Google Blog (Nov. 5, 2007), https://googleblog.blogspot.com/2007/11/wheres-my-gphone.html................ 8

Audrey Shi, *Here Are the 10 Most Profitable Companies*, Fortune (Jun. 8, 2016), http://for.tn/2kp6nes.......................................................................... 7

Cisco Systems, Inc., *Cisco Visual Networking Index: Global Mobile Data Traffic Forecast Update, 2016–2021* (Feb. 7, 2017)...................................... 2

Competitive Carriers Association, Petition for Reconsideration, WC Docket No. 16-106 (FCC filed Jan. 3, 2017) .................................................... 13

Competitive Carriers Association, Reply Comments, WC Docket No. 16-106 (FCC filed July 6, 2016) .............................................................. 19

Datanyze, *Analytics market share in the Datanyze Universe*, https://www.datanyze.com/market-share/analytics (last visited Feb. 16, 2017) ...................................................................................... 20

iv

David Pierce, *Location Is Your Most Critical Data, and Everyone's Watching*, Wired (Apr. 27, 2015, 7:00 AM), https://www.wired.com/2015/04/location/amp ............................................... 20

Ewan Spence, *Android and iOS Fight to Dominate Mobile Advertising*, Forbes (May 11, 2015), http://www.forbes.com/sites/ewanspence/2015/05/11/ android-apple-mobile-advertising-winner ....................................... 21

Google's Opposition to Oracle's Rule 50(a) Motion for Judgment as a Matter of Law (filed May 21, 2016). ............................................................. 13

Ian Barker, *Android overtakes iOS in mobile ad revenue*, BetaNews (Jan. 2017), https://betanews.com/2017/01/12/android-revenue-overtakes-ios .................. 21

Iggy Krajci & Darren Cummings, *Android on x86: An Introduction to Optimizing for Intel Architecture* (2013) .......................................................... 12

Int'l Data Corp., *Smartphone OS Market Share, 2016 Q3*, http://www.idc.com/ promo/smartphone-market-share/os (last visited Feb. 15, 2017) .................... 18

Jason Ostrander, *Android UI Fundamentals: Develop and Design* (Clifford Colby ed., 2012) ...................................................................... 15

Jay Yarow & Jon Terbush, *CHART OF THE DAY: Android Is Totally Blowing Away The Competition*, Business Insider (Nov. 15, 2011, 4:58 PM), http://www.businessinsider.com/chart-of-the-day-android-is-taking-over-the-smartphone-market-2011-11 .......................................................... 17

Jean-Charles Rochet & Jean Tirole, *Two-Sided Markets: An Overview* (Mar. 12, 2004), http://web.mit.edu/14.271/www/rochet_tirole.pdf.............................. 10

Julia Angwin, *Google has Quietly Dropped Ban on Personally Identifiable Web Tracking*, ProPublica (Oct. 21, 2016, 7:00 AM), https://www.propublica.org/ article/ google-has-quietly-dropped-ban-on-personally-identifiable-web-tracking ...................................................................... 21

Lisa Phifer, *How Android 5 security compares to other mobile OSes*, TechTarget (Jun. 13, 2016), http://searchsecurity.techtarget.com/video/How-Android-5-security-compares-to-other-mobile-OSes....................................... 18

Marguerite Reardon, *Location information to make mobile ads more valuable*, CNET (Apr. 15, 2013, 6:18 PM), https://www.cnet.com/news/location-information-to-make-mobile-ads-more-valuable ........................................... 19

MasterCard, *No Annual Fee Credit Cards*, https://www.mastercard.us/ en-us/consumers/find-card-products/categories/no-annual-fee.php (last visited Feb. 15, 2017) ............................................................................................. 10

Mike Issac, G*oogle Dives Into Brick-And-Mortar With First Android Retail Store*, Wired (Dec. 2, 2011), https://www.wired.com/2011/12/google-android-store-australia ...................................................................................................... 14

Oracle, Petition for Reconsideration, WC Docket No. 16-106 (FCC filed Dec. 21, 2016) ............................................................................................................ 19

Oracle's Rule 50(a) Motion for Judgment as a Matter of Law (filed May 17, 2016) ........................................................................................................... 17

Peter Swire et al., *Online Privacy and ISPs:  ISP Access to Consumer Data is Limited and Often Less than Access by Others* (Inst. for Info. Sec. & Privacy, Working Paper, Feb. 29, 2016) ....................................................................... 19

