NONCONFIDENTIAL
Nos. 17-1118, -1202

IN THE
𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

ORACLE AMERICA, INC.,

*Plaintiff-Appellant*,

**v.**

GOOGLE INC.,

*Defendant-Cross Appellant*.

On Appeal from the United States District Court
for the Northern District of California
No. 3:10-cv-03561-WHA Hon. William H. Alsup

**BRIEF FOR THE COPYRIGHT ALLIANCE
AS *AMICUS CURIAE*
IN SUPPORT OF ORACLE AMERICA, INC.**

Kenneth L. Doroshow
Erica L. Ross
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
(202) 639-6000

*Counsel for Amicus Curiae*

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, Kenneth L. Doroshow, counsel for *Amicus Curiae* the Copyright Alliance, certifies the following:

1.     The full name of the party represented by me is the Copyright Alliance.

2.     The name of the real party in interest represented by me is the Copyright Alliance.

3.     The Copyright Alliance is not a subsidiary of any corporation and the Copyright Alliance has issued no stock.

4.     The names of all law firms and the partners and associates that appeared for the party now represented by me in this proceeding are: Jenner & Block LLP; Kenneth L. Doroshow and Erica L. Ross.

February 17, 2017                              /s/ Kenneth L. Doroshow
                                               Kenneth L. Doroshow
                                               Counsel for *Amicus Curiae*
                                               The Copyright Alliance

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ...................................................................i

TABLE OF AUTHORITIES ..................................................................... iii

STATEMENT OF INTEREST .................................................................. 1

SUMMARY OF ARGUMENT ................................................................. 3

ARGUMENT ............................................................................................ 6

I.    The Fair Use Doctrine Is An Important, But Limited, Exception To The Exclusive Protection Of Copyright................................................. 6

II.   The District Court Erred In Holding That Transporting A Work From One Medium To Another Is "Transformative" Under The First Fair Use Factor. ................................................................................................ 11

III.  The District Court Examined Too Narrow A Market In Considering The Fourth Fair Use Factor. ...................................................... 15

IV.   The District Court's Errors Are Particularly Problematic For Individual Creators, Small Businesses, And Developing Industries. ........................... 21

CONCLUSION ....................................................................................... 27

# TABLE OF AUTHORITIES

C<span></span>ASES

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) ....12, 14, 20, 25

*American Geophysical Union v. Texaco Inc.*, 60 F.3d 913
  (2d Cir. 1994)........................................................................................13, 16

*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) ........................10, 14

*Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015),
  *cert. denied*, 136 S. Ct. 1658 (2016) ..................................................................10

*Cable/Home Communication Corp. v. Network Productions, Inc.*,
  902 F.2d 829 (11th Cir. 1990) ........................................................................16

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994)..........9, 10, 14, 15, 16, 21

*Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.*,
  150 F.3d 132 (2d Cir. 1998) ............................................................................17

*Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539
  (1985) .....................................................................................6, 8, 9, 15, 16, 17

*Homeowner Options for Massachusetts Elders, Inc. v. Brookline
  Bancorp, Inc.*, 754 F. Supp. 2d 201 (D. Mass. 2010)..........................................8

*Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998) ...............12–13

*Monge v. Maya Magazines, Inc.*, 688 F.3d 1164 (9th Cir. 2012).......................7, 16

*Oracle America, Inc. v. Google Inc.*, 750 F.3d 1339 (Fed. Cir.
  2014) ................................................................................3, 7, 8, 9, 13, 14

*Oracle America, Inc. v. Google Inc.*, No. C 10-03561,
  2016 WL 1743111 (N.D. Cal. May 2, 2016).....................................................19

*Oracle America, Inc. v. Google Inc.*, No. C 10-03561 WHA,
  2016 WL 3181206 (N.D. Cal. June 8, 2016)...................................11, 12, 13, 18

*Oracle America, Inc. v. Google Inc.*, No. C 10-03561 WHA,
  2016 WL 5393938 (N.D. Cal. Sept. 27, 2016)............................4, 11, 12, 18, 19

*Salinger v. Random House, Inc.*, 811 F.2d 90 (2d Cir. 1987) ..........................17, 22

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ..............................................................................................................7

*Stewart v. Abend*, 495 U.S. 207 (1990) ....................................................6

*Time, Inc. v. Bernard Geis Associates*, 293 F. Supp. 130 (S.D.N.Y. 1968) ..................................................................................7

*Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110 (9th Cir. 2000) ...........................................................17

## CONSTITUTIONAL PROVISIONS AND STATUTES

Const. art. I, § 8, cl. 8 ..........................................................................6

17 U.S.C. § 101 ...................................................................................10

17 U.S.C. § 107 ...............................................................................7, 15

## OTHER AUTHORITIES

Fed. Cir. R. 29(c) ................................................................................1

