Appeal No. 2017-1118, -1202

# United States Court of Appeals

## *for the*

# Federal Circuit

ORACLE AMERICA, INC.,

*Plaintiff-Appellant,*

– v. –

GOOGLE INC.,

*Defendant-Cross-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA IN CASE NO. 3:10-CV-03561-WHA HONORABLE WILLIAM H. ALSUP

# BRIEF FOR *AMICI CURIAE* PACA DIGITAL MEDIA LICENSING ASSOCIATION, INC., GRAPHIC ARTISTS GUILD, NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, NORTH AMERICAN NATURE PHOTOGRAPHY ASSOCIATION, AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS, INC., AMERICAN PHOTOGRAPHIC ARTISTS, AND PROFESSIONAL PHOTOGRAPHERS OF AMERICA IN SUPPORT OF APPELLANT

LINDSAY W. BOWEN
SCOTT J. SHOLDER
COWAN, DEBAETS, ABRAHAMS
& SHEPPARD LLP
41 Madison Avenue, 38th Floor
New York, New York 10010
(212) 974-7474

*Attorneys for Amici Curiae*

Dated: February 17, 2017

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, Lindsay W. Bowen, counsel for *Amici Curiae* PACA Digital Media Licensing Association, Inc., Graphic Artists Guild, National Press Photographers Association, North American Nature Photography Association, American Society of Media Photographers, Inc., American Photographic Artists, and Professional Photographers of America, certifies the following:

1.      The full names of the parties represented by me are PACA Digital Media Licensing Association, Inc., Graphic Artists Guild, National Press Photographers Association, North American Nature Photography Association, American Society of Me

2.      dia Photographers, Inc., American Photographic Artists and Professional Photographers of America.

3.      The names of the real parties in interest represented by me are PACA Digital Media Licensing Association, Inc., Graphic Artists Guild, National Press Photographers Association, North American Nature Photography Association, American Society of Media Photographers, Inc., American Photographic Artists, and Professional Photographers of America.

4.      PACA Digital Media Licensing Association, Inc., Graphic Artists Guild, National Press Photographers Association, North American Nature

Photography Association, American Society of Media Photographers, Inc., American Photographic Artists, and Professional Photographers of America are not subsidiaries of any corporation and have issued no stock.

5.    The names of all law firms and the attorneys that appeared for the parties now represented by me in this proceeding are:  Cowan, DeBates, Abrahams & Sheppard LLP, Lindsay W. Bowen and Nancy E. Wolff.

February 17, 2017                                    /s/ Lindsay W. Bowen
                                                     Lindsay W. Bowen
                                                     Attorney for *Amici Curiae*
                                                     PACA Digital Media Licensing
                                                     Association, Inc. *et al.*

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTEREST ................................................................*i*

TABLE OF CONTENTS.......................................................................*iii*

TABLE OF AUTHORITIES ...................................................................*v*

STATEMENT OF INTEREST .................................................................1

SUMMARY OF ARGUMENT .................................................................5

ARGUMENT ........................................................................................8

I.   The District Court Incorrectly Instructed the Jury on the Relevance
     of Google's Bad Faith..................................................................8

II.  The District Court's Analysis of the First Fair Use Factor Ignores
     the Flexible Purposes of Licensing..............................................12

     a.  The District Court Impermissibly Accepted the Price of
         Google's Android Licenses as Signifying a Non-Commercial
         Purpose ...............................................................................13

     b.  The District Court Did Not Consider that the Purpose of a
         Licensed Work Is To Be Used in Multiple Contexts in Its
         Transformativeness Analysis ................................................16

III. The District Court's Analysis of the Fourth Fair Use Factor Also
     Ignores the Flexible Purposes of Licensing..................................18

     a.  The District Court's Consideration of the "Value" of Oracle's
         Copyrighted Work Was Limited to Its Price Under Certain
         Licenses ..............................................................................19

     b.  The District Court Impermissibly Excluded "Potential Market"
         Evidence From the Trial........................................................21

IV.    The District Court Improperly Determined that a Non-Public
        Benefit to Java Programmers Bore Significantly on the First Three
        Fair Use Factors ............................................................................... 26

CONCLUSION ................................................................................... 29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A&M Records, Inc. v. Napster, Inc.*,
   239 F.3d 1004 (9th Cir. 2001) ............................................................27

*Am. Geophysical Union v. Texaco Inc.*,
   60 F.3d 913 (2d Cir. 1994) .........................................................25, 27

*Atari Games Corp. v. Nintendo of Am. Inc.*,
   975 F.2d 832 (Fed. Cir. 1992) ..............................................................8

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994)..............................................................*passim*

*Davis v. The Gap, Inc.*,
   246 F.3d 152 (2d Cir. 2001) ......................................................... 23-24

*Gaylord v. United States*,
   595 F.3d 1364 (Fed. Cir. 2010) ............................................................8

*Harper & Row, Publs., Inc. v. Nation Enter.*,
   471 U.S. 539 (1985)..............................................................*passim*

