**Nos. 17-1118, 17-1202**

**IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

ORACLE AMERICA, INC.,

*Plaintiff-Appellant / Cross-Appellee*

v.

GOOGLE INC.,

*Defendant-Appellee / Cross-Appellant.*

---

On Appeal from the United States District Court
for the Northern District of California
Case No. 3:10-cv-0356-WHA, Hon. William H. Alsup

---

# BRIEF OF THE AMERICAN ANTITRUST INSTITUTE AS AMICUS CURIAE IN SUPPORT OF DEFENDANT-APPELLEE AND AFFIRMANCE

---

PROF. SHUBHA GHOSH
SYRACUSE UNIV. COLLEGE OF LAW
950 Irving Avenue
Syracuse, NY 13244
(315) 443-2532
sghosh01@law.syr.edu

RICHARD M. BRUNELL
AMERICAN ANTITRUST INSTITUTE
1730 Rhode Island Avenue, NW
Washington, DC 20036
(202) 600-9640
rbrunell@antitrustinstitute.org

*Counsel for Amicus Curiae*

May 30, 2017

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rules 29(a) and 47.4, counsel for Amicus Curiae certifies that:

1. The full names of every party or amicus represented by me is: The American Antitrust Institute.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: None

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: None

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court and who are not already listed on the docket for the current case are: None

s/ Richard M. Brunell
Richard M. Brunell

Dated: May 30, 2017

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .................... i

TABLE OF CONTENTS .................... ii

TABLE OF AUTHORITIES .................... iii

INTEREST OF AMICUS CURIAE .................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .................... 2

ARGUMENT .................... 7

I. FAIR USE IS A TOOL FOR PROMOTING INNOVATION AND COMPETITION .................... 7

A. Fair Use Broadly Promotes the Innovation and Competition Goals It Shares with Antitrust Law .................... 9

B. Transformativeness Is Paramount in the Fair Use Inquiry .................... 12

II. TO PROTECT INNOVATION AND COMPETITION, FAIR USE SHOULD BE APPLIED LIBERALLY TO COPYRIGHTED SOFTWARE INTERFACES .................... 16

III. ORACLE'S NARROW VIEW OF FAIR USE WOULD GUT THE DOCTRINE'S ABILITY TO PROMOTE INNOVATION AND COMPETITION IN MARKETS THAT DEPEND ON SOFTWARE .................... 22

CONCLUSION .................... 28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

### CASES

*Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286 (Fed. Cir. 2014) .............. 2, 20

*Assessment Techs. of WI, LLC v. WIREdata, Inc.*, 350 F.3d 640 (7th Cir. 2003) .............. 9

*Authors Guild, Inc. v. Google Inc.*, 804 F.3d 202 (2d Cir. 2015) .............. 13, 23, 24

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) .............. *passim*

*Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.*, 809 F.3d 1295 (Fed. Cir. 2015) .............. 20

*Computer Assoc. Int'l, Inc., v. Altai, Inc.*, 23 U.S.P.Q. 2d (BNA) 1241 (2d Cir. 1992) .............. 17

*Fisher v. Dees*, 794 F.2d 432 (9th Cir. 1986) .............. 14

*Folsom v. Marsh*, 9 F. Cas. 342 (C.C.D. Mass. 1841) .............. *passim*

*Image Technical Servs. v. Eastman Kodak Co.,* 125 F.3d 1195 (9th Cir. 1997) .............. 9

*Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307 (Fed. Cir. 2016) .............. 21

*Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) .............. 12, 13

*Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807 (1st Cir. 1995) .............. 17, 18, 19

*Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024 (9th Cir. 2015) .............. 20

*Monge v. Maya Magazines, Inc.*, 688 F.3d 1164 (9th Cir. 2012) .............. 8

*Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339 (Fed. Cir. 2014) .............. 19, 20, 24

*Sega Ents. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992) .............. 10, 16, 17, 25

*Seltzer v. Green Day, Inc.*, 725 F.3d 1170 (9th Cir. 2013) .............. 8, 12, 13, 24

*SOFA Entm't, Inc. v. Dodger Productions, Inc.*, 709 F.3d 1273 (9th Cir. 2013) .............. 3

*Sony Computer Entm't Am., Inc. v. Bleem, LLC*,
214 F.3d 1022 (9th Cir. 2000) .......................................................... 3, 10

*Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596
(9th Cir. 2000)...................................................................... *passim*

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) ............................................................... 10, 14

*Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001) ...... 24

*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151 (1975) ................ 2

