**Orrick, Herrington & Sutcliffe LLP**
51 West 52nd Street
New York, NY 10019

+1-212-506-5000
**www.orrick.com**

**E. Joshua Rosenkranz**

**E** jrosenkranz@orrick.com
**D** +1-212-506-5380

August 29, 2017

***Via CM/ECF***

Hon. Peter R. Marksteiner
Circuit Executive & Clerk of Court
United States Court of Appeals
for the Federal Circuit
717 Madison Place, NW
Room 401
Washington, DC 20005-7700

**Re: Notice of Supplemental Authority in *Oracle America, Inc. v. Google Inc.*, Nos. 17-1118, -1202 (Fed. Cir.)**

Dear Mr. Marksteiner:

Pursuant to Federal Rule of Appellate Procedure 28(j), Oracle submits *Disney Enterprises, Inc. v. VidAngel, Inc.*, No. 16-56843 (9th Cir. Aug. 24, 2017), as supplemental authority. In *VidAngel*, the Ninth Circuit upheld a preliminary injunction, holding in relevant part that the defendant was unlikely to prevail on its fair use defense. *VidAngel* further supports Oracle's argument that Google's copying of Oracle's copyrighted APIs was not fair use as a matter of law.

First, *VidAngel* rejects Google's argument that *Sony Computer Entertainment, Inc. v. Connectix Corp.*, 203 F.3d 596, 602-07 (9th Cir. 2000), and *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1520 (9th Cir. 1993), support fair use in a case such as ours. *See* Red Br. 41, 44, 50, 59. *VidAngel* explains that those cases "are inapposite" where an infringer "does not copy [a] work[] to access unprotected functional elements it cannot otherwise access." Slip Op. 24 n.12; *see* Yellow Br. 20-21. Here, Google did not copy Oracle's APIs to access unprotected

functional elements, and Google has never argued that it did. *See* Yellow Br. 28.

Second, *VidAngel* supports Oracle's argument that Android is not transformative because it uses Oracle's APIs for the same purpose as Java. *See* Blue Br. 29-33; Yellow Br. 14-18. *VidAngel* recognizes that an otherwise infringing use is not transformative where it uses the copied work for the "same intrinsic … value as the original[]." Slip Op. 22.

Third, *VidAngel* confirms that "likely market harm," under the fourth factor, is to be "presume[d]" when a use is "commercial and not transformative." Slip Op. 23. Moreover, the Ninth Circuit again rejects, as a legal matter, the argument (made here by Google) that a use is fair because it supposedly helps the copyright holder, Red Br. 46. *See* Slip Op. 23-24 ("Any allegedly positive impact of defendant's activities on plaintiff's prior market in no way frees defendant to usurp a further market that directly derives from reproduction of the plaintiffs' copyrighted works." (quoting *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1017 (9th Cir. 2001))).

Respectfully submitted,

*/s/ E. Joshua Rosenkranz*

E. Joshua Rosenkranz

cc: Counsel of Record

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2017, the foregoing document was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit using the appellate CM/ECF system. All participants are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

Dated: August 29, 2017

*/s/ E. Joshua Rosenkranz*

E. Joshua Rosenkranz
Orrick, Herrington &
Sutcliffe LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000
jrosenkranz@orrick.com

*Counsel for Appellant*

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DISNEY ENTERPRISES, INC.; LUCASFILM LTD. LLC; TWENTIETH CENTURY FOX FILM CORPORATION; WARNER BROTHERS ENTERTAINMENT, INC.,
*Plaintiffs-Counter-Defendants-Appellees,*

v.

VIDANGEL, INC.,
*Defendant-Counter-Claimant-Appellant.*

No. 16-56843

D.C. No. 2:16-cv-04109-AB-PLA

OPINION

Appeal from the United States District Court
for the Central District of California
André Birotte, Jr., District Judge, Presiding

Argued and Submitted June 8, 2017
Pasadena, California

Filed August 24, 2017

Before: Carlos T. Bea and Andrew D. Hurwitz, Circuit Judges, and Leslie E. Kobayashi,* District Judge.

Opinion by Judge Hurwitz

## SUMMARY**


### Preliminary Injunction / Copyright

The panel affirmed the district court's preliminary injunction against the defendant in an action under the Copyright Act and the Digital Millennium Copyright Act.

Defendant VidAngel, Inc., operated an online streaming service that removed objectionable content from movies and television shows. VidAngel purchased physical discs containing copyrighted movies and television shows, decrypted the discs to "rip" a digital copy to a computer, and then streamed to its customers a filtered version of the work.

The panel held that the district court did not abuse its discretion in concluding that VidAngel's copying infringed the plaintiffs' exclusive reproduction right. Because VidAngel did not filter authorized copies of movies, it was unlikely to succeed on the merits of its defense that the Family Movie Act of 2005 exempted it from liability for


* The Honorable Leslie E. Kobayashi, United States District Judge for the District of Hawaii, sitting by designation.

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

copyright infringement. VidAngel also was unlikely to succeed on its fair use defense.

The panel held that the district court also did not abuse its discretion in concluding that the plaintiffs were likely to succeed on their DCMA claim. The panel held that the anti-circumvention provision of the DMCA, 17 U.S.C. § 1201(a), covered the plaintiffs' technological protection measures, which controlled both access to and use of the copyrighted works.

The panel affirmed the district court's findings regarding the likelihood of irreparable harm, the balancing of the equities, and the public interest.

---

## COUNSEL

Peter K. Stris (argued), Elizabeth Rogers Brannen, Dana Berkowitz, and Victor O'Connell, Stris & Maher LLP, Los Angeles, California; Brendan S. Maher, Daniel L. Geyser, and Douglas D. Geyser, Stris & Maher LLP, Dallas, Texas; Ryan Geoffrey Baker, Jaime Wayne Marquart, and Scott M. Malzahn, Baker Marquart LLP, Los Angeles, California; David W. Quinto, VidAngel Inc., Beverly Hills, California; Shaun P. Martin, University of San Diego School of Law, San Diego, California; for Defendant-Counter-Claimant-Appellant.

Donald B. Verrilli Jr. (argued), Munger Tolles & Olson LLP, Washington, D.C.; Glenn D. Pomerantz, Kelly M. Klaus, Rosa Leda Ehler, and Allyson R. Bennettt, Munger Tolles & Olson LLP, Los Angeles, California; for Plaintiffs-Counter-Defendants-Appellees.

William A. Delgado, Willenken Wilson Loh & Delgado LLP, Los Angeles, California; Susanna Frederick Fischer, Columbus School of Law, The Catholic University of America, Washington, D.C.; for Amici Curiae U.S. Representatives John Hostettler and Spencer Bachus.

