# Nos. 17-1118, -1202

**IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

ORACLE AMERICA, INC.,

*Plaintiff-Appellant*,

v.

GOOGLE INC.,

*Defendant- Cross-Appellant.*

Appeal from the United States District Court for the Northern District of California, Case No. 3:10-cv-03561-WHA, Hon. William H. Alsup

## CORRECTED BRIEF OF DEFENDANT-APPELLEE/ CROSS-APPELLANT GOOGLE INC.


Robert A. Van Nest
Christa M. Anderson
Michael S. Kwun
Reid P. Mullen
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111
Telephone: (415) 391-5400

Renny Hwang
GOOGLE INC.
1600 Amphitheatre Parkway
Mountain View, CA 94043
Telephone: (650) 253-2551

Daryl L. Joseffer
*Principal Attorney*
Ethan P. Davis
KING & SPALDING LLP
1700 Pennsylvania Ave. NW
Washington, D.C. 20006
Telephone: (202) 737-0500
djoseffer@kslaw.com

Bruce W. Baber
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, GA 30309
Telephone: (404) 572-4600

*Counsel for Defendant-Appellee/Cross-Appellant*

## CERTIFICATE OF INTEREST

Counsel for Cross-Appellant Google Inc. certifies the following:

1. The full name of the party represented by me is Google Inc.

2. The names of the real parties in interest represented by me are Google Inc.

3. Alphabet Inc., a publicly traded company (NASDAQ: GOOG, GOOGL), has more than 10% ownership of Google Inc. No publicly held company owns 10% or more of Alphabet Inc.'s stock.

4. The names of all firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this court are:

King & Spalding LLP: Bruce W. Baber; Christopher C. Carnaval; Ethan Davis; Geoffrey M. Ezgar; Truman H. Fenton; Mark H. Francis; Daryl L. Joseffer; Marisa Maleck; Robert F. Perry; Cheryl A. Sabnis; Steven T. Snyder; Anne M. Voigts; Scott T. Weingaertner; Joseph R. Wetzel; and Donald F. Zimmer, Jr.

Keker & Van Nest LLP: Christa M. Anderson; Edward Andrew Bayley; Elizabeth Ann Egan; Sarah Brienne Faulkner; Steven A. Hirsch; Matthias Andreas Kamber; Maya Beth Karwande; Michael S. Kwun; Kate Ellis Lazarus; Reid Patrick Mullen; Eugene Morris Paige; Daniel Edward Purcell; Steven Ragland; Robert Addy Van Nest; and David Zimmer.

Greenberg Traurig LLP: Ian Ballon; Valerie Wing Ho; Wendy Michelle Mantell; Dana K. Powers; and Luis Villa, IV.

/s/ Daryl L. Joseffer
Daryl L. Joseffer

## TABLE OF CONTENTS


CERTIFICATE OF INTEREST .......... i

TABLE OF AUTHORITIES .......... v

STATEMENT OF RELATED CASES .......... ix

JURISDICTION .......... ix

INTRODUCTION .......... 1

STATEMENT OF THE ISSUES .......... 5

STATEMENT OF THE CASE .......... 6

A. Sun Microsystems And J2SE: "One Big Tent" .......... 7

1. Sun Encourages The Free and Open Use Of The Java Language and APIs .......... 9

B. Google Builds Android .......... 12

1. Sun Could Not Figure Out How To Apply Its Technology To Smartphones .......... 13

2. Google Acquires Android And Develops A Software Platform For Mobile Devices .......... 14

3. Sun Welcomes Android To The Java Community .......... 17

4. The Continuing Market For J2SE .......... 20

C. Oracle Sues .......... 20

D. The Appellate Proceedings .......... 21

E. The Remand Proceedings .......... 22

1. The Retrial .......... 22

2. The Court Denies Oracle's Motion For Judgment As A Matter Of Law .......... 24

3. The District Court Denies Oracle's Motion For A New Trial ..... 30

SUMMARY OF ARGUMENT ..... 31

ARGUMENT ..... 33

I. Oracle Is Not Entitled To Judgment As A Matter of Law On Fair Use ..... 33

A. Fair Use Turns On Facts Decided By The Jury ..... 33

B. The Jury Could Have Reasonably Found In Google's Favor On Every Fair Use Factor ..... 36

1. There Is Substantial Evidence That The Purpose And Character Of The Use Favor Google ..... 36

a. A Reasonable Jury Could Find The Use To Be Highly Transformative ..... 36

b. A Commercial Purpose Does Not Preclude A Finding of Fair Use ..... 43

c. Google Acted In Good Faith ..... 45

2. A Reasonable Jury Could Have Found That The Copyrighted Work's Functional Nature Warranted Weaker Protection ..... 49

3. A Reasonable Jury Could Have Found That Google Used Only A Small Portion of J2SE ..... 54

4. A Reasonable Jury Could Have Found That Android Did Not Cause Market Harm ..... 58

a. Android Did Not Harm J2SE In Traditional, Reasonable, Or Likely To Be Developed Markets ..... 60

b. Java ME Is Irrelevant To The Market Harm Analysis ..... 63

C. This Court Should Affirm The Judgment ..... 66

II. Oracle Is Not Entitled To A New Trial ........................................ 69

A. The District Court Appropriately Limited The Issues On Retrial ........................................ 70

B. Google Complied With Its Discovery Obligations ........................................ 77

C. The District Court Did Not Abuse Its Discretion In Excluding Evidence ........................................ 80

1. The Mazzocchi Email ........................................ 80

2. Oracle's Responses To The European Commission ........................................ 82

III. The Declarations And SSO Are Not Entitled to Copyright Protection ........................................ 83

CONCLUSION ........................................ 85

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

### Cases

*Am. Geophysical Union v. Texaco, Inc.*,
60 F.3d 913 (2d Cir. 1994) .................................................... 43, 58, 59

*Arica Inst., Inc. v. Palmer,*
970 F.2d 1067 (2d Cir. 1992) ............................................................ 35

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) .............................................................. 75

*Baker v. Selden*,
101 U.S. 99 (1879) ............................................................................. 84

*Balsely v. LFP, Inc.*,
691 F.3d 747 (6th Cir. 2012) ............................................................. 67

*Beatrice Foods Co. v. New Eng. Printing & Litho. Co.*,
899 F.2d 1171 (Fed. Cir. 1990) .......................................................... 69

*Bikram's Yoga Coll. of India, L. P. v. Evolation Yoga, LLC*,
803 F.3d 1032 (9th Cir. 2015) ............................................................ 84

*Blanch v. Koons*,
467 F.3d 244 (2d Cir. 2006) .............................................................. 40

*Brewer v. Hustler Magazine, Inc.,*
749 F.2d 527 (9th Cir. 1984) .............................................................. 35

*Bridgeport Music, Inc. v. UMG Recordings Inc.*,
585 F.3d 267 (6th Cir. 2009) .............................................................. 67

*Cambridge Univ. Press v. Patton*,
769 F.3d 1232 (11th Cir. 2014) ..................................................... 41, 74

*Campbell v. Acuff-Rose Music Inc.*,
510 U.S. 569 (1994) ........................................................................ passim

*Cariou v. Prince*,
714 F.3d 694 (2d Cir. 2013) .............................................................. 58

*CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*,
499 F.3d 184 (3d Cir. 2007) .............................................................. 71

*Compaq Computer Corp. v. Ergonome Inc.*,
387 F.3d 403 (5th Cir. 2004) .............................................................. 67

*Elvis Presley Enters., Inc. v. Passport Video*,
349 F.3d 622 (9th Cir. 2003)........................................................................75

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991)...................................................................................53

*Fiset v. Sayles*,
963 F.2d 379 (9th Cir. 1992)........................................................................67

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985)................................................................21, 34, 58, 67

*Jartech, Inc. v. Clancy*,
666 F.2d 403 (9th Cir. 1982)...................................................................35, 67

*Jones v. Aero/Chem Corp.*,
921 F.2d 875 (9th Cir. 1990)........................................................................77

*Kelly v. Arriba Soft Corp.*,
336 F.3d 811 (9th Cir. 2003)...................................................................58, 59

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
688 F.3d 1342 (Fed. Cir. 2012) ....................................................................35

*L.A. News Serv. v. CBS Broad. Inc.*,
305 F.3d 924 (9th Cir. 2002)...........................................................40, 43, 54, 75

*Leadsinger, Inc. v. BMG Music Pub.*,
512 F.3d 522 (9th Cir. 2008)........................................................................49

*Lotus Dev. Corp. v. Borland Int'l, Inc.*,
49 F.3d 807 (1st Cir. 1995) ..........................................................................84

*Luke v. Fam. Care and Urgent Med. Clinics*,
323 Fed. Appx. 496 (9th Cir. 2009) ...............................................................79

*Maykuth v. Adolph Coors Co.*,
898 F.2d 156 (9th Cir. 1990)........................................................................71

*Micro Star v. Formgen Inc.*,
154 F.3d 1107 (9th Cir. 1998)......................................................................64

*Monge v. Maya Magazines, Inc.*,
688 F.3d 1164 (9th Cir. 2012)..................................................................42, 59

*Navellier v. Sletten*,
262 F.3d 923 (9th Cir. 2001)........................................................................69

*Oracle Am. Inc. v. Google Inc.*,
750 F.3d 1339 (Fed. Cir. 2014) .................................................. passim

*Perez v. Curcio*,
841 F.2d 255 (9th Cir. 1988)............................................................45

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007)..............................................34, 36, 40

*Peter Letterese And Assocs., Inc. v. World Inst. Of Scientology Enters.*,
533 F.3d 1287 (11th Cir. 2008)..........................................................35

*Schudel v. Gen. Elec. Co.*,
35 F. App'x 484 (9th Cir. 2002) .........................................................71

*Sega Enters., Ltd. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992).................................................... passim

*Seltzer v. Green Day, Inc.*,
725 F.3d 1170 (9th Cir. 2013)..............................................40, 54, 61

*Sony Computer Entm't, Inc. v. Connectix Corp.*,
203 F.3d 596 (9th Cir. 2000)................................................41, 43, 59

*Sprint/United Mgmt. Co. v. Mendelsohn,*
552 U.S. 379 (2008)...........................................................................80

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
756 F.3d 73 (2d Cir. 2014) .................................................................59

*United States v. Dhingra*,
371 F.3d 557 (9th Cir. 2004).........................................................81, 82

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
342 F.3d 191 (3d Cir. 2003) ...............................................................42

*Wall Data v. L. A. Cty. Sheriff's Dept.*,
447 F.3d 769 (9th Cir. 2006).................................................... passim

*Wharf v. Burlington N. R. Co.*,
60 F.3d 631 (9th Cir. 1995).................................................................69

*Wright v. Warner Books, Inc.*,
953 F.2d 731 (2d Cir. 1991) ...............................................................34

**Statutes**

17 U.S.C. § 106.....................................................................................42

17 U.S.C. § 107 .......... 34, 54

**Constitutional Provisions**

U.S. Const., Art. I, § 8, cl. 8 .......... 34

**Other Authorities**

11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2803 (2d ed. 1995) .......... 71

4 Nimmer on Copyright § 13.05[A] .......... 49, 58

Ned Snow, *Fair Use As A Matter of Law*, 89 Denv. U. L. Rev. 1 (2011) .......... 67

## STATEMENT OF RELATED CASES

There was one prior appeal in this case, *see Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 2887 (2015), and one mandamus petition, *In re Google Inc.*, 462 F. Appx 975 (Fed. Cir. 2012). Counsel for Google is not aware of any related cases.

## JURISDICTION

Oracle's brief correctly explains the jurisdictional basis for its appeal. After Oracle filed its notice of appeal on October 26, 2016 (Appx1683-1684), Google filed a timely notice of cross-appeal on November 9, 2016 (Appx2116-2117).

## INTRODUCTION

In the first appeal in this case, this Court held that Oracle was not entitled to judgment as a matter of law on fair use and remanded for a new trial on that question. After hearing from 29 witnesses during a nine-day trial, being instructed on the fact-intensive, four-factor balancing test for fair use, and deliberating for four days, the jury found that Google's challenged use was fair. That should be the end of the matter, as the district court explained in its thorough opinions.

