Nos. 2017-1118, 2017-1202

IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ORACLE AMERICA, INC.,
*Plaintiff-Appellant*,

v.

GOOGLE LLC,
*Defendant-Cross-Appellant.*

On Appeal from the United States District Court for the Northern District of California in Civil Action No. 3-10-CV-3561-WHA
Judge William Alsup

# BRIEF *AMICUS CURIAE* OF THE COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION IN SUPPORT OF GOOGLE LLC'S PETITION FOR REHEARING *EN BANC*

Matthew Schruers
Computer & Communications
Industry Association
655 15th Street NW, Suite 410
Washington, D.C. 20005
(202) 783-0070
mschruers@ccianet.org

Jonathan Band
*Counsel of Record*
Jonathan Band PLLC
21 Dupont Circle NW, Suite 800
Washington, D.C. 20036
(202) 296-5675
jband@policybandwidth.com

*Counsel for Amicus Curiae*

June 12, 2018

## CERTIFICATE OF INTEREST

Counsel for *amicus curiae* the Computer & Communications Industry Association certifies the following:

1. The full name of every *amicus curiae* represented by me is:

The Computer & Communications Industry Association.

2. The name of the real party in interest represented by me is:

The Computer & Communications Industry Association.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the *amicus curiae* represented by me are:

None.

4. The names of all law firms and attorneys that appeared for the *amicus curiae* now represented by me in the district court or are expected to appear in this court are:

The Computer & Communications Industry Association did not appear in the district court.

Before this court, the Computer & Communications Industry Association is represented by Jonathan Band.

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

None.

June 12, 2018

/s/ Jonathan Band
Jonathan Band

# TABLE OF CONTENTS


CERTIFICATE OF INTEREST ..... i

TABLE OF CONTENTS ..... ii

TABLE OF AUTHORITIES ..... iii

INTEREST OF *AMICUS CURIAE* ..... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..... 2

ARGUMENT ..... 4

I. European Union Law Encourages Competition in the Software Industry ..... 5

II. Copyright Policies Around the Pacific and Across the World Promote Competition in the Software Industry ..... 7

III. U.S. Free Trade Agreements Encourage Competition in the Software Industry ..... 9

CONCLUSION ..... 10

CERTIFICATE OF COMPLIANCE ..... 11

CERTIFICATE OF SERVICE ..... 12

# TABLE OF AUTHORITIES

## CASES

**_Page(s)_**

*Apple Computer v. Franklin Computer*,
714 F.2d 1240 (3d Cir. 1983)............................................................. 4

*Oracle America, Inc., v. Google Inc.*,
750 F.3d 1339 (Fed. Cir. 2014)......................................................... 4

*Oracle America, Inc. v. Google LLC*,
886 F.3d 1179 (Fed. Cir. 2018)......................................................... 4

*SAS Institute, Inc. v. World Programming Ltd.*,
(C-406/10) [2012] 3 CMLR 4 (Eng.) ................................................. 6

*Sega Enters., Ltd. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992)......................................................... 5, 7

## STATUTES AND TRADE AGREEMENTS

17 U.S.C. § 1201 ........................................................................ 9

U.S.-Korea Free Trade Agreement, June 30, 2007, 46 I.L.M. 642........... 9

## INTERNATIONAL SOURCES

Attorney-General of Law, Second Reading of Copyright (Amendment)
Bill of 1998 (Sing.) (February 19, 1998) ............................................. 8

Cheojakkweonbeob [Copyright Act], Act No. 432, Jan. 28, 1957,
amended by Act No. 11110, Dec. 2, 2011, art. 35-3 (S. Kor.) ............ 8

Commonwealth, *Parliamentary Debates*, House of Representatives,
11 August 1999, 8479 (Daryl Williams, Attorney-General) (Austl.) .. 7

Copyright Act, No. 14 of 1957, India Code (1999), § 52(1)(ab) .............. 8

Copyright Act, 5767-2007, 2007, § 24(c)(3), 2199 LSI 34 (Isr.) ............. 8

Copyright Act (2009) Cap. 130 § 26(5) (Kenya) ...................................... 8

Copyright Act (2016), § 52(3) (Malawi) ........ 8

Copyright Act § 13.2 (Malaysia) ........ 8

Copyright Amendment Act 2008, s 80A (N.Z.) ........ 8

Copyright Law art. 65 (2007) (Taiwan) ........ 8

Copyright Modernization Act, S.C. 2012, c. 20, s. 30.61 (Can.) ........ 8

Council of Ministers Directive 91/250/EEC of 14 May 1991 on the Legal Protection of Computer Programs, 1991 O.J. (L 122) ........ 5