Press Release, Gartner, *Gartner Says Worldwide Smartphone Sales Reached Its Lowest Growth Rate With 3.7 Per Cent Increase in Fourth Quarter of 2007* (Mar. 3, 2009), http://www.gartner.com/newsroom/id/910112 ..................... 17

Press Release, T-Mobile, T-Mobile Unveils the T-Mobile G1 — the First Phone Powered by Android (Sept. 23, 2008), https://newsroom.t-mobile.com/news-and-blogs/t-mobile-unveils-the-t-mobile-g1-the-first-phone-powered-by-android.htm .................................................................................................... 8

Ramon Casadesus-Masanell & Joan E. Ricart, *How to Design a Winning Business Model*, Harv. Bus. Rev., Jan. 2011, https://hbr.org/2011/01/how-to-design-a-winning-business-model .......................................................................... 10, 11

Sam Jewler, *Mission Creep-y:  Google Is Quietly Becoming One of the Nation's Most Powerful Political Forces While Expanding Its Information-Collection Empire*, Public Citizen (Nov. 13, 2014) .......................................................... 19

Symbian Foundation, *Symbian Foundation Has Transitioned to a Licensing Body*, http://licensing.symbian.org (last visited Feb. 15, 2017) ................................ 17

**STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE AS AMICUS CURIAE**

CCA is the nation's leading association for competitive wireless providers and stakeholders across the United States. CCA's membership includes nearly 100 competitive wireless providers, ranging from small, rural carriers serving fewer than 5,000 customers to regional and national providers serving millions of customers. CCA also represents nearly 200 associate members, including vendors and suppliers that provide products and services throughout the mobile communications supply chain. The licensed service area of CCA's carrier members covers 95% of the United States. CCA regularly represents the interests of its members before Congress and the Federal Communications Commission ("FCC"), and through amicus curiae briefs in the courts on significant issues affecting its members.

CCA's members interact with Google as the providers of the networks over which Google's services connect to CCA members' customers, and as purchasers and distributors of phones using Android. CCA members interact with Google as competitors in the mobile advertising marketplace and, in the case of members like Oracle, developing and licensing code for mobile devices. CCA asserts that the District Court held incorrectly that Google's appropriation of Oracle's Java for its Android platform was "fair use." Google's current marketplace dominance with respect to mobile software platforms, online advertising, and online traffic is the

1

result of many strategic decisions, including its decision to flout Oracle's

copyrights in Java – harming competition and CCA members.

Pursuant to Fed. R. App. P. 29(a), all parties have consented to the filing of

this brief.[1]

## BACKGROUND/SUMMARY OF ARGUMENT

As competitive wireless carriers and vendors and suppliers with limited

market power, CCA's members are acutely aware of how the online and mobile

marketplaces have changed as Google (now "Alphabet")[2] has consolidated its

dominant position with respect to mobile software platforms, internet advertising,

and online traffic. CCA's members, which typically provide mobile voice and

broadband data services, build and maintain the networks that subscribers use to

enjoy Google's services, including bandwidth-intensive YouTube.[3] CCA's

members engage in extensive testing to ensure that Android phones work on their

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund the preparation or submission of this brief, and no person other than CCA, its members, and its counsel contributed money intended to fund the preparation or submission of this brief.

[2] For consistency, we refer to Google and other companies owned by Alphabet Holding Company, Inc. as "Google."

[3] Cisco Systems, Inc., *Cisco Visual Networking Index: Global Mobile Data Traffic Forecast Update, 2016–2021* 22 (Feb. 7, 2017), http://www.cisco.com/c/en/us/solutions/collateral/service-provider/visualnetworking-index-vni/mobile-white-paper-c11-520862.pdf (explaining that mobile video content has "much higher bit rates than other mobile content," that video is responsible for a 60% of mobile data traffic, and that that figure is growing).

networks and purchase phones to sell to subscribers, phones that, more and more, are Android-based. In addition, they compete in the online advertising space against Google, the dominant player in that market.

CCA focuses herein on two of the four statutory "fair use" factors: (1) "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes," 17 U.S.C. § 107(1); and (2) "the effect of the use upon the potential market for or value of the copyrighted work," *id.* § 107(4). With respect to the first factor, the courts have already determined that Google's appropriation of Java code was a commercial act. Even if the courts had not made that determination, the facts leave no doubt: Google's actions to incorporate Java into Android without obtaining a license were entirely commercial. Google adopted a business model based on provisioning Android to customers at low cost or no cost, knowing that this strategy would increase its advertising revenues and thus its profitability. The popular ad-driven model for success in the online and telecommunications spheres has been a success for Google: its market capitalization is $567 billion,[4] with advertising revenues of nearly $80 billion in 2016.[5] To achieve this status, Google made specific tactical

---

[4] *Alphabet Inc. CL C*, Wall St. J. (Feb. 13, 2017, 3:10p), http://quotes.wsj.com/GOOG.