Fed. R. App. P. 29(a)(2) .......................................................................1

Fed. R. App. P. 29(a)(4)(E) ..................................................................1

Joshua P. Friedlander, *News and Notes on 2015 RIAA Shipment and Revenue Statistics*, https://www.riaa.com/wp-content/uploads/2016/03/RIAA-2015-Year-End-shipments-memo.pdf ........................................................................................24

Josh Halliday, *Digital Downloads Overtake Physical Music Sales in the US for First Time*, The Guardian (Jan. 6, 2012, 11:17 AM), https://www.theguardian.com/media/2012/jan/06/downloads-physical-sales-us ....................................................................23–24

Aisha Harris, *Is Rap Genius Illegal?*, Slate (Nov. 13, 2013, 3:28 PM), http://www.slate.com/blogs/browbeat/2013/11/13/rap_genius_copyright_lawsuit_national_music_publishers_association_threatens.html ................................................................................................26

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05[B][1] (2016) ......................................................................20

Press Release, NMPH, *NMPA Files Suites Against Two Unlicensed Lyric Sites*, NMPA (May 21, 2014), http://nmpa.org/press_release/nmpa-files-suits-against-two-unlicensed-lyric-sites/ .................................................................25

U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* §§ 101, 802.3 (3d ed. 2014) ..............................................................25

# STATEMENT OF INTEREST[1]

The Copyright Alliance is a non-profit, non-partisan, public interest and educational organization representing the copyright interests of more than 1.8 million individual creators and 13,000 organizations in the United States, across the spectrum of copyright disciplines.  The Copyright Alliance is dedicated to advocating policies that promote and preserve the value of copyright, and to protecting the rights of creators and innovators.

The Copyright Alliance represents individual creators including authors, photographers, performers, artists, software developers, musicians, journalists, directors, songwriters, game designers, and many others.  In addition, the Copyright Alliance represents the interests of book publishers, motion picture studios, software companies, music publishers, sound recording companies, sports leagues, broadcasters, guilds, unions, newspaper and magazine publishers, and many other organizations.  These diverse individuals and organizations all rely on copyright law to protect their ability to pursue a livelihood based on creativity and innovation, and

---

[1] The parties have consented to the filing of this amicus brief pursuant to Fed. R. App. P. 29(a)(2) and Fed. Cir. R. 29(c).  Pursuant to Fed. R. App. P. 29(a)(4)(E), *Amicus* states that although Oracle America, Inc. is a member of the Copyright Alliance, no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person other than the Copyright Alliance, its members, or its counsel, contributed money that was intended to fund preparing or submitting this brief.

to protect their investment in their creation and dissemination of copyrighted works. As particularly relevant to this case, the Copyright Alliance's members depend on a predictable and appropriately circumscribed fair use doctrine that furthers the purposes of copyright law, including the rights of authors to control the reproduction and distribution of their works, as well as derivative works.

The Copyright Alliance recognizes and supports the importance of fair use and is dedicated to ensuring that the balance Congress struck between creators' exclusive rights and a meaningful fair use doctrine is maintained. The Copyright Alliance is concerned that the district court's judgment in this case disrupts that balance by making it too easy for individuals and companies to transport a copyrighted work from one medium to another and claim both that the adaptation is transformative under the first factor of fair use analysis, and that it does not affect the market for the original work under the fourth factor of that inquiry. The Copyright Alliance believes that, if applied broadly, the district court's analysis would have a negative impact on potential or emerging markets for copyrighted works more generally, and would unduly harm individual creators and small businesses that do not have the resources to enter all potential markets simultaneously (or license others to do so on their behalf). The Copyright Alliance therefore submits this brief to ensure that the fair use doctrine continues to be applied

in a manner consistent with copyright's goals of incentivizing the creation of works that are vital to our nation's cultural, scientific, and technological progress.

## SUMMARY OF ARGUMENT

This case concerns Oracle America, Inc.'s ("Oracle") claim that Google, Inc. ("Google") infringed Oracle's copyrights when it copied and used certain application programming interface ("API") packages from Oracle's Java platform in the Android mobile operating system. *See generally Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1347–48 (Fed. Cir. 2014).   In 2014, this Court rejected Google's arguments that the API packages were not copyrightable and remanded the case for further proceedings on Google's fair use defense; a jury subsequently found that Google engaged in fair use, and the district court denied Oracle's motions for judgment as a matter of law and for a new trial.   While this case thus examines the fair use doctrine in the particular context of the software at issue, it has implications far beyond the software industry.   Indeed, the district court's ruling, if left undisturbed, will have serious consequences for creators across a wide range of industries—including, and especially, individuals and small businesses that lack the resources of the parties before the Court.