*Lenz v. Universal Music Corp.*,
   815 F.3d 1145 (9th Cir.), *cert. denied*, 137 S. Ct. 416 (2016) ........................ 8-9

*Los Angeles News Serv. v. CBS Broad., Inc.*,
   305 F.3d 924 (9th Cir.), *opinion amended and superseded*, 313
   F.3d 1093 (9th Cir. 2002) ..................................................................28

*Los Angeles News Service v. KCAL-TV Channel 9*,
   108 F.3d 1119 (9th Cir. 1997) ......................................................9, 10

*Los Angeles News Serv. v. Reuters Television Int'l, Ltd.*,
   149 F.3d 987 (9th Cir. 1998) ............................................................22

*Meeropol v. Nizer*,
   560 F.2d 1061 (2d Cir. 1977) ............................................................23

*Monge v. Maya Magazines,*
  688 F.3d 1164 (9th Cir. 2012) .................................................................*passim*

*NXIVM Corp. v. Ross Inst.,*
  364 F.3d 471 (2d Cir. 2004) ...............................................................10

*Oracle Am., Inc. v. Google Inc.,*
  750 F.3d 1339 (Fed. Cir. 2014) .........................................5, 13, 17, 18

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs.*, Inc.,
  923 F. Supp. 1231 (N.D. Cal. 1995) ....................................................9

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
  464 U.S. 417 (1984).......................................................................19, 23

*TCA Television Corp. v. McCollum,*
  839 F.3d 168 (2d Cir. 2016) ........................................................22, 23

*Worldwide Church of God v. Philadelphia Church of God, Inc.,*
  227 F.3d 1110 (9th Cir. 2000) .................................................... 19-20

**Statutes**

17 U.S.C. § 107 ...........................................................................18, 21, 28

**Other Authorities**

Fed. R. Civ. P. 50 .......................................................................................6

House Rep. No. 94-1476.........................................................................28

J.R.R. Tolkien, The Hobbit, Chapter IV: "Over Hill And Under Hill,"
  at 65 (Ballantine Books, 1973) ...........................................................5

BusinessWire, Red Hat Reports Fourth Quarter and Fiscal Year 2016
  Results (Mar. 22, 2016) ......................................................................16

Steven J. Vaughan-Nichols, *Red Hat: The First Billion Dollar Linux
  Company Has Arrived*, ZDNet (Mar. 28, 2012)..................................15

## STATEMENT OF INTEREST[1]

The PACA Digital Media Licensing Association, Inc. ("DMLA") (formerly known as the Picture Archive Council of America, Inc.) is a not-for-profit trade association that represents the interests of entities who license still and motion images to editorial and commercial users.  Founded in 1951, DMLA's membership currently includes over 100 image libraries worldwide that are engaged in licensing millions of images, illustrations, film clips, and other content on behalf of thousands of individual creators. Members include large general libraries, such as Getty Images (US), Inc., Adobe, and Shutterstock, Inc., and smaller specialty libraries, all of which support and provide livelihoods to individual visual artists.  DMLA members also provide a valuable service to the media and commercial users by granting ready access to historical and contemporary collections of visual content that illustrates and illuminates all aspects of our society and culture. Over the years, DMLA has developed licensing standards, promoted ethical business practices, and actively advocated for copyright protection on behalf

---

[1] The parties have consented to the filing of this *amicus* brief pursuant to Fed. R. App. P. 29(a) and Fed. Cir. R. 29(c).  Pursuant to Fed. R. App. P. 29(4)(E), *Amici* state that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person other than *Amici*, their members, if any, or their counsel, contributed money that was intended to fund preparing or submitting this brief.

1

of its members.  In addition, DMLA educates and informs its members on issues including technology, tools, and changes in the marketplace.

DMLA has an interest in the outcome of the present appeal, because maintaining the balance between copyright protection and fair use is especially important to the image licensing industry.  A robust licensing economy, in turn, is important to individual artists and their representatives.

The Graphic Artists Guild (the "Guild") is a professional organization for graphic artists that embraces creators at all levels of skill and expertise, who create art intended for presentation as originals or reproductions.  The mission of the Guild is to promote and protect the economic interests of its members, to improve conditions for all creators, and to raise standards for the entire industry.  Since its founding in 1967, the Guild has established itself as the leading advocate for the rights of graphic artists on a wide range of economic and legislative issues, from copyright to tax law.

The National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of photojournalism in its creation, editing and distribution.  NPPA's approximately 6,000 members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism community.  Since its founding in 1946, the NPPA has been the

"Voice of Visual Journalists," vigorously promoting the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism.

The North American Nature Photography Association ("NANPA") is the first and premier association committed solely to serving the field of nature photography. NANPA's 3,100 members include professional photographers who contribute images to DMLA members, such as Animal Animals, Minden Pictures and Grant Heilman Photography, and other libraries specializing in licensing nature and wildlife images.

American Society of Media Photographers, Inc. ("ASMP") represents the interests of professional photographers whose photographs are created for publication and has approximately 7,000 members. It is the oldest and largest organization of its kind in the world.