*Wall Data Inc. v. Los Angeles County Sheriff's Dept.*,
447 F.3d 769 (9th Cir. 2006) ................................................................ 25

**STATUTES**

17 U.S.C. § 107 (2012) ........................................................................ 8

**OTHER AUTHORITIES**

Clark D. Asay, *Software's Copyright Anticommons*,
66 Emory L.J. 265 (2017) ............................................................ 21, 24

Donald S. Chisum et al., *Last Frontier Conference Report on Copyright Protection of Computer Software*,
30(1) Jurimetrics 15 (1989)............................................................... 16

Pierre Leval, *Toward a Fair Use Standard*,
103 Harv. L. Rev. 1105 (1990) .......................................................... 13

William F. Patry, *Patry on Fair Use* § 6:7 (March 2017 Update) .......... 26

Pamela Samuelson, *The Uneasy Case for Software Copyrights Revisited*, 79 Geo. Wash. L. Rev. 1746 (2011)................... 18

Scott A. Sher & Bradley T. Tennis, *Exploiting Others' Investments in Open Standards*, 3(1) Comp. Pol'y Int'l 1 (2016) ............................ 21

Christopher Sprigman, *Copyright and the Rule of Reason*,
7 J. Tel. & High Tech. L. 317 (2009)................................................... 10

## INTEREST OF AMICUS CURIAE

The American Antitrust Institute ("AAI") is an independent non-profit organization devoted to promoting competition that protects consumers, businesses, and society. It is managed by its Board of Directors with the guidance of an Advisory Board that consists of over 130 prominent antitrust lawyers, law professors, economists, and business leaders. *See* http://www.antitrustinstitute.org.[1] AAI serves the public through education, research, and advocacy on the benefits of competition and the use of antitrust enforcement as a vital component of national and international competition policy. AAI also seeks to ensure that the intellectual property laws are interpreted and applied in a manner that reflects their ultimate goals of promoting innovation, competition, and consumer welfare. Toward that end, AAI has filed several amicus briefs in this Court on important patent-related issues. *See, e.g.,* Brief of Amicus Curiae The American Antitrust Institute in Sup-

[1] All parties have consented to the filing of this brief. Individual views of members of AAI's Board of Directors or Advisory Board may differ from AAI's positions. Pursuant to Fed. R. App. P. 29, amicus curiae states: No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person or entity other than amicus curiae or its counsel contributed money that was intended to fund preparing or submitting this brief.

port of Neither Party, *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286 (Fed. Cir. 2014). AAI submits this brief because Oracle's arguments, if accepted, would seriously undermine the ability of the fair use doctrine to promote innovation and competition in software markets, where it is particularly needed.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Copyright is not a tool for controlling markets; it is a tool for promoting the progress of science and useful arts. "The limited scope of the copyright holder's statutory monopoly, like the limited copyright duration required by the Constitution, reflects a balance of competing claims upon the public interest: Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts. . . . [T]he ultimate aim is, by this incentive, to stimulate artistic creativity for the general public good." *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975).

The fair use doctrine "permits"—indeed "requires"—"courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster."

*Sony Computer Entm't Am., Inc. v. Bleem, LLC*, 214 F.3d 1022, 1026 (9th Cir. 2000) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994)) (internal quotation marks and brackets omitted); *SOFA Entm't, Inc. v. Dodger Productions, Inc.*, 709 F.3d 1273, 1278 (9th Cir. 2013) ("an overzealous monopolist can use his copyright to stamp out the very creativity that the [Copyright] Act seeks to ignite," and Congress codified the fair use doctrine "[t]o avoid that perverse result"). When exclusionary rights threaten to impede beneficial competitive behavior, fair use intervenes in favor of innovative parties who build on existing works to create new products, unlock new functionalities, or open new markets that benefit consumers.

1. The fundamental concern underlying the fair use doctrine in the American legal system is that a copyright holder's gain from exercising the right to exclude is not always justifiable in relation to society's loss. Congress has deemed this concern most troubling when deference to the copyright holder's interest in creative rewards would deprive society of innovative uses that benefit competition and consumers. Without fair use, a copyright owner may be able to occupy a field and prevent pro-consumer transformations of a particular product. In this

sense, fair use shares the same pro-innovation and pro-competition goals as a universe of statutory and equitable rules that police marketplace abuses, including the antitrust laws and varying doctrines of intellectual property "misuse." But unlike these other rules, which tend to focus on the "bad" behavior of incumbents, fair use tends to focus on the "good" behavior of entrepreneurs and other agents of dynamic competition and economic growth.