Mitchell L. Stoltz and Kit Walsh, San Francisco, California, as and for Amicus Curiae Electronic Frontier Foundation.

James M. Burger, Thompson Coburn LLP, Washington, D.C.; Mark Sableman, Thompson Coburn LLP, St. Louis, Missouri; for Amicus Curiae ClearPlay, Inc.

Dean E. Short, Short Legal Group, Newport Coast, California; Bruce H. Turnbull, Turnbull Law Firm PLLC, Washington, D.C.; for Amici Curiae DVD Copy Control Association Inc., and Advanced Access Content System License Administrator LLC.

Eleanor M. Lackman and Lindsay W. Bowen, Cowan DeBaets Abrahams & Sheppard LLP, New York, New York; Keith Kupferschmid and Terry Hart, The Copyright Alliance, Washington, D.C.; for Amicus Curiae The Copyright Alliance.

---

## OPINION

HURWITZ, Circuit Judge:

VidAngel, Inc. operates an online streaming service that removes objectionable content from movies and television shows. VidAngel purchases physical discs containing copyrighted movies and television shows, decrypts the discs

to "rip" a digital copy to a computer, and then streams to its customers a filtered version of the work.

The district court found that VidAngel had likely violated both the Digital Millennium Copyright Act and the Copyright Act, and preliminarily enjoined VidAngel from circumventing the technological measures controlling access to copyrighted works on DVDs and Blu-ray discs owned by the plaintiff entertainment studios, copying those works, and streaming, transmitting, or otherwise publicly performing or displaying them electronically. VidAngel's appeal presents two issues of first impression. The first is whether the Family Movie Act of 2005 exempts VidAngel from liability for copyright infringement. 17 U.S.C. § 110(11). The second is whether the anti-circumvention provision of the Digital Millennium Copyright Act covers the plaintiffs' technological protection measures, which control both access to and use of copyrighted works. 17 U.S.C. § 1201(a)(1). The district court resolved these issues against VidAngel. We agree and affirm the preliminary injunction.

## FACTUAL BACKGROUND

### I. The copyrighted works.

Disney Enterprises, LucasFilm Limited, Twentieth Century Fox Film Corporation, and Warner Brothers Entertainment ("the Studios") produce and distribute copyrighted motion pictures and television shows. The Studios distribute and license these works for public dissemination through several "distribution channels": (1) movie theaters; (2) sale or rental of physical discs in DVD or Blu-ray format; (3) sale of digital downloads through online services, such as iTunes or Amazon Video; (4) on-demand rental for short-term viewing through cable and satellite television or internet video-on-demand

platforms, such as iTunes or Google Play; and (5) subscription on-demand streaming online outlets, such as Netflix, Hulu, HBO GO, and cable television.

To maximize revenue, the Studios employ "windowing," releasing their works through distribution channels at different times and prices, based on consumer demand. Typically, new releases are first distributed through digital downloads and physical discs, and are only later available for on-demand streaming. The Studios often negotiate higher licensing fees in exchange for the exclusive rights to perform their works during certain time periods. Digital distribution thus provides a large source of revenue for the Studios.

The Studios employ technological protection measures ("TPMs") to protect against unauthorized access to and copying of their works. They use Content Scramble System ("CSS") and Advanced Access Content System ("AACS"), with optional "BD+," to control access to their copyrighted content on DVDs and Blu-ray discs, respectively. These encryption-based TPMs allow consumers to use players from licensed manufacturers only to lawfully decrypt a disc's content, and then only for playback, not for copying.[1]

---

[1] Thus, as the licensors of CSS and AACS, amicus curiae DVD Copy Control Association, Inc. and Advanced Access Content System License Administrator, LLC, explain, "[i]ndividual consumers purchasing a DVD or Blu-ray Disc are not provided the keys or other cryptographic secrets that are necessary for playback. They must use a licensed player which, in turn, must abide by the technical specifications and security requirements imposed by [their] licenses."

## II. VidAngel's streaming service.

VidAngel offers more than 2500 movies and television episodes to its consumers. It purchases multiple authorized DVDs or Blu-ray discs for each title it offers. VidAngel then assigns each disc a unique inventory barcode and stores it in a locked vault. VidAngel uses AnyDVD HD, a software program, to decrypt one disc for each title, removing the CSS, AACS, and BD+ TPMs on the disc, and then uploads the digital copy to a computer.[2] Or, to use VidAngel's terminology, the "[m]ovie is ripped from Blu-Ray to the gold master file." After decryption, VidAngel creates "intermediate" files, converting them to HTTP Live Streaming format and breaking them into segments that can be tagged for over 80 categories of inappropriate content. Once tagged, the segments are encrypted and stored in cloud servers.

Customers "purchase" a specific physical disc from VidAngel's inventory for $20. The selected disc is removed from VidAngel's inventory and "ownership" is transferred to the customer's unique user ID. However, VidAngel retains possession of the physical disc "on behalf of the purchasers," with the exception of the isolated cases in which the consumer asks for the disc. To date, VidAngel has shipped only four discs to purchasers.

---

[2] AnyDVD HD is sold by RedFox, a Belize-based company run by former employees of a company convicted overseas for trafficking in anti-circumvention technology and identified by the United States Trade Representative as selling software that facilitates copyright violations. AnyDVD is commercially available outside of the United States.

After purchasing a disc, a customer selects at least one type of objectionable content to be filtered out of the work.[3] VidAngel then streams the filtered work to that customer on "any VidAngel-supported device, including Roku, Apple TV, Smart TV, Amazon Fire TV, Android, Chromecast, iPad/iPhone and desktop or laptop computers." The work is streamed from the filtered segments stored in cloud servers, not from the original discs. Filtered visual segments are "skipped and never streamed to the user." If the customer desires that only audio content be filtered, VidAngel creates and streams an altered segment that mutes the audio content while leaving the visual content unchanged. VidAngel discards the filtered segments after the customer views them.

After viewing the work, a customer can sell the disc "back to VidAngel for a partial credit of the $20 purchase price," less $1 per night for standard definition purchases or $2 per night for high-definition purchases. VidAngel accordingly markets itself as a $1 streaming service. After a disc is sold back to VidAngel, the customer's access to that title is terminated.[4] Virtually all (99.6%) of VidAngel's customers sell back their titles, on average within five hours, and VidAngel's discs are "re-sold and streamed to a new

[3] VidAngel initially permitted streaming without filters. It then began requiring a filter, but soon discovered customers were selecting inapplicable filters (e.g., a *Star Wars* character for a non-*Star Wars* movie) to obtain unfiltered films. VidAngel subsequently required filtering to correspond to the specific movie being streamed, but permitted the single required filter to be simply for the opening or closing credits. After the Studios brought this action, VidAngel began requiring customers to "pick at least one additional [non-credits] filter."