No court has ever overturned a jury's determination on fair use. This is no time to start. Oracle does not challenge the jury instructions, which were based on this Court's opinion. And Oracle's challenge to the sufficiency of the evidence is meritless because the record contains more than substantial evidence to support the verdict on this fact-bound question.

The fair-use defense "encourage[s] the production of original works" by allowing innovators to "build on" what has come before. *Sega Enters., Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1527 (9th Cir. 1992). The jury heard that is exactly what Google did.

The Java 2 Standard Edition ("J2SE") platform—the copyrighted work at issue—was designed for desktops and servers and was not suited for use in mobile phones. The jury heard that Google used a miniscule percentage of J2SE in creating the world's first open-source, full-stack, mobile operating system for smartphones, and did so to enable programmers to write applications for Android in the Java programming language, which was free and open for all to use. Specifically, Google used a small fraction of the declarations in J2SE's Application Programming Interface ("API")—only the declarations for functions that Google determined to be key for mobile phones or that were necessary to make meaningful use of the Java language. Google added many other new API packages and declarations for additional functions needed in the mobile environment. And Google wrote or obtained all of its implementing code for performing the declared functions.

Google made Android, including the new API packages created by Google, available free of charge for anyone to build on, modify, or adapt under an open source license. Android was "revolutionary," "completely

different from any other approach" (Appx50346-50347), and something that no one else, including Sun or Oracle, had ever managed to do.

The jury also heard Sun's former CEO testify that Sun marketed the Java APIs "as free and open" for all to use without a license. Appx50499. Witnesses testified that practice was consistent with industry custom that API specifications or declarations were not proprietary.

Although Oracle's brief paints a very different picture, the jury was free to credit Google's evidence, which Oracle mostly ignores or minimizes. Oracle's repeated reliance on non-existent concessions only underscores the extent to which its position is at odds with the record. For example, Oracle asserts that:

- It is "undisputed" that Google copied the "heart" of the copyrighted work. Oracle Br. 4. In fact, the jury heard that Google used only some of the declarations (which Sun held out as being free for all to use) and none of the implementations (which Sun treated as proprietary).
- "[T]here is no dispute that Google copied Oracle's copyrighted work into a competing commercial product."

Oracle Br. 25. In fact, many witnesses testified that Android did *not* compete with the J2SE platform because J2SE was designed for desktop computers and servers, not smartphones. The jury also heard that Oracle's mobile version of Java (Java ME) was a small, simple platform, fit only for feature phones and other small devices—not smartphones. It was not the copyrighted work at issue (that was J2SE), nor was it a derivative work of J2SE.

- "Google did not dispute that Android caused" it to lose business. Oracle Br. 50. Not so. Numerous witnesses testified that J2SE continued to perform well in the marketplace for desktops and servers, and that Oracle's business losses were attributable to other factors.

The jury heard competing evidence on all four fair-use factors and was entitled to credit Google's evidence on each one. There is substantial evidence that: (i) the purpose and character of the use favored Google because Android was transformative—the world's first open-source, full-stack mobile operating system—and Google's use was consistent with industry custom and Sun's stated view that the

declarations were free and open for all to use; (ii) the functional nature of the declarations weighs in favor of fair use, as the declarations are uniformly short and constrained by the need to be descriptive and by conventions common to all programming languages; (iii) the amount and substantiality of the portion used in relation to the copyrighted work as a whole favored fair use, in part because Google used less than one half of one percent of J2SE; and (iv) Android did not cause market harm to Oracle because no version of Java competed with Android in the smartphone market or was likely to do so.

Oracle also seeks a new trial based on its remarkable assertion that "[a]t every turn, in countless ways, the district court issued rulings that obstructed Oracle's case." Oracle Br. 55. The court was meticulous and fair throughout the proceedings, explained all of the challenged rulings in detail, and properly exercised its considerable discretion.

## STATEMENT OF THE ISSUES

1. Whether sufficient evidence supports the jury verdict of fair use.

2. Whether various trial-management decisions were proper exercises of discretion.

a. Whether the district court abused its discretion in limiting the retrial to the Android products considered and found to be infringing at the first trial.

b. Whether the district court clearly erred in finding that Google had not committed discovery misconduct and that the alleged misconduct was immaterial.

c. Whether the court abused its discretion in excluding: (i) one line of an email as lacking foundation and being too inflammatory, while admitting the rest of the email and permitting the email's author to testify; and (ii) other materials that Oracle had withheld from Google during discovery.

3. Whether copyright protection extends to all elements of an original work of computer software.[1]

## STATEMENT OF THE CASE

Over nine days, the jury heard testimony from 29 witnesses, fifteen of whom were former or current Sun and/or Oracle executives or employees, namely Jonathan Schwartz (former Sun CEO), Eric Schmidt

[1] This Court resolved this issue against Google in the first appeal. Google raises it here to preserve the issue.

(former Sun CTO and later Google CEO), Lawrence Ellison, Joshua Bloch, Donald Smith, Simon Phipps, Safra Catz, Henrik Stahl, Hasan Rizvi, Craig Gering, Terrence Barr, Edward Screven, Mark Reinhold, Neal Civjan, and Alan Brenner. That testimony and hundreds of exhibits showed as follows:

### A. Sun Microsystems And J2SE: "One Big Tent"

Sun Microsystems developed the Java platform for computer programming in the 1990s. *Oracle Am. Inc. v. Google Inc.,* 750 F.3d 1339, 1348 (Fed. Cir. 2014). The Java 2 Standard Edition of that platform includes the Java Virtual Machine, the Java programming language, and the Java Application Programming Interface. *Id.* The Java programming language is free for all to use without a license. Appx50494; Appx50955; Appx50989; Appx51089-51090. The API is "an integral part" of that language, and "not separable" from it. Appx50979; Appx55430.

The API provides access to thousands of "methods," each of which performs a specific operation or function, like choosing the higher of two numbers. Appx50337; Appx50965-50970; Appx51082-51083. Each method consists of a header, also known as a declaration, and a body,

also known as the implementing code. Appx34; Appx50957. The declarations describe what the method will do, and there are practical and functional constraints on how they can be written. Appx51245-51246; Appx51928-51932. The declarations provide a shorthand way for programmers to call on the implementing code, which contains the actual instructions that perform the relevant function. Appx50502; Appx50957. The implementing code is "the code that does the work," "where a lot of the creativity happens." Appx50971; Appx50729. By using the declarations to access the implementing code, programmers can write complex software efficiently because they do not have to write new implementing code from scratch for every function they want to include. Appx50956-50970; Appx51452.

The methods are grouped into "packages," which are further grouped into "classes" of programs. Appx50965; Appx50968; Appx51453. The combined package, class, and method names, together with other necessary elements, constitute the structure, sequence, and organization ("SSO") of the API packages. Appx51931-51932. "The SSO specifies the relationships between and among the elements of the Java API packages and also organizes the classes, methods, and other

elements within the package." Appx50957. Because the declarations reflect the SSO, copying the declarations is tantamount, in Oracle's view, to copying the SSO. *See Oracle Am. Inc.,* 750 F.3d at 1351. "[T]hat sequence of package name, class name, method name, that's required by the language, and that's how Java works." Appx51225.

By 2008, the Java platform contained 166 API packages. *Oracle Am. Inc.*, 750 F.3d at 1349; Appx51454. To write at all in the Java programming language, at least 62 classes (and some of their methods) "must be used. Otherwise, the language itself will fail." Appx36; Appx51444-51446; Appx51473-51474.

#### 1. Sun Encourages The Free And Open Use of The Java Language and APIs

The jury heard evidence that Sun and its collaborators made the Java language and API declarations open and free for anyone to use without obtaining a license or paying a royalty. Appx50499-50500; Appx50609; Appx51553-51554. In encouraging computer programmers to learn and use Java, Sun touted the openness and accessibility of the APIs. Appx50494-50495; Appx50499. It did so to bring in as many people as possible to the Java community. *Id.*; Appx55327 ("we would love . . . to have one big tent rather than a hundred little ones").

Millions of programmers invested time and effort into learning Java (including how to use the APIs to write programs), making it one of the world's most popular programming languages. Appx50499; Appx50963-50964.

Jonathan Schwartz, Sun's CEO at the time Google introduced Android, confirmed that "Sun promote[d] the Java APIs along with the language," and that Sun "[a]bsolutely" marketed the APIs "as free and open." Appx50499; *see also* Appx50500. As he and other Sun employees testified, the Java declarations were "never" "considered proprietary to Sun." Appx50505. Because Sun did not consider the Java declarations proprietary and because its strategy was to share them, Schwartz agreed that "it was fair" for third parties to "us[e] the APIs with their own implementations" so long as they did not use the Java logo, which is subject to a trademark license. Appx50507-50508; *see also* Appx50419 ("Q: [W]ithin what you give away for free, it's the declaring code and the structure, sequence and organization of the 37 packages that we're here in this courtroom talking about; right? A: Yes."); Appx50405 (Sun gave away for free its "APIs and any design or structure, sequence and organization of those APIs.").

Other industry participants, including GNU Classpath and Apache Harmony, used the Java APIs to make their own implementations, which was "completely consistent with [Sun's] practices." Appx50507-50508; Appx50512-50516; Appx50518-50519; Appx51025-51029. As Google co-founder Larry Page testified, the reimplementation of API declarations "was established industry practice. . . . That's been done many, many times." Appx51849; *see also* Appx50500; Appx50340; Appx50360-50362. Sun itself used APIs created by other companies to "build its own implementations" of those third-party APIs. Appx50504.

Sun's business model was to share the declarations/SSO and "compete on implementations." Appx50500; Appx55362. Sun hoped that the ubiquity of Java-proficient programmers would drive the sales of Sun hardware and support services, and thus, the more the industry embraced Java (including the declarations), the better for Sun. Appx50516-50517; Appx50520; Appx50609. "[T]he point of Java was . . . creating a marketplace in which Sun was able to sell its products and skills and the reputation that was a door opener for [its] sales force." Appx51023; *see also* Appx54720; Appx51867; Appx51875-51879.

As part of that strategy, before Android's release, Sun made available without charge under an open source license a version of Java called OpenJDK. Appx50735-50737; Appx50557-50558. OpenJDK included the declarations for all of the API packages in J2SE, as well as millions of lines of implementing code for the API packages. Appx51023-51024; Appx51247; Appx51021; Appx51063-51064.

### B. Google Builds Android

The jury heard that, before Android, there was no open-source, full-stack platform tailored for smartphones on the market. Appx50622; Appx50640-50641; Appx50346-50347. It was "really, really hard to build a phone." Appx50622; *see also* Appx50346-50347. Few were innovating in the mobile phone space, Appx50997-50998, and the result "just wasn't a good user experience" for consumers. Appx50622; *see also* Appx51845-51846.

Smartphones posed "really different constraints from those servers and desktops for which [J2SE] was written." Appx50997. Those constraints include differences in power supply, memory availability, and the power of the processing chips. Appx50997.

Creating a platform in that "constrained environment" was "quite a challenge." Appx50997-50998.

### 1. Sun Could Not Figure Out How To Apply Its Technology To Smartphones

Sun/Oracle never managed to overcome those constraints. As the jury heard, Sun/Oracle "never brought a full-stack mobile operating platform to market" with J2SE despite many efforts to do so. Appx51197; Appx51200-51202; *see also* Appx50559-50560; Appx51706; Appx51801-51802; Appx51867-51868. Before Oracle bought Sun, Sun tried and failed to build a successful smartphone platform with Java technology. Appx51240; Appx51787-51789. Oracle eventually abandoned its efforts and, as Oracle CEO Larry Ellison acknowledged, never competed in the smartphone market. Appx54693; Appx50950; Appx55426.

As early as September 29, 2006—over a year before Android was released—Sun acknowledged that it was ill-prepared for the shift to the modern smartphone market. Appx55332 ("Market Changes Threaten Our Position"); Appx55334 ("Stay The Course and Revenue Drops"); Appx50560-50561; Appx51854-51857; Appx55329 (Sun product manager in 2007 stating "our mobile strategy is failing"). No Java

product did everything a smartphone needed. Appx51865. J2SE—the copyrighted work at issue—was designed for servers and desktop computers, and could not be transferred successfully to the smartphone environment. Appx50580; Appx50997-50998.