Intellectual Property Code of the Philippines, § 185.1, Rep. Act 8293, as amended (Phil.) ........ 8

Law No. 20435 art. 71N, Abril 23, 2010, Diario Oficial [D.O.] (Chile) .. 8

Denise Yu, Sec'y of Trade and Indus., Speech by the Secretary of Trade and Industry on Resumption of Second Reading Debate 10 (June 24, 1997) ........ 8

**OTHER MATERIALS**

Jonathan Band, *The Global API Copyright Conflict*, 31 Harvard J.L. & Tech. 615 (2018) ........ *passim*

## INTEREST OF *AMICUS CURIAE*[1]

The Computer & Communications Industry Association ("CCIA") represents over 20 companies of all sizes providing high technology products and services, including computer hardware and software, electronic commerce, telecommunications, and Internet products and services – companies that collectively generate more than $540 billion in annual revenues.[2] CCIA members have a large stake in the rules of software copyright being properly designed: effective intellectual property protection encourages developers to create new applications, but the improper extension of copyright law to functional elements discourages innovation and inhibits competition in the industry.

Over the past 30 years, a global consensus has emerged on the appropriate scope of copyright protection for software. Legislatures and courts around the world have exercised great care to prevent excessive protection that would prevent the creation of new computer programs that can run on existing platforms, or the creation of new platforms that can be used by programmers with their existing skill-set. The panel's two decisions

---

[1] No counsel for any party authored this brief in whole or part, and no person other than *amicus curiae* or its counsel made a monetary contribution to the preparation or submission of this brief.

[2] A list of CCIA members is available at https://www.ccianet.org/members. Google is a CCIA member, and Oracle and Sun were formerly members of CCIA, but none of these parties took any part in the preparation of this brief.

in this case run directly contrary to this global consensus. These decisions thus place American software firms at a competitive disadvantage to foreign firms. For this reason, rehearing *en banc* should be granted.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Computer systems have evolved into highly complex networks of complementary products. This complexity gives a vendor a significant first-mover advantage over new entrants. Products manufactured by the same vendor are more likely to be seamlessly interoperable with one another because the manufacturer has a complete understanding of its products' functionality. Similarly, products manufactured by the same vendor often are operated in the same manner, making it easier for employees to migrate from one product to another without retraining. This inherent first-mover advantage presents a significant barrier to entry if the elements necessary for interoperability are protected by intellectual property laws. Without the availability of competing interoperable products, the customer effectively is locked-in to the vendor's product line, leading to less competition, higher prices, and less innovation.

The complexity of computer systems can also lead to a different form of lock-in: the locking of computer programmers into a particular programming environment. Programmers must invest significant time and

resources to learn the conventions of a programming environment, meaning that there are significant switching costs for a programmer to learn a new set of conventions to program in a new environment. Because of the worldwide shortage of skilled programmers, a new entrant can participate in the market only if it can attract programmers from other firms, and it can do so only if it can use widely-used conventions the programmers already know. The shortage of programmers presents a significant barrier to entry if intellectual property laws prohibit a new firm from using existing conventions.

Recognizing the potential for copyright to prevent competition by locking customers and programmers into particular computing environments, courts and legislatures around the world, including in the United States, have applied copyright to software in a manner that facilitates, rather than inhibits, legitimate competition. Unfortunately, the panel's two decisions in this case deviate from this competition-enhancing consensus. Google's brief explains how the two decisions depart from precedents in U.S. copyright law. This brief describes how the decisions depart from competition-enhancing rules adopted abroad. The brief first discusses the competition-enhancing approach adopted in the European Union. Next, the brief explains how jurisdictions in the Pacific Rim and elsewhere have enacted copyright exceptions encouraging competition in the software industry. Finally, the

brief discusses the pro-competitive provisions in U.S. free trade agreements.

## ARGUMENT

The panel, in its 2014 decision in this case, *Oracle America, Inc. v. Google Inc.*, 750 F.3d 1339, 1375 (Fed. Cir. 2014), endorsed the long-discredited *dicta* in *Apple Computer v. Franklin Computer*, 714 F.2d 1240, 1253 (3d Cir. 1983) that compatibility is "a commercial and competitive objective which does not enter into the somewhat metaphysical issue of whether particular ideas and expression have merged." By indicating that program elements necessary for interoperability could be protectable under copyright, the panel impeded the development of interoperable programs. The panel compounded this error in its 2018 decision that the fair use doctrine did not permit Google to employ widely-used Java application programming interface ("API") declarations for the purpose of attracting Java developers to the new Android platform. *Oracle America, Inc. v. Google LLC*, 886 F.3d 1179 (Fed. Cir. 2018). This decision will impede the development of new software platforms. Taken together, these two decisions represent a major setback to competition and innovation in the software industry.