[5] Alphabet, Annual Report (Form 10-K) 47 (Feb. 2, 2017), https://goo.gl/5iFnrd (hereinafter Alphabet 10-K).

3

choices, such as disregarding the Java copyright and license. These choices have resulted in harm to both the market for Java and the broader telecommunications marketplace in which CCA's members interact with Google. In short, given Google's motives, its acts, and the resulting marketplace harm, Google's use of Java to build Android was not a valid fair use.

## ARGUMENT

### I. GOOGLE'S APPROPRIATION OF JAVA CODE FOR USE IN ITS "FREE" ANDROID PLATFORM WAS A COMMERCIAL ACT BY A COMMERCIAL ACTOR.

The district court erred by assuming that Android's "open-source" status "tempered Google's overall commercial goals" and relying on the "free and open availability of Android" as a counterweight to the commerciality of Google's conduct. *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2016 U.S. Dist. LEXIS 74931 at *28–*29 (N.D. Cal. June 8, 2016). The record establishes that Google's use of Oracle's code was for an entirely commercial purpose. *See generally* 17 U.S.C. § 107(1) (identifying the "purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes" as being relevant to the fair use analysis). Google has admitted that its use was entirely commercial. Google's status as a public company with an obligation to maximize its profit, further demonstrates its motives were commercial, as does its embrace of a business model under which

the free licensing of open-source Android software is essential to growing those profits. Google's primarily commercial use of Oracle's code weighs strongly against its claim of fair use.[6] *Harper & Row Publ'rs. v. Nation Enterps.*, 471 U.S. 539, 562 (1985).

### A.    It is Undisputed by Google that Its Use of Java was Purely Commercial.

As a threshold issue, Google has conceded that its use of the Java code was purely commercial, and this Court has held as much. A court generally will not revisit an issue decided in the litigation. *Momenta Pharms, Inc. v. Teva Pharms. USA Inc.*, 809 F.3d 610, 619 (Fed. Cir. 2015) (citing *Mendenhall v. Barber-Greene Co.*, 26 F.3d 1573, 1582 (Fed. Cir. 1994)); *Banks v. United States*, 741 F.3d 1268, 1276 (Fed. Cir. 2014) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16 (1988) ("The law-of-the-case doctrine 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'"). Accordingly, "the practice of the courts

---

[6] The courts have held that a use's "purpose and character" turns on "transformativeness" as well as commerciality. Given the significant, real-world experience of CCA and its members with Google in the marketplace, CCA focuses herein on commerciality. The overwhelmingly commercial purpose and character of Google's infringement here should alone be determinative in evaluating the first statutory fair use factor. For the reasons discussed in Oracle's opening brief, however, CCA also agrees that Google's use of Java was not transformative.

[is] generally to refuse to reopen what has been decided." *Messenger v. Anderson*, 225 U.S. 436, 444 (1912).

During the previous phase of this case, this Court had the opportunity to examine whether Google's use of Java was wholly commercial as part of the fair use analysis, and Google agreed that it was. In particular, the Court had the following exchange with Google's counsel during oral argument:

> *Judge O'Malley:* But for purpose and character, though, you don't dispute that it was entirely a commercial purpose.
>
> *Van Nest:* No.

*Oracle Am., Inc. v. Google Inc.*, 2016 U.S. Dist. LEXIS at *28 (quoting oral argument during the first appeal). In returning the case to the district court to develop a more robust factual record on fair use, this Court explained that Google had "admitted[]" that it "copied portions of the API packages . . . for what were purely commercial purposes." *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1376 (Fed. Cir. 2014). The Court should not backtrack here, and rather, it should again accept Google's admission at face value. Therefore, the Court should conclude that the "entirely . . . commercial" purpose and character of Google's copying weighs heavily against a fair use finding.

6

**B.     Google Is a For-Profit, Commercial Entity Utilizing a Common Business Model That Does Not Rely On Directly Charging Its Users a Fee.**

Even if Google had not conceded that its infringement was in service of commercial purposes, the evidence removes any doubt.  As CCA members well know, Google is a profit-seeking enterprise that takes seriously its fiduciary duty to maximize shareholders' returns.  This fact applies with no less force to products – such as Google Search, YouTube, and the Android platform – that seem, at first glance, to be offered to the public for "free."