The decision below is deeply concerning for the artists, authors, software developers, and other creators who rely on the copyright laws to protect their livelihoods.   In holding that Google's use of Oracle's API packages constituted fair

use, the district court made two fundamental and related errors regarding the first and fourth fair use factors, which courts consider to be the most important in the fair use analysis.

With respect to the first fair use factor, the purpose and character of Google's use of the API packages, the district court held that the jury reasonably could have found that "Android was transformative because it took the declaring code in question, which had been designed for desktops and laptops, and reimplemented it for use in a new context, smartphones and tablets." *Oracle Am. Inc. v. Google Inc.*, No. C 10-03561 WHA, 2016 WL 5393938, at *7 (N.D. Cal. Sept. 27, 2016). That holding is contrary to well-established law, which makes clear that adapting a work to a new format or medium is not transformative.

With respect to the fourth factor of the fair use analysis—the effect of Google's use upon the potential market for Oracle's Java platform—the district court similarly misapplied the governing statute and case law. Rather than considering the market for all *potential* uses of the Java API packages or derivative works that Oracle might develop or license others to develop, as the law requires, the court focused myopically on the markets for desktop and laptop computers (Oracle's original uses of Java) and smartphones and tablets (Google's first uses of Android). The court refused to consider that Oracle might have in the future licensed its own products in other derivative markets—including those for wearable devices with

4

small screens, dashboard interfaces in cars, televisions, and e-readers—and that Google's use of Android in those markets detracted from Oracle's ability to monetize its creation. Again, the error in the district court's analysis is clear when viewed through a different example: If an artist creates a website and another person copies its content to create a mobile application, that application undoubtedly diminishes the artist's *potential* market to create her own derivative work, and the fourth factor favors the artist. Limiting the artist to only the market she is already in would clearly violate the Copyright Act's explication of the fourth factor.

The district court's legal errors, if applied to other types of works, would be particularly problematic for small businesses and individuals, including many of the Copyright Alliance's members. Due to resource constraints (and often for strategic reasons), it is frequently impossible for those smaller entities and individuals to enter all markets at once. To date, copyright law has protected their ability to choose when and whether to enter potential markets and create derivative works. The decision below disrupts that status quo, holding that if a (quite often larger) competitor enters a potential or derivative market before the original creator is able to do so, the competitor's use is likely to be deemed transformative under the first fair use factor, and considered not to detract from the narrowly defined market for the original work under the fourth fair use factor. As historical examples—including the emergence of the markets for digital music and lyric websites—make clear, such a system would

not only fail to protect copyright owners' investments in their works, it would also disincentivize them from creating new or derivative works going forward. Simply put, the district court's decision threatens to undermine the very "Progress of Science and useful Arts" that copyright is meant to protect. U.S. Const. art. I, § 8, cl. 8.

## ARGUMENT

### I.    The Fair Use Doctrine Is An Important, But Limited, Exception To The Exclusive Protection Of Copyright.

As the Supreme Court has explained, "the Framers intended copyright itself to be the engine of free expression. By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985). Thus, the Constitution and the Copyright Act recognize the principle that, by protecting original works from copying by secondary users, the law can encourage creators to produce such works and thereby "promote the Progress of Science and useful Arts." U.S. Const. art. I, § 8, cl. 8.

At the same time, the fair use defense "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity that law is designed to foster." *Stewart v. Abend*, 495 U.S. 207, 236 (1990) (quoting *Iowa State Univ. Research Found., Inc. v. ABC*, 621 F.2d 57, 60 (2d Cir. 1980)). The doctrine thus strikes a "sensitive balanc[e]" between robust protections

for copyright, on the one hand, and permitting limited forms of copying and distribution, on the other. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 455 & n.40 (1984). Because it is "so flexible," *Time, Inc. v. Bernard Geis Associates,* 293 F. Supp. 130, 144 (S.D.N.Y. 1968), however, "[t]he fair use doctrine has been called 'the most troublesome in the whole law of copyright.'" *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1170 (9th Cir. 2012) (quoting *Dellar v. Samuel Goldwyn, Inc.*, 104 F.2d 661, 662 (2d Cir. 1993) (per curiam)).

Although fair use began as an "entirely equitable" doctrine, *Bernard Geis Associates*, 293 F. Supp. at 144, the Copyright Act of 1976 codified the judicial practice. Today, 17 U.S.C. § 107 provides:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.

17 U.S.C. § 107. The statute then delineates "four nonexclusive factors to be considered." *Oracle Am.*, 750 F.3d at 1373 (quoting *Harper & Row*, 471 U.S. at 549). Those factors are:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

"The Supreme Court has explained that all of the statutory factors 'are to be explored, and the results weighed together, in light of the purpose[] of copyright.'" *Oracle Am.*, 750 F.3d at 1373 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994)) (alterations in *Oracle Am.*)). Nonetheless, case law makes clear that "[t]he first and fourth factors often are afforded the greatest weight." *Homeowner Options for Mass. Elders, Inc. v. Brookline Bancorp, Inc.*, 754 F. Supp. 2d 201, 210 (D. Mass. 2010). Because that is the case—and because the district court's misguided reasoning with respect to these two factors creates the greatest dangers for copyright owners—*Amicus* focuses on those two factors here.