American Photographic Artists ("APA") is a leading non-profit organization run by, and for, professional photographers since 1981. Recognized for its broad industry reach, APA works to champion the rights of photographers and image-makers worldwide.

Founded in 1869, Professional Photographers of America ("PPA") is the world's oldest and largest association for professional photographers. PPA's membership consists of more than 29,000 direct members and an

additional 20,000 affiliated members from more than 130 affiliated organizations. In total, PPA's membership reach includes some 50,000 professional photographers. For more than 140 years, PPA has dedicated its efforts to protecting the rights of photographers and to creating an environment in which these members can reach their full business and creative potential.

The Guild, NPPA, NANPA, ASMP, APA, and PPA are all associations that represent members including individual visual artists such as illustrators, photojournalists, sports photographers, commercial media and advertising photographers, nature photographers, and videographers (together, the "Individual Artist *Amici*") who have significant personal interests in the fair use issue. The proper balance between exclusive and fair uses is critical to the ability of Individual Artist *Amici* to make their livings as professionals who license their work to customers in order to pay the rent and otherwise provide for themselves and their families. Therefore, any expansion of fair use has a direct impact on them just as surely as any new exception to federal labor laws would have a direct impact on wage earners or salaried employees. As such, all *Amici* strongly prefer to have a voice in changes to the copyright laws through their elected representatives.

## SUMMARY OF ARGUMENT

"You know how terrific a really big thunderstorm can be down in the land and in a river-valley; especially at times when two great thunderstorms meet and clash. More terrible still are thunder and lightning in the mountains at night, when storms come up from East and West and make war. . . . [A]cross the valley the stone-giants were out, and were hurling rocks at one another . . . and tossing them down into the darkness where they smashed among the trees far below."

J.R.R. Tolkien, The Hobbit, Chapter IV: "Over Hill And Under Hill," at 65 (Ballantine Books, 1973).

This case involves a fight between two giants of American technology. But the shockwaves from their battle will be felt across creative industries from relatively large companies down to individual artists, because copyright law applies equally to people and companies of all statures.

The present appeal by Oracle America, Inc. ("Oracle") concerns its claim that Google, Inc. ("Google") infringed its copyrighted computer software code in the popular Java program when Google built its Android mobile operating system. *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1347-48 (Fed. Cir. 2014). On May 9, 2014, this Court remanded the case to the District Court for further proceedings on Google's fair use defense. *Id.* at 1381. On May 26, 2016, after a two-week trial, a jury found that

Google's infringement was protected by the fair use doctrine. On June 8 and September 9, 2016, respectively, the District Court denied Oracle's motions for judgment as a matter of law under Fed R. Civ. P. 50(b) and for a new trial under Fed. R. Civ. P. 50(a). (Dkt. No. 1988 & 2070, collectively, the "Motions").

In its jury instructions (Dkt. 1950) and in its decisions on the Motions, the District Court made fundamental errors in its application of the traditional fair use factors that, unless reversed, will have significant negative effects on licensors of copyrighted work like *Amici*. These errors include: minimizing the role of bad faith in the licensing context in its analysis of the first factor, misunderstanding the value of "free" licenses and the common practice of licensing across markets in its analysis of the first and fourth factors, and considering a private benefit to Google and a limited number of programmers to be a "public benefit" outweighing the Constitutional purposes of copyright protection.

Unless this Court intervenes, these errors threaten to distend fair use until it is no longer recognizable as a narrow and equitable tool for promoting public benefits like criticism, comment, news reporting, teaching, scholarship, or research. Instead, fair use will become negotiating leverage

for parties who are unsatisfied with licensing options offered by *Amici* and embolden them to simply ignore copyrights.

A needless expansion of fair use will also increase losses to *Amici* from outright online piracy and from unsophisticated Internet users who routinely find images through Google Image Search, "right-click" them to create an infringing copy, and then display or further distribute them (a common form of infringement colloquially known as "right-click licensing.")   Such behavior, which has already harmed artists and the legitimate image licensing industry immensely, will only be encouraged if Google's commercial use of copyrighted material in this widely-publicized case is found to be fair.

As in Tolkien's analogy to the risk of collateral damage during World War I, the boulders thrown by Google in this case could smash down through the creative economy and harm far more people than their intended target.   Google's fair use argument would destroy businesses that invest heavily in equipment, software, and complex licensing platforms that permit users to find and legally license images.   In turn, the livelihoods of individual artists who depend on the income those platforms produce would dry up.   Moreover, if professional photographers and visual artists are forced to leave the licensing market, the general public will also be harmed.

Photographs and images are an integral part of a free press and a vibrant economy, and readers of "real news," editors, publishers, advertisers, and consumers all depend on high-quality images from the most talented professional artists to illustrate and illuminate the world around them.

## ARGUMENT

### I.    The District Court Incorrectly Instructed the Jury on the Relevance of Google's Bad Faith.

Although the fair use defense was enacted in Section 107 of the 1976 Copyright Act, it has its roots in equity. *Gaylord v. United States*, 595 F.3d 1364, 1372 (Fed. Cir. 2010). True to these roots, fair use is applied as a rule of reason weighing "traditional equities" which have been partially enacted as four non-exclusive factors. *See Harper & Row, Publs., Inc. v. Nation Enter.*, 471 U.S. 539, 540, 560 (1985); *Gaylord*, 595 F.3d at 1372.