In the fair use paradigm, "good" behavior means making transformative use of copyrighted works. The Supreme Court and the Ninth Circuit agree that transformativeness is paramount in the fair use inquiry. It speaks not only to the innovative nature (or lack thereof) of an alleged infringer's use, but also to the legitimacy of any market impact of that use. Very often, a transformative use will have no impact at all on the market for the copyright holder's work, in which case copyright protection carries no water in preserving an author's incentive to create. Sometimes, however, a transformative use can cause decreased demand for the copyrighted work, and it is the role of the courts to determine whether the decrease is attributable to the use's innovative or usurpative effect. Controlling Supreme Court and Ninth Circuit precedent

make clear that the former amounts to fair use, whereas the latter does not.

2. The stakes of properly answering the innovation-usurpation question are particularly high in the context of copyrighted software interfaces. Notwithstanding that it may have expressive content, software is inherently utilitarian and functional in nature. Google's arguments about "interoperability" and the API declarations being an "industry standard," although irrelevant to the question of copyrightability under the law of the case, are highly relevant to the question of fair use. Much as this Court has recognized that remedies in cases involving standard-essential patent infringement should not allow patentees to take advantage of lock-in, so too should it recognize here that allowing copyright owners to monopolize software programming interfaces poses similar risks, with important implications for fair use. An especially broad role for fair use is required when a copyrighted work's *functional* value can be leveraged to raise the costs of innovative software development by rivals and others.

3. Oracle's arguments are inimical to the fair use doctrine's goals of promoting innovation and competition in markets that depend

on software. If fair use is evaluated at Oracle's preferred level of abstraction, it would mean that software interfaces that become industry standards because of their functional value, not their expressive content, could never be subject to fair use. Innovation in software would necessarily suffer. Moreover, Oracle's contention that the creativity of a piece of software must be compared to other software rather than copyrighted works in general is unsupported in the case law and inconsistent with Oracle's other arguments attempting to narrow the transformativeness inquiry for software. Finally, Oracle's contention that the inclusion of the Java API packages at issue harmed the market *or potential market* for the copyrighted works is unavailing insofar as it is claiming that the mere loss of an opportunity to license the alleged infringer is cognizable market harm. Moreover, notwithstanding any harm that Oracle may have suffered from the introduction of Android, harm from a transformative use that is not based on the expressive content of the infringed work is not relevant copyright harm.

# ARGUMENT

## I. FAIR USE IS A TOOL FOR PROMOTING INNOVATION AND COMPETITION

Since its recognition in the United States in *Folsom v. Marsh*, 9 F. Cas. 342 (C.C.D. Mass. 1841), fair use has served as a critical doctrinal tool to facilitate the entry of new works into copyright-governed marketplaces, whether for books, music, film, video recorders, video games, or software. In *Folsom*, Justice Story, sitting by designation as a district court judge for the District of Massachusetts, focused on two principal factors in determining whether an accused infringer has made a "justifiable use of the original materials, such as the law recognizes as no infringement of the copyright of the plaintiffs." *Id.* at 348.

First, in considering whether the defendants' two-volume tome of selected letters of George Washington constituted a permissible abridgement of plaintiffs' multivolume compilation, Justice Story stated that "[t]here must be real, substantial condensation of the materials, and intellectual labor and judgment bestowed thereon; and not merely the facile use of the scissors; or extracts of the essential parts, constituting the chief value of the original work." *Id.* at 345. However, defen-

dants' work added little additional value, as the "work of the defendants is mainly founded upon these [copyrighted] letters . . . imparting its greatest, nay, its essential value." *Id.* at 349. Second, the court examined the impact of the abridgment on the market for the original work, concluding that "plaintiffs' copyright [would] be totally destroyed" if defendants' copying were permitted. *Id.* at 349.

In contemporary fair use analysis, the lessons of Justice Story's decision have endured. The fair use doctrine, codified in 17 U.S.C. § 107 (2012), remains a species of justification. And the relevant factors to be considered[2] focus in significant part on the value added by the infringer and the market effects of the infringement. *See Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1179 (9th Cir. 2013) ("factor one and factor four have 'dominated the case law' and are generally viewed as the most important factors" (quoting *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1171 (9th Cir. 2012))). The doctrine has evolved to serve a broad

[2] "[T]he factors to be considered shall include—(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107 (2012).

role in promoting innovation and competition, and it is particularly important in the software context where innovation and competition often depend on interoperability with existing software elements.