[4] VidAngel previously permitted customers to select "automatic sellback," but eliminated that feature after this suit was filed.

customer an average of 16 times each in the first four weeks" of a title's release.

## III. VidAngel's growth.

In July 2015, VidAngel sent letters to the Studios describing its service. The letters explained that VidAngel was in "a limited beta test of its technology" and had only 4848 users, and concluded: "If you have any questions concerning VidAngel's technology or business model, please feel free to ask. If you disagree with VidAngel's belief that its technology fully complies with the Copyright Act . . . please let us know." The Studios did not respond, but began monitoring VidAngel's activities.

VidAngel opened its service to the general public in August 2015. Its marketing emphasized that it could stream popular new releases that licensed video-on-demand services like Netflix could not, for only $1. For example, when VidAngel began streaming Disney's *Star Wars: The Force Awakens*, it was available elsewhere only for purchase on DVD or as a digital download, not as a short-term rental. Similarly, VidAngel began streaming Fox's *The Martian* and *Brooklyn* while those works were exclusively licensed to HBO for on-demand streaming. Customers responded favorably.[5] And, a survey indicated that 51% of VidAngel's users would not otherwise watch their selections without filtering.

---

[5] For example, one customer tweeted: "Son asked for #StarWars A New Hope. Not on Netflix, Google play charges $19.99. Streamed HD on @VidAngel. $2 & hassle free!" Another gave VidAngel a 5-star rating on Facebook, explaining: "We bought Star Wars and sold it back for a total of $1 when it was like $5 to rent on Amazon. So even if you don't need content cleaned, it's a great video service."

VidAngel eventually reached over 100,000 monthly active users. When the Studios filed this suit in June 2016, VidAngel offered over 80 of the Studios' copyrighted works on its website. VidAngel was not licensed or otherwise authorized to copy, perform, or access any of these works.

## PROCEDURAL BACKGROUND

The Studios' complaint alleged copyright infringement in violation of 17 U.S.C. § 106(1), (4), and circumvention of technological measures controlling access to copyrighted works in violation of the Digital Millennium Copyright Act of 1998 ("DMCA"), 17 U.S.C. § 1201(a)(1)(A). VidAngel denied the statutory violations, raising the affirmative defenses of fair use and legal authorization by the Family Movie Act of 2005 ("FMA"), 17 U.S.C. § 110(11). The Studios moved for a preliminary injunction, and after expedited discovery, the district court granted the motion.

The district court found that the Studios had demonstrated a likelihood of success on the merits of both their DMCA and copyright infringement claims. It first found that VidAngel violated § 1201(a)(1)(A) of the DMCA by circumventing the technological measures controlling access to the Studios' works. The district court also concluded that VidAngel violated the Studios' exclusive right to reproduce their works under § 106(1) by making copies of them on a computer and third-party servers. It also held that VidAngel violated the Studios' exclusive right to publicly perform their works under § 106(4), because at most the customers "own" only the physical discs they "purchase," not the digital content streamed to them.

The district court rejected VidAngel's FMA defense, holding that "VidAngel's service does not comply with the express language of the FMA," which requires a filtered

transmission to "come from an 'authorized copy' of the motion picture." § 110(11)). The district court also found that VidAngel was not likely to succeed on its fair use defense, emphasizing that the "purpose and character of the use" and "effect of the use upon the potential market for or value of the copyrighted work" factors weighed in favor of the Studios. 17 U.S.C. § 107.

The district court concluded that the Studios had demonstrated a likelihood of irreparable injury from VidAngel's interference "with their basic right to control how, when and through which channels consumers can view their copyrighted works" and with their "relationships and goodwill with authorized distributors." Finally, the court found that "the balance of hardships tips sharply in [the Studios'] favor."

The court therefore preliminarily enjoined VidAngel from copying and "streaming, transmitting, or otherwise publicly performing or displaying any of Plaintiff's copyrighted works," "circumventing technological measures protecting Plaintiff's copyrighted works," or "engaging in any other activity that violates, directly or indirectly," 17 U.S.C. §§ 1201(a) or 106. VidAngel timely appealed.[6]

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction of this appeal under 28 U.S.C. § 1292(a)(1) and review the district court's entry of a

[6] Both the district court and this court denied VidAngel's motions for a stay of the preliminary injunction. Before its motions were denied, VidAngel continued to stream the Studios' copyrighted works and added at least three additional works to its inventory. The district court held VidAngel in contempt for violating the preliminary injunction. The contempt citation is not involved in this appeal.

preliminary injunction for abuse of discretion. *Garcia v. Google, Inc.*, 786 F.3d 733, 739 (9th Cir. 2015) (en banc). "Because our review is deferential, we will not reverse the district court where it got the law right, even if we would have arrived at a different result, so long as the district court did not clearly err in its factual determinations." *Id.* (citation omitted, alteration incorporated); *see also Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (per curiam) (asking whether the district court "identified the correct legal rule" and whether its application of that rule "was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record" (citation omitted)).

## DISCUSSION

A party can obtain a preliminary injunction by showing that (1) it is "likely to succeed on the merits," (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A preliminary injunction may also be appropriate if a movant raises "serious questions going to the merits" and the "balance of hardships . . . tips sharply towards" it, as long as the second and third *Winter* factors are satisfied. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). The district court applied both of these standards.

### I. Likelihood of success on the merits.

Likelihood of success on the merits "is the most important" *Winter* factor; if a movant fails to meet this "threshold inquiry," the court need not consider the other factors, *Garcia*, 786 F.3d at 740, in the absence of "serious questions going to the merits," *All. for the Wild Rockies*,

632 F.3d at 1134–35. However, "once the moving party has carried its burden of showing a likelihood of success on the merits, the burden shifts to the non-moving party to show a likelihood that its affirmative defense will succeed." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007). Thus, if the Studios demonstrated a likelihood of success on their copyright infringement and DMCA claims, the burden shifted to VidAngel to show a likelihood of success on its FMA and fair use affirmative defenses. *Id.*

**A. Copyright infringement.**

To establish direct copyright infringement, the Studios must (1) "show ownership of the allegedly infringed material" and (2) "demonstrate that the alleged infringers violate at least one exclusive right granted to copyright holders under 17 U.S.C. § 106." *Id.* at 1159 (citation omitted). VidAngel's briefing on appeal does not contest the Studios' ownership of the copyrights, instead focusing only on the second requirement.