Sun had also developed Java Micro Edition ("Java ME"), which "was intended for resource-constrained devices much smaller and much simpler than a modern smartphone." Appx51861-51862; Appx51793-51794; Appx51800; Appx54701. Sun licensed Java ME in mobile phones known as "feature phones," which are flip phones with "small screens" that are not connected to "any data networks." Appx50618. Oracle's Vice President of Product Management, Henrik Stahl, admitted that Java ME did not "provide[] the features and functionality needed for a modern smartphone." Appx51188; Appx54706; Appx51902-51903; Appx51797; Appx51792-51794; Appx55455-55456. Internal Oracle documents confirmed it had "no solution for smartphones." Appx55400-55401; Appx51859-51860.

#### 2. Google Acquires Android And Develops A Software Platform For Mobile Devices

In 2005, Google acquired Android Inc. as part of a plan to develop a software platform for mobile devices. Appx50623-50624. In 2005 and

2006, Google and Sun discussed a potential co-development partnership, under which Google would have received a license to the entire J2SE platform, including the Java trademarks and the entire J2SE API, including the implementing code. Appx50347-50348; Appx51848-51849.

After those negotiations broke down, Google used only the free and open declarations from 37 of the 166 J2SE API packages—those that Google determined to be key for mobile devices. Appx51236; Appx51938. Google used the declarations because, as computer science expert Dr. Astrachan explained, "developers . . . would expect that if you're going to be using the Java programming language, that you have access to a rich suite of APIs . . . ." Appx51264-51265; *see also* Appx51236.

Google combined the declarations/SSO of the 37 packages with over 100 other, totally new packages designed specifically for a mobile platform. Appx51229-51230; Appx51610. Those new packages were for smartphone functions such as mobile web browsing, location awareness, accelerometers for responsiveness to phone shaking, and cameras—none of which was available in the J2SE platform. Appx51229-51231.

Android also has an application framework layer that includes other functions not included in the J2SE platform, including a graphical user interface, telephony services, multimedia, application frameworks, application distribution, an activity manager, and a location manager. Appx51606-51607.

Google created its own implementations for all of the declared functions, as well as a new virtual machine runtime, both of which Google tailored for the mobile environment. Appx50665-50669; Appx51236-51237; Appx50665-50666. In assembling all this software, Google customized its work for the battery and memory limitations of a smartphone. Appx51231-51232; Appx51237-51238. The new Android implementations of the 37 API packages, for example, were 80 percent of the size of the J2SE implementations. Appx51237. Google built all of this on top of an enhanced version of the Linux kernel operating system created with Android-specific features. Appx51643.

As the jury heard, Google spent three years building Android. Appx50363-50364. The result was a "revolutionary" open-source mobile platform, "completely different from any other approach." Appx50346-50347. One of Oracle's expert witnesses described this as a "feat."

Appx51786-51787. Not including the kernel, the resulting platform contained roughly 15,000,000 lines of code. Appx51247. The parties stipulated that the 15,000,000 lines of code included approximately 11,500 lines of J2SE declarations (about 0.4% of J2SE and 0.08% of the Android code). Appx51246-51247.

Google released the Android platform in 2007, and the first Android phones went on sale the following year. Appx50363-50364. Google provides the Android platform free of charge to smartphone manufacturers and publishes the source code for use without charge under an open source license. Appx50364-50365. Virtually all of Google's revenues arise from its pre-existing search and ad technologies, which are separate from Android. Appx51869-51871.

### 3. Sun Welcomes Android To The Java Community

The jury heard that Sun welcomed Android into the Java community. Appx50538; Appx50743-50746. Because Android was open source, Sun knew that it contained the declarations and SSO of the 37 J2SE API packages. Appx50538; Appx50368; Appx50744-50745.

When Android was released, Schwartz wrote on his Sun CEO blog, an official statement of the company:




« ZFS Puts Net App... | Main | Offering Color on... »

MONDAY NOV 05, 2007

**Congratulations Google, Red Hat and the Java Community!**

I just wanted to add my voice to the chorus of others from Sun in offering my heartfelt congratulations to Google on the announcement of their new Java/Linux phone platform, Android. Congratulations!

I'd also like Sun to be the first platform software company to commit to a complete developer environment around the platform, as we throw Sun's NetBeans developer platform for mobile devices behind the effort. We've obviously done a ton of work to support developers on all Java based platforms, and were pleased to add Google's Android to the list.

Appx55325; Appx50538; Appx50368. Schwartz added that Google had "strapped another set of rockets to the [Java] community's momentum." Appx55325.

And at the time of Android's announcement, he emailed Schmidt:

```
> -----Original Message-----
> From: Jonathan.Schwartz@sun.com [mailto:Jonathan.Schwartz@sun.com]
> On Behalf
> Of Jonathan Schwartz
> Sent: Friday, November 09, 2007 10:57 AM
> To: Eric Schmidt
> Subject: android
>
> Let us know how we can help support your announcements next week -
> we're
> happy to do so.
>
> Jonathan
```

Appx55327; *see also* Appx50744-50745. Schwartz also wrote an email to Schmidt offering ideas for "changes [Google] should make that would make [Android's release] more successful." Appx50544.

In a 2008 email, Schwartz wrote again to Schmidt: "On your deal, don't hesitate to let me know if I or Sun can be supportive." Appx55328. And in November 2009, Schwartz emailed Verizon Wireless: "Congrats on your Droid launch. Don't hesitate to call on us if we can be of help in ensuring your extraordinary success." Appx50555. Schwartz never complained to Google that Google was doing anything wrong or that Google needed a license. Appx50555-50556.

After announcing its acquisition of Sun, Oracle publicly embraced Android. At the annual JavaOne conference in 2009, Oracle CEO Larry Ellison lauded Sun for "opening up Java," spoke of "giving Java to the world," promised "more of the same" from Oracle, and stated: "I think we can see lots and lots of Java devices, some coming from our friends at Google." Appx55319-55320; Appx51385-51387; *see also* Appx55402-55412 (presentation for meeting with Ellison and Schmidt).

#### 4. The Continuing Market For J2SE

Ellison acknowledged that revenue from Java increased after Oracle acquired Sun ("we're selling more"), Oracle was doing better in its business categories, and was expanding to new categories. Appx54694; Appx50950; Appx55426. The jury heard that Sun's general losses were attributable to factors such as the advent of smartphones generally, not Android in particular, and the fact that it was hit especially hard by the recession. Appx51807; Appx51855; Appx50578-50579. As Oracle's expert explained, consumers were moving toward smartphones (including the iPhone, which does not use Java), but Sun's Java products could not support smartphones. Appx51864-51869. As Sun acknowledged, its commitment to "open source software and open interfaces could affect revenue" as well. Appx51878.

### C. Oracle Sues

After Oracle Corporation acquired Sun and changed its name to Oracle America, Oracle made an about-face and filed suit against Google for patent and copyright infringement in 2010, three years after Android's launch. Appx400-411. A jury found no infringement of the asserted patents. *See Oracle*, 750 F.3d at 1347. The district court

entered judgment in Google's favor on Oracle's patent claims, and Oracle did not appeal that determination. *Id.*

Oracle's copyright claims accused Google of copying the declarations and SSO of the J2SE API packages. *See Oracle*, 750 F.3d at 1347. At the first trial in 2012, the district court considered whether the declarations were copyrightable at the same time the jury considered, among other things, Google's fair use defense. *Id.* at 1351.

The first jury found infringement, but hung on fair use. *Id.* at 1351-52. The district court found the declarations were not copyrightable and Google was entitled to judgment as a matter of law. *Id.* The district court also denied Oracle's motion for judgment as a matter of law regarding fair use. *Id.*

### D. The Appellate Proceedings

On appeal, this Court held that the Java declarations/SSO were copyrightable, but that Oracle was not entitled to judgment as a matter of law on fair use. *Oracle*, 750 F.3d at 1372. The Court explained that fair use "requires a case-by-case determination," with "four non-exclusive factors to be considered." *Id.* at 1373 (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 549 (1985)). And "due

respect for the limit of our appellate function requires that we remand the fair use question for a new trial." *Id.* at 1376. The Court noted factual disputes for a jury to decide on all four factors, including whether Google's use was transformative, whether "functional aspects of the packages" and Google's "desire to achieve commercial 'interoperability'" weighed in favor of the second and third factors, and whether Android caused market harm to Oracle. *Id.* at 1376-77.

The Court therefore remanded for a new trial on fair use, with instructions to the district court to reinstate the jury's verdict of infringement and to "revisit and revise its jury instructions on fair use." *Id.* at 1377.

### E. The Remand Proceedings

#### 1. The Retrial

The original trial covered six versions of the Android mobile operating system for smartphones and tablets. Appx58. On remand, Oracle filed a supplemental complaint identifying six further versions of Android released since the original complaint and alleging that Google had implemented Android in various new products. *Id.* When Oracle served expert reports that attempted to expand the scope of the retrial

to include versions of Java SE that were not at issue in the first trial, Google moved to strike those reports. Appx58.

After the parties were unable to agree on the scope of the retrial, the court limited the trial to: (i) the two versions of J2SE that Oracle asserted in the first trial; and (ii) released versions of Android used in smartphones and tablets, the only types of devices addressed in the first trial. Appx1851-1852. That decision was based on the court's concern with "the peril of retrial spinning out of control via a piling on of ever-expanding 'updating' issues" and "the ever-mounting prolixity of this case and the need for a cutoff of new device implementations to be tried (without prejudice to trying the rest later)." Appx58. Oracle retained the right to sue Google in another case for infringement by those other device implementations. Appx49-50. The district court also granted Google's motion in limine to exclude all evidence of those new Android products. Appx51-55.

After the jury heard nine days of evidence, the district court gave it extensive instructions (which Oracle does not challenge in this appeal) based on this Court's opinion. Appx1041-1062. After deliberating for four days, the jury found for Google.

### 2. The Court Denies Oracle's Motion For Judgment As A Matter Of Law

Oracle moved for judgment as a matter of law, which the district court denied. Appx29. The court determined that "[u]nder the law as stated in the final charge and on our trial record, our jury could reasonably have found for either side on the fair use issue" because the "trial presented a series of credibility calls for our jury." *Id.*

At the outset, the court rejected Oracle's contention that only the "Java programming language as distinct from the Java API library . . . was free for all to use." Appx36. The court explained that, "in order to write at all in the Java programming language, 62 classes (and some of their methods), spread across three packages within the Java API library, must be used. Otherwise, the language itself will fail." *Id.* Oracle had stipulated that it was fair to use the 62 "necessary" classes given that the Java programming language itself was free and open to use without a license. *Id.* "That the 62 'necessary' classes reside without any identification as such within the Java API library (rather than reside within the programming language)," the court explained, "supports Google's contention that the Java API library is simply an extension of the programming language itself and helps explain why

some view the Java API declarations as free and open for use as the programming language itself." Appx36-37.

The court summarized Oracle's argument as follows: "Yes, all were free to use [1] the Java programming language . . . [2] the 62 necessary classes from the Java API . . . [and] [3] the same functionality of any and all methods in the Java API library," but "anyone doing so should have scrambled the functionalities among a different taxonomy of packages and classes (except as to the 62 'necessary' classes)." Appx37. Accepting this argument would lead to a frustrating result for programmers: "If, as it was entitled to do, Google had simply reorganized the same functionality of the 37 re-implemented Java packages into a different SSO . . . then Java programmers, in order to use the Java system as well as the reorganized Android system, would have had to master and keep straight two different SSO's as they switched between the two systems for different projects." *Id.* The court analogized to the QWERTY keyboard that all typewriters use: "imagine the confusion and universal disservice if every typewriter maker had to scramble the keyboard." *Id.*

Because the Android and Java systems both "presupposed the Java programming language in the first place," a jury reasonably could have found that "it was better for both to share the same SSO insofar as they offered the same functionalities, thus maintaining usage consistency across systems and avoiding cross-system confusion. . . ." Appx37-38. This consideration "bears significantly upon" the first three fair-use factors, especially considering that Google used "only so much declaring code as was necessary to maintain inter-system consistency among Java users" and "Google supplied its own code for the rest." Appx38. "Overall, avoiding cross-system babel promoted the progress of science and useful arts—or so our jury could reasonably have found." *Id.*

The court also emphasized that a reasonable jury could have found that "Google's use of parts of the Java API . . . was undertaken based on a good faith belief that at least the declaring code and SSO were free to use (which it did use), while a license was necessary for the implementing code (which it did not use)." Appx39-40. The court pointed to "evidence that many at Google (and Sun) understood that at least the declaring code and their SSO were free to use and

re-implement, both as a matter of developer practice and because the availability of independent implementations of the Java API enhanced the popularity of the Java programming language, which Sun promoted as free for all to use." Appx39. "Sun's own CEO at the time . . . testified on Google's behalf at trial and supported Google's view that a practice of duplicating declarations existed and that the competition was on implementations." *Id.*

A reasonable jury could have also found that "Google's concern about making an enemy of Sun reflected concern about the parties' business relationship in light of the failed negotiations that would have brought Sun in as a major partner in Android, rather than concerns about litigation." Appx39-40. "This is no small point in this case, for no Oracle jury argument received more airtime than its argument that Google 'knew' it needed a license and chose in bad faith to 'make enemies' instead." Appx31.