These decisions run directly contrary to legal norms promoting competition in the software industry that have been adopted by over 40 of

our trading partners, including all members of the European Union, countries around the Pacific Rim, and parties to free trade agreements with the United States. Significantly, these norms developed in large part in response to U.S. judicial decisions such as *Sega Enters., Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992), and Congressional enactment of the Digital Millennium Copyright Act, 17 U.S.C. § 1201.

## I. European Union Law Encourages Competition in the Software Industry.

In 1991, the European Union adopted a Software Directive, which reflects a policy judgment that copyright should not prevent competition in the software industry.[3] Council of Ministers Directive 91/250/EEC of 14 May 1991 on the Legal Protection of Computer Programs, 1991 O.J. (L 122). In particular, Article 6 of the Software Directive permits reverse engineering "indispensible to obtain the information necessary to achieve … interoperability."[4] Further, Article 9(1) renders unenforceable contractual prohibitions on such reverse engineering. The Software Directive has been

[3] The legislative process leading to the adoption of the Directive is discussed in Jonathan Band, *The Global API Copyright Conflict*, 31 Harvard J.L. & Tech. 615, 617-19 (2018) ("*Global API Conflict*").

[4] Identifying software interfaces often requires reverse engineering. Software reverse engineering necessitates the making of reproductions and derivative works, which would be infringing but for an exception.

implemented by all EU member states, as well as Norway, Russia, Serbia, Switzerland, and Turkey. *Global API Conflict* at 619.

The Software Directive did not directly address the protectability of software interfaces. However, in 2012, the EU's highest court ruled in *SAS Institute v. World Programming,* (C-406/10) [2012] 3 CMLR 4 (Eng.), ¶ 40, that the Software Directive "must be interpreted as meaning that neither the functionality of a computer program nor the programming language and the format of data files used in a computer program in order to exploit its functions constitute a form of expression of that program and, as such, are not protected by copyright...." This affirmed World Programming's ability to create "middleware" that interoperated with SAS Institute's software. The CJEU observed that "the main advantage of protecting computer programs by copyright" as opposed, presumably, to patents, "is that such protection covers only the individual expression of the work and thus leaves other authors the desired latitude to create similar or even identical programs," *id.* at ¶ 41, provided that they refrain from copying protected expression. In other words, the CJEU reached precisely the same conclusion as the district court below, and the opposite of the panel's 2014 decision.

## II. Copyright Policies Around the Pacific and Across the World Promote Competition in the Software Industry.

As policymakers in the Pacific Rim considered how best to encourage the development of domestic software industries, they followed either the U.S. fair use approach based on *Sega* or the specific statutory exception approach of the Software Directive—two different means to the same end. *Global API Conflict* at 617. After a decade-long copyright law review, Australia followed the Directive model, adopting an exception for reverse engineering for purposes of interoperability. *Id.* at 631-33. Australian officials explained that "if Australian industry is to be allowed to compete on level terms with producers of similar products in the USA and Europe, Australian software copyright laws must be brought more into line with the law in these countries."[5]

In the months before the 1997 turnover to China, the Hong Kong Legislative Council broadened Hong Kong's fair dealing provision to more closely resemble the fair use provision of the U.S. Copyright Act, in order "to encourage competition in the information technology industry by facilitating timely access to information and ideas underlying computer

---

[5] Commonwealth, *Parliamentary Debates*, House of Representatives, 11 August 1999, 8479 (Daryl Williams, Attorney-General) (Austl.).

programs."[6] Similarly, Singapore amended its fair dealing provision to "bring [it] in line with the United States, the United Kingdom, other European Union countries, Hong Kong, and Australia, which do not bar the use of copyright materials for commercial research."[7]

Over the following years, other Pacific Rim countries, including Canada,[8] Chile,[9] Malaysia,[10] New Zealand,[11] the Philippines,[12] South Korea,[13] Taiwan,[14] and Japan all amended their copyright laws to encourage competition through interoperability, often citing the U.S. approach. Nations in other regions have also explicitly embraced competition through interoperability in their copyright statutes, including India,[15] Kenya,[16] Israel,[17] and Malawi.[18]