As an initial matter, the very nature of Google is relevant to the commerciality inquiry.  *Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 922 (2d Cir. 1994) ("[I]t is overly simplistic to suggest that the 'purpose and character of the use' can be fully discerned without considering the nature and objectives of the user.").  Accordingly, Google's status as a for-profit company is highly relevant to factor one of the fair use analysis.  *Id.* at 921; *see also Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1264–65 (11th Cir. 2014) (noting that a university's nonprofit status was "relevant" to the fair use inquiry).

Google is one of the largest, most profitable companies on the planet.[7] Since 2007–2008, when the Android operating system was introduced[8] and when

---

[7] *See* Audrey Shi, *Here Are the 10 Most Profitable Companies*, Fortune (Jun. 8, 2016), http://for.tn/2kp6nes (ranking Google as number 36 on the Fortune 500 and the eighth most profitable company of 2015).

the first commercial Android smartphone was announced,[9] Google has catapulted up the Fortune 500.[10]  Clearly, Google understands how to maximize its profit as a commercial actor riding on the Android wave.

Google's profitability to date is grounded in its strategy of taking paths that do not directly yield revenues from its products' users, but rather harvests access to consumers for other commercial purposes.  Its business relies primarily on advertising, and has for the past decade.[11]  Google's advertising revenues continue to grow year-over-year, reaching nearly $80 billion in 2016.[12]  Generally, advertising is served on Google websites and through Google products that do not involve payments from consumers, such as google.com, the Google app, YouTube,

[8]  Andy Rubin, *Where's my Gphone?*, Official Google Blog (Nov. 5, 2007), https://googleblog.blogspot.com/2007/11/wheres-my-gphone.html.

[9]  Press Release, T-Mobile, T-Mobile Unveils the T-Mobile G1 — the First Phone Powered by Android (Sept. 23, 2008), https://newsroom.t-mobile.com/news-and-blogs/t-mobile-unveils-the-t-mobile-g1-the-first-phone-powered-by-android.htm.

[10]  *See Alphabet:  Fortune 500 Rank History*, Fortune, http://for.tn/2lHkE7h (last visited Feb. 15, 2017) (showing that Google joined the Fortune 500 in 2006 at number 353, ranked 241st in 2007, ranked 150th in 2008, and has been steadily climbing since to its current rank of 36th).

[11]  Alphabet 10-K at 47 ("We generate revenues primarily by delivering performance and brand advertising."); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1166 (9th Cir. 2007) (observing that "Google's AdSense programs [just one subset of Google's advertising businesses] as a whole contributed '$630 million, or 46% of total revenues' to Google's bottom line").

[12]  Alphabet 10-K at 47 (revealing that Google's advertising revenues were $59.6 billion in 2014, $67.4 billion in 2015, and $79.4 billion in 2016).

Gmail, Google Maps, and Google Play, as well partners' websites and, critically, Android.[13]  Google earns vast sums of money from these offerings, even if very little of it comes directly from its products' "users."

The fact that Android is provided to users without charge does not detract from (and in fact enhances) its commercial nature.  Indeed, Android has generated an estimated $42.35 billion in revenues for Google from 2008–2015.  Plaintiff-Appellant Br. at 18.  That profit is no less significant or "commercial" because it comes from advertisers rather than the users of Android devices.  This is especially true for public companies, which have a fiduciary duty to maximize shareholder value.  *See, e.g.*, *Revlon, Inc. v. Macandrews & Forbes Holdings, Inc.*, 506 A.2d 173, 185 (Del. 1986); *In re Family Dollar Stores, Inc.*, 2014 Del. Ch. LEXIS 263 (Del. Ch. Dec. 19, 2014).