The first fair use factor—the purpose and character of the use—considers, among other things, "whether and to what extent the new work is transformative." *Oracle Am.*, 750 F.3d at 1374 (quoting *Campbell*, 510 U.S. at 579).[2] As this Court has explained, a work is likely to be transformative if it uses copyrighted material "for purposes distinct from the purpose of the original material." *Id.* (quoting *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003), *overruled*

---

[2] The first factor also considers whether the use serves a commercial purpose, and the defendant's bad faith. *See Harper & Row*, 471 U.S. at 562–63; *Oracle Am.*, 750 F.3d at 1374.

*on other ground by Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 995 (9th Cir. 2011) (per curiam)); *see also Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (work is transformative if it "adds something new, with a further purpose or different character, altering the first with new expression, meaning or message"). By contrast, a work is *not* transformative if it "merely supersedes the objects of the original creation," *Campbell*, 510 U.S. at 579 (internal quotation marks and alterations omitted), or if "the use is for the same intrinsic purpose as the copyright holder's," *Oracle Am.*, 750 F.3d at 1375 (internal quotation marks and alterations omitted). The first factor's focus on purpose dovetails with the examples Congress provided in the preamble to § 107: "whether the use is for criticism, or comment, or news reporting, and the like." *Oracle Am.*, 750 F.3d at 1374 (quoting *Campbell*, 510 U.S. at 578–79). As discussed in more detail below, a work is not transformative simply because it uses copyrighted material in a new medium where that material serves the same purpose.

The fourth fair use factor—the effect of the use upon the potential market for or value of the copyrighted work—"is undoubtedly the single most important element of fair use." *Harper & Row*, 471 U.S. at 566; *see id.* at 602 (Brennan, J., dissenting) (agreeing with this aspect of the Court's analysis). This factor "reflects the idea that fair use 'is limited to copying by others which does not materially impair the marketability of the work which is copied.'" *Oracle Am.*, 750 F.3d at 1376

(*quoting Harper & Row*, 471 U.S. at 566–67).  The fourth factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in substantially adverse impact on the *potential* market for the original."  *Campbell*, 510 U.S. at 590 (internal quotation marks omitted and emphasis added).  Crucially, analysis of the fourth factor "must take account not only of harm to the original but also of harm to the market for derivative works."  *Id.* (quoting *Harper & Row*, 471 U.S. at 568).

In this way, the fourth factor sheds light on the first factor's "transformativeness" inquiry.  The Copyright Act defines a derivative work as one that is "based upon one or more preexisting works," including any "form in which a work may be recast, *transformed*, or adapted."  17 U.S.C. § 101 (emphasis added).  As the Second Circuit has explained, "[p]aradigmatic examples of derivative works include the translation of a novel into another language, the adaptation of a novel into a movie or play, or the recasting of a novel as an e-book or an audiobook."  *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 95 (2d Cir. 2014).  While such changes can, in some sense, "be described as transformations," they generally involve mere "transformations in the nature of *changes of form*," and lack "the kind of transformative purpose that favors a fair use finding."  *Authors Guild v. Google, Inc.*, 804 F.3d 202, 215–16 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 1658 (2016).

10

Thus, the fourth factor's recognition that the copyright owner enjoys the exclusive right to create "derivative works"—and its command that courts consider the market for such works—makes clear that, to be a fair use, a new work must do more than merely "transform" the original from one medium to another. Instead, it must use the copyrighted material for a meaningfully different purpose.

## II.    The District Court Erred In Holding That Transporting A Work From One Medium To Another Is "Transformative" Under The First Fair Use Factor.

The district court's analysis in this case runs afoul of the principles described above. In considering the first factor, the district court held that the jury could have found Google's use of the API packages in Android to be "transformative because [Google] took the declaring code in question, which had been designed for desktops and laptops, and reimplemented it for use in a new context, smartphones and tablets." 2016 WL 5393938, at *7 (order denying renewed motion for judgment as a matter of law and motion for a new trial); *see also Oracle Am. Inc. v. Google Inc.*, No. C 10-03561 WHA, 2016 WL 3181206, at *9 (N.D. Cal. June 8, 2016) (order denying motion for judgment as a matter of law) (stating that jury reasonably could have found Google's use to be transformative because "the mobile smartphone platform" constituted "a fresh context giving new expression, meaning, or message to the duplicated code," which was "designed and used for desktop and laptop

computers"). Thus, the district court held that a change in form, but not purpose, was "transformative" under the first factor.