In keeping with the familiar understanding that parties seeking equity must come to the court with clean hands, fair use presupposes good faith. *Harper & Row*, 471 U.S. at 540; *Atari Games Corp. v. Nintendo of Am. Inc.*, 975 F.2d 832, 846 (Fed. Cir. 1992). Indeed, the bad faith of an infringer can hardly be ignored when a copyright owner's own good faith regarding fair use is weighed if she submits takedown notices under the Digital Millennium Copyright Act. *See Lenz v. Universal Music Corp.*, 815 F.3d

1145, 1151 (9th Cir.), *cert. denied*, 137 S. Ct. 416 (2016) (citing 17 U.S.C. § 512(c)(3)(A)(v)).

Accordingly, an infringer's bad faith is considered as part of the first factor regarding the character of the infringing use. *Monge v. Maya Magazines*, 688 F.3d 1164, 1173 n.6 (9th Cir. 2012); *see also Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs.*, Inc., 923 F. Supp. 1231, 1244 (N.D. Cal. 1995). The District Court acknowledged the propriety of an inquiry into Google's bad faith in its Order of June 8, 2016. (*See* Dkt. 1988 at 3.)

Bad faith related to copyright licensing, which is of course particularly relevant to *Amici*, was a significant issue in this case. (Dkt. 1988 at 2-3.) The Ninth Circuit case of *Los Angeles News Service v. KCAL-TV Channel* 9, demonstrates that in the licensing context, bad faith can be demonstrated where a defendant "may knowingly have exploited a purloined work for free that could have been obtained for a fee." 108 F.3d 1119, 1122 (9th Cir. 1997). Citing the Supreme Court case of *Campbell v. Acuff-Rose Music, Inc.*, the *Los Angeles News Service* court held that while the fact that an infringer requested and was refused a license is not dispositive, it is *relevant* to bad faith. *Id.* (citing 510 U.S. 569, 585 n.18 (1994)). The court also considered whether an infringer's license request was "a good faith

effort to avoid . . . litigation," or whether it subsequently and in bad faith "directly copied the original [using] it for the same purpose for which it would have been used had it been paid for."  *Id.*; s*ee also NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 478 (2d Cir. 2004) (considering the bad faith of potential licensees who infringe after initiating and walking away from licensing negotiations is "an integral part of the analysis under the first factor.").

However, in this case, rather than following the Ninth Circuit's binding precedent, the District Court modified its jury instructions "based on *Campbell*" and did not instruct the jury to consider bad faith in the licensing context.  (Dkt. 1988 at 3.)  Indeed, although the instructions correctly identified bad faith in general as relevant, they stated outright that Google's behavior *regarding licensing* was not relevant.  (Dkt. 1950 at 15.)

Specifically, the District Court instructed the jury that "[y]ou have heard evidence concerning the possibility of Google seeking a license from Oracle.  Under the law, if the accused use is otherwise fair, then no permission or license need be sought or granted.  Thus, seeking or being denied permission to use a work *does not weigh against a finding of fair use*."  *Id*. (emphasis added).  This instruction was in error because it invited

the jury to ignore Oracle's overwhelming evidence of Google's bad faith during and after the licensing process itself, including that:

⟩ Google knew that the Java APIs "are copyrighted," and that it "[m]ust take [a] license from" Oracle's predecessor to use them, (TX 10; TX 18; TX 1 at 9; Tr. 889:20-891:12 (Rubin));

⟩ Google "walked away" and "brok[e] off" licensing negotiations because it wished to dictate the terms under which the copyrighted works at issue would be licensed to it, (*see* Tr. 801:10-13, 807:6-7 (Rubin); Tr. 488:1-4 (E. Schmidt); TX 435 TX 215; TX435 (Schwartz Email));

⟩ Google explicitly chose to infringe "Java anyway and defend our decision, perhaps making enemies along the way" rather than pay for a license from Oracle, (TX 7 at 2); and

⟩ Rather than engage in the open exchange of technical ideas that are one of the hallmarks of fair use and computer trade shows, Google instructed Android designers at such a fair not to show Android to or attorneys of Oracle's predecessor, because they would have recognized the infringement. (TX 29).

In light of the clear precedent of *Los Angeles News Service* and because Google's bad faith was a live issue in the case, the District Court should have given the jury the opportunity to weigh Google's licensing behavior, rather than steer it away from the subject altogether. Had the jury been given the chance, no doubt it would have found Google to have acted in bad faith, thereby undercutting Google's fair use defense before it could get off the ground.

The District Court's failure to instruct the jury appropriately is perhaps not surprising in light of its open speculation that there is an

"ongoing debate" and a "respectable view" that bad faith "should no longer be a consideration after" *Campbell.* (Dkt. 1988 at 3, 10). But there is no such debate within the Ninth Circuit, where the post-*Campbell* case of *Los Angeles News Service* is the law. *See Maya Magazines,* 688 F.3d at 478 (citing *Los Angeles News Service* and criticizing commentators who argue that bad faith should not be considered). The District Court may not substitute its preferred reading of *Campbell* for the Ninth Circuit's.