### A. Fair Use Broadly Promotes the Innovation and Competition Goals It Shares with Antitrust Law

Although copyright fair use, much like the doctrine of copyright misuse, shares the pro-competition and pro-innovation goals of the antitrust laws, it must be understood on its own distinct terms. Rather than policing harmful anticompetitive behavior within the narrow confines of "relevant markets," "market power," and "exclusionary conduct," fair use serves as an enabler of innovation and competition by limiting the extent to which copyright itself may serve as an unreasonable barrier to entry.[3] And whereas antitrust (and copyright misuse) would focus on the conduct of the copyright owner and whether it has harmed competition, statutory fair use, by contrast, focuses on the transformative and innovative activities (or lack thereof) of the in-

[3] Accordingly, fair use does not require courts to answer vexing questions involving the relationship between copyright and antitrust, *see Image Technical Servs. v. Eastman Kodak Co.,* 125 F.3d 1195, 1214 (9th Cir. 1997), which are also germane in the copyright misuse context. *See, e.g., Assessment Techs. of WI, LLC v. WIREdata, Inc.*, 350 F.3d 640, 647 (7th Cir. 2003).

fringer, with the purpose of affirmatively encouraging innovation and competition.[4]

The Ninth Circuit has been at the forefront of applying the fair use defense to promote innovation and competition. *See, e.g., Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000) (holding that rival's intermediate copying of Sony's software was fair use to enable reverse engineering so that Sony PlayStation games would work on rival's new platform); *Sega Ents. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992) ("wholesale copying of Sega's copyrighted code" was permissable to enable rival video game cartridge company to make its games compatible with Sega console); *Bleem*, 214 F.3d at 1027, 1030 (holding that copying screen shots was fair use to allow comparative advertising which promoted competition and product improvements).

[4] Fair use's "equitable rule of reason," *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 448 (1984), is analogous to antitrust's rule of reason insofar as it enables a factfinder to weigh the positive and negative effects of exclusion on innovation and competition, albeit with the burden of proof on the defendant. *See* Christopher Sprigman, *Copyright and the Rule of Reason*, 7 J. Tel. & High Tech. L. 317, 327-30 (2009).

As the four statutory factors indicate, the essential competition policy underlying fair use is to affirmatively promote innovative and procompetitive uses while protecting the valid interests of the copyright owner. Inquiry into the purpose and character of the work, the first factor, focuses the court's attention on the "transformativeness" of the use, especially on the innovative dimensions of what the alleged infringer has done. The second factor, the nature of the copyrighted work, invites courts to calibrate fair use based on the originality of the work and its market characteristics, including in relation to the actual uses and functions of the protected work. The third factor, the amount and substantiality of what is taken, helps gauge the amount of "intellectual labor and capital" the alleged infringer has bestowed upon the copyrighted work in creating its potentially competing product or use. Is the challenged use beneficial only because it extracts "the essential parts, constituting the chief value of the original work," *Folsom*, 9 F. Cas. at 345, or is it a substantive re-deployment of one or more such parts that can unlock previously unavailable consumer benefits? Finally, considering the impact on potential markets for the copyrighted work focuses

courts on the market harms to the copyrighted products and benefits to consumers that may result from permitting the use.

### B. Transformativeness Is Paramount in the Fair Use Inquiry

"[T]he goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works." *Campbell,* 510 U.S. at 579. The Ninth Circuit has found this broad transformative quality to be a keystone of fair use analysis. *E.g.*, *Connectix*, 203 F.3d at 606-07. Indeed, "[t]he more transformative the new work, the less important the other factors, including commercialism, become." *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818 (9th Cir. 2003) (citing *Campbell*, 510 U.S. at 579). "Although such transformative use is not absolutely necessary for a finding of fair use, . . . [s]uch works . . . lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright." *Campbell*, 510 U.S. at 579.

A defining quality of transformativeness is enabling functionalities beyond those provided by the original copyrighted work. "[O]ne work transforms another when 'the new work . . . adds something new, with a further purpose or different character, altering the first with new expression, meaning or message.'" *Seltzer*, 725 F.3d at 1176 (quoting

*Campbell*, 510 U.S. at 579) (ellipsis in original). "'If . . . the secondary use adds value to the original—if the [copyrighted work] is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings—this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society.'" *Id.* (quoting Pierre Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990)). Inventions that expand on copyrighted works to create new technological functionalities and capabilities clearly meet this standard. *See, e.g., Authors Guild v. Google Inc.*, 804 F.3d 202, 214 (2d Cir. 2015) ("transformative use is one that communicates something new and different from the original *or expands its utility*") (emphasis added).