Copyright owners have the exclusive right "to reproduce the copyrighted work in copies," or to authorize another to do so. 17 U.S.C. § 106(1). VidAngel concedes that it copies the Studios' works from discs onto a computer. VidAngel initially argued that because it lawfully purchased the discs, it can also lawfully re-sell or rent them. But, lawful owners "of a particular copy" of a copyrighted work are only entitled to "sell or otherwise dispose of the possession of that copy," not to reproduce the work. 17 U.S.C. § 109(a). The district court thus did not abuse its discretion in concluding that VidAngel's copying infringed the Studios' exclusive reproduction right. *See MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 518 (9th Cir. 1993) (transferring digital files "from a permanent storage device to a computer's RAM" is "copying" under § 106); *Sega Enters. Ltd. v.*

*Accolade, Inc.*, 977 F.2d 1510, 1518 (9th Cir. 1993) (holding that § 106 "unambiguously . . . proscribes 'intermediate copying'" (citation omitted)).[7]

### B. Defenses to copyright infringement.

#### 1. The Family Movie Act.

The FMA was designed to allow consumers to skip objectionable audio and video content in motion pictures without committing copyright infringement. Family Entertainment and Copyright Act of 2005, Pub. L. No. 109-9, Title II, §§ 201, 202(a), 119 Stat. 218 (2005). The statute provides, in relevant part:

> Notwithstanding the provisions of section 106, the following are not infringements of copyright:
>
> [. . .]
>
> the making imperceptible, by or at the direction of a member of a private household, of limited portions of audio or video content of a motion picture, during a performance in or transmitted to that household for private home viewing, from an authorized copy of the motion picture, or the creation or provision of a computer program or other technology that enables such making imperceptible and that is designed and

[7] Indeed, at oral argument, VidAngel conceded that it relies entirely on the FMA and fair use as affirmative defenses to the reproduction claim.

> marketed to be used, at the direction of a member of a private household, for such making imperceptible, if no fixed copy of the altered version of the motion picture is created by such computer program or other technology.

17 U.S.C. § 110(11).

We have had no previous occasion to interpret the FMA, so we begin with its text. *See Hernandez v. Williams, Zinman & Parham PC*, 829 F.3d 1068, 1072 (9th Cir. 2016). The statute clearly identifies two acts that "are not infringements of copyright." § 110(11). First, it authorizes "making imperceptible"—filtering—by or at the direction of a member of a private household, of limited portions of audio or video content of a motion picture, during performances or transmissions to private households, "from an authorized copy of the motion picture." *Id.* Second, the statute authorizes the creation or distribution of any technology that enables the filtering described in the first provision and that is designed and marketed to be used, at the direction of a member of a private household, for that filtering, if no fixed copy of the altered version of the motion picture is created by the technology. *Id.* Thus, the second act authorized by the FMA—the creation or distribution of certain technology that enables "such" filtering—necessarily requires that the filtering be "from an authorized copy of the motion picture." *Id.*

Indeed, VidAngel concedes that under the FMA, "the filtering must come 'from an authorized copy' of the movie." But, VidAngel argues that because it "*begins* its filtering process with an authorized copy"—a lawfully purchased

disc—"any subsequent filtered stream" is also "from" that authorized copy.

We disagree. The FMA permits "the making imperceptible . . . of limited portions of audio or video content of a motion picture, during a performance in or transmitted to [a private household], *from* an authorized copy of the motion picture." § 110(11) (emphasis added). It does not say, as VidAngel would have us read the statute, "beginning from" or "indirectly from" an authorized copy. *See id.* VidAngel "would have us read an absent word into the statute," but, "[w]ith a plain, nonabsurd meaning in view, we need not proceed in this way." *Lamie v. U.S. Tr.*, 540 U.S. 526, 538 (2004). Rather, the most natural reading of the statute is that the filtered performance or transmission itself must be "from" an authorized copy of the motion picture. *See Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) (plurality opinion) ("The words immediately surrounding ['from' in § 110(11)] . . . cabin the contextual meaning of that term."); Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 148–49 (2012) (explaining that a "postpositive modifier"—that is, one "positioned after" multiple phrases or clauses, such as "from an authorized copy" here—modifies all the preceding clauses, unless a "determiner" is repeated earlier in the sentence).[8]

---

[8] In support of its argument that the transmission need only be the culmination of a process that begins with the possession of an authorized copy, VidAngel offers the following analogy: "Holiday cards are best described as coming from loved ones, even though the mailman serves as an intermediary. Only a hypertechnical interpretation would insist the card came from the mailman." But, VidAngel is not a mailman who simply delivers movies from the seller to the customer in their original form—it delivers digital, altered copies of the original works, not the

The statutory context of § 110(11) supports this interpretation. *See Yates*, 135 S. Ct. at 1081–82 (noting that the interpretation of statutory language is "determined not only by reference to the language itself, but as well by the specific context in which that language is used, and the broader context of the statute as a whole" (citation omitted, alterations incorporated)). The FMA was enacted as part of Title II of the Family Entertainment and Copyright Act of 2005, which is entitled "exemption from infringement for skipping audio and video content in motion pictures." Pub. L. No. 109-9, § 202(a), 119 Stat. 218. It is found in a subsection of 17 U.S.C. § 110, which is entitled "Limitations on exclusive rights: Exemption of certain performances and displays." These headings indicate that the FMA exempts compliant filtered performances, rather than the processes that make such performances possible. *See Yates*, 135 S. Ct. at 1083 (looking to statute heading to "supply cues" of Congress's intent). Indeed, the title of § 110 indicates that it is directed only at "certain performances and displays" that would otherwise infringe a copyright holder's exclusive public performance and display rights, *see* 17 U.S.C. § 106(4), (5), (6), while other limitations on exclusive rights in Title 17 are directed at the reproduction right. *Compare* § 110 *with* § 108 ("Limitations on exclusive rights: Reproduction by libraries and archives").

Moreover, the enacting statute was created "to provide for the protection of intellectual property rights." Pub. L. No. 109-9, 119 Stat. 218. Notably, the FMA concludes by noting: "Nothing in paragraph (11) shall be construed to imply further rights under section 106 of this title, or to have any effect on defenses or limitations on rights granted under

---

discs. Moreover, if we adopted VidAngel's reading of "from," the card would be "from" Hallmark, the card creator, not the loved one.

any other section of this title or under any other paragraph of this section." § 110. VidAngel's interpretation of the statute—which permits unlawful decryption and copying prior to filtering—would not preserve "protection of intellectual property rights" or not "have any effect" on the existing copyright scheme. *See Yates*, 135 S. Ct. at 1083 (explaining that "[i]f Congress indeed meant to make" a statute "an all-encompassing" exemption, "one would have expected a clearer indication of that intent").