The district court then considered each of the four factors. As to the nature of Google's use (factor one), the court concluded that the jury could reasonably have found for Google based on the transformative nature of Android, because there was evidence that: (1) "Android did

not merely adopt the Java platform wholesale as part of a broader software platform without any changes," (2) "[i]nstead, it integrated selected elements, namely declarations from 37 packages to interface with all new implementing code optimized for mobile smartphones and added entirely new Java packages written by Google itself," which (3) enabled a "purpose distinct from the desktop purpose of the copyrighted works." Appx43; *see also* Appx46.

The court rejected Oracle's argument that Google's use could never be fair because the "copied declarations serve the same function in both works." Appx42. "If this were enough to defeat fair use, it would be impossible ever to duplicate declaring code as fair use and presumably the Federal Circuit would have disallowed this factor on the first appeal rather than remanding for a jury trial." *Id.*

In addition, "even though Google's use was commercial, which weighed against fair use," the jury could reasonably have found either that "the open-source character of Android tempered Google's overall commercial goals," Appx40, or "that Google's use of the declaring code and SSO from 37 Java API packages constituted a fair use despite even a heavily commercial character of that use." Appx40; *see also* Appx46.

On the nature of the work (factor two), a reasonable jury could have found that, "while the declaring code and SSO were creative enough to qualify for copyright protection," they were not "highly" creative, and "functional considerations predominated in their design." Appx44; *see also* Appx46. Some of the witnesses "emphasized the functional role of the declaring lines of code," and the jury was entitled to credit their testimony. Appx44.

On the amount and substantiality of the portion used (factor three), "[t]he number of lines of code duplicated constituted a tiny fraction of one percent of the copyrighted works (and even less of Android, for that matter)." Appx45. In addition, the "jury could reasonably have found that Google duplicated the bare minimum of the 37 API packages, just enough to preserve inter-system consistency in usage, namely the declarations and their SSO only." *Id.*

On market harm (factor four), the "jury could reasonably have found that use of the declaring lines of code (including their SSO) in Android caused no harm to the market for the copyrighted works, which were for desktop and laptop computers," and that Java ME "declined in

revenue" because people wanted smartphones (which neither J2SE or Java ME supported). Appx45.

#### 3. The District Court Denies Oracle's Motion For A New Trial

Oracle also moved for a new trial, which the district court denied. Oracle argued that the court abused its discretion by limiting the retrial to Android in smartphones and tablets. The court determined, among other things, that Oracle ignored (a) "the fact that Oracle's earlier win on infringement in 2010 . . . concerned only smartphones and tablets" and (b) that "one use might be a fair use but another use might not, and the four statutory factors are to be applied on a use-by-use basis." Appx60.

The district court also rejected Oracle's allegations of discovery misconduct, noting that Google had produced relevant documents and that the subject matter of those documents (future support of Android applications on the Chrome operating system for laptops and desktops) was not relevant to the trial, which was limited to smartphones and tablets. Appx62-67.

Finally, the court rejected Oracle's assertion that two evidentiary rulings were abuses of discretion. The court explained that it had

redacted one line in an email because it was "too inflammatory and without foundation," and Oracle had accepted the redaction during trial. Appx71. The court had excluded other documents of questionable relevance because Oracle had withheld them from Google as privileged, and its "gamesmanship" had prejudiced Google. Appx76.

## SUMMARY OF ARGUMENT

I. This Court's remand for a new trial on fair use was not a pointless formality. The Court must presume that the jury found all facts in favor of the verdict—including all facts bearing on the four fair-use factors. Even if the evidence had been insufficient on one or more factors, the other factors would provide more than a sufficient basis for the jury verdict.

The jury heard evidence that Google's transformative use—creating a platform for smartphones—did not cause market harm because no version of Java supported smartphones and Sun/Oracle did not compete in the smartphone market. Moreover, Google's use of a miniscule percentage of J2SE was fully consistent with Sun's business model and industry custom, which was to hold out the functional declarations as being free and open for everyone to use in order to

expand the Java user base. The jury was entitled to conclude that, by building on what had come before, and creating an open source platform on which others could build further, Google engaged in the type of use that the fair use doctrine protects.

II. There is no reason to require a third trial. The district court did not abuse its discretion in limiting the fair-use retrial to the subject matter of the first trial—the Android operating system in smartphones and tablets. This Court's remand did not require proceedings on other Android products or different devices, and the district court had legitimate case-management concerns about dramatically expanding the scope of the retrial.

Nor did the court clearly err in finding that Google had committed no discovery misconduct. Google produced documents discussing the goals and technical details of the ARC++ program (which relates to the different Chrome operating system) at least five months before trial. The court correctly found that: (i) "Oracle's failure to review the ARC++ documents is its own fault" and (ii) given the scope of the retrial (smartphones and tablets), discovery concerning other products was irrelevant to this trial in any event. Appx66.

As for evidentiary rulings, the court: (i) accommodated Oracle by allowing it to call a witness who was not included on Oracle's pretrial witness list, and excluded only a single, cumulative line from an email by that witness; and (ii) excluded other materials because Oracle had withheld them from Google, as privileged, until it tried to spring them on Google during trial.

## ARGUMENT

### I. Oracle Is Not Entitled To Judgment As A Matter of Law On Fair Use

Oracle implies that the only issues this Court left open for resolution on remand are narrow ones. Not so. This Court remanded for a new trial on fair use. *Oracle*, 750 F.3d at 1376-77. It did not remand only for fact findings on specific questions relevant to fair use. *See id.* The district court based its jury instructions on this Court's opinion, Appx1041-1062, and Oracle does not challenge those instructions on appeal. Oracle's challenge to the sufficiency of the evidence fails on the record and under controlling Ninth Circuit law.

#### A. Fair Use Turns On Facts Decided By The Jury

"[S]ince the [fair use] doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the

question must be decided on its own facts." *Harper & Row*, 471 U.S. at 560 (internal quotation marks omitted). The law "requires a case-by-case determination whether a particular use is fair. . . ." *Id.* at 549. Relevant factors include: (1) "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;" (2) "the nature of the copyrighted work;" (3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole;" and (4) "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107.

Those factors "are not meant to be exclusive," *Harper & Row*, 471 U.S. at 560, "[n]or . . . treated in isolation, one from another." *Campbell v. Acuff-Rose Music Inc.*, 510 U.S. 569, 578 (1994). They "are to be explored, and the results weighed together, in light of the purpose[] of copyright," which is "[t]o promote the Progress of Science and useful Arts." *Id.* at 578, 575; *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1163 (9th Cir. 2007) (quoting U.S. Const., Art. I, § 8, cl. 8).

Thus, a defendant need not establish that each of the factors weighs in its favor. *Sega Enters.,* 977 F.2d at 1522; *Wright v. Warner Books, Inc.*, 953 F.2d 731, 740 (2d Cir. 1991); *see also Peter Letterese*

*And Assocs., Inc. v. World Inst. Of Scientology Enters.*, 533 F.3d 1287, 1308 (11th Cir. 2008) (refusing to rule out possibility that specific factual circumstances may compel a conclusion cutting against all four factors). But "victory on the fair use playing field is assured" when all four factors do favor fair use. *Arica Inst., Inc. v. Palmer,* 970 F.2d 1067, 1079 (2d Cir. 1992).

This Court must presume that the jury made all findings in support of the verdict that are supported by substantial evidence. *See Kinetic Concepts, Inc. v. Smith & Nephew, Inc.,* 688 F.3d 1342, 1356-57 (Fed. Cir. 2012); *Jartech, Inc. v. Clancy,* 666 F.2d 403, 407 (9th Cir. 1982); *Brewer v. Hustler Magazine, Inc.,* 749 F.2d 527 (9th Cir. 1984). As explained below, Google presented substantial evidence on every factor. And even if one or more of the factors did not favor Google, the jury could have reasonably found fair use based on the record as a whole.[2]

[2] The jury verdict must be reviewed based on the trial record, not extra-record statements in amicus briefs, such as those of Scott McNealy and Brian Sutphin. McNealy and Sutphin are not true amici; they were witnesses for Oracle in the first trial.

## B. The Jury Could Have Reasonably Found In Google's Favor On Every Fair Use Factor

### 1. There Is Substantial Evidence That The Purpose And Character Of The Use Favor Google

#### a. A Reasonable Jury Could Find The Use To Be Highly Transformative

The "central purpose" of the first factor—the purpose and character of the challenged use—"is to determine whether and to what extent the new work is 'transformative.'"[3] *Perfect 10, Inc.*, 508 F.3d at 1164 (quoting *Campbell*, 510 U.S. at 579). Instead of "merely supersed[ing] the objects of the original creation," a transformative work "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Id.*

In the first appeal, this Court quoted the above language from *Campbell* and added that "[a] use is considered transformative" if a defendant either "[i] changes a plaintiff's copyrighted work or [ii] uses the . . . work in a different context such that the plaintiff's work is transformed into a new creation." *Oracle*, 750 F.3d at 1374 (quoting *Perfect 10, Inc.*, 508 F.3d at 1165); *accord Wall Data v. L. A. Cty.*

---

[3] "[T]ransformative use is not absolutely necessary for a finding of fair use." *Campbell*, 510 U.S. at 579.

*Sheriff's Dept.*, 447 F.3d 769, 778 (9th Cir. 2006); Appx1053. A reasonable jury could have found Google's use "transformative" under these tests.

The copyrighted work is J2SE, a platform designed for desktops and servers, Appx51938; Appx50997-50998. J2SE was not suitable for smartphones because it was too large, included an abundance of code and functionality that was irrelevant to smartphones, and lacked other code and functionality necessary for them. Appx50997-50998. The jury heard evidence that Google used a small portion of J2SE to create a new work in a new context—Android, a platform for smartphones, not desktops and servers. Appx51246-51247; Appx50623-50624. Oracle's expert acknowledged that Android was the greatest technological evolution he had seen since becoming a professor. Appx51600; Appx51612-51614; *see also* Appx55325.

As the district court determined, a reasonable jury could have concluded that Google's selection of particular declarations and their SSO "re-implemented with new implementing code adapted to the constrained operating environment of mobile smartphones devices with small batteries" and "combined with brand new methods, classes, and

packages written by Google for the mobile smartphone platform—all constituted a fresh context giving new expression, meaning, or message to the duplicated code." Appx42; *see* Appx51938; Appx51229-51230; Appx50671-50677.[4]

Oracle responds with arguments that are fundamentally incompatible with this inquiry's factual nature or Ninth Circuit law. Oracle contends "smartphones were not even a new context for Oracle's APIs." Oracle Br. 32. Not so. The jury heard considerable evidence that neither J2SE nor Java ME was suitable for smartphones. *See* pp. 13-14, *supra*.

Oracle asserts that "Google concededly uses Oracle's APIs for the same purpose as Oracle" because the declarations enable "programmers to remember, locate, and run prepackaged programs" in both Android and Java. Oracle Br. 30-31. That is wrong and irrelevant—although it

---

[4] The jury could also have concluded that Google's open-source distribution of Android contributed to its transformativeness. Appx51233. Google "innovated this model of open source" for which it could "create the perfect operating system and the perfect smartphone and let the open source adoption spread it across the globe." Appx50621. The jury could reasonably have found that that open sourcing led to the creation of a broad ecosystem and further innovation, including other third party Android-based operating systems like the Cyanogen-Mod operating system. Appx50621; Appx51239-51240.

does underscore the functional nature of the declarations and SSOs. *See* pp. 49-54, *infra*.