---

[6] Denise Yu, Sec'y of Trade and Indus., Speech by the Secretary of Trade and Industry on Resumption of Second Reading Debate 10 (June 24, 1997).
[7] Attorney-General of Law, Second Reading of Copyright (Amendment) Bill of 1998 (Sing.) (February 19, 1998).
[8] Copyright Modernization Act, S.C. 2012, c. 20, s. 30.61 (Can.).
[9] Law No. 20435 art. 71N, Abril 23, 2010, Diario Oficial [D.O.] (Chile).
[10] Copyright Act § 13.2 (Malaysia).
[11] Copyright Amendment Act 2008, s 80A (N.Z.).
[12] Intellectual Property Code of the Philippines, § 185.1, Rep. Act 8293, as amended (Phil.).
[13] Cheojakkweonbeob [Copyright Act], Act No. 432, Jan. 28, 1957, amended by Act No. 11110, Dec. 2, 2011, art. 35-3 (S. Kor.).
[14] Copyright Law art. 65 (2007) (Taiwan).
[15] Copyright Act, No. 14 of 1957, India Code (1999), § 52(1)(ab).
[16] Copyright Act (2009) Cap. 130 § 26(5) (Kenya).
[17] Copyright Act, 5767-2007, 2007, § 24(c)(3), 2199 LSI 34 (Isr.).
[18] Copyright Act (2016), § 52(3) (Malawi).

## III. U.S. Free Trade Agreements Encourage Competition in the Software Industry.

The contours of U.S. trade agreements reflect pro-competition principles similar to the statutory provisions described above. Since 2002, U.S. free trade agreements ("FTAs") have included provisions modeled on the interoperability exception to Section 1201 of the Digital Millennium Copyright Act, 17 U.S.C. § 1201(f). *See, e.g.*, United States-Korea Free Trade Agreement, art. 18.4.7(d)(i), June 30, 2007, 46 I.L.M. 642 (parties may allow circumvention of technological protection measures in order to engage in "[n]oninfringing reverse engineering activities with regard to a lawfully obtained copy of a computer program… for the sole purpose of achieving interoperability of an independently created computer program with other programs"). Interoperability exceptions appear in FTAs with Australia, Bahrain, Chile, Colombia, Costa Rica, Dominican Republic, El Salvador, Guatemala, Honduras, Morocco, Nicaragua, Oman, Panama, Peru, and Singapore. *Global API Conflict* at 636. Like the United States, many of these countries have implemented their FTA obligation to promote competition by adopting exceptions permitting circumvention for the purpose of software reverse engineering.

## CONCLUSION

Over 40 countries, including many of our major trading partners, have recognized that permitting copyright law to obstruct competition would impede the growth of the software industry and the Internet economy. By extending copyright protection to software interfaces, and overturning the jury's fair use finding, the panel's decisions in this case run contrary to global competition-enhancing copyright norms that have evolved in part in response to U.S. case law and the DMCA. The panel's decisions would stifle innovation in the United States, and encourage the outsourcing of software jobs overseas, where interoperable software can be developed without the threat of copyright liability.

For the forgoing reasons, rehearing *en banc* should be granted.

Respectfully submitted,

/s/ Jonathan Band

Matthew Schruers
Computer & Communications
Industry Association
655 15th Street NW, Suite 410
Washington, D.C. 20005
(202) 783-0070
mschruers@ccianet.org

Jonathan Band
*Counsel of Record*
Jonathan Band PLLC
21 Dupont Circle NW, Suite 800
Washington, D.C. 20036
(202) 296-5675
jband@policybandwidth.com

*Counsel for Amicus Curiae*

June 12, 2018

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Federal Circuit Rule 35(g) because it contains 1,993 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the types style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

/s/ Jonathan Band
Jonathan Band
Jonathan Band PLLC
21 Dupont Circle NW, Suite 800
Washington, D.C. 20036
(202) 296-5675
jband@policybandwidth.com
*Counsel of Record*

June 12, 2018

## CERTIFICATE OF SERVICE

I hereby certify, that on this 12th day of June, 2018, a true and correct copy of the foregoing brief of *Amicus Curiae* the Computer & Communications Industry Association was timely filed electronically with the Clerk of the Court using CM/ECF, which will send notification to all counsel registered to receive electronic notices.

/s/ Jonathan Band
Jonathan Band
Jonathan Band PLLC
21 Dupont Circle NW, Suite 800
Washington, D.C. 20036
(202) 296-5675
jband@policybandwidth.com
*Counsel of Record*