It is quite common, moreover, for companies to offer services that charge the "user" nothing – or less than would be charged if the price charged to the user was the only source of revenues – and to rely principally or exclusively on payments from other actors.  In a "two-sided market" of this sort, a provider (sometimes called the "platform") maintains relationships with both the "customer" consuming the offering and another entity that generally benefits from

---

[13] *Id.* at 47–48.

the product's widespread use.[14]  For example, credit card providers derive revenues from merchant fees that multiply as consumers use their cards.  Often, the "customer" pays the credit card company nothing at all.[15]  Magazines and newspapers are often distributed for free (or for a nominal charge), with the publisher relying primarily on advertising revenues.  In these cases, broad distribution of the publication increases the value of the advertisement and the prices paid by advertisers, whereas a higher cover price for the publication itself would reduce circulation, diminishing the value of advertisements and possibly reducing total revenues.[16]

Google's "free" offerings succeed on the same principles.  The fact that Google offers Android (or its search engine, or mapping capabilities, or email, or translation service) at no charge has nothing to do with altruism.  To the contrary,

---

[14] *See generally* Jean-Charles Rochet & Jean Tirole, *Two-Sided Markets: An Overview* (Mar. 12, 2004), http://web.mit.edu/14.271/www/rochet_tirole.pdf.

[15] *See, e.g.*, MasterCard, *No Annual Fee Credit Cards*, https://www.mastercard.us/ en-us/consumers/find-card-products/categories/no-annual-fee.php (last visited Feb. 15, 2017).

[16] *See, e.g.*, Ramon Casadesus-Masanell & Joan E. Ricart, *How to Design a Winning Business Model*, Harv. Bus. Rev., Jan. 2011, https://hbr.org/2011/01/how-to-design-a-winning-business-model ("Metro, the world's largest newspaper, has created an ad-sponsored business model that dictates that the product must be free. That precludes Metro from using price as a tactic.").

this pricing model is meant to maximize use, and, in turn, profit.[17]  Indeed, indirect

pricing models of the sort described above are especially prevalent in the

communications and technology industries.    As CCA's members know well,

network effects are profound.    Google's model is common among internet

companies founded around the same time.  *See, e.g.*, *United States v. ASCAP*, 559

F. Supp. 2d 332, 337–38 (S.D.N.Y. 2008) (describing the "advertising model" used

by many businesses "offering access to content" online in the late 1990s).

### C.    Given Google's Ad-Based Business Model, Its Appropriation of Java Code to Build the "Free" Android Platform Was Wholly Commercial.

Google undoubtedly put Oracle's code to commercial use by expanding the

Android platform, which enhanced Google's associated advertising revenues.

Android is no mere operating system.  Android is expressly designed to reach up

through nearly every layer of the device and the applications that run on it to

collect user data.  The Android ecosystem affords Google exceptional access to a

consumer's location, web browser, and app interactions.  By aggregating customer

data acquired via the Android ecosystem, the "free" services provided via that

system, and web trackers, Google has achieved an unparalleled ability to target

advertising to the consumers most likely to be receptive.    This capability is

---

[17] *See id.* ("[P]ricing (a choice) affects sales volume, which, in turn, shapes the company's . . .  bargaining power . . . .").

immensely valuable to Google's real customers: the advertisers.  Calling Android a

simple platform thus disguises its powerful role in collecting comprehensive data

about individual users and dramatically understates the ways in which the "free"

Android platform propels Google's commercial activities.  It is beyond cavil that

access to this type of consumer information drives the online advertising market,

including  Google's  mobile  advertising  business.    As  explained  by  Google

Executive Chairman Eric Schmidt at the trial in this matter:

> The vast majority of Google's revenue at the time and today [2012]
> comes  from  search  revenue.    And  so  the  primary  reason  to  have
> something like Android is that people will do more searches, and then
> we'll get more money as a result.  And that's how we, essentially, pay
> for the strategy of Android.

Trial  Tr.  1458:12-16.    This  "search  revenue"  does  not  come  from  the  users

performing  searches – those,  of  course,  are  free – but  rather  from  the  advertisers

who place ads amidst or alongside the search results.[18]

In fact, Google's lucrative targeted advertising business specifically depends

on key elements of Android.  Every Android device requires the user to create a

new Google account or use an existing Google account and to remain logged into

that account at all times when using the device.  Google thus has user-specific data

---

[18] *See, e.g.*, Iggy Krajci & Darren Cummings, *Android on x86:  An Introduction to
Optimizing for Intel Architecture* 26 (2013) ("With Android being a free and open
source platform, how is Google making money from it? . . . Google collected
money from Android through advertising in the browser . . . this is where the
majority of Google's money is made.").

for every Android user, in contrast to the more generalized data collected by most online advertising firms without the benefit of Android's reach. This is a significant competitive advantage over CCA carrier members, especially with respect to targeted ads.[19] Google also can track each individual user across multiple Android-based devices and combine that data with additional information collected from the same user based on the use of other Google services (such as search), even on a non-Android device. Thus, Google cannot credibly minimize the significance of its infringement by arguing that there was no connection between the use of Oracle's code and Google's own revenues. Google's Opposition to Oracle's Rule 50(a) Motion for Judgment as a Matter of Law at 2–3 (filed May 21, 2016).