The court's logic is wrong as a matter of fact as well as a matter of law. On the facts, the district court ignored that the Java platform *already* was running on smartphones—meaning that Google did not "transform" the API packages for use in a "fresh" or "new" context, as the district court opined. 2016 WL 3181206, at *9; 2016 WL 5393938, at *7; *see* ECF No. 1914 at 5 (providing evidence that "Sun's Java SE APIs were in smartphones, serving the same purpose as in Android, *years before* Android's release"). Moreover, the district court's reasoning ignores that smartphones are merely small computers, often possessing more power and speed than the laptops and PCs in which Java was originally used; thus, even if Java had not been running on smartphones, Google's "transformation" was nothing more than adapting the copyrighted material from one type of computer to another.

But even if smartphones are considered a separate "context" entirely, that is insufficient under the law to show that Google's use was transformative. As discussed above, transformativeness under the first fair use factor requires a change in purpose; it is insufficient for a defendant to adapt copyrighted material from one medium to another. *See, e.g.*, *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001) ("Courts have been reluctant to find fair use when an original work is merely retransmitted in a different medium."). For example, in *Infinity*

12

*Broadcast Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998), the Second Circuit held that a service allowing subscribers to listen over the telephone to contemporaneous radio broadcasts in remote cities was not transformative because it was a "mere repackag[ing] . . . [of] the original" broadcasts. *Id.* (quoting Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990)).   As the court explained, while the defendant had changed "the format of the broadcasts so that they are available by telephone rather than radio . . . a change of format, though useful, is not technically a transformation." *Id.* at 108 n.2; *see also, e.g.*, *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 923 (2d Cir. 1994) (holding that a change in format was not transformative and explaining that "an untransformed copy is likely to be used simply for the same intrinsic purpose as the original, thereby providing limited justification for a finding of fair use").

The same is true here.   Google implemented the Java API packages in a conceivably different format, but for the same intrinsic purpose as did Oracle: to "form[] the nexus between the code that calls the library and the code that does the work." ECF No. 1914 at 8 (quoting Tr. 970:10–17 (testimony of Dr. Bloch)); *see Oracle Am.*, 750 F.3d at 1349–51 (explaining function of declaring code copied by Google).   The district court recognized as much.   *See* 2016 WL 3181206, at *8 ("[T]he copied declarations serve the same function in both works, for by definition, declaring code in the Java programming language serves the [same] specific

definitional purposes[.]").  Because "Google believed Java application programmers would want to find the same 37 sets of functionalities in the new Android system callable by the same names as used in Java," it "copied the declaring source code from the Java API packages verbatim, inserting that code into parts of its Android software."  *Oracle Am.*, 750 F.3d at 1350–51 (internal quotation marks omitted)).  Thus, Google's use of the API packages allowed it to benefit from Java's popularity, and permitted it to "avoid the drudgery of working up something fresh."  *Campbell*, 510 U.S. at 580.  Because Google did not use the API packages for a new purpose, its "claim to fairness . . . diminishes accordingly (if it does not vanish)."  *Id.*

Indeed, to see the error in the district court's decision, one need only consider analogous "transformations" of other copyrighted works.  For example, if a novel were made into an e-book or an audiobook, no court would hold that adaptation transformative; to the contrary, this is a "[p]aradigmatic example[] of [a] derivative work" that the original copyright owner has the exclusive right to create.  *HathiTrust*, 755 F.3d at 95.  So too, if a person copied sound recordings from a compact disc and made them into digital audio files or MP3s, that change in form also would not constitute a transformation.  *See Napster*, 239 F.3d at 1015.  As these examples demonstrate, Google's use of the same API packages for the same exact function, just in a different technological form, was not transformative.

14

### III.    The District Court Examined Too Narrow A Market In Considering The Fourth Fair Use Factor.

Just as the district court misapplied the first factor's transformativeness inquiry, it also misconstrued the fourth factor's analysis of "the effect of the [infringing] use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. As discussed above, the fourth factor requires the reviewing court to look beyond the market that the original work *currently* occupies, and to consider the effect of the alleged infringer's use on "*potential* market[s]" for the copyrighted material, as well as the "harm to the market for derivative works." *Campbell*, 510 U.S. at 590 (quotation marks omitted and emphasis added); *Harper & Row*, 471 U.S. at 568. In conducting this inquiry, courts must consider not only "derivative uses" that the creator of the original work itself would develop, but also those derivative uses that the individual or company would "license others to develop." *Campbell*, 510 U.S. at 592.