While the District Court may prefer the view that engaging in licensing negotiations merely reflects an infringer's "subjective worry" over fair use that "arguably should not penalize" it, the Ninth Circuit recognizes that an infringer's knowing evasion of an available license is relevant to the question of bad faith and the first factor. (*See* Dkt. No. 1988 at 3.) In light of this error, this Court should apply the Ninth Circuit's guidance in *Los Angeles News Service* and reaffirm its sister court's important holding that in the Ninth Circuit, knowing appropriation and exploitation of a work that is otherwise available for a license fee is incompatible with Congress' intent to provide a limited exception to copyright protection.

## II.    The District Court's Analysis of the First Fair Use Factor Ignores the Flexible Purposes of Licensing.

*Amici* represent a diverse group of individual artists as well as their licensing representatives, from large global stock libraries to small specialty

12

collections that aggregate and make collections of visual content available. Despite these differences in size, *Amici* all earn incomes from intellectual property licensing. Like *Amici* themselves, licenses come in all shapes and sizes. Licensing arrangements enable *Amici* to efficiently offer images for a variety of uses under a spectrum of licensing models that allow narrow or broad uses with fee structures for all budgets. The broad applicability and flexibility of intellectual property licenses are crucial to a healthy marketplace.

*Amici* are extremely concerned that the District Court failed to consider these characteristics of the licensing market in applying the first fair use factor, especially in weighing the considerations of Google's commercial use and transformativeness.

### a. The District Court Impermissibly Accepted the Price of Google's Android Licenses as Signifying a Non-Commercial Purpose.

This Court has previously held in this case that analysis of the first factor "requires inquiry into the commercial nature of the use" and that commercial use "tends to weigh against a finding of fair use." *Oracle Am.*, 750 F.3d at 1375 (citing *Harper & Row*, 471 U.S. at 562). In *Harper & Row*, the Supreme Court cautioned that this inquiry was "not whether the sole motive of the use is monetary gain but whether the user stands to profit

from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562.

Despite this clear guidance, the District Court found that Google's use of Java reasonably "served non-commercial purposes" because Google did not charge for the Android operating system. (Dkt. 1988 at 13). Such a finding, however, weighs monetary gain in isolation, contrary to the *Harper & Row* Court's holding.

The District Court instead should have considered whether Google paid the customary price to Oracle and whether Google stood to profit from its use. As an initial matter, in the face of Google's refusal to pay for a license, it did not pay any price, customary or not. And Google unquestionably stood to profit from copying Oracle's code and using it in the open-source Android operating system, even though Android was offered without charge. (*See* Dkt. 1988 at 13 n.7 (acknowledging Oracle's position regarding Google's profits from Android)). Companies like Google routinely license works for free because they will profit from the license beyond what they could gain from an immediate license payment. *See id.* In fact, so do individual artists and other *Amici*.

Common commercial purposes for free or open source licenses include efforts to promote a new artist or product in the public eye, to

encourage adoption of a platform by professionals like photo editors or programmers, and to strategically weaken competitors. For example, some DMLA members permit non-commercial users to embed images in webpages without charge in exchange for such valuable consideration as, *inter alia*, attribution and usage data. The members profit from this because such licensing promotes their name or brand, builds goodwill with the public, educates individuals about the importance of crediting artists, and also weakens pirate image sites that might otherwise grow to siphon more valuable editorial licensing opportunities. Some Individual Artist *Amici* and other artists may choose to license certain works for limited uses through other free or open-source licenses where no money is charged, like Creative Commons, to promote their other, non-free photography.

In the software world, free licenses are offered for commercial purposes by many companies, including IBM, Oracle, and Google. Indeed, the North Carolina-based open-source Linux software company Red Hat reported revenue of $1.1 billion in 2012 and over $2 billion in 2016 built on the exploitation of its "free" software. Steven J. Vaughan-Nichols, Red Hat: The First Billion Dollar Linux Company Has Arrived, ZDNet (Mar. 28, 2012), http://www.zdnet.com/article/red-hat-the-first-billion-dollar-linux-company-has-arrived; BusinessWire, Red Hat Reports Fourth Quarter and

Fiscal Year 2016 Results (Mar. 22, 2016), http://www.businesswire.com
/news/home/20160322006480/en/Red-Hat-Reports-Fourth-Quarter-Fiscal-
Year.

The District Court's error in conflating the apparent price of free
licenses with non-commercial usage was one of the reasons it denied
Oracle's motion for a judgment as a matter of law. (Dkt. 1988 at 13.) This
Court should reverse that decision and instruct the District Court to consider
Google's actual measure of profit from the Android operating system.

### b. The District Court Did Not Consider that the Purpose of a Licensed Work Is To Be Used in Multiple Contexts in Its Transformativeness Analysis.