"Tranformativeness" is also closely intertwined with market effects, the fourth factor. Specifically, "[a] transformative work is less likely to have an adverse impact on the market of the original." *Kelly*, 336 F.3d at 821. As the Supreme Court has observed,

> [W]hen a commercial use amounts to mere duplication of the entirety of an original, it clearly 'supersede[s] the objects' of the original and serves as a market replacement for it, making it likely that cognizable market harm to the original will occur. But when, on the contrary, the second use is trans-

> formative, market substitution is at least less certain, and market harm may not be so readily inferred.

*Campbell*, 510 U.S. at 591 (quoting *Folsom*, 9 F. Cas. at 348) (citations omitted); *see also Connectix*, 203 F.3d at 607. This makes intuitive sense because a transformative use often will facilitate entry into a new or existing market in which the copyright holder does not or is not likely to compete. And "a use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create." *Sony*, 464 U.S. at 450.

Courts also recognize that a transformative use may well lead to decreased demand for the copyrighted work. However, such a use is legitimate so long as the demand decrease is attributable to the transformative quality and not "the chief value of the original work." *Folsom*, 9 F. Cas. at 345. "[T]he role of the courts is to distinguish between [a use] that merely 'suppresses demand and copyright infringement, which usurps it.'" *Campbell*, 510 U.S. at 592 (quoting *Fisher v. Dees*, 794 F.2d 432, 438 (9th Cir. 1986)) (alterations omitted).

The Copyright Act does not protect against economic injury owing to decreased demand that is a byproduct of a transformative use. *See*

*Campbell*, 510 U.S. at 592 (although parody may "kill[] demand for the original" and aim to "destroy[] it commercially as well as artistically," this "does not produce a harm cognizable under the Copyright Act" (internal quotation omitted)); *Connectix*, 203 F.3d at 607 (a copyright holder often "understandably seeks control over the market" for products that use the copyrighted work, but "[t]he copyright law . . . does not confer such a monopoly"). Rather, such decreased demand may be the byproduct of legitimate innovation and competition that the fair use doctrine encourages. As the Ninth Circuit explained in *Connectix*,

> [B]ecause the [allegedly infringing video game emulator] is transformative, and does not merely supplant the PlayStation console, the [emulator] is a legitimate competitor in the market for platforms on which Sony and Sony-licensed games can be played. For this reason, some economic loss by Sony as a result of this competition does not compel a finding of no fair use.

203 F.3d at 607; *see also Campbell*, 510 U.S. at 598 (Kennedy, J., concurring) ("[I]t is legitimate for [a use] to suppress demand for the original . . . . What it may not do is usurp demand by its substitutive effect.").

## II. TO PROTECT INNOVATION AND COMPETITION, FAIR USE SHOULD BE APPLIED LIBERALLY TO COPY-RIGHTED SOFTWARE INTERFACES

Congress extended copyright to software in 1980 as a compromise among lesser alternatives. Affording patent protection would have gone too far. Defining a new, sui generis protection threatened to upset the long-standing traditions of overarching patent and copyright laws. And affording no protection would have left the software industry in the tenuous position of relying on contract and other state laws, such as trade secret laws.

In the first decade after Congress made its choice, a group of leading intellectual property scholars observed that "Congress . . . has left to the courts the difficult tasks of determining how to apply copyright to computer programs," and "[c]ourts have generally articulated traditional copyright standards for determining the scope of protection . . . ." Donald S. Chisum et al., *Last Frontier Conference Report on Copyright Protection of Computer Software*, 30(1) Jurimetrics 15, 16-17 (1989). But courts have recognized that applying concepts designed for literary works to computer software can be like trying "'to fit the proverbial square peg in a round hole.'" *Sega*, 977 F.2d at 1524 (quoting *Computer*

*Assoc. Int'l, Inc., v. Altai, Inc.*, 23 U.S.P.Q. 2d (BNA) 1241, 1257 (2d Cir. 1992)); *see Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, 820 (1st Cir. 1995) (Boudin, J., concurring) (likening the difficulties of applying copyright law to computer programs to "assembling a jigsaw puzzle whose pieces do not quite fit").