VidAngel argues that the FMA was crafted "to avoid turning on the technical details of any given filtering technology," citing the statutory authorization of "the creation or provision of . . . other technology that enables such making imperceptible." § 110(11)).[9] But, the phrase "such making imperceptible" clearly refers to the earlier description of "making imperceptible," which must be "from an authorized copy of the motion picture." § 110(11). Thus, even if VidAngel employs technology that enables filtering, the FMA exempts that service from the copyright laws only if the filtering is from an authorized copy of the motion picture. VidAngel's interpretation, which ignores "intermediate steps" as long as the initial step came from a legally purchased title and the final result involves "no fixed copy of the altered version," ignores this textual limitation.[10]

---

[9] Because this argument was not raised below, we would be hard-pressed to find that the district court abused its discretion by failing to address it. We address it nonetheless.

[10] At oral argument, VidAngel asserted that the FMA's prohibition on creating a "fixed copy of the altered version" contemplates that fixed copies of the authorized copy can be made. We disagree. The FMA states only that, when streaming from an authorized copy, "the altered

More importantly, VidAngel's interpretation would create a giant loophole in copyright law, sanctioning infringement so long as it filters some content and a copy of the work was lawfully purchased at some point. But, virtually all piracy of movies originates in some way from a legitimate copy. If the mere purchase of an authorized copy alone precluded infringement liability under the FMA, the statute would severely erode the commercial value of the public performance right in the digital context, permitting, for example, unlicensed streams which filter out only a movie's credits. *See* 4 Patry on Copyright § 14:2 (2017). It is quite unlikely that Congress contemplated such a result in a statute that is expressly designed not to affect a copyright owner's § 106 rights. § 110. *See Hernandez*, 829 F.3d at 1075 (adopting an interpretation because it "is the only one that is consistent with the rest of the statutory text and that avoids creating substantial loopholes . . . that otherwise would undermine the very protections the statute provides").

And, although we need not rely upon legislative history, it supports our conclusion. The FMA's sponsor, Senator Orrin Hatch, stated that the Act "should be narrowly construed" to avoid "impacting established doctrines of copyright" law and "sets forth a number of conditions to ensure that it achieves its intended effect." 151 Cong. Rec. S450-01, S501 (daily ed. Jan. 25, 2005). Thus, "an infringing performance . . . or an infringing transmission . . . are not rendered non-infringing by section 110(11) by virtue of the fact that limited portions of audio or video content of the motion picture being performed are made imperceptible during such performance or transmission in a manner consistent with that section." *Id.* Indeed, Senator Hatch

---

version of the motion picture" created by the filtering technology cannot be fixed in a copy. § 110(11).

stressed that "[a]ny suggestion that support for the exercise of viewer choice in modifying their viewing experience of copyrighted works requires violation of either the copyright in the work or of the copy protection schemes that provide protection for such work should be rejected as counter to legislative intent or technological necessity." *Id.*

Senator Hatch identified "the Clear Play model" as one intended to be protected by the FMA. *Id.* So did the House of Representatives. H.R. Rep. No. 109-33, pt. 1, at 70 (2005) (minority views); *Derivative Rights, Moral Rights, and Movie Filtering Technology: Hearing Before the Subcomm. on Courts, the Internet, and Intellectual Prop. of the H. Comm. on the Judiciary*, 108th Cong. (2004) (ClearPlay CEO testimony).[11] ClearPlay sells a fast-forwarding device which uses video time codes to permit customers to skip specific scenes or mute specific audio; it does not make copies of the films because the time codes are "integrated" into the disc's encrypted content and players licensed to decrypt and play the content. Not surprisingly, therefore, the only other court to construe the FMA has held that ClearPlay's technology "is consistent with the statutory definition," *Huntsman v. Soderbergh*, No. Civ.A02CV01662RPMMJW, 2005 WL 1993421, at *1 (D. Colo. Aug. 17, 2005), but that a filtering technology that made digital copies from lawfully purchased discs and then filtered them, as VidAngel does, is not, *Clean Flicks of*

[11] Indeed, the legislative history stresses that the FMA was a response to litigation between ClearPlay and several studios. 150 Cong. Rec. H7654 (daily ed. Sept. 28, 2004) (statement of Rep. Jackson-Lee); *see also* Family Movie Act of 2004, H.R. Comm. on the Judiciary Rep. No. 108-670 at 41–42 (dissenting views) (opposing the FMA because it "takes sides in a private lawsuit" and "is specifically designed to legalize ClearPlay technology").

*Colo., LLC v. Soderbergh*, 433 F. Supp. 2d 1236, 1238, 1240 (D. Colo. 2006).

VidAngel does not stream from an authorized copy of the Studios' motion pictures; it streams from the "master file" copy it created by "ripping" the movies from discs after circumventing their TPMs. The district court therefore did not abuse its discretion in concluding that VidAngel is unlikely to succeed on the merits of its FMA defense to the Studios' copyright infringement claims.

**2. Fair use.**

"[T]he fair use of a copyrighted work, including such use by reproduction in copies . . . is not an infringement of copyright." 17 U.S.C. § 107. In determining whether the use of a copyrighted work is fair, we consider:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

*Id.* Although we must consider all of these factors "together, in light of the purposes of copyright," we are not confined to them; rather, we must conduct a "case-by-case analysis." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577–78 (1994).

The district court correctly identified the four fair use factors and applied them. VidAngel concedes that the

district court correctly found that the second and third factors—"the nature of the copyrighted work" and "the amount and substantiality of the portion used in relation to the copyrighted work as a whole"—weigh against finding fair use. VidAngel claims, however, that the district court abused its discretion with respect to the first and fourth factors.

In addressing the first factor, the court asks "whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character . . . [;] in other words, whether and to what extent the new work is 'transformative.'" *Id.* at 579 (citations omitted, alterations incorporated); *see* § 107(1). VidAngel concedes its use is commercial, and thus "presumptively . . . unfair." *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 530 (9th Cir. 2008) (citation omitted). But, it argues that its use is "profoundly transformative" because "omissions can transform a work," affirming "[r]eligious convictions and parental views."

The district court found, however, that "VidAngel's service does not add anything to Plaintiff's works. It simply omits portions that viewers find objectionable," and transmits them for the "same intrinsic entertainment value" as the originals. This factual finding was not clearly erroneous. Although removing objectionable content may permit a viewer to enjoy a film, this does not necessarily "add[] something new" or change the "expression, meaning, or message" of the film. *Campbell*, 510 U.S. at 579. Nor does reproducing the films' discs in digital streaming format, because "both formats are used for entertainment purposes." *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 819 (9th Cir. 2003). *Star Wars* is still *Star Wars*, even without Princess Leia's bikini scene.