Oracle errs in focusing exclusively on the declarations and their purposes. The copyrighted work is J2SE as a whole, and the relevant purposes are those of the works as a whole. *See Campbell,* 510 U.S. at 579 (considering whether "the *new work* merely 'supersede[s] the objects' of *the original creation*, or instead adds something new, with a further purpose or different character . . . .") (emphasis added and citation omitted). While the declarations and SSO may perform the same general functions in Android and J2SE, the jury could reasonably find that Android and J2SE have different purposes. The very point of Android was to create a groundbreaking platform for smartphones. *See* Appx50623-50624; p. 14, *supra*.

Moreover, a new purpose is not a necessary condition of transformativeness. Oracle contends that Google is recycling a theory this Court rejected in the first appeal, but the opposite is true. This Court correctly determined that it is enough for a new work (here, Android) to use elements of an original work "in a different context such that the plaintiff's work is transformed into a new creation." *Oracle,*

750 F.3d at 1374. As a result, a use may be fair even if an element of a broader work serves the same purpose (at a very general level) when incorporated into an otherwise transformative work. In contexts outside of computer programs, this principle is so well established as to be mundane. *See Blanch v. Koons*, 467 F.3d 244, 252-53 (2d Cir. 2006) (artist who incorporated and altered copyrighted fashion photograph of a pair of women's legs as part of a larger work of art engaged in a transformative use); *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1178 (9th Cir. 2013) (use of unaltered street art in concert video was fair); *L.A. News Serv. v. CBS Broad. Inc.,* 305 F.3d 924, 939 (9th Cir. 2002) (incorporation of video clip as part of montage was fair), *opinion amended and superseded*, 313 F.3d 1093 (9th Cir. 2002).[5]

There is no reason to treat software differently, and the Ninth Circuit has not. Although Oracle contends that Google's use differs from the examples of fair uses listed in the preamble to Section 107, Oracle Br. 34, those examples are non-exhaustive. *Cambridge Univ.*

[5] Use of a copyrighted work can be transformative in function or purpose without changing the work at all. *See, e.g., Perfect 10, Inc.*, 508 F.3d at 1165; *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009); *see also Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006); *Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513, 541 (S.D.N.Y. 2008).

*Press v. Patton*, 769 F.3d 1232, 1284 (11th Cir. 2014). The Ninth Circuit has held other types of uses—specifically including uses of computer code—to be fair. In *Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000), for example, the defendant copied computer code to make a new product that competed with the plaintiff's. The Ninth Circuit found the use transformative "notwithstanding the similarity of uses and functions" between the parties' competing products, and fair "as a matter of law." *Id.* at 606, 608; *see also, e.g., Sega Enters.,* 977 F.2d at 1521-22 (copying of computer code for purposes of creating interoperable product fair as a matter of law and use's "purpose and character" supported that conclusion).

No principle of law prevented the jury from reaching the same conclusion as a factual matter on this extensive record. If "serv[ing] the same function . . . were enough to defeat fair use, it would be impossible to ever duplicate declaring code as fair use," as the district court recognized. Appx42. Section 107 contains no such carve-out.

Oracle's argument that it alone could transform Java through the creation of derivative works, Oracle Br. 33, would swallow fair use whole. A copyright owner generally has the exclusive rights to prepare

derivative works under 17 U.S.C. § 106(2). But Section 106 specifies that its exclusive rights are "[s]ubject to section[] 107," which codifies the fair-use defense. 17 U.S.C. § 106. Thus, fair use expressly applies to the right to create derivative works, just as it applies to all other rights of a copyright owner. *See Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191, 196 (3d Cir. 2003).

Oracle analogizes to "adaptations" of a copyrighted work, and notes that there can be no fair use when an original work is merely retransmitted in its entirety in a different medium. Oracle Br. 32-33. This, however, is not a case where the same material is presented in a new format, such as a song converted from CD to MP3. Instead of copying J2SE wholesale into a different medium, Google used miniscule portions of it in a different product (Android) that Google created for a different purpose (smartphones). *Compare Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1176 (9th Cir. 2012) (publication of photos of celebrity's secret wedding not transformative because it did not "alter[ ] the first [work] with new expression, meaning or message") with *L.A.*

*News Serv.,* 305 F.3d at 939 (incorporation of video clip as part of montage was fair use).[6]

#### b. A Commercial Purpose Does Not Preclude A Finding of Fair Use

The jury was not required to find against Google based on its commercial motivation. "[T]he more transformative the new work, the less will be the significance of the other factors." *Campbell*, 510 U.S. at 579; *accord* Appx1053-1054. Commercial uses are not presumed unfair. *Connectix*, 203 F.3d at 598. "Since many, if not most, secondary users seek at least some measure of commercial gain from their use, unduly emphasizing the commercial motivation of a copier will lead to an overly restrictive view of fair use." *Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 921 (2d Cir. 1994). Indeed, such a restrictive view

[6] Oracle complains that, "[a]fter seeing Oracle's case," the district court modified a jury instruction "in a way that directly contradicted Oracle's approach to the case." Oracle Br. 37 n.2. That says more about Oracle's approach to the case than the instruction, which told the jury not to "disqualify [Google's use] from being transformative merely because the declaring code and SSO were carried over without change." Appx1053. That is unquestionably a correct statement of the law: this Court already held that it is transformative to use unchanged elements of an original work "in a different context such that the plaintiff's work is transformed into a new creation." *Oracle*, 750 F.3d at 1374. The court correctly instructed the jury on that point, Appx1053, and on the transformation test as a whole, Appx1053-1054. Oracle does not seek a new trial on this ground in any event.

would "swallow nearly all of the illustrative uses listed in . . . [Section] 107 . . . ." *Campbell*, 510 U.S. at 584. If commercial motive were somehow disqualifying, there would have been no reason for this Court to remand.

In addition, the jury "could reasonably have found that Google's decision to make Android available open source and free for all to use had non-commercial purposes as well (such as the general interest in sharing software innovation)." Appx40; *see Sega Enters.*, 977 F.2d at 1523 (use of copyrighted object code served public interest notwithstanding commercial benefit to defendant because it led to increase in independently designed programs). Google gives away Android for free under an open source license. Appx50364-50365. Although Oracle claims that "Google reaps billions from exploiting Java in Android," Oracle Br. 29, the jury could have found that "the revenue benefit to Google flows from the ad revenue generated by its search engine which preexisted Android." Appx41 n.7; Appx51869-51871.[7]

[7] Oracle asserts that Google admitted that its use of the APIs at issue was "entirely commercial." Oracle Br. 28-29. The district court rejected this argument, explaining that Google's answer "no" to this Court's question whether Google disputed that "for purpose and character" Google's use "was entirely a commercial purpose" was "part of the give

**c. Google Acted In Good Faith**

At Oracle's urging, the court instructed the jury that the "propriety of the accused infringer's conduct" (*i.e.*, the defendant's good or bad faith) is relevant to the first fair use factor. Appx1054. The jury heard substantial evidence of Google's good faith when measured against the practices of both Sun and the software industry more generally. The jury was entitled to credit that evidence: mental state, intent, and witness credibility are classic jury questions. *Perez v. Curcio*, 841 F.2d 255, 258 (9th Cir. 1988).

Jonathan Schwartz, the former Chief Executive Officer of Sun, testified that Sun "[a]bsolutely" marketed the Java APIs "as free and open" (*id.; see also* Appx50500), and that they were "never" "considered proprietary to Sun." Appx50505; *see* pp. 9-12, *supra*. Engineers "had always felt free to re-implement each other's APIs." Appx50995. Sun engineers hoped that other programmers would create independent implementations of Java APIs, because that would be "the mark of a successful API." Appx50975.

---

and take of an oral argument." Appx41. Oracle does not challenge on appeal the district court's refusal to include the phrase "entirely commercial" in the jury instructions.

This wasn't altruism on Sun's part. As Schwartz explained, "the strategy, which had been the strategy long before I joined Sun, was we agree on APIs. . .; we share them; and then we compete on implementations." Appx50500. Allowing others to copy the APIs "benefi[ted] Sun" because more people were using Java. Appx50516-50517; Appx50520; pp. 11-12, *supra.* Schwartz agreed that "it was fair" for third parties to "us[e] the APIs with their own implementations" so long as they did not use the Java logo. Appx50507-50508.

Indeed, the jury heard that Sun knew about and welcomed Google's use of the Java APIs. Appx50376-50377; *see also* Appx50726-50727; Appx50732-50733; pp. 17-19, *supra.* Schwartz testified that Android was "helpful" to Sun because Google used Java technology instead of Microsoft technology. Appx50540.

Similarly, Sun never objected to Apache Harmony's and GNU Classpath's use of the Java APIs in their independent re-implementations of the J2SE libraries, even though it was "well aware" of them. Appx51038; Appx51025-51029; Appx55415-55416; Appx50953 (12/21/2015 Duimovich Depo. at 51:15-52:1); Appx55363-55399. To the contrary, when Dr. Bloch was at Sun, he helped

engineers from GNU Classpath work on an independent implementation of the Java APIs, and their questions helped Dr. Bloch improve the quality of the APIs. Appx50990-50992.

Oracle ignores most of this evidence and asks this Court to draw factual inferences based on other evidence the jury presumably rejected. For example, Oracle contends that Google copied Sun's work in bad faith because negotiations between Google and Sun for a "license" broke down and there was much urgency to get Android on the market. Oracle Br. 11-12. As many witnesses explained, however, the failed negotiations with Sun related to a far broader joint co-development partnership that would have included not just the Java API declarations and SSO, but also Sun's implementations of the libraries and virtual machines, Java branding, and cooperation. Appx5638-5665; Appx51849-51850; Appx54205-54208. After those negotiations failed, Google chose to use only the small subset of declarations/SSO at issue, consistent with Sun's and the industry's practice. Moreover, although every product development venture faces urgency to get to market, Google witnesses testified that there was no fixed deadline within which Google had to get Android to market. Appx50761; Appx51848.

Oracle also accuses Google of trying to "cover[] its tracks" by "directing its engineers to 'scrub' the word 'Java' from the code and documentation." Oracle Br. 13. But the Google engineer who scrubbed the code testified that he did so to ensure that there was no improper use of the Java trademark, and that the scrubbing had nothing to with keeping Google's use of the Java APIs secret; "there was absolutely no secret" about that. Appx51179-51181.

Similarly, Oracle accuses Google of "admonishing its salespeople not to 'demonstrate [Android] to any [S]un employees or lawyers.'" Oracle Br. 13 (quoting Appx54034). This allegation is based on an email about Android's presence at a conference for Java developers. Appx50907; Appx50916. The author of the email explained that he did not want Google to demonstrate these features to Sun because "[w]e were in the middle of these negotiations. So it was hard for [him] to kind of tell somebody, 'Yeah, go out and say whatever you want when you're talking to the employees of, you know, the partner that I'm negotiating with." *Id.* The jury was entitled to find good faith, and it presumably did so.

Even though "no Oracle jury argument received more airtime" than its assertion of bad faith, Appx31, Oracle now claims Google's good faith is irrelevant to fair use. While the transformativeness of Google's use is sufficient to support the jury's presumed finding on the first factor, Google's good faith based on industry custom further supports it. "[F]air use is appropriate where a 'reasonable copyright owner' would have consented to the use, *i.e.,* where the custom or public policy at the time would have defined the use as reasonable." *Wall Data Inc.,* 447 F.3d at 778. Moreover, as the district court found, "once Oracle endeavored to prove bad faith, it opened the door for Google to prove good faith." Appx32.

#### 2. A Reasonable Jury Could Have Found That The Copyrighted Work's Functional Nature Warranted Weaker Protection

"Not all copyrighted works are entitled to the same level of protection." *Sega Enters.,* 977 F.2d at 1524. The more creative a work, the more protection it receives; whereas the more functional the work is, the less protection it receives, *id.* at 1527, and "the broader . . . the scope of the fair use defense." *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 531 (9th Cir. 2008) (citing 4 Nimmer on Copyright

§ 13.05[A][2][a]). "This result is neither unfair nor unfortunate." *Sega Enters.*, 977 F.2d at 1527. "[C]opyright advances the progress of science and art" by "leaving . . . functional concepts in the public domain for others to build on." *Id.*

The jury could reasonably have found that the functional elements of the declarations/SSO meant that they did not fall near the core of copyright protection. The jury heard extensive evidence that declarations are uniformly short, descriptive, and functional. Appx51213; Appx51242-51245; Appx50972. They (1) declare the precise name of the method so the right file will be accessed; and (2) specify the inputs and their type so the implementing code will receive the inputs in the way expected. Appx34; Appx51244-51245. For developers to understand and use them effectively, each part of the declaration's name must be descriptive of its functionality—functionality that Oracle does not own. Appx51241; Appx51245-51246.