Google's suggestion that the lack of direct customer revenues proves fair use is not only incorrect, but also irrelevant. To the contrary, a finding of commerciality does not depend on the direct receipt of revenue from a sale of an infringing work. *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001) ("Direct economic benefit is not required to demonstrate a commercial use."). Copying that facilitates another type of commercial gain also is a commercial use. *See, e.g.*, *Am. Geophysical Union*, 60 F.3d at 922 (company's

---

[19] *See generally* Competitive Carriers Association, Petition for Reconsideration, WC Docket No. 16-106, at 9 (FCC filed Jan. 3, 2017), https://ecfsapi.fcc.gov/file/10103178455609/CCA%20Privacy%20Order%20Petiti on%20for%20Reconsideration%20(010317)%20_2.pdf.

copying of scientific and technical journal articles for internal use in developing profitable products was "commercial" for purposes of fair use analysis); *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 61 (1st Cir. 2012) (finding that an archbishop profited from copying a work, by, in part, enhancing the archbishop's professional reputation); *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110 (9th Cir. 2000) (finding an organization profited indirectly by using a work to attract new members who would then tithe ten percent of their income).

Copying Oracle's code to expand Android clearly enabled commercial gain for Google's advertising business.  Android facilitates a complete view into essentially everything that happens on a phone:  every website visit, every domain name request, a user's location at any time of day, and countless activities across various apps.  Google also makes Android-based tracking part of the same profile that it constructs about users based on the use of other Google services (*e.g.*, Gmail, Maps, search).  In addition, Google heavily promoted Android as a "free and open source platform" (Android's *de facto* tagline), attracting more phone and tablet manufacturers to the platform.[20]  These developments, in turn, increased the

---

[20] *See, e.g.*, Mike Issac, G*oogle Dives Into Brick-And-Mortar With First Android Retail Store*, Wired (Dec. 2, 2011), https://www.wired.com/2011/12/google-android-store-australia ("Because Google's Android OS is a free and open source platform, multiple manufacturers strap the software to their devices."); Jason

(continued on next page)

number of Android users, which, exponentially increased Google's ability to collect data on consumers.

It is no accident that Google's overall advertising business has grown astronomically since it first announced the Android platform in 2007. *See supra* pp. 7–8. Manifestly, Google's use of the Oracle code and API packages was not only inherently commercial but a significant contributor to the success of Google's extraordinarily profitable advertising business, as well as its overall financial success, in the years since the launch of Oracle's appropriated code in the form of Android.

*    *    *

For these reasons, the commerciality aspect of the statutory fair use factors weighs heavily against Google's claim that its use of Oracle's copyrighted works was excused by fair use.

## II.    GOOGLE'S BEHAVIOR HERE IMPOSED GREAT MARKETPLACE HARM AND THUS CANNOT BE DEEMED FAIR USE.

CCA is also well-positioned to speak to the fourth statutory prong of the fair use analysis, regarding the effect of Google's infringing use on "the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). As purchasers

---

(footnote continued)

Ostrander, *Android UI Fundamentals:  Develop and Design* viii (Clifford Colby ed., 2012).

of mobile devices and providers of mobile services, CCA's members had a ringside seat from which to observe Android's relentless subjugation of Java in the marketplace. Android's usurpation of Java's position in the market for mobile software is critical to the fair use analysis, but it is not the end of the story. The ascension of Android and the proliferation of Android devices also gave Google unparalleled visibility into consumers' online activities. Google exploited this information to great competitive advantage in the online advertising market in which CCA's members also participate. The enormous financial reward that Google reaped by misappropriating Oracle's copyrighted material is more than sufficient to support the presumption that Google's commercial use was not a fair use. *See Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 531–32 (9th Cir. 2008) (*citing Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984)) ("[I]t is well accepted that when 'the intended use is for commercial gain,' the likelihood of market harm 'may be presumed.'").

### A. Google's Behavior Harmed Competition in the Mobile Device Marketplace, to the Benefit of Its Android Platform.

The "'effect of [a] use upon the potential market for or value of the copyrighted work'" is "undoubtedly the single most important element of fair use." *Harper & Row*, 471 U.S. at 566. *See also Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (supplanting the original work is an unfair superseding use).