This broad conception of the relevant markets under the fourth factor is driven by economic reality: "By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate

ideas." *Harper & Row*, 471 U.S. at 558.  To foster that incentive, copyright law protects not only the initial iteration of a copyrighted work, but also any derivative works the copyright owner might create, any markets he is "likely" to develop using the original work, and any licensing opportunities he might exploit for it.  *Campbell*, 510 U.S. at 590, 592; *id.* at 599 (Kennedy, J., concurring) ("[U]nderprotection of copyright disserves the goals of copyright just as much as overprotection, by reducing the financial incentive to create"); *supra* at 9–10.  Thus, the fourth factor should weigh against a finding of fair use if the particular use in question interferes with a "traditional, reasonable, or *likely to be developed market*" for the original work.  *Am. Geophysical Union*, 60 F.3d at 929–30 (emphasis added).

Moreover, the law recognizes that a copyright owner need not move into all markets at once (or at all) to avoid fair use by others.  To the contrary, creators have the "exclusive right" to decide "when, whether and in what form to release the" copyrighted work into new markets, whether on their own or through licensing agreements.  *Monge*, 688 F.3d at 1182 (internal quotation marks omitted); *see also, e.g.*, *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 845 (11th Cir. 1990) ("Under section 107, 'potential market' means either an immediate *or a delayed market*, and includes harm to derivative works." (emphasis added)).  Thus, the Second Circuit has held that diminution of the market value in a plaintiff's works "is not lessened by the fact that their author has disavowed any intention to publish

16

them during his lifetime," because "[h]e is entitled to protect his *opportunity* to sell his letters"—whether he has immediate plans to exploit that opportunity or not. *Salinger v. Random House, Inc.*, 811 F.2d 90, 99 (2d Cir. 1987). Similarly, the Ninth Circuit has held that a plaintiff's decision not to print a work for ten years, "and its lack of a concrete plan to publish a new version," does not support a finding of limited or no harm to a potential market under the fourth factor. *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1119 (9th Cir. 2000). As the court explained, the author remains entitled to protect its copyright "first, because the relevant consideration [i]s the 'potential market' and, second, because he has the right to change his mind." *Id.* Thus, courts agree that "[i]t would not serve the ends of the Copyright Act—*i.e.,* to advance the arts—if artists were denied" their exclusive right to develop "derivative versions of their creative works merely because they made the artistic decision not to saturate those markets with variations of their original." *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 146 (2d Cir. 1998) (quotation marks and alterations omitted); *cf. Harper & Row*, 471 U.S. at 554 (finding "unpersuasive respondents' argument that fair use may be made of a soon-to-be-published manuscript on the ground that the author has demonstrated he has no interest nonpublication," because an author has a "'right to choose when he will publish'").

Despite the clear requirement under established copyright law that courts take a broad view of the relevant markets under the fourth factor, the district court employed an unduly narrow understanding of those markets in this case. Rather than consider how Google's actions affected the potential markets that Oracle might enter or derivative works it might create in the future, the district court focused on the market it found Oracle *already* had entered—specifically, that for desktop and laptop computers. In denying Oracle's Rule 50 motion, the court explained, "our jury could reasonably have found that use of the declaring lines of code (including their SSO) in Android caused no harm to the market for the copyrighted works, *which were for desktop and laptop computers.*" 2016 WL 3181206, at *10 ¶ 9 (emphasis added).[3] In its subsequent order denying Oracle's renewed motion for judgment as a matter of law and for a new trial, the district court suggested that it also considered the markets for smartphones and tablets, *see* 2016 WL 5393938, at *3, *i.e.*, the markets that Google's Android first entered. However, the district court flatly refused to consider all other potential markets and derivative works. For example, it did not take into account the harm done to Oracle's potential use of Java in markets for

_____

[3] In the "summary" paragraph of its Rule 50 Order, the court stated: "On Factor Four, our jury could have found that Android caused no harm to the desktop market for the copyrighted works *or to any mobile derivative* . . . ." 2016 WL 3181206, at *11 ¶ 11 (emphasis added). However, the district court's *analysis* focused solely on the market for desktop and laptop computers.

18

derivative uses like television, automobiles, wearable electronics, and e-readers—even though Android had already entered those markets, and even though it is quite likely that Oracle would have developed or licensed others to develop them.  *Id.* at *3–4.[4]

The district court's misapplication of the fourth factor, like its misunderstanding of the first factor, appears to stem from the fact that it viewed each change in medium as legally significant.  Just as the court erroneously found that transferring the API packages from desktops and laptops to smartphones and tablets was transformative under the first factor, it erroneously believed that Google's use of the API packages in other media—including television, automobiles, wearable devices, and e-readers—was sufficiently distinct to render it irrelevant under the fourth factor.  But it is well-established that "[i]n determining the effect of the defendant's use upon the potential market for or value of the plaintiff's work, a

---

[4] The district court grounded its refusal to consider other markets in the fact that Google's activities in those other markets were not part of the initial infringement trial.  *See Oracle Am., Inc. v. Google Inc.*, No. C 10-03561, 2016 WL 1743111, at *2–3 (N.D. Cal. May 2, 2016) (ruling on motion *in limine*); 2016 WL 5393938, at *3–4.  But Oracle correctly noted that these uses were still relevant to first and fourth factors, and, in any event, it offered to "demonstrate that the implementations of Android in these new products also include the 37 API packages at issue in a three- to five page motion for summary judgment."  2016 WL 1743111, at *3.  The court declined, citing timing constraints and reiterating its flawed (and circular) understanding that "[t]he market effect attributable to works that are not the subject of this action is irrelevant to the fair use analysis of the accused works."  *Id.* at *2.