The weight given to whether an infringer's use is transformative is
inversely related to how commercial the use is. In this case, the District
Court instructed the jury that "the more transformative an accused work, the
more other factors, such as commercialism, will recede in importance. By
contrast, the less transformative the accused work, the more other factors
like commercialism will dominate." (Dkt. 1988 at 13.) But, like its inquiry
into the commercial nature of Android, the District Court's inquiry into
whether Google transformed Java was flawed.

A use is transformative if it "adds something new, with a further
purpose or different character, altering the first with new expression,

meaning, or message." *Campbell,* 510 U.S. at 579.   In the commercial

context, the purpose of a work can include its potential for robust and

diverse licensing opportunities, which ties this subfactor together with the

fourth fair use factor.

The District Court held that Google's use of Java for smartphones had

a different purpose from Oracle's implementation, which was "designed and

used for desktop and laptop computers."  (Dkt. 1988 at 14).  This analysis is

flawed.  As an initial matter, as this Court previously recognized, the record

shows that Oracle licensed Java for smartphones.  *Oracle Am.*, 750 F.3d at

1351.

More importantly for *Amici*, Oracle valued Java in part for the robust

array of licensing opportunities it presented.   (*See* Tr. 1701:20-1702:5

(mobile devices); Dkt. 1560-7 ¶ 400 (televisions); Dkt. 1996-8 at 3

(automobiles).  Just as *Amici* create imagery with the purpose of licensing it

across all media, Oracle intended Java to be licensed on many different

hardware platforms.  Indeed, Google admits that it explored licensing Java

for its Android phones, acknowledging that it was aware that smartphone

implementations were included in the Java licensing market.  The District

Court's finding that Google's implementation of Oracle's declaring code to

run on a smartphone was "transformative," despite this broad and robust

licensing, ignores the intentional flexibility that licensing gives copyright owners.

Unless this Court reverses the District Court's decision, infringers of *Amici*'s copyrighted works could cite this case for similar so-called "transformations," such as arguing that a photograph that has heretofore been licensed for large-format coffee-table art books has been "transformed" merely by being used as the splash page for a website. Of course, such a use would not be a transformative new purpose, but instead would be one of a number of possible intended uses of a work created with transmedia licensing in mind.

### III.    The District Court's Analysis of the Fourth Fair Use Factor Also Ignores the Flexible Purposes of Licensing.

The Supreme Court declared in *Harper & Row* that the fourth "factor is undoubtedly the single most important element of fair use." *Oracle Am.*, 750 F.3d at 1376 (citing 471 U.S. at 566); *Maya Magazines*, 688 F.3d at 1180 (same). The factor examines the effect of the infringing use on the "value of the copyrighted work" or on the potential market for it. 17 U.S.C. § 107. The first and fourth factors are often connected, and factual elements that are relevant to one have implications on the other. Indeed, here, the District Court's analysis of the fourth factor was flawed for the same reasons that marred its application of the first factor:    (a) the District Court

18

misunderstood the significance of free licensing in weighing the harm to the value of Java, and (b) it discounted the purpose of broad copyright licensing in determining which potential markets were relevant to its analysis.

### a. The District Court's Consideration of the "Value" of Oracle's Copyrighted Work Was Limited to Its Price Under Certain Licenses.

Like Oracle in the present litigation, DMLA members license their works via many types of licenses.  Many members offer both "Rights Managed" and "Royalty Free" licenses as well as subscriptions for customers who typically use large numbers of images for brief periods.  Others offer special options for nonprofit and educational uses.

Copyright law "does not require a copyright owner to charge a fee for the use of his works," because "the owner of a copyright may well have economic" reasons for permitting certain uses "without receiving direct compensation."  *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 447 (1984).  Thus, it is "not the role of the courts to tell copyright holders the best way for them to exploit their copyrights."  *Id.*  As the Ninth Circuit has held "rewards need not be limited to monetary rewards; compensation may take a variety of forms."  *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1119 (9th Cir. 2000).  Any copyright holder, including Oracle and *Amici*, should have the option to

license its work under whatever terms are most beneficial, with the understanding that, in some instances, financial remuneration may not be the most valuable consideration.

However, in its analysis, the District Court focused only on Oracle's "revenue" from Java. (Dkt. 1988 at 17, 18). It found that the fact that Oracle's predecessor made the Java APIs available under a free, open source license could have informed the jury's decision that the fourth fair use factor tipped against Oracle. (Dkt. 1988 at 17, 18). However, the District Court failed to account for the non-monetary value to Oracle of such a license.

Like virtually every license, the open source license for the Java API was offered subject to terms and conditions, as the District Court acknowledged (although it opined that those conditions were "lax.") *Id*. at 17. Despite the District Court's assessment, however, the terms of this license clearly had some value for Oracle. Moreover, as the District Court further acknowledged, Google did not license the Java APIs under these terms, indicating that instead of being "lax," the terms were too restrictive for Google's use. *Id.*; *but see* TX 405 (referring to the "field-of-use restrictions in the Java SE TCK licenses"). Finally, by Google's own admission, it could not reach an agreement to license the Java APIs under a bespoke license, because the terms Oracle proposed were too onerous. *See* Tr.