The problem, of course, is that "computer programs are, in essence, utilitarian articles—articles that accomplish tasks." *Sega*, 977 F.2d at 1524; *see Lotus*, 49 F.3d at 819 (Boudin, J., concurring) ("The computer program is a *means* for causing something to happen; it has a mechanical utility, an instrumental role, in accomplishing the world's work."). Thus, "[c]omputer programs pose unique problems for the application of the 'idea/expression distinction' that determines the extent of copyright protection." *Sega*, 977 F.2d at 1524; *see Connectix*, 203 F.3d at 603. More generally, as Judge Boudin explained, "[u]tility does not bar copyright (dictionaries may be copyrighted), but it alters the calculus" for providing intellectual property protection. *Lotus*, 49 F.3d at 819. The benefit may be the same (in terms of stimulating the produc-

tion of computer software),[5] "[b]ut the 'cost' side of the equation may be different [than for traditional literary works] where one places a very high value on public access to a useful innovation that may be the most efficient means of performing a given task." *Id.*

In particular, the calculus for providing protection to computer software "interfaces" like the command menu hierarchy at issue in *Lotus* is problematic at best. As Judge Boudin explained:

> Requests for the protection of computer menus present the concern with fencing off access to the commons in an acute form. A new menu may be a creative work, but over time its importance may come to reside more in the investment that has been made by *users* in learning the menu and in building their own mini-programs—macros—in reliance upon the menu. Better typewriter keyboard layouts may exist, but the familiar QWERTY keyboard dominates the market because that is what everyone has learned to use.

*Id.* at 819-20.

While this Court dismissed Google's arguments about "interoperability" and the API declarations being an "industry standard" as irrelevant to copyrightability, and rejected the First Circuit's holding in

---

[5] *But see* Pamela Samuelson, *The Uneasy Case for Software Copyrights Revisited*, 79 Geo. Wash. L. Rev. 1746, 1776-81 (2011) (identifying "significant developments in the software industry [that] raise questions about how important copyright protection now is to enabling developers to recoup their R&D investments in software").

*Lotus* that the computer commands at issue were not copyrightable, the Court expressly held that such factors *are* relevant to the fair use analysis. *See Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1377 (Fed. Cir. 2014); *see also* Brief for the United States as Amicus Curiae, *Google, Inc. v. Oracle America, Inc.*, 135 S.Ct. 2887 (2015) (No. 14-410), 2015 WL 2457656, *17 (filed May 26, 2015) (concerns with interoperability and lock-in are "substantial and important" but "are better addressed through the fair-use doctrine"); *Lotus*, 49 F.3d at 821 (Boudin, J., concurring) (suggesting that fair use might be used to ensure that users of a computer program do not "remain captives of [the copyright owner] because of an investment in learning made by the users and not [the copyright owner]").[6]

This Court is familiar with the problem of *patents* on industry standards whereby implementers of the standard become locked-in to the standard, and the Court has adjusted patent remedies to prevent holders of standard essential patents (SEPs) from taking advantage of

[6] This Court described Google's interoperability argument as, "Google wanted to capitalize on the fact that software developers were already trained and experienced using the Java API packages at issue." *Oracle*, 750 F.3d at 1371. Alternatively, one might describe it as giving developers "an option to exploit their own prior investment in learning" the packages. *Lotus*, 49 F.3d at 821 (Boudin, J., concurring).

such lock-in. Thus, holders of SEPs are not entitled to royalties that "include any value flowing to the patent from the standard's adoption." *Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1305 (Fed. Cir. 2015). And holders of SEPs who have committed to licensing their patents on FRAND terms cannot hold up implementers by obtaining injunctive relief against an infringer who is a willing licensee. *Apple,* 757 F.3d at 1286. As the Ninth Circuit has noted, "[t]he development of standards . . . creates an opportunity for companies to engage in anticompetitive behavior" because "[o]nce a standard becomes widely adopted, SEP holders have substantial leverage over new product developers, who have little choice but to incorporate SEP technologies into their products." *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1030-31 (9th Cir. 2015).