Moreover, VidAngel's service does not require removing a crucial plot element—it requires the use of only one filter, which can be an audio filter temporarily silencing a portion of a scene without removing imagery, or skipping a gratuitous scene. Indeed, the FMA sanctions only making "limited portions" of a work imperceptible. 17 U.S.C. § 110(11). The district court did not abuse its discretion in finding that VidAngel's use is not transformative. *See Kelly*, 336 F.3d at 819 ("Courts have been reluctant to find fair use when an original work is merely retransmitted in a different medium . . . . for entertainment purposes." (footnote omitted)).

The fourth fair use factor evaluates "the extent of market harm caused by" the infringing activity and "whether unrestricted and widespread conduct of the sort engaged by the defendant . . . would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (citation omitted, alteration incorporated); *see* § 107(4). Because the district court concluded that VidAngel's use was commercial and not transformative, it was not error to presume likely market harm. *Leadsinger*, 512 F.3d at 531.

VidAngel argues that its service actually benefits the Studios because it purchases discs and expands the audience for the copyrighted works to viewers who would not watch without filtering. But, the district court found that "VidAngel's service [is] an effective substitute for Plaintiff's unfiltered works," because surveys suggested that 49% of its customers would watch the movies without filters. This finding was not clearly erroneous. VidAngel's purchases of discs also do not excuse its infringement. *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1017 (9th Cir. 2001) ("Any allegedly positive impact of

defendant's activities on plaintiffs' prior market in no way frees defendant to usurp a further market that directly derives from reproduction of the plaintiffs' copyrighted works.") (quoting *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 352 (S.D.N.Y. 2000)). And, the market factor is less important when none of the other factors favor VidAngel. *See Leadsinger*, 512 F.3d at 532.[12]

Finally, VidAngel argues that its service is "a paradigmatic example of fair use: space-shifting." But, the case it cites states only that a portable music player that "makes copies in order to render portable, or 'space-shift,' those files that already reside on a user's hard drive" is "consistent with the [Audio Home Recording] Act's main purpose—the facilitation of personal use." *Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072, 1079 (9th Cir. 1999). The reported decisions unanimously reject the view that space-shifting is fair use under § 107. *See A&M Records*, 239 F.3d at 1019 (rejecting "space shifting" that "simultaneously involve[s] distribution of the copyrighted material to the general public"); *UMG Recordings*, 92 F. Supp. 2d at 351 (rejecting "space shift" of CD files to MP3 files as "another way of saying that the unauthorized copies are being retransmitted in another

[12] VidAngel also argues that creating an "intermediate copy" for filtering is a "classic fair use." The cases it cites are inapposite, because VidAngel does not copy the Studios' works to access unprotected functional elements it cannot otherwise access. *See Sega*, 977 F.2d at 1520 ("Where there is good reason for studying or examining the unprotected aspects of a copyrighted computer program, disassembly for purposes of such study or examination constitutes a fair use."); *Sony Comput. Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 602–07 (9th Cir. 2000) (copying necessary "for the purpose of gaining access to the unprotected elements of Sony's software" was fair use and not a "change of format").

medium—an insufficient basis for any legitimate claim of transformation"). Indeed, in declining to adopt an exemption to the DMCA for space-shifting, *see* 17 U.S.C. § 1201(a)(1)(C), the Librarian of Congress relied on the Register of Copyright's conclusion that "the law of fair use, as it stands today, does not sanction broad-based space-shifting or format-shifting." Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 80 Fed. Reg. 65944-01, 65960 (Oct. 28, 2015) (to be codified at 37 C.F.R. pt. 201). And, even assuming space-shifting could be fair use, VidAngel's service is not personal and non-commercial space-shifting: it makes illegal copies of pre-selected movies and then sells streams with altered content and in a different format than that in which they were bought.[13]

---

[13] Because the Studios are likely to succeed on the merits of their reproduction claim, and VidAngel is unlikely to succeed on the merits of its affirmative defenses, we therefore need not reach the district court's alternative § 106 ground for imposing the preliminary injunction—the public performance right. *See* 17 U.S.C. § 502(a) (authorizing a court to enter a temporary injunction "on such terms as it may deem reasonable to prevent or restrain infringement of copyright"); *Perfect 10*, 508 F.3d at 1159 (holding that plaintiff must show defendant infringed "at least one exclusive right" under § 106); *see also Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191, 197 (3d Cir. 2003) (explaining that "for preliminary injunction purposes, [plaintiff] needed to show" only that the defendant's action "likely violates any provision of § 106," and the district court's injunction, based upon likely violations of multiple subsections of § 106, "would not be affected by any conclusion [the appellate court] might make as to whether" defendant's actions violated a different subsection of § 106). The district court properly enjoined VidAngel from streaming, transmitting, or otherwise publicly performing or displaying any of the Studios' works, because such actions all stem from either past or future unauthorized copying. *See* 2 Nimmer on Copyright § 8.02(c) (2017) ("[S]ubject to certain . . . exemptions, copyright infringement occurs whenever an unauthorized copy . . . is

### C. Circumvention of access control measures under the Digital Millennium Copyright Act.

The district court also did not abuse its discretion in finding that the Studios are likely to succeed on their DMCA claim. In relevant part, that statute provides that "[n]o person shall circumvent a technological measure that effectively controls access to a [copyrighted] work." 17 U.S.C. § 1201(a)(1)(A). Circumvention means "to decrypt an encrypted work . . . without the authority of the copyright owner." § 1201(a)(3)(A). VidAngel concedes that CSS, AACS, and BD+ are encryption access controls, and that it "uses software to decrypt" them. But, it argues that, "like all lawful purchasers, VidAngel is *authorized* by the Studios to decrypt [the TPMs] to view the discs' content."

The argument fails. Section 1201(a)(3)(A) exempts from circumvention liability only "those whom a copyright owner authorizes to circumvent an access control measure, not those whom a copyright owner authorizes to access the work." *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 953 n.16 (9th Cir. 2011). *MDY* acknowledged a circuit split between the Second Circuit and the Federal Circuit regarding "the meaning of the phrase 'without the authority of the copyright owner,'" and chose to follow the Second Circuit's approach in *Universal City Studios, Inc. v. Corley*.

---

made, even if it is used solely for the private purposes of the reproducer, or even if the other uses are licensed."); *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 762–63 (7th Cir. 2012) (explaining that "copying videos . . . without authorization" constitutes direct infringement and plaintiff would therefore "be entitled to an injunction," even if the defendant does not "perform" the works itself).