The jury also heard that, because of these straightforward naming conventions, a programmer can understand what the "method would do based simply on its names and its inputs and outputs," without knowing anything about the method. Appx51930; Appx51081-51083.

And because of the limitations on how declarations can be written, the names in Java and other programming languages are similar, with Java APIs abiding by the rules of other languages, which makes Java easier for programmers to learn. Appx50965 ("a computer language "is completely inflexible . . . it has a certain set of rules, and you have to obey those rules"); Appx51245-51246; Appx50963-50964.

By contrast, there is much more flexibility in writing implementations than declarations. That is where a programmer's "experience and taste" come into play. Appx51088-51089.

Oracle asserts that "none of th[e] organization [of the declarations] was mandated by any function." Oracle Br. 40. As a legal matter, that is not the test. *See* p. 49, *supra.* And as a factual matter, the jury heard that the declaration names and the structure, sequence, and organization are designed to enable programmers to know where to look for particular functions: for example, math functions are in the math class. Appx50963; *see also* Appx51225 ("that sequence of package name, class name, method name, that's required by the language, and that's how Java works").

It also bears emphasis that Oracle stipulated that some of the declarations were necessary to use the Java language *at all*, and that Google's use of those declarations was fair. Appx51447. Oracle presented no evidence explaining how the jury should distinguish the functionality and creativity of those declarations from the others.

Oracle is mistaken in claiming that a former Google and Sun employee, Dr. Bloch, "admitted" that "Oracle's work was an 'art, not a science.'" Oracle Br. 23, 39. What Dr. Bloch said was that the API *design process* (not any particular APIs, let alone the APIs here) was an art, not a science. Appx51009. Dr. Bloch—and other witnesses—also testified that the declarations in question were functional. Appx50965; Appx50972; Appx50979. The jury was entitled to credit that testimony and find that the functional aspects were significant enough to favor a robust fair use defense.

Oracle claims that Google admitted that functional considerations did not predominate in the declarations and that this Court already decided this question against Google. Oracle Br. 42. Neither is true. Nothing in the cited pages suggests that Google conceded anything on this point. And this Court held only that the declarations/SSO were

sufficiently creative to provide the "minimal degree of creativity," *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991), that is required for copyrightability—while also determining that a reasonable jury might find that "the functional aspects of the packages" are "relevant to Google's fair use defense." *Oracle*, 750 F.3d at 1369, 1376-77.

Whether the declarations have some creativity is not the question. Because software is inherently functional but may also be somewhat creative, the question is where the work falls on the spectrum: the "less creativity . . . indicated," the less the "core values of copyright protection are . . . implicated." Appx1056; *see also Sega*, 977 F.2d at 1524-25. On remand, the district court correctly instructed the jury that "[t]he extent to which the 37 API packages in question here involved greater creativity than the minimum required to obtain copyright is disputed and is open for you to examine." Appx1055-1056.

Oracle relies heavily on *Wall Data*, 447 F.3d at 778, essentially arguing that because the second factor weighed against fair use on the facts of that case, it does here, too. But each case turns on its facts and *Wall Data* involved wholesale copying of an entire computer program.

Google's decision to replicate only the declarations—and add its own, highly creative implementing code—makes this case altogether different. *See* Appx1056; *Sega*, 977 F.2d at 1524-25; *see also L.A. News Serv.,* 305 F.3d at 940 (weighing creative and factual aspects of video). And the jury verdict is amply supported on the record here, as discussed above.

#### 3. A Reasonable Jury Could Have Found That Google Used Only A Small Portion of J2SE

The jury could reasonably have found that the third factor—"the amount and substantiality of the portion used in relation to the copyrighted work as a whole," 17 U.S.C. § 107—favors fair use. The fact finder may consider this factor both quantitatively and qualitatively. *See Campbell*, 510 U.S. at 586-87. The less of the work that is used, the more likely the use is to be fair. *Seltzer*, 725 F.3d at 1178.

As the jury heard, Google used 11,500 lines of declarations out of 2.86 million lines of code in the J2SE class libraries and approximately 5 million lines of code in J2SE as a whole. Appx51246-51247. The jury could reasonably have concluded that using such a miniscule percentage of the work favored fair use—especially considering that Google used "just enough to preserve inter-system consistency in usage,

namely the declarations and their SSO only, and did not copy *any* of the implementing code." Appx45 (emphasis added); Appx1051; Appx51236; Appx51264-51265.

Oracle even stipulated that some classes were necessary to use the Java language and that the use of those classes was fair. Appx1057. As the court noted, there was no obvious way to distinguish "necessary" from "unnecessary" classes. Appx36-37. Nowhere in the Java manuals or documentation put out by Sun/Oracle were the stipulated "necessary" classes identified or distinguished from the others. Appx50978-50979; Appx50987-50990. As a Sun former employee testified, all of the packages/classes were integral to the open and free Java language. Appx50979. The jury was entitled to conclude in light of this that the "amount and substantiality of the portion used in relation to the copyright work as a whole" was "reasonable in relation to the purpose of copying." *Wall Data*, 447 F.3d at 780.

Oracle argues that "Google undisputedly copied the heart of Java." Oracle Br. 43. But that was not undisputed; Oracle is, once again, simply trying to re-litigate a factual question the jury decided against it. The jury heard, for example, that Google did not use any of J2SE's

implementing code. Appx45. And Oracle's own witness, Chief Java Architect Mark Reinhold, admitted that the declarations were no more important than the implementing code, Appx51477, a statement that is hard to reconcile with the proposition that this subset of declarations and SSO was in fact what mattered most. Oracle's position is somewhat akin to arguing that the heart of a document storage facility is its organizational structure, not the documents stored therein. The jury could reasonably conclude that makes especially little sense here, considering that Sun itself chose to make the declarations free while competing on the implementations. Appx50499-50500.

Nevertheless, Oracle relies on two diagrams to purportedly demonstrate that Google copied the "heart" of J2SE. Oracle Br. 40-41, 44-45. One of Oracle's expert witnesses, Douglas Schmidt, who used those diagrams as a demonstrative, admitted that the diagrams failed to account for the facts that (1) much of the J2SE platform is free and not subject to copyright (Appx51553); (2) Oracle had conceded that the use of at least 170 lines of code was fair (Appx51554-51556); and (3) Google had "change[d] … different components in order to integrate them into Android" (Appx51605). Moreover, the diagrams were created

for this litigation; no similar depictions were ever used by the programming community to depict the language and APIs outside of (or before) this lawsuit. Appx51557.

Oracle also suggests that Google could prevail only by showing that the declarations were "necessary to 'speak' the Java language," and that Google conceded that only 170 lines of code were necessary for that purpose. Oracle is wrong on the facts and the law. Although Oracle stipulated that 170 lines of code were necessary, Google never conceded that others were not. Appx51447-51448. Instead, the court properly left that question to the jury in view of the lack of any clear distinction between "necessary" and "unnecessary" declarations. *See* Appx1057 ("It is for you to determine the extent to which other additional declaring code . . . either was or was not necessary to use the Java programming language.").

In any event, the third factor looks to the amount and substantiality of the use, not its necessity. To be sure, necessity can demonstrate fair use—as this Court observed in the first appeal, a defendant can prevail on this factor by showing that it "only copie[d] as much as is necessary for his or her intended use," with "the extent of

permissible copying var[ying] with the purpose and character of the use." *Oracle*, 750 F.3d at 1375-76 (quoting *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820-21 (9th Cir. 2003) and *Campbell*, 510 U.S. at 586-87). But the jury was not required to find that Google used only what was necessary to find for Google on this factor. *See, e.g., Cariou v. Prince*, 714 F.3d 694, 710 (2d Cir. 2013) ("[T]he law does not require that the secondary artist may take no more than is necessary").

**4. A Reasonable Jury Could Have Found That Android Did Not Cause Market Harm**

The final fair use factor requires courts to consider the market harm caused by the alleged infringement. *See Campbell*, 510 U.S. at 590 (quoting *Harper & Row*, 471 U.S. at 568). This is "the single most important element of fair use." *See Harper & Row,* 471 U.S. at 568.

Only those potential derivative works that the copyright owners "would in general develop or license others to develop" count for purposes of market harm. *Campbell*, 510 U.S. at 592; *see also Am. Geophysical Union*, 60 F.3d at 930. "[I]t is a given in every fair use case that plaintiff suffers a loss of a potential market if that potential is defined as the theoretical market for licensing the very use at bar." 4 Nimmer on Copyright § 13.05[A][4]. To guard against this "vice of

circular reasoning," case law limits the factfinder's analysis to a use's "impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets." *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 91 (2d Cir. 2014) (quoting *Am. Geophysical Union*, 60 F.3d at 930-31).

A defendant need not show that such markets were wholly unaffected. In *Connectix*, for example, the defendant re-implemented interfaces to create a new platform that competed directly with Sony's game consoles. The Ninth Circuit nevertheless found fair use as a matter of law, holding that "some economic loss . . . as a result of this competition does not compel a finding of no fair use." 203 F.3d at 607-08.

Oracle contends that this Court must presume market harm. But that presumption only applies when a commercial use amounts "to mere duplication *of the entirety* of an original." *Monge*, 688 F.3d at 1181 (quoting *Campbell*, 510 U.S. at 590 n.21) (emphasis added). Google did not use the entirety of J2SE—far from it. Appx51246-51247. Moreover, when a use is highly transformative, as the jury was entitled to find here, market harm cannot be presumed. *See Kelly*, 336 F.3d at 821.

**a. Android Did Not Harm J2SE In Traditional, Reasonable, Or Likely To Be Developed Markets**

A reasonable jury was entitled to find that Android did not supersede J2SE in the market because they were "just very different types of products" "on very different devices." Appx51900-51902. J2SE was designed and licensed for use on desktops and servers, Appx51862-51863; Appx50917, and Android for use with smartphones. Appx50620-50622.

Oracle claims there was "undisputed evidence that the markets overlap," and that Java and Android were competitors "targeting the same industry with the same products." Oracle Br. 49 (citing Appx50844). Oracle Br. 54. Not so. As Oracle's Larry Ellison testified, J2SE was not in the smartphone market—only Google and Apple were. Appx54689; Appx54691-54693; Appx50950; Appx55426; *see also* Appx50580 (Schwartz) ("Q: And how many phones, mobile phones, at this time was Java in, ballpark? A: Well, none of them were running SE. None of them were running desktop Java."). Craig Gering, former head of engineering services for Sun's Java licensing organization, testified that Sun "never brought a full-stack mobile operating system to market" with J2SE despite many efforts to do so—even before

Android came on the scene. Appx51197; Appx51200-51202; *see also* Appx50559-50560; Appx51706; Appx51801-51802; Appx51867-51868; Appx55400-55401.

As Schwartz testified, "Sun's failure to build its own Java-based smartphone platform" was in no way "attributable . . . to the presence of Android." Appx50561. And Oracle was "not really a device maker. They did look at that possibility, and tried for a short period of time, and then abandoned it." Appx51788. Thus, a reasonable jury could have found that J2SE and Android did not directly compete in the same market. *See Seltzer*, 725 F.3d at 1179 (defendant's video backdrop did not perform the same "market function" as the original).

Oracle argues that companies licensed J2SE for smartphones and Kindles before Android arrived. Oracle Br. 49-50. But the jury heard evidence that the only phone that Oracle identified as having used J2SE, SavaJe, was not a smartphone. It lacked a touchscreen and QWERTY keypad, Appx51789, and looked nothing like a smartphone. *See* Appx51792-51794. Even Sun did not consider SavaJe, which failed even before Android's release (Appx51857-51868), to be a smartphone. Appx51792-51794. As the jury heard repeatedly, smartphones and

feature phones are fundamentally different. Appx51668; Appx51790; Appx51793-51794; Appx51800; Appx51803; *see also* Appx50870 ("We're building a smartphone, and it built feature phones."). They were not market substitutes, nor did they share a market.