16

It is clear from the record evidence that Android displaced Oracle's Java in the nascent smartphone market. Oracle's Rule 50(a) Motion for Judgment as a Matter of Law at 22 (filed May 17, 2016). By strategically licensing Java to commercial users (and distributing a free alternative, OpenJDK, to non-commercial users), Oracle forged relationships with several mobile phone manufacturers – some of which work with CCA's members – and secured an integral role in the evolving mobile ecosystem. But the appeal of Android as an open-source and free alternative to Java prompted wide-scale reevaluation of those arrangements, and, in short order, various manufacturers debuted phones that ran on Android in lieu of Java. *Id.* For example, in 2007, Java-based Symbian and early RIM software powered 73.1% of mobile devices globally.[21] "Free and open" Android quickly replaced Java-based systems,[22] and Symbian was discontinued by 2011.[23] Android's ascent thereafter was all but assured – it now controls approximately

---

[21] Press Release, Gartner, *Gartner Says Worldwide Smartphone Sales Reached Its Lowest Growth Rate With 3.7 Per Cent Increase in Fourth Quarter of 2007* (Mar. 3, 2009), http://www.gartner.com/newsroom/id/910112.

[22] Jay Yarow & Jon Terbush, *CHART OF THE DAY: Android Is Totally Blowing Away The Competition*, Business Insider (Nov. 15, 2011, 4:58 PM), http://www.businessinsider.com/chart-of-the-day-android-is-taking-over-the-smartphone-market-2011-11.

[23] Symbian Foundation, *Symbian Foundation Has Transitioned to a Licensing Body*, http://licensing.symbian.org (last visited Feb. 15, 2017).

87% of the global smartphone OS market,[24] exceeding a million new activations of Android devices each day.[25]

### B. Google's Behavior Badly Distorted the Marketplace for Mobile Advertising In Which CCA Members Also Participate.

Each of Android's million activations per day does more than simply fuel Google's dominance of the software platform market.  These activations provide several avenues for Google to view a user's online activities, giving it a profound advantage over competitors like CCA's members and thereby distorting the online advertising market as well.  And it has been well-documented by the press, regulators, and lawmakers at the state and federal levels.  For instance, as many, including CCA, observed in a recent FCC proceeding concerning proposed rules governing broadband privacy, Google and its various data-grabbing applications

---

[24] Int'l Data Corp., *Smartphone OS Market Share, 2016 Q3*, http://www.idc.com/promo/smartphone-market-share/os (last visited Feb. 15, 2017).

[25] Lisa Phifer, *How Android 5 security compares to other mobile OSes*, TechTarget (Jun. 13, 2016), http://searchsecurity.techtarget.com/video/How-Android-5-security-compares-to-other-mobile-OSes.  The determination of fair use is essentially an equitable one in nature, and courts will look to "'the propriety of the defendant's conduct' . . . at least to the extent that [the defendant] may knowingly have exploited a purloined work for free that could have been obtained for a fee." *L.A. News Serv. v. KCAL-TV Channel 9*, 108 F.3d 1119, 1122 (9th Cir. 1997) (citations omitted).  Under that standard, given the evidence here, any suggestion that Google acted fairly in this context is not credible.

likely collect and utilize far more personal information than all Internet Service Providers ("ISPs") combined.[26]

Once Google had cemented its control over the mobile software platform marketplace through Android, it quickly gained the ability to track a consumer's every movement through the day via that user's Android phone or tablet.[27] Indeed, Oracle has observed that every time a consumer turns on the display screen of an Android device, the device sends and receives no fewer than 35 data requests, including inquiries soliciting the customer's location.[28] Such location data is critical to monetizing mobile search.[29] Accordingly, Google has leveraged

---

[26] *See, e.g.*, Peter Swire et al., *Online Privacy and ISPs: ISP Access to Consumer Data is Limited and Often Less than Access by Others* (Inst. for Info. Sec. & Privacy, Working Paper, Feb. 29, 2016), http://www.iisp.gatech.edu/sites/default/files/images/online_privacy_and_isps.pdf; Competitive Carriers Association, Reply Comments, WC Docket No. 16-106, at 29 (FCC filed July 6, 2016), https://ecfsapi.fcc.gov/file/1070634898119/CCA%20Reply%20Comments%20vFINAL.pdf.

[27] *See, e.g.*, Sam Jewler, *Mission Creep-y: Google Is Quietly Becoming One of the Nation's Most Powerful Political Forces While Expanding Its Information-Collection Empire*, Public Citizen (Nov. 13, 2014), http://www.citizen.org/documents/Google-Political-Spending-Mission-Creepy.pdf.