19

comparison must be made not merely of the media in which the two works may appear, but rather in terms of the function of each such work *regardless of media*." 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05[B][1] at 13-211 (2016) (emphasis added) (footnote omitted). Thus, in the *Napster* case, the Ninth Circuit held that Napster's "deleterious effect on the present and future digital download market" was relevant under the fourth factor, even though the digital downloads available through Napster represented a change in media from the original sound recordings on CDs. 239 F.3d at 1017. As the Ninth Circuit explained, "lack of harm to an established market cannot deprive the copyright holder of the right to develop alternative markets for the works," even if those markets take a different form. *Id.* The same is true here: Because Oracle could have used its API packages in the same way that Google did with Android in other media, the district court should have considered the effect of those uses on Oracle's ability to similarly market its Java platform.

Had the district court correctly analyzed the fourth factor, it would have determined that Google's use of the API packages in Android had a significant negative impact on the market for Oracle's Java, whether embodied in desktops or laptops, smartphones or tablets, or other derivatives ranging from e-readers to automobiles. There is no question that Oracle, as the "creator[] of the original work[,] would in general develop or license others to develop" these other uses.

20

*Campbell*, 510 U.S. at 592; *see id.* at 593 (noting that "the licensing of derivatives is an important economic incentive to the creation of originals"). That is particularly clear because Java is a software platform intended for use in any computer, and these other uses simply adapted the API packages to different types of computers.

Once again, the error in the district court's logic is especially clear when it is extrapolated beyond the world of software. For example, if an artist creates a website and another person copies its content to create a mobile application, that individual has invaded a market the original creator was likely to enter—and so has caused harm cognizable under the fourth factor. The court's contrary application of the fourth factor in this case threatens this longstanding understanding on which creators of all types have relied in building their businesses or other creative enterprises.

## IV. The District Court's Errors Are Particularly Problematic For Individual Creators, Small Businesses, And Developing Industries.

The district court's erroneous reasoning on the first and fourth fair use factors undermines the functioning of the copyright system by allowing infringers to change the format of a work, or enter a new, but related, market and claim fair use on the ground that they have "transformed" the original work under the first factor, and left the potential markets for it unaffected under the fourth factor. While this reasoning is dangerous for content owners of all sizes—including Oracle—it is particularly

problematic for small businesses and individual creators (including many of the Copyright Alliance's members) who may not have the resources to enter all potential or derivative markets at one time. Similarly, the district court's reasoning is harmful to emerging industries, prohibiting them from developing naturally to fit changing demands over time.

As discussed above, copyright protects the owner's "*opportunity*" to enter a "potential market." *Salinger*, 811 F.2d at 99 (quoting 17 U.S.C. § 107(4)). As a result, a copyright owner need not show that he has already entered a particular market in order to preserve his right to do so in the future, and case law recognizes that there are many perfectly valid reasons why an author may decline to make a work immediately available in particular formats or distribution channels (or available at all). *Supra* at 15–19. For small businesses and individual creators— including many of the Copyright Alliance's members—resource constraints may make it difficult, or undesirable, to immediately make a work available in all formats or create all potential derivatives.

The district court's analysis ignores these realities, allowing a competitor to use a copyrighted work for the same purpose in a related technology in contravention of the copyright owner's exclusive right to do so. This diminishes the incentive for copyright owners to create in the first place, because it limits the rewards that they can reap from their work. Indeed, the district court's analysis creates an adverse-

22

possession theory of new markets, rewarding the secondary user who is able to quickly create a derivative work or enter a new market by copying the original copyright owner's work. This rule favors the large competitor with greater resources over the smaller original creator, who may not have the financial resources or technical ability to immediately enter all markets itself or implement costly and sophisticated licensing regimes for others to do so.