20

801:10-13, 807:6-7 (Rubin); Tr. 488:1-4 (E. Schmidt); TX 435 (Schwartz Email); TX 215.

These are clear indications that restrictive terms are important components of a license's value. However, despite such indications that the value of Oracle's licenses was not merely a factor of the price they could command, but also of the terms Oracle could set, the District Court did not include this measure of value in its analysis or its instructions.

### b. The District Court Impermissibly Excluded "Potential Market" Evidence From the Trial.

As discussed in Section II(b), *supra*, *Amici* and other licensors of copyrighted works rely on intentionally broad and flexible licensing techniques. This is, in part, because although licensors cannot foresee all potential uses of their products, potential licensees in new markets can seek licensors out themselves.

Fair use analysis protects this flexible arrangement. Section 107 states that a copyright owner does not have to be active in a market; harm to potential markets must also be considered. 17 U.S.C. § 107. Significantly, "[m]arket harm need not be certain" and does not need to have materialized at the time of the infringement in order to weigh against fair use. *Los Angeles News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 994 (9th Cir. 1998). In addition, the Supreme Court has made clear that licensing

into markets is not treated differently from other forms of market entry. *Campbell*, 510 U.S. at 590-92; *see also TCA Television Corp. v. McCollum*, 839 F.3d 168, 186 (2d Cir. 2016).

The effect of this statutory and case law is that licensors like Oracle and *Amici* have the "exclusive right" to decide "when, whether and in what form to release the copyrighted work into new markets." *Maya Magazines*, 688 F.3d at 1182 (quotation marks omitted). An infringer's violation of that right weighs against a fair use defense.

In this case, however, the District Court limited the scope of the trial in a way that impermissibly narrows the meaning of the phrase "potential markets" for licensors. Specifically, the court excluded evidence of harm to Oracle in the potential market for non-smartphone devices, because although Google was using Oracle's APIs on such devices and Oracle included those devices in its supplemental complaint, the Court found the issues too complex for the jury. *See* Dkt. 2070 at 5; *see also* Dkt. 1781 at 3.

The District Court held that Section 107 supported its reasoning because it specifies that the fourth factor includes the "effect of *the use* upon the potential market." *Id.* (emphasis in original). According to the District Court, because Google's infringements in the smartphone market were

separate uses from any infringements outside of that market, harm in the non-smartphone markets need not have been considered. *Id.*

There are two ways to view the District Court's holding, each of which reveal problems. First, the District Court's opinion could be read to require a copyright owner to occupy a given market in order for potential harm to that market to be considered in a Section 107 analysis.

Such a holding would be contrary to well-settled law that an infringer's use can harm a market where neither party is active. For example, in an early case decided under the 1976 Copyright Act, the Second Circuit held that infringing excerpts of unpublished letters in a book could harm the market for the film rights of those letters, even though neither party was active in that market. *Meeropol v. Nizer*, 560 F.2d 1061, 1070 (2d Cir. 1977) (cited in *Harper & Row*, 471 U.S. at 566); *see also Sony Corp. of Am.*, 464 U.S. at 485 (Blackmun, J.) ("the infringer must demonstrate that he had not impaired the copyright holder's ability to demand compensation from (or to deny access to) any group who would otherwise be willing to pay to see or hear the copyrighted work."); *McCollum*, 839 F.3d at 186 (holding that derivative markets are relevant); *Davis v. The Gap, Inc.*, 246 F.3d 152, 176 (2d Cir. 2001), as amended (May 15, 2001) (potential harm relevant where plaintiff was not actively licensing eyewear for use in television

commercials). Such a holding would also be contrary to the practice of licensors like *Amici*, who offer licenses that could apply across markets, without formally "entering" them.

Alternatively, the District Court's holding could be read to impermissibly restrict the evidence of potential market harm to proceedings where the ultimate question of infringement in that market is at issue. The implication of such an error is perhaps best illustrated with an analogy to a hypothetical case with different facts then the one on appeal, but one that could easily arise for *Amici*.

In this example, an infringer publishes a photojournalist's book, claiming fair use, and also makes a film based on the book. The claims involving the book and the film are bifurcated by the judge for two separate trials. At the book trial, the journalist attacks the infringer's fair use defense and as part of the fourth factor, offers evidence that the publication of the book damaged the secondary market for her film rights. However, the judge excludes that evidence, purportedly because of the bifurcation. Such a ruling would prevent the journalist from making her full case on fair use, and be clearly prejudicial. Yet this is essentially what has happened here.

In this case, Oracle was not allowed to show how Google's appropriation of the Java code in the smartphone market harmed it in new derivative

markets. While Oracle offered considerable evidence of market harm in both actual and potential markets, it also had the right to offer the evidence that the District Court excluded as well. *Campbell*, 510 U.S. at 593 (recognizing that evidence of harm to derivative market would weigh against fair use); *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994) (reasonable or likely to be developed markets should be legally cognizable under fourth factor).