A similar problem arises with copyrighted software interfaces. The point is not that software elements lose their copyright protection when they become industry standards. This Court has already held to the contrary. *Oracle*, 750 F.3d at 1372. Rather, the point is that a copyright on elements of software that become an industry standard gives a copyright holder great anticompetitive power to thwart or tax

innovative developments that build upon the elements, and to misappropriate for itself the investments made by users in learning those elements. Even if the copyrighted elements are not as essential, and the lock-in not as severe, as with a SEP, the anticompetitive harm from the ability of a copyright holder to substantially raise the costs of the innovative developments to the detriment of new entrants, customers of the incumbent, and the public at large is similar, and is appropriately cabined by the fair use doctrine.[7]

---

[7] Absent a robust fair use defense, the risk of copyright holdup seems likely to increase as software development becomes increasingly collaborative and "any given piece of software may include dozens, hundreds, or even thousands of copyright holders." Clark D. Asay, *Software's Copyright Anticommons*, 66 Emory L.J. 265, 279 (2017). The "building-block approach to software development . . . means that some copyright holder of a software object within a particular software stack could become an obstacle to the entire stack's use." *Id.* at 314; *cf. Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1327-28 (Fed. Cir. 2016) (Mayer, J., concurring) (describing software *patent* thicket). The risk of copyright holdup becomes more acute where the copyright holder allows its copyrighted interface to be freely used and then reverses course. *See* Scott A. Sher & Bradley T. Tennis, *Exploiting Others' Investments in Open Standards*, 3(1) Comp. Pol'y Int'l 1, 4 (2016) ("'Open early, closed late' strategies based on copyright can be particularly problematic" because of lengthy term of copyright, ability to restart clock with modifications (unlike patents), absence of independent review of validity by appeal board, and easy exploitation of operational benefits to create lock-in). There is evidence that such a reversal occurred in this case. *See* Google Br. 45-47.

## III. ORACLE'S NARROW VIEW OF FAIR USE WOULD GUT THE DOCTRINE'S ABILITY TO PROMOTE INNOVATION AND COMPETITION IN MARKETS THAT DEPEND ON SOFTWARE

The facts of this case seem tailor made for the fair use defense. The expressive value of the copyrighted material at issue seems slight, and its value in the marketplace is derived from its functional benefits and the investments of users. At the same time, Google's use of the material helped it to bring to market a highly innovative product of which the infringed material was a trivial part. Giving Oracle a monopoly over the API packages would have raised a substantial barrier to this innovation and caused confusion among programmers. As the district court concluded, "avoiding cross system babel promoted the progress of science and useful arts." Appx38. Moreover, the district court concluded that the jury could reasonably have found that Google's infringement "caused no harm to the market for the copyrighted works," Appx45, which, if correct, makes this a particularly easy fair use case.

Some of Oracle's arguments, if accepted, would seriously gut the ability of the fair use doctrine to promote innovation and competition in markets that depend on software. As to transformativeness, Oracle argues that "repackaging the same exact copyrighted material from one

platform to another without changing the expressive purpose is not transformative" as a matter of law. Oracle Br. 34-37. But, as the district court noted, "If this were enough to defeat fair use, it would be impossible ever to duplicate declaring code as fair use." Appx42. Indeed, it would mean that software interfaces that become industry standards because of their *functional* value, not their expressive content, could never be subject to fair use. That makes no sense.[8]

This Court's statement that "[a] work is not transformative where the user 'makes no alteration to the *expressive content or message* of the

[8] Oracle also argues that because Google's use was commercial, "to win factor 1, Google must show that its transformation of Oracle's expression was especially significant." Oracle Br. 29. That is not the law. To be sure, "the more transformative the new work, the less will be the significance of other factors, like commercialism . . . ." *Campbell*, 510 U.S. at 579. But commercial use does not create a presumption against fair use in general, or the first factor in particular. *See id.* at 584 ("the commercial or nonprofit educational purpose of a work is only one element of the first factor enquiry into its purpose and character"); *Connectix*, 203 F.3d at 606 (rejecting presumption; first factor favored fair use although copying was strictly commercial and work was "modestly transformative"). If the fair use doctrine is going to serve as a means to promote innovation and competition in *markets* that depend on software, commercial use will almost always be present and should not be a significant factor. *Cf. Authors Guild*, 804 F.3d at 219 ("Many of the most universally accepted forms of fair use, such as news reporting and commentary, quotation in historical or analytic books, reviews of books, and performances, as well as parody, are all normally done commercially for profit."); *Campbell*, 510 U.S. at 584.

original work'" is not to the contrary. *Oracle*, 750 F.3d at 1374 (quoting *Seltzer*, 725 F.3d at 1177) (emphasis in original). Works can be transformative if they expand the utility of copyrighted works. *See Authors Guild*, 804 F.3d at 214. Moreover, placing a work in a new context changes its meaning, even if the work itself is unaltered, as the facts of *Seltzer* attest. And in the context of computer code, reimplementing the declaring code itself changes the "message" of the code. *Cf. Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001) (recognizing computer code as a form of speech); *Connectix*, 203 F.3d at 606-07 ("Connectix's drafting of entirely new object code for its VGS program [is] transformative, despite the similarities in function and screen output."). As Professor Asay points out, "Software interfaces [like Java's API packages] are strictly functional in carrying out the specified functions and facilitating communication between software products. . . . Hence whatever creativity interfaces entail only becomes present and relevant when they are paired with the software that implements them." Asay*, supra* note 7, at 321.