*Id.* (citing 273 F.3d 429, 444 (2d Cir. 2001)).[14] *Corley* rejected the very argument VidAngel makes here: "that an individual who buys a DVD has the 'authority of the copyright owner' to view the DVD, and therefore is exempted from the DMCA pursuant to subsection 1201(a)(3)(A) when the buyer circumvents an encryption technology in order to view the DVD on a competing platform." 273 F.3d at 444. Rather, the Second Circuit explained, § 1201(a)(3)(A) "exempts from liability those who would 'decrypt' an encrypted DVD with the authority of the copyright owner, not those who would 'view' a DVD with the authority of a copyright owner." *Id.*

Like the defendant in *Corley*, VidAngel "offered no evidence that [the Studios] have either explicitly or implicitly authorized DVD buyers to circumvent encryption technology" to access the digital contents of their discs. *Id.* Rather, lawful purchasers have permission only to view their purchased discs with a DVD or Blu-ray player licensed to decrypt the TPMs. Therefore, VidAngel's "authorization to circumvent" argument fails.[15]

VidAngel also argues, for the first time on appeal, that the TPMs on the Studios' discs are use controls under

---

[14] Although *MDY* and *Corley* involved claims under § 1201(a)(2) rather than § 1201(a)(1), both provisions rely on the definition of circumvention in § 1201(a)(3)(A), so the same analysis applies to claims under both provisions. *See MDY*, 629 F.3d at 953 n.16; *Corley*, 273 F.3d at 444.

[15] The two Ninth Circuit cases cited by VidAngel in support of its argument interpret different phrases, "without authorization" and "exceeds authorized access," in a different statute, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. *See United States v. Nosal*, 676 F.3d 854, 856–63 (9th Cir. 2012) (en banc); *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1132–35 (9th Cir. 2009).

§ 1201(b) rather than access controls under § 1201(a), and therefore it cannot be held liable for circumventing them. Unlike § 1201(a), § 1201(b) does not prohibit circumvention of technological measures. Rather, it "prohibits trafficking in technologies that circumvent technological measures that effectively protect 'a right of a copyright owner,'" meaning the "existing exclusive rights under the Copyright Act," such as reproduction. *MDY*, 629 F.3d at 944 (quoting § 1201(b)(1)). In other words, § 1201(b) governs TPMs that control use of copyrighted works, while § 1201(a) governs TPMs that control access to copyrighted works. *Id.* at 946 (explaining that DMCA "created a new anticircumvention right in § 1201(a)(2) independent of traditional copyright infringement and granted copyright owners a new weapon against copyright infringement in § 1201(b)(1)").

But, even assuming that VidAngel's argument is not waived, it fails. VidAngel contends that because the Studios object only to decryption to copy—a *use* of the copyrighted work—but permit those who buy discs to decrypt to view—a way of *accessing* the work—the TPMs are "conditional access controls [that] should be treated as use controls" governed by § 1201(b). VidAngel therefore argues that because it only circumvents use controls, but does not traffic, it does not violate the DMCA. But, the statute does not provide that a TPM cannot serve as both an access control and a use control. Its text does not suggest that a defendant could not violate both § 1201(a)(1)(A), by circumventing an access control measure, and § 106, by, for example, reproducing or publicly performing the accessed work. Indeed, this court has acknowledged that a TPM could "both (1) control[] access and (2) protect[] against copyright infringement." *MDY*, 629 F.3d at 946.

To be sure, "unlawful circumvention under § 1201(a)—descrambling a scrambled work and decrypting an encrypted work—are acts that do not necessarily infringe or facilitate infringement of a copyright." *Id.* at 945. Thus, a defendant could decrypt the TPMs on the Studios' discs on an unlicensed DVD player, but only then "watch . . . without authorization, which is not necessarily an infringement of [the Studios'] exclusive rights under § 106." *Id.* But, when a defendant decrypts the TPMs and then also reproduces that work, it is liable for both circumvention in violation of § 1201(a)(1)(A) and copyright infringement in violation of § 106(1). *See Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 300 (3d Cir. 2011) ("Thus, for example, if a movie studio encrypts a DVD so that it cannot be copied without special software or hardware, and an individual uses his own software to 'crack' the encryption and make copies without permission, the studio may pursue the copier both for simple infringement under the Copyright Act and, separately, for his circumvention of the encryption . . . under the DMCA.").[16]

VidAngel relies heavily on the DMCA's legislative history, which states that "1201(a)(2) and (b)(1) are 'not interchangeable,'" and that circumvention of a TPM controlling access "is the electronic equivalent of breaking into a locked room in order to obtain a copy of a book." *MDY*, 629 F.3d at 946–47 (citations omitted). VidAngel argues that it instead was given the key to a locked room and

[16] VidAngel argues that adopting this view would "deepen[] a controversial split with the Federal Circuit" regarding whether § 1201(a) requires an "infringement nexus." *See Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178 (Fed. Cir. 2004). But this panel is bound by *MDY*. *See* 629 F.3d at 950. In any event, even assuming a nexus is required for dual access-use controls, VidAngel's circumvention was for an infringing use—to copy.

entered the room only to take a photograph of the room's contents. But, it was never given the "keys" to the discs' contents—only authorized players get those keys. VidAngel's decision to use other software to decrypt the TPMs to obtain a digital copy of the disc's movie thus is exactly like "breaking into a locked room in order to obtain a copy of a [movie]." *Id.* at 947 (citation omitted). Nothing in the legislative history suggests that VidAngel did not circumvent an access control simply because there are authorized ways to access the Studios' works. *See, e.g.*, WIPO Copyright Treaties Implementation and On-line Copyright Infringement Liability Limitation, H.R. Rep. No. 105–551, pt. 1 at 18 (1998) (presuming that a defendant "obtained authorized access to a copy of a work" before it circumvented the TPMs or circumvented "in order to make fair use of a work").

Finally, VidAngel contends that a TPM cannot serve as both an access and use control, because that would permit copyright holders to prohibit non-infringing uses of their works. It cites a Final Rule of the Library of Congress stating that "implementation of merged technological measures arguably would undermine Congress's decision to offer disparate treatment for access controls and use controls." Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 65 Fed. Reg. 64,556-01, 64,568 (Oct. 27, 2000). But, the Rule also states that "neither the language of section 1201 nor the legislative history addresses the possibility of access controls that also restrict use." *Id.* And, it concludes that "[it] cannot be presumed that the drafters of section 1201(a) were unaware of CSS," which existed "when the DMCA was enacted," and "it is quite possible that they anticipated that CSS would be" an access control measure

despite involving "a merger of access controls and copy controls." *Id.* at 64,572 n.14.