Although Oracle CEO Safra Catz testified that Amazon switched to Android for the Kindle Fire because it was free, Appx51361, the jury heard that the J2SE APIs were also free through OpenJDK. Appx51020-51024. Accordingly, the jury reasonably could have discounted Catz's testimony.

The jury also heard that J2SE continued to do well. Appx51863-51864. Despite Android, Sun/Oracle continued to successfully license J2SE in the desktop and server markets, Appx51864, and Oracle's J2SE business was still growing well. Appx51658; Appx51660; Appx51864-51865. Oracle's expert, Dr. Adam Jaffe, conceded that he had conducted no analysis whatsoever of whether revenues for J2SE had gone up or down, or whether Oracle's J2SE business had been otherwise affected by Android. Appx51863-51864.

Oracle argues that Google's entire fair use defense is "negated" by a single, purportedly undisputed statement by Oracle's CEO that "if

everyone else did what Google did, which is just take a copy of the software without a license, we couldn't have a business." Oracle Br. 52. But that evidence was anything but undisputed. The jury heard over and over that Sun's business strategy was to share the declarations (some of which Google, like many others, used), and compete on the software implementations (which Google did not use). Appx50499-50508.

That key fact further demonstrates the lack of market harm. Sun's business model was built on free and open use of the APIs so that people would buy related products and services from Sun. Appx50499-50508; Appx54720 (open interfaces key to long-term success). That is why Sun welcomed Android's launch, and why Sun never objected to Harmony's or Classpath's re-implementation of the API declarations. *See* pp. 11, 17-19, *supra.*

**b. Java ME Is Irrelevant To The Market Harm Analysis**

Oracle relies on Java ME, which is not the copyrighted work asserted by Oracle in this case, Appx50917; Appx51795 and does not even contain most of the APIs at issue here (it had only 10 to 12 API packages total). Appx51796-51798. Google presented evidence that

Sun used Java ME in feature phones and "much smaller and much simpler" devices, but not smartphones. Appx51861-51862. Java ME was "not even capable of supporting a smartphone." Appx51798.

Moreover, Java ME was not a derivative work of J2SE that could be used to measure market harm. To be a "derivative work," a work "must substantially incorporate protected material from the preexisting work." *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1110 (9th Cir. 1998). Java ME was initially created in September 2000—two years *before* the earliest version of J2SE at issue here. Appx51670. Oracle could not identify any particular protectable expression—let alone a "substantial amount"—incorporated from J2SE versions 1.4 or 5.0 into any later versions of Java ME after February 2002. Appx51693-51694.

As the jury heard, Oracle lost revenue for numerous reasons that had nothing to do with Android. Sun rightly predicted that its revenue would decline because of the advent of smartphones even before Google announced its plan to release Android. Appx51807; Appx51855. Those predictions were born out: Companies like Samsung, HTC, and Sony did not renew their licenses with Sun because they wanted to build smartphones, which neither J2SE nor Java ME was capable of

supporting. Appx51861-51862; Appx51868. Sun also lost market share to Apple, which built the iPhone without Java. Appx51868-51869; Appx51902-51908.

In addition, as the district court explained, "our jury could reasonably have found that Android's impact on the market for copyrighted works paralleled what Sun already expected via OpenJDK," which made all of the J2SE APIs free for all to use. Appx45. Oracle dismisses this, claiming that "the undisputed testimony was that OpenJDK had no such effect." Oracle Br. 53. But Oracle's own expert, Dr. Adam Jaffe, testified that Sun's "actions with respect to open source software and open interfaces could affect revenue," and Sun acknowledged as much in its own securities filings. Appx51878.

Oracle's expert conceded that the jury should not infer that Sun would have been as commercially successful as Google but for Google's introduction of Android. Appx51868-51879. Because Google's revenue comes from its search and ads products, not Android, Sun/Oracle would not have seen Google's commercial success even absent Android. Appx51869-51873.

### C. This Court Should Affirm The Judgment

Because the jury could reasonably have found for Google on all four fair-use factors, there is no need to balance some factors against others. But even if one or more of the factors did not support fair use, the jury could reasonably have balanced the factors in Google's favor.

Oracle urges this Court "to apply the law and balance the factors de novo" because the relevant facts are supposedly "undisputed." Oracle Br. 26. But the facts are disputed, and Oracle waived the position that the court rather than the jury should balance the factors. Oracle never argued that to the district court. In its motions for judgment as a matter of law, Oracle argued each of the four factors separately and contended that Google failed to meet its burden on each one. *See* Appx1064-1093; Appx2065-2068; Appx2071-2073; Appx2076-2079; Appx2084-2086. At no time did Oracle suggest that the district court should independently balance the factors. Having failed to argue for de novo balancing in the district court, Oracle is in no position now to fault that court for not doing so or to ask this Court to do so in the first instance.

No appellate court has ever overturned a jury verdict on fair use, let alone decided to re-balance the factors in a way different than the jury did. *See* Ned Snow, *Fair Use As A Matter of Law*, 89 Denv. U. L. Rev. 1, 25-26 (2011). Instead, courts have evaluated whether sufficient evidence supports the verdict. These cases reason, for example, that "the evidence presented at trial and the reasonable inferences therefrom, when viewed through the lens of the statutory fair use factors, support the jury's fair use finding." *Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 411 (5th Cir. 2004); *see also Jartech, Inc. v. Clancy*, 666 F.2d 403 (9th Cir. 1982); *Balsely v. LFP, Inc.*, 691 F.3d 747 (6th Cir. 2012); *Bridgeport Music, Inc. v. UMG Recordings Inc.*, 585 F.3d 267 (6th Cir. 2009); *Fiset v. Sayles*, 963 F.2d 379 (9th Cir. 1992).

The cases cited by Oracle to support its request for de novo balancing did not involve jury verdicts. All followed a bench trial or a grant of summary judgment in which the underlying facts were undisputed. *See, e.g., Harper & Row*, 471 U.S. at 560. Oracle cites no case authorizing an appellate court to upset the jury's weighing of the fair-use factors, particularly where, as here, the jury was presented with and resolved a host of contested factual disputes.

When all factual inferences are drawn in favor of the verdict, Google's use was fair under any reasonable application of the fair-use standard. *First*, as discussed above, market harm is the most important factor. Substantial evidence showed that no version of Java competed with Android in the smartphone market or was likely to do so. And Android did not cause market harm to Oracle precisely because it was transformative—a new platform for smartphones that used only a tiny percentage of J2SE along with millions of other lines of code. *See* pp. 20, 36-43, 54-65, *supra.*

*Second*, "fair use is appropriate where a 'reasonable copyright owner' would have consented to the use, *i.e.*, where the custom or public policy at the time would have defined the use as reasonable." *Wall Data Inc.*, 447 F.3d at 778 (citations omitted). The jury heard evidence not just that a reasonable copyright owner would have consented to the use, but that Sun, the actual copyright holder, affirmatively invited it, consistent with its own business practices and broader industry practice. *See* pp. 9-12, 17-19, *supra.*

*Third*, a reasonable jury could have found that Google's use served the best interests of "*both*" the Android and the Java platforms, as well

as Java programmers. Appx37 (emphasis in original). The fair use factors must be considered "in light of the purpose[] of copyright," which is "[t]o promote the Progress of Science and useful Arts." *Campbell*, 510 U.S. at 578. Because the Android and Java systems both "presupposed the Java programming language in the first place," a jury reasonably could have found that "avoiding cross-system babel promoted the progress of science and the useful arts . . . . ." Appx37-38; Appx51205; Appx55451; Appx54706; Appx51188; Appx55445; Appx55446; Appx55455.

Because the jury's fair use verdict was supported by substantial evidence, this Court should affirm.

## II. Oracle Is Not Entitled To A New Trial

Oracle's new-trial arguments are meritless. "A trial court has broad discretionary authority in managing the litigation before it." *Beatrice Foods Co. v. New Eng. Printing & Litho. Co.*, 899 F.2d 1171, 1177 (Fed. Cir. 1990); *accord Navellier v. Sletten*, 262 F.3d 923, 941-42 (9th Cir. 2001). Denial of a new trial is reviewed only for abuse of discretion. *Wharf v. Burlington N. R. Co.*, 60 F.3d 631, 637 (9th Cir. 1995). There was none here.

### A. The District Court Appropriately Limited The Issues On Retrial

Google moved to strike statements in Oracle's expert reports concerning alleged copying of J2SE 6 and J2SE 7, newer versions of Java that were not at issue in the first trial. Appx1840. After the court offered the parties an opportunity to agree on the scope of the retrial, and Oracle refused to compromise, the court limited the trial to (i) the two versions of J2SE at issue in the first trial and (ii) certain versions of Android used in smartphones and tablets, the only products addressed in the first trial. Appx1851-1852. (The court did so months before trial, not, as Oracle contends, on the eve of it.) Google also filed a motion in limine to exclude evidence of Android products used in devices other than smartphones and tablets, which the district court granted. Appx51-55.

The court did not abuse its discretion by declining to expand the scope of the retrial to include additional Android products used in devices like automobiles, wristwatches, printers, Blu-Ray players, game consoles, vending machines, televisions, and household appliances—none of which were accused of infringement (let alone found to be infringing) in the first trial. Oracle Br. 55-66. "A district court has

broad discretion to limit the issues to be tried, evidence to be used, and the witnesses and experts who can be produced at trial, including discretion on remand to limit the parties at retrial to the same evidence and witnesses presented at the first trial." *Schudel v. Gen. Elec. Co.*, 35 F. App'x 484, 487 (9th Cir. 2002); *see also* 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2803 (2d ed. 1995); *CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 499 F.3d 184, 190 n.2 (3d Cir. 2007) (courts have discretion to decide "whether parties may make additional arguments in a new trial . . .").

In the first appeal, this Court directed the district court to reinstate the jury's infringement determination, and "remand[ed] Google's fair use defense for further proceedings consistent with this decision." *Oracle*, 750 F.3d at 1381. Nothing in this Court's decision contemplated proceedings on additional issues or products. Keeping the new trial within the scope of the remand was no abuse of discretion. *See, e.g., Maykuth v. Adolph Coors Co.*, 898 F.2d 156 (9th Cir. 1990).

Moreover, as the district court explained, adding new products to the trial would raise case management concerns by multiplying the

number of witnesses and volume of evidence beyond reason. Appx58. Oracle would have had to prove that each new product infringed by using the declarations/SSO of the 37 J2SE APIs. Google would have had the right to proffer evidence that each use was de minimis.

Oracle argues that these case-management concerns are illusory because Google conceded that the other Android products infringed. *See* Oracle Br. 62-63. False. Google never conceded that any other Android products infringed. It merely agreed to be "subject to the prior jury's adverse finding that Google has infringed the overall structure, sequence, and organization of the 37 Java API packages in question" with respect to the Android versions presented at the first trial and six newer version releases for smartphones and tablets. Appx49-50. That agreement had nothing to do with additional Android products in other devices.

In pre-trial briefing, Oracle conceded that it would at least need to show that allegedly infringing versions of Android were used in the other devices. *See* Appx1857. Oracle then waited until the eleventh hour to suggest to the court that it could move for summary judgment on infringement. By "the time of that offer," however, "there wasn't

sufficient time for the Court to pursue that alternative while sorting out the superabundancy of pretrial issues." Appx59. Oracle was in no way prejudiced because it remains free to pursue infringement claims arising from other Android products in a separate proceeding and trial. Appx60; Appx62.

Oracle falsely contends that the district court did not consider whether additional mini-trials would have been required. Oracle Br. 62. In fact, the court conducted a "hearing that featured the peril of the retrial spinning out of control via a piling on of ever-expanding 'updating' issues," and "expressed concern over the ever-mounting prolixity of this case and the need for a cutoff of new device implementations to be tried." Appx58. The court explained that "[h]ad those uses been included in the retrial, Oracle would have had the burden . . . to prove that those uses infringed, rather than relying . . . solely on the original verdict of infringement." Appx59. That the court did not use the word "mini trial" does not mean the court failed to fully consider this issue. Appx60 (rejecting Oracle's argument that it should have a "mega-trial on all uses").