[28] *See* Oracle, Petition for Reconsideration, WC Docket No. 16-106, at 6 (FCC filed Dec. 21, 2016), https://ecfsapi.fcc.gov/file/1221003408004/Oracle_Broadband_Privacy_Petition_for_Reconsideration.pdf.

[29] Marguerite Reardon, *Location information to make mobile ads more valuable*, CNET (Apr. 15, 2013, 6:18 PM), https://www.cnet.com/news/location-information-to-make-mobile-ads-more-valuable.

Android's dominance into advertising dominance, crowding out other entities such as CCA's members (including Oracle).

In addition to smartphones, Google brought Android capabilities to its Chromebook laptops, to newer televisions through Chromecast, and to Android-based televisions, watches, automobiles (all of which compete against devices utilizing Java, Plaintiff-Appellant Br. at 57-58), and so much more – each device capable of collecting and tracking more consumer information and increasing Google's dominance in advertising.

Google combines Android data with data it acquires through tracking software on third-party websites that report information back to Google and its partners about visitors to the website.  In fact, Google holds an 80% market-share in third-party tracking services on the most popular, top-level domains.[30] Combined profiles reveal what type of information a consumer needs or desires, where a consumer has been, where she is going, and who is going with her.[31] Google's ability to aggregate specific consumer data is more comprehensive than that of any other technology company or ISP that may wish to compete in the

---

[30] *See* Datanyze, *Analytics market share in the Datanyze Universe*, https://www.datanyze.com/market-share/analytics (last visited Feb. 16, 2017).

[31] David Pierce, *Location Is Your Most Critical Data, and Everyone's Watching*, Wired (Apr. 27, 2015, 7:00 AM), https://www.wired.com/2015/04/location/amp.

advertising space.[32]  As of 2015, Google had leveraged these capabilities to become the biggest player in the mobile advertising business, in terms of both volume and revenue.[33]  By the third quarter of 2016, Google's share had grown further, to account for 88% of the world's market by mobile platform shipments and 55% of global mobile ad revenue.[34]  The Java platform's share of shipments, meanwhile, has sunk to "almost zero."  Plaintiff-Appellant Br. at 17.  This kind of market-share reversal is acceptable if achieved through fair and open competition, not the misappropriation of property and the related opportunity to compete on a level playing field.

Making matters worse, Google has achieved such milestones on the backs of CCA members and other ISPs.  Google uses ISP connectivity to expand its empire and increase its economic benefit.  The provision of that connectivity by CCA's members required profound investment over many years, and now continued investment to produce competitive services and capabilities in a rapidly-changing,

---

[32] *See* Julia Angwin, *Google has Quietly Dropped Ban on Personally Identifiable Web Tracking*, ProPublica (Oct. 21, 2016, 7:00 AM), https://www.propublica.org/ article/ google-has-quietly-dropped-ban-on-personally-identifiable-web-tracking.

[33] *See* Ewan Spence, *Android and iOS Fight to Dominate Mobile Advertising*, Forbes (May 11, 2015), http://www.forbes.com/sites/ewanspence/2015/05/11/ android-apple-mobile-advertising-winner.

[34] Ian Barker, *Android overtakes iOS in mobile ad revenue*, BetaNews (Jan. 2017), https://betanews.com/2017/01/12/android-revenue-overtakes-ios.

incumbent-dominated marketplace on the cusp of its next leap forward: Fifth Generation ("5G") network services.

In short, by enabling it to assume a dominant role in the online platform market, Google's infringement has distorted the marketplace for mobile operating systems, online advertising, and consumers alike.

## CONCLUSION

For the reasons stated herein and in the Plaintiff-Appellant's Brief, the Court should reverse the judgment, or, as explained in Plaintiff-Appellant's Brief, order a new trial.

Respectfully submitted,

*/s/ Rebecca Murphy Thompson*

Rebecca Murphy Thompson
EVP & General Counsel
COMPETITIVE CARRIERS ASSOCIATION
805 15th Street, NW
Suite 401
Washington, DC 20005
(202) 747-0711

*Counsel for Amicus Curiae*

February 17, 2017

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) and 32(a) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Rule 32(b) of the Federal Circuit, this document contains 4,908 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.

*/s/ Rebecca Murphy Thompson*

Rebecca Murphy Thompson

February 17, 2017

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2017, I caused a copy of the foregoing document to be served by electronic means by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Rebecca Murphy Thompson*

Rebecca Murphy Thompson