Once again, broad application of the district court's approach would be extremely problematic: It would frustrate the ability and incentives for artists, authors, and others to continue to create expressive works. To see the effect that the district court's reasoning would have on emerging markets, one need only look at markets that have developed in the past ten to twenty years, and imagine how they might have progressed differently under the district court's rule:

**Growth of Digital Music.** For much of its history, the recorded music industry relied on sales of physical copies as its primary source of revenue. The shift from physical to digital did not happen overnight. In 1999, Napster brought unauthorized copies of digital music files to the masses. Apple's iTunes store, the first commercially successful digital retailer, was not founded until four years later, in 2003. And the digital market in the U.S. did not outpace the physical market for another nine years after that, until 2012. *See* Josh Halliday, *Digital Downloads Overtake Physical Music Sales in the US for First Time*, The Guardian (Jan. 6, 2012,

23

11:17 AM), https://www.theguardian.com/media/2012/jan/06/downloads-physical-sales-us.  It took another three years for the streaming of music to replace digital downloads as the majority of the music market.  *See* Joshua P. Friedlander, *News and Notes on 2015 RIAA Shipment and Revenue Statistics*, https://www.riaa.com/wp-content/uploads/2016/03/RIAA-2015-Year-End-shipments-memo.pdf.

Critically, had the district court's analysis in this case governed when digital music first became popular, it might have caused courts to hold that services like Napster were engaging in fair use.  In particular, under the district court's analysis here, Napster might have successfully argued that by making sound recordings available in digital audio files, rather than on compact discs, it "transformed" those sound recordings and did not affect the original market for CDs.  That is particularly likely because, when Napster first came into existence, most music labels (whether considered "major" or "independent") had not yet entered the market for digital downloads—meaning that, on the district court's reasoning, such markets might not have been considered *at all*.  That result not only would have permitted sites like Napster to continue to make available unauthorized copies of existing music, stymying the development of authorized online music stores like iTunes; it also would have utterly destroyed the recorded music industry by eliminating the

incentive for recording artists and labels to create new works without any prospect of recovering their investment.

Fortunately, that is not the direction the law took: The Ninth Circuit held that Napster's provision of unauthorized downloads was *not* fair use. See *Napster*, 239 F.3d at 1014–17. As a result, creators and owners of sound recordings had the time and space they needed to figure out how best to enter the market for digital downloads and make their music available in that format to consumers who wanted it, without giving up their right to reap the rewards of their work. The result was a market for digital music that benefited both the recording industry through continued incentives to create and the public through continued access to new music.

**Lyric Websites.** Although song lyrics are elements of authorship in musical works, for many years they were not exploited independently of songs. *See* U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* §§ 101, 802.3 (3d ed. 2014). In recent years, however, websites and mobile application developers found that offering lyrics online or via download draws a significant amount of traffic, which may be monetized through advertising. Music publishers therefore began to license these sites and applications and threaten legal action against those who failed to acquire licenses. *See, e.g.*, Press Release, NMPA, *NMPA Files Suits Against Two Unlicensed Lyric Sites*, (May 21, 2014), http://nmpa.org/press_release/nmpa-files-suits-against-two-unlicensed-lyric-sites/.

25

As a result of these activities, copyright owners have now licensed over 100 different websites and mobile applications that offer lyrics, leading to a new source of revenue for songwriters, composers, and music publishers.    Notably, among the sites currently licensed is Rap Genius, which initially took the position that its reproduction and display of lyrics constituted fair use.  *See* Aisha Harris, *Is Rap Genius   Illegal?*,   Slate   (Nov.   13,   2013,   3:28   PM), http://www.slate.com/blogs/browbeat/2013/11/13/rap_genius_copyright_lawsuit_n ational_music_publishers_association_threatens.html.    If that argument had prevailed—as it likely would under the district court's reasoning here—copyright owners would have lost a significant source of revenue and a meaningful incentive for further creation.

* * *

As these examples demonstrate, it takes significant time for copyright owners—especially smaller, independent businesses and individuals—to enter or even discover all potential markets for their original works or derivatives, and for these markets to develop in ways that reward content producers while satisfying the public's demand.  By rewarding large companies that are able to quickly enter and overtake new markets by copying the original creator's work, the district court's decision threatens to short-circuit this process and deprive original creators of the right to reap the benefits of their hard work.  This, in turn, will lead to diminished

incentives to create new works and develop new markets—a result that is harmful to authors, artists, and other creators, as well as to the public itself.

## CONCLUSION

For all of these reasons, the Copyright Alliance respectfully submits that the decision below should be reversed.

Respectfully submitted,

/s/ Kenneth L. Doroshow

Kenneth L. Doroshow
Erica L. Ross
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
(202) 639-6000

*Counsel for Amicus Curiae*

Date:    February 17, 2017

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on February 17, 2017.


/s/ Kenneth L. Doroshow

Kenneth L. Doroshow
Erica L. Ross
JENNER & BLOCK LLP
Suite 900
1099 New York Avenue, NW
Washington, DC 20001
(202) 639-6000

*Counsel for Amicus Curiae*

Date:    February 17, 2017

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 6,548 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in Times New Roman 14-point font.

/s/ Kenneth L. Doroshow

Kenneth L. Doroshow
Erica L. Ross
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
(202) 639-6000

*Counsel for Amicus Curiae*

Date:   February 17, 2017