The District Court's holding, if affirmed, would lead to perverse results. It would not only reward infringers for entering markets first, but it would force owners like the Individual Artist *Amici* to bear the costs of suing on multiple fronts instead of offering the ordinary limited showing as part of a fair use market harm analysis. Such an incentive for serial infringement would be in tension with the goal of copyright law to protect an owner's ability to choose when to launch its work into new markets. *Maya Magazines*, 688 F.3d at 1182.

This Court should reverse the District Court's decisions on the Motions, *inter alia*, so that the finder of fact may properly consider all available evidence under the fourth factor relating to the harm to the potential market for or to the value of Java.

### IV.  The District Court Improperly Determined that a Non-Public Benefit to Java Programmers Bore Significantly on the First Three Fair Use Factors.

Finally, the District Court erred by holding that a time savings to certain programmers was reasonably a public benefit with a significant impact on multiple fair use factors.  (*See* Dkt. 1988 at 9-10).  Specifically, the District Court found that, had Google not infringed Oracle's copyrights, the result would have been that "programmers, in order to use the Java system as well as the reorganized Android system, would have had to master and keep straight two different SSO's as they switched between the two systems for different projects."  *Id.*  This, in turn, would have led to "confusion and error to the detriment of both Java-based systems and to the detriment of Java programmers at large."  *Id*.

As an initial matter, courts have uniformly held that any residual benefit to a copyright owner, such as the lack of "confusion and error to the detriment of" Oracle's system, is not cognizable in weighing fair use. *Campbell*, 510 U.S. at 591 n. 21 ("Even favorable evidence [of a benefit to a copyright owner,] without more, is no guarantee of fairness."); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1018 (9th Cir. 2001), as amended (Apr. 3, 2001) ("We agree that increased sales of copyrighted

material attributable to unauthorized use should not deprive the copyright holder of the right to license the material").

Further, the convenience to a group of programmers who choose to work in both Oracle's and Google's systems is irrelevant to consideration of fair use.   In *Texaco*, the defendant argued that it would have been more convenient to use an unlicensed photocopy of an article, rather than to purchase an authorized copy.  The court nevertheless held that the use was not fair use.   60 F.3d at 919, 923.   Likewise, in *Infinity Broadcast Corporation v. Kirkwood*, the court held that it was not transformative to make radio broadcasts "available by telephone rather than radio" even though the parties agreed that doing so would be "useful" to the defendant's users. 150 F.3d 104, 108 n.2 (2d Cir. 1998).

Additionally, such convenience does not rise to the level of the societal benefits enumerated in the preamble to Section 107, "criticism, comment, news reporting, teaching . . ., scholarship, or research."   17 U.S.C. § 107. "Although these categories have an illustrative and not limitative function, . . . the illustrative nature of the categories should not be ignored." *Infinity Broad. Corp.,* 150 F.3d at 107.  As such, a private benefit, even if shared by a large number of members of one profession using one company's products, is not enough of a benefit to the public at large to outweigh the

constitutional purposes of copyright. *Cf.* House Rep. No. 94-1476 (the making of copies for visually impaired persons); *Los Angeles News Serv. v. CBS Broad., Inc*., 305 F.3d 924, 942 (9th Cir.), *opinion amended and superseded*, 313 F.3d 1093 (9th Cir. 2002) (news coverage of a riot that was "history of the day").

Moreover, the District Court's holding is contrary to the established principle that where a "public benefit" can "be accomplished by other methods," a finding of fair use is inappropriate. *Infinity Broad. Corp.*, 150 F.3d at 108-09; *see also WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 288 (2d Cir. 2012) (where "the public will still be able to access [television] programs through means other than [such] Internet service[s], including cable television," there is no reason to distort traditional copyright principles).

The District Court's reasoning ignores that the most expedient solution to the programmers' dilemma would have been for Google to have obtained a license, not to ignore Oracle's copyright protection.

If the District Court's opinion is upheld, and convenience to Android programmers is enshrined as a cognizable pubic benefit, there may be no delimiting principle that would stop another class of professionals, photo editors, from claiming that "right click licensing" a photo found using Google Image Search and dispensing with any actual licensing process rises

to the level of a public benefit as well, simply because it is also convenient. Because far too many people think that any image on the Internet can be infringed under fair use as it is, the consequences to the image licensing economy of such a line of reasoning could be disastrous.

## CONCLUSION

For all of these reasons, *Amici* respectfully submit that the decision below should be reversed.

Respectfully submitted,


/s/ Lindsay W. Bowen

Lindsay W. Bowen
    *Counsel of Record*
Scott J. Sholder
COWAN, DEBATES, ABRAHAMS &
    SHEPPARD LLP
41 Madison Ave
New York, NY 10010
(212) 974-7474


Date:    February 17, 2017

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,284 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as counted by Microsoft® Word 2007, the word processing software used to prepare this brief.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Word 2007, Times New Roman, 14 point.

/s/ Lindsay W. Bowen
Lindsay W. Bowen
*Attorney for Amici Curiae*
Dated:        February 17, 2017

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on February 17, 2017.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:     February 17, 2017

By:     /s/ Lindsay W. Bowen
*Counsel for amicus curiae PACA, DMLA*