As to the nature of the copyrighted work, Oracle contends that no reasonable jury could have found that functional considerations pre-

dominated because "this Court must look to the degree of creativity *within* the functional universe of software" and the second factor does not "always cut against the copyright holder in software cases." Oracle Br. 42-43 (emphasis added). However, regardless of whether a piece of software in theory may be sufficiently creative to militate against fair use,[9] Oracle's contention that creativity of a piece of software must be compared to other software rather than literary works in general is not only unsupported, but is inconsistent with its use of case law involving artistic works to narrow the transformativeness inquiry for software. *See id.* at 32-37.

As to the effect of the infringement on the potential market for or value of the copyrighted work, Oracle argues that no reasonable jury

[9] Oracle maintains that its API packages were more creative than the software at issue in *Wall Data Inc. v. Los Angeles County Sheriff's Dept.*, 447 F.3d 769 (9th Cir. 2006). Of course, *Wall Data* involved wholesale copying and no transformative use. Moreover, in finding the second factor to militate against fair use, the Ninth Circuit did not rely on the creativeness of the copyrighted software at issue, but the amount of time and money spent by the copyright holder in developing the software, *id.* at 780, which the court elsewhere suggested is irrelevant. *See Sega*, 977 F.2d at 1527 (noting that Supreme Court has "rejected the 'sweat of the brow' rationale for copyright protection," and that "[u]nder the Copyright Act, if a work is largely functional it receives only weak protection") (citation omitted); *cf. Connectix*, 203 F.3d at 605 (finding that nature of the work "strongly favors" fair use where work was operating system (BIOS) for Sony PlayStation).

could have found that the inclusion of the Java API packages at issue did not harm the market *or potential market* for the copyrighted works. Oracle Br. 47-48. Oracle seems to suggest that it is entitled to use the Java API packages at issue to monopolize the market for mobile operating systems built on the free Java language, or at least to tax entrants into that market, even if it *never* would have entered that market itself. *Id.* at 51. But the loss of an opportunity to license an infringer cannot be the economic harm of which fair use is concerned; such loss will be present in every case. *See* Google Br. 58-59 and the authority cited therein. In any event, as noted above, economic harm to the copyright owner is not dispositive of the fair use issue. A transformative use that opens up new markets, unleashes new functionalities, or makes possible new and superior products can be a fair use even if it inflicts losses on the copyright holder. Indeed, where the value of the copyrighted work in the marketplace derives from its functional rather than expressive contribution, competition inflicts little or no *copyright* harm. *See* William F. Patry, *Patry on Fair Use* § 6:7 (March 2017 Update) ("harm must be caused by the use of expression").

## CONCLUSION

This Court should affirm that Oracle is not entitled to a judgment as a matter of law on the fair use issue.[10] It should recognize the appropriateness of applying the fair use defense to transformative uses of functional software interfaces, like the Java API packages, to promote innovation and competition in markets that depend on software.

Respectfully submitted,

/s/ Richard M. Brunell

PROF. SHUBHA GHOSH
SYRACUSE UNIV. COLLEGE OF LAW
950 Irving Avenue
Syracuse, NY 13244
(315) 443-2532
sghosh01@law.syr.edu

RICHARD M. BRUNELL
*Principal Attorney*
AMERICAN ANTITRUST INSTITUTE
1730 Rhode Island Avenue, NW
Washington, DC 20036
(202) 600-9640
rbrunell@antitrustinstitute.org

May 30, 2017

[10] AAI takes no position on Oracle's argument that it is entitled to a new trial.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e). The brief contains 5711 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and the type styles requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word, in 14 point Century Schoolbook font.

s/ Richard M. Brunell

Dated: May 30, 2017

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing document on all registered counsel on May 30, 2017 by electronic means through the Court's CM/ECF system.

s/ Richard M. Brunell
Richard M. Brunell

Dated: May 30, 2017