Because VidAngel decrypts the CSS, AACS, and BD+ access controls on the Studios' discs without authorization, the district court did not abuse its discretion in finding the Studios likely to succeed on their § 1201(a)(1)(A) circumvention claim.[17]

## II. Irreparable harm.

A preliminary injunction may issue only upon a showing that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. VidAngel contends that once the district court concluded the Studios were likely to succeed on their copyright infringement claim, it relied on a forbidden presumption of harm rather than "actual evidence." *See Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 998 (9th Cir. 2011) (per curiam). However, the district court expressly rejected any such presumption, instead extensively discussing the declaration of Tedd Cittadine, Fox Senior Vice President of Digital Distribution. Crediting this "uncontroverted evidence," the district court found that the Studios showed "VidAngel's service undermines [their] negotiating position . . . and also damages goodwill with licensees," because it offers the

[17] VidAngel argued in its briefing that the FMA immunizes it from liability for the DMCA claim, but conceded at oral argument that it is "not arguing that the FMA is a defense to the DMCA claim." And, although it also claimed a fair use defense, VidAngel did not advance any arguments for why its violation of § 1201(a)(1)(A) is a fair use independent of those it advances for its copyright infringement. Thus, even assuming that fair use can be a defense to a § 1201(a) violation, the defense fails for the same reasons it does for the copyright infringement claim.

Studios' works during negotiated "exclusivity periods" and because licensees raised concerns about "unlicensed services like VidAngel's."

VidAngel argues that these harms are "vague and speculative," but the district court did not abuse its discretion in concluding otherwise. Although Cittadine's declaration does not state that licensees have specifically complained about VidAngel, it says that licensees complain that "it is difficult to compete with" unlicensed services. The Studios also provided uncontroverted evidence that VidAngel offered *Star Wars: The Force Awakens* before it was available for legal streaming and offered *The Martian* and *Brooklyn* during HBO's exclusive streaming license.

This evidence was sufficient to establish a likelihood of irreparable harm. The district court had substantial evidence before it that VidAngel's service undermines the value of the Studios' copyrighted works, their "windowing" business model, and their goodwill and negotiating leverage with licensees. *See, e.g.*, *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285–86 (2d Cir. 2012) (holding that "streaming copyrighted works without permission," including at times "earlier . . . than scheduled by the programs' copyright holders or paying" licensees was likely to cause irreparable harm to copyright owners' "negotiating platform and business model"); *Fox Television Stations, Inc. v. FilmOn X LLC*, 966 F. Supp. 2d 30, 50 (D.D.C. 2013) (rejecting contention that harms to negotiation leverage with licensees were "pure speculation" and noting existence of an uncontroverted "sworn declaration from a senior executive at Fox who states that [licensees] have *already* referenced businesses like [the defendant] in seeking to negotiate lower fees"). And, although VidAngel argues that damages could be calculated based on licensing fees, the district court did not abuse its

discretion in concluding that the loss of goodwill, negotiating leverage, and non-monetary terms in the Studios' licenses cannot readily be remedied with damages. *See Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) ("Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm."); *WPIX*, 691 F.3d at 286.

VidAngel also argues that the Studios' delay in suing obviates a claim of irreparable harm. But, "courts are loath to withhold relief solely" because of delay, which "is not particularly probative in the context of ongoing, worsening injuries." *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014) (citation omitted). The district court found that the Studios' "delay in seeking an injunction was reasonable under the circumstances, their alleged harms are ongoing, and will likely only increase absent an injunction." This finding, based on the Studios' cautious investigation of VidAngel, their decision to sue only after VidAngel expanded from beta-testing into a real threat, and VidAngel's admission that "it intends to continue to stream [the Studios'] works and add other future releases, unless enjoined," was not an abuse of discretion.

## III. Balancing the equities.

Before issuing a preliminary injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted). VidAngel argues that the district court abused its discretion by failing to consider the harm to its "fledgling business" from an injunction. However, the district court did consider the harm to VidAngel—in both its original order and again in denying a stay—and concluded that "lost profits from an activity which has been shown likely to be infringing . . .

merit[] little equitable consideration." *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995) (citation omitted). VidAngel argues that the district court erred in relying on cases that predate *Winter* and *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006). But, those subsequent cases held only that the district court must balance the harms to both sides before issuing an injunction, *Winter*, 555 U.S. at 24; *eBay Inc.*, 547 U.S. at 391–93, and do not undermine the long-settled principle that harm caused by illegal conduct does not merit significant equitable protection.

The district court might have provided greater detail in balancing the equities. But, contrary to VidAngel's assertions, the court did not conclude that the Studios were "automatically" entitled to an injunction once it found that their "copyright [was] infringed." *eBay*, 547 U.S. at 392–93. Nor did it relegate its "entire discussion" of the required equity balancing to "one . . . sentence" without analysis. *Winter*, 555 U.S. at 26. Rather, it concluded that the only harm VidAngel asserted—financial hardship from ceasing infringing activities—did not outweigh the irreparable harm likely to befall the Studios without an injunction. This was not an abuse of discretion. *See All. for the Wild Rockies*, 632 F.3d at 1138.[18]

[18] Moreover, most of the evidence VidAngel cites to show damage to its business was not submitted to the district court until after the preliminary injunction was issued. *See, e.g.*, Declaration of David Quinto in Support of VidAngel, Inc.'s Opposition to Plaintiffs' *Ex Parte* Application for an Order to Show Cause at 2 ("The parties never briefed or explained . . . why it is impossible for VidAngel to comply immediately with the preliminary injunction without ceasing business activities entirely."); Declaration of Neal Harmon in Support of VidAngel, Inc.'s *Ex Parte* Application to Stay Preliminary Injunction

## IV. Public interest.

Finally, the court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citation omitted). VidAngel argues that the preliminary injunction harms the public's interest in filtering, enshrined in the FMA. But, as the district court recognized, this argument "relies on VidAngel's characterization of its service as the only filtering service" for streaming digital content. It is undisputed that ClearPlay offers a filtering service to Google Play users, and the district court did not clearly err in finding that other companies could provide something "similar to ClearPlay's." That VidAngel believes ClearPlay's service is technically inferior to its own does not demonstrate that consumers cannot filter during the pendency of this injunction.

On the other hand, as the district court concluded, "the public has a compelling interest in protecting copyright owners' marketable rights to their work and the economic incentive to continue creating television programming" and motion pictures. *WPIX*, 691 F.3d at 287 (citing *Golan v. Holder*, 565 U.S. 302, 328 (2012)). The Studios own copyrights to some of the world's most popular motion pictures and television shows. In light of the public's clear interest in retaining access to these works, and the ability to do so with filters even while VidAngel's service is unavailable, we conclude that the district court did not abuse

---

Pending Appeal Or, Alternatively, Pending Decision by the Ninth Circuit on Stay Pending Appeal at 5 (declaring that VidAngel can modify its applications by January 2017).

its discretion in finding that a preliminary injunction is in the public interest. *Id.* at 288.

## CONCLUSION

The judgment of the district court is **AFFIRMED.**