Oracle also argues that these are not different products, just the same platform running on different hardware. Oracle Br. 63. But there has been no infringement finding regarding what APIs or declarations, if any, were in "Android Wear" (a smartwatch product), "Android Auto" (an automobile product), or "Android TV" (a television product), let alone vending machines or household appliances. To the extent there is evidence in the record, it contradicts the assertion that these were just the same products in a different context. Appx1978-1979; Appx1990-1992.

Oracle argues that evidence of the additional products was nonetheless relevant to the fair use inquiry for the Android smartphone and tablet operating system. Oracle Br. 58-59. Not so. Each use must be assessed separately. Section 107 refers to the factors used in "determining whether the *use*" (singular) "made of a work in any particular case is a fair use . . . ." Fair use therefore "must be determined on a case-by-case basis, by applying the four factors to *each* work at issue. . . ." *Cambridge Univ. Press*, 769 F.3d at 1259. For example, the Ninth Circuit held that the "mere rebroadcast" of riot videos "was not in itself transformative," but the inclusion of a clip in an

introductory video montage was. *L.A. News Serv.*, 305 F.3d at 938; *see also Authors Guild v. Google, Inc.*, 804 F.3d 202, 221 (2d Cir. 2015) (considering search and snippet views of copyrighted books separately).

Oracle cites a single case in support of its claim of error: *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622 (9th Cir. 2003), overruled on other grounds as stated in *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.,* 654 F.3d 989, 995 (9th Cir. 2011) (per curiam). *Elvis* involved a single use of multiple copyrighted works in one product. *Id.* at 622. Here, Oracle complains of multiple uses of a single copyrighted work in different products. Even if *Elvis* were instructive, the court there analyzed some of the copyrighted works separately. *Id.* at 630 (explaining that "still photographs and songs used . . . require a different analysis" from television footage).

Moreover, Oracle never satisfactorily explains how the evolution of other Android products in other, different contexts reduces the transformativeness of the uses here, which resulted in the creation of the world's first open-source, full-stack, mobile operating system. Nor would it have helped Oracle make out an adequate showing of market harm. As discussed above, Oracle did not prove harm in the relevant

markets. *See* Appx51862-51863; Appx51865. The court was not obligated to let Oracle cast its net further afield in the remote hope of proving by tangent what it could not prove directly. The only "evidence" proffered by Oracle reveals that its TV and automobile products used Java ME or unknown Java platforms—not J2SE, the copyrighted work at issue here. *See* Appx904-905 (automobiles); Appx909 (TV). For these reasons, Oracle cannot show that their exclusion was an abuse of discretion or that Oracle was harmed by it.

Finally, the district court was not required to conduct a balancing test under Federal Rule of Evidence 403. Oracle Br. 65. That rule governs the exclusion of *relevant* evidence. Here, the court determined that the evidence was not relevant. The court explained, for example, that the fourth fair use factor considers market effects, but "the concern is whether a use of the *same* sort, if multiplied via use by others, would cause market harm, even though the actual use by the infringer caused only minimal harm." Appx60. "That is not [this] case," which "concerned two very important uses— smartphones and tablets." *Id.* Moreover, the court did consider case-management issues, Appx1979;

Appx1985; Appx1987, and acted well within its discretion by relying on those concerns, as discussed above.

### B. Google Complied With Its Discovery Obligations

Oracle's allegations of discovery misconduct are meritless, as the district court found. To prevail on this issue, Oracle must prove "by clear and convincing evidence" that: (1) Google obtained the fair use verdict through discovery misconduct; and (2) Google's alleged misconduct prevented Oracle from fully and fairly presenting its case. *Jones v. Aero/Chem Corp.*, 921 F.2d 875, 878-79 (9th Cir. 1990). Oracle cannot meet that burden given the district court's findings that Google produced the relevant evidence and that Oracle's allegations have no bearing on the trial in any event. Appx66.

As the court explained, following the remand, "Oracle sought discovery into all Google products that incorporated the copyrighted lines at issue." Appx63. Google provided evidence related to a project called App Runtime for Chrome ("ARC"), which allowed Android applications to run on the Chrome Operating System ("Chrome OS"), which runs on desktops and laptop computers. Appx63. Oracle was

well aware of the ARC project; two of its own experts discussed it in their reports. *Id.*

In 2015, Google continued with the next version of the ARC project ("ARC++"), which Google hoped would "allow users to run all Android apps on Chrome OS devices." Appx63-64. At least five months before trial (shortly after the ARC++ project began), Google produced nine documents explaining: (1) that "Google intended for ARC++ to make the 'entire Android app ecosystem' available on Chrome OS devices, so that Android apps would 'appear alongside Chrome apps' in the Chrome OS program menu"; (2) that Google "planned to run 'Android in an isolated container inside Chrome OS,' and '[i]nside the container should be effectively another Linux environment, similar to on an actual device'"; (3) "extensive technical details" of the ARC++ project; and (4) the development of the project. Appx63-66.

As Oracle admitted in supplemental briefing, its counsel did not read those documents. Appx66. Nevertheless, Oracle contended after trial that Google engaged in discovery misconduct by purportedly failing to supplement the discovery it had provided regarding ARC++. Appx64-65. As the district court explained, however, a party must "supplement

discovery responses . . . only 'if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.'" Appx66 (citing *Luke v. Fam. Care and Urgent Med. Clinics*, 323 Fed. Appx. 496, 500 (9th Cir. 2009)). Because Google had already provided documents with information about ARC and ARC++, Google had "no duty to supplement responses" with information Oracle already had. Appx66. Oracle does not and cannot explain why this finding is clear error.

Oracle's allegations are not only wrong, they are irrelevant. Given the scope of the retrial (the Android operating system in smartphones and tablets), any nondisclosure concerning ARC++ "clearly and convincingly would have been inconsequential." Appx68.

Oracle's related contention that Google relied on a false assertion at trial is untrue. Google correctly argued that Android was a full-stack operating system designed for use in smartphones and tablets, whereas J2SE was not suitable for use in smartphones and tablets. Appx62. ARC++ came later in time. Appx63. In addition, it is not an operating system (much less an operating system for smartphones and tablets).

Appx63-64. ARC++ simply allowed Android apps to run on Chrome OS. Appx64.

### C. The District Court Did Not Abuse Its Discretion In Excluding Evidence

Evidentiary rulings are committed to the sound discretion of the trial courts. *Sprint/United Mgmt. Co. v. Mendelsohn,* 552 U.S. 379, 384-85 (2008). The district court did not abuse that discretion.

#### 1. The Mazzocchi Email

Even though Oracle never designated Stefano Mazzocchi as a trial witness, the district court allowed Oracle to call him as a witness and to introduce into evidence an email that he had sent as a member of Apache Software Foundation to Apache's vice president of legal affairs in 2008. Appx70. Mazzocchi's email expressed concern that Apache might not be able to distribute Harmony at that time without a license from Sun because "the copyright on the API is real and hard to ignore." Mazzocchi added, "[s]o, we are, in fact, infringing on the spec lead copyright if we distribute something that has not passed the TCK and *we know that*." *Id.* The district court admitted all of that evidence, and excluded only one other line from the email. It read: "This makes

us *already* doing illegal things (in fact, Android using Harmony is illegal as well).” Appx71; Appx1867-1868.

The district court considered that sentence to be “too inflammatory and without foundation.” Appx71. Excluding that line was not an abuse of discretion for multiple reasons. First, “the email made no mention of ‘fair use’” and so “had nothing to do with the fair use issue [the] jury had to decide.” Appx73. Second, the email would have been “cumulative” because Mazzocchi had already “acknowledged” that his email merely “reflected initial concern about the legality of Apache’s work,” about which he had later changed his mind. *Id.* Third, because Mazzocchi was not a lawyer, “merely repeating what some lawyer might have told him would have been hearsay (within hearsay).” Appx72. Fourth, there was no prejudice to Oracle, which was allowed to call Mazzocchi despite not designating him as a witness, introduce all but one line of the email, and bring in other statements discussing “infringement.” Appx74.

*United States v. Dhingra*, 371 F.3d 557, 565 (9th Cir. 2004) (Oracle Br. 76), is entirely inapposite. There, the defendant sought to exclude testimony regarding his sexual contact with a minor on the

ground that the testimony was inflammatory. The court rejected that argument, finding the testimony "particularly relevant . . . because intent is a key element of the crime." *Id.* Here, the single, excluded line lacked such relevance, was cumulative, and was hearsay.

**2. Oracle's Responses To The European Commission**

The district court also excluded responses to the European Commission in connection with a 2009 review of Oracle's acquisition of Sun. Appx75. The Commission asked Oracle to explain "the conflict between Sun and Google with regard to Google's Android"; Oracle's response to the Commission stated that "Sun believes that the Dalvic [sic] virtual machine plus class libraries, which together constitute Android runtime environment, are an unauthorized derivative work of" J2SE. *Id.*

The court ruled that the evidence was inadmissible "self-serving hearsay" unless Oracle could show that Sun, not Oracle, had written the answer. Appx75. Oracle proffered drafts of the response to the European Commission to attempt to show that they originated from Sun's in-house counsel. *Id.* But Oracle had withheld these documents on privilege grounds until mid-trial, and Google had no opportunity to

"vet Oracle's representations about the drafts." Appx75. The court excluded the document, holding that "the extraordinary after-the-deadline waiver of privilege was too timewise prejudicial to Google." Appx76. "Oracle's gamesmanship deprived Google of a fair opportunity to vet the privileged documents and to verify the supposed chain of authorship." *Id.*

"Anyway," the court explained, "the timing of the emails (at a time when Sun's employees had cause to curry favor with their new boss) suggested that any response 'from Sun' was really 'from Oracle.'" Appx76. That Oracle told a governmental agency that it believed that Android infringed J2SE has minimal probative value. Its exclusion was not error, let alone prejudicial error warranting a new trial.[8]

## III. The Declarations and SSO Are Not Entitled to Copyright Protection

Google's cross-appeal is limited to preserving its claim that the declarations/SSO are not protected by copyright law. As Google has

[8] *Wagner v. Cty. of Maricopa,* 747 F.3d 1048, 1052-53 (9th Cir. 2013) does not help Oracle. (Oracle Br. 77). There, the Ninth Circuit determined that the district court abused its discretion in excluding evidence on hearsay grounds because the evidence fit within one of the exceptions to hearsay. 747 F.3d at 1052-53. Oracle's evidence does not fit within such an exception, and the court excluded it for a different reason—Oracle's failure to disclose it before trial.

previously argued, the declarations/SSOs are an unprotected "method of operation" under 17 U.S.C. § 102(b) because they allow programmers to operate the pre-written programs of the Java language and platform. The Supreme Court long ago held that such methods of operation are protectable, if at all, only under patent law. *Baker v. Selden*, 101 U.S. 99, 105 (1879); *see also Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, 819 (1st Cir. 1995), *aff'd*, 516 U.S. 233 (1996); *Bikram's Yoga Coll. of India, L. P. v. Evolation Yoga, LLC*, 803 F.3d 1032 (9th Cir. 2015). In Google's view, the declarations/SSO are also subject to the merger doctrine. Google recognizes that this Court resolved those questions against Google in the first appeal, but raises them for preservation.

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

/s/ Daryl L. Joseffer

Daryl L. Joseffer
*Principal Attorney*
Ethan P. Davis
KING & SPALDING LLP
1700 Pennsylvania Ave. NW
Washington, D.C. 20006
Telephone: (202) 737-0500
djoseffer@kslaw.com

Bruce W. Baber
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, GA 30309
Telephone: (404) 572-4600

Robert Van Nest
Christa M. Anderson
Michael R. Kwun
Reid P. Mullen
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111
Telephone: (415) 391-5400

Renny Hwang
GOOGLE INC.
1600 Amphitheatre Parkway
Mountain View, CA 94043

May 22, 2017

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Appellate Procedure 25 and Federal Circuit Rule 25, I certify that on August 30, 2017, I caused a copy of the foregoing corrected brief to be served electronically on all registered counsel through the Court's CM/ECF system.

/s/ Daryl L. Joseffer
Daryl L. Joseffer

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7), I certify that this corrected brief complies with the length limitations set forth in that rule because it contains 16,175 words, as counted by Microsoft Word, excluding the items that may be excluded.

/s/ Daryl L. Joseffer
Daryl L